*JACKSON v. USD, et al.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## SOUTHERN DIVISION

| | |
|---|---|
| TIAUNA JACKSON, | No. ___26 - 4060___ |
| Plaintiff, | |
| vs. | COMPLAINT FOR DECLARATORY AND |
| UNIVERSITY OF SOUTH DAKOTA; | INJUNCTIVE RELIEF AND DAMAGES |
| SOUTH DAKOTA BOARD OF | **JURY DEMAND** |
| REGENTS; | |
| SHEILA KAY GESTRING, officially; | |
| NEIL FULTON, individually and | |
| officially; | |
| SHIRLEY MAYS, individually and | |
| officially; JURY TRIAL DEMANDED | |
| ROBERT MILLER, individually and | |
| officially; | |
| TYLER SCOTT MOORE, individually | |
| and officially; | |
| KATEY ANN ULRICH, individually and | |
| officially; | |
| EMMA THOMPSON, individually and | |
| officially; | |

*JACKSON v. USD, et al.*

KATHLEEN A. FITZGERALD,

individually and officially;

ANTHONY JAMES FRANKEN, p/k/a AJ

FRANKEN, individually and officially;

CHRISTOPHER HEALY, individually

and officially;

JEAN M. MERKLE, individually and

officially;

JENNIFER LEIGH FUERST, p/k/a

JENNIE FUERST, individually;

JULIANNE MARI SEVERSON,

individually;

Defendants.

*JACKSON v. USD, et al.*

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................ 5

II. JURISDICTION AND VENUE ................................................................. 33

III. PARTIES ................................................................................................. 34

    A. PLAINTIFF ............................................................................................ 34

    B. INSTITUTIONAL DEFENDANTS ....................................................... 34

    C. INDIVIDUAL DEFENDANTS ............................................................. 35

IV. FACTUAL ALLEGATIONS .................................................................... 37

    A. ENROLLMENT, DISABILITY REGISTRATION, AND INSTITUTIONAL CONTEXT ........................... 37

    B. THE BLACK HISTORY MONTH DISPLAY AND PROTECTED SPEECH ....................................... 55

    C. THE INVESTIGATION (MARCH 4-17, 2024) ....................................... 61

    D. THE COORDINATED ATTACK (MARCH 17-27, 2024) ......................... 77

    E. THE AFTERMATH (MARCH 28 - APRIL 16, 2024) ............................... 85

    F. THE LSAC CHARGE AND COLLAPSE (APRIL 4 - APRIL 9, 2024) ........................................ 113

    G. COMPLAINT PROCESSING, THIRD-PARTY CONFIRMATION, AND INSTITUTIONAL NOTICE

    (APRIL 9 - JULY 24, 2024) ...................................................................... 119

    H. TRANSFER BLOCKED AND FORCED DEPARTURE (MAY - AUGUST 2024) ............................. 131

    I. THE DISMISSAL (SEPTEMBER 30 - OCTOBER 3, 2024) ....................... 139

    J. PROCEDURAL FAILURES, DISABILITY SERVICES INACTION, AND STRUCTURAL CONFLICTS .. 145

V. CAUSES OF ACTION ............................................................................. 154

    COUNT I, FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983) ............... 155

    COUNT II, CIVIL CONSPIRACY (42 U.S.C. § 1983) ................................... 172

COUNT III, PROCEDURAL DUE PROCESS (42 U.S.C. § 1983) ......................................... 189

COUNT IV, TITLE IX RETALIATION (20 U.S.C. § 1681) .................................................. 202

COUNT V, TITLE VI DISCRIMINATION (42 U.S.C. § 2000D)............................................ 209

COUNT VI, SECTION 504 RETALIATION AND DISCRIMINATION (29 U.S.C. § 794) . 218

COUNT VII, ADA TITLE II VIOLATION (42 U.S.C. § 12132)............................................ 225

COUNT VIII, LIBEL PER SE ............................................................................................ 228

COUNT IX, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.......................... 232

COUNT X, ABUSE OF PROCESS...................................................................................... 236

COUNT XI, TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC

ADVANTAGE ................................................................................................................... 242

COUNT XII, INSTITUTIONAL NEGLIGENCE AND NEGLIGENT SUPERVISION ....... 247

COUNT XIII, EQUAL PROTECTION (42 U.S.C. § 1983) .................................................. 255

COUNT XIV, CONSPIRACY TO DEPRIVE CIVIL RIGHTS (42 U.S.C. § 1985(3))........... 264

COUNT XV, BREACH OF IMPLIED CONTRACT............................................................. 270

COUNT XVI, UNJUST ENRICHMENT ............................................................................ 274

COUNT XVII, MALICIOUS PROSECUTION .................................................................... 275

**VI. DAMAGES**...................................................................................................................... **281**

**VII. PRAYER FOR RELIEF**.................................................................................................. **288**

**VIII. JURY DEMAND** ........................................................................................................... **292**

**EXHIBIT INDEX**.................................................................................................................. **292**

*JACKSON v. USD, et al.*

## I. INTRODUCTION

1. In February 2024, the USD Knudson School of Law McKusick Law Library erected a Black History Month display assembled from elementary school craft supplies, construction paper cutouts with adhesive name tags, visually identical to a Pinterest "MLK Day Kids Craft" project designed for children. Jackson posed a question on social media: is this the best we can do? After a meeting on February 22 in which the library voted to take it down, Plaintiff donated digital files of prominent Black attorneys and judges from American history, including trailblazers from the 1800s and 1900s, to the library. Library Director Kammer printed and laminated the materials and erected a replacement display.



2. Tiauna Jackson is a service-connected disabled veteran whose education at USD was funded by the federal government through Chapter 31 Vocational Rehabilitation. Before law school, she founded The Jackson Agency, a Hollywood talent and literary agency, and became the first Black woman ever elected to the Board of Directors of the

*JACKSON v. USD, et al.*

Association of Talent Agents, the professional trade organization representing the entertainment industry's major agencies. The New York Times profiled her alongside agents from ICM, WME, CAA, and United Talent Agency in a feature on Black talent agents in Hollywood. Cara Buckley, The Uphill Battles of Black Talent Agents in Hollywood, N.Y. Times, Feb. 13, 2019. Essence magazine named her one of its Black Women in Hollywood in 2022. Five days before the coordinated attack described herein, Howard University School of Law featured her as a speaker at its 28th Annual Center Court Conference on sports and entertainment law. She put her agency on pause to pursue a law degree in entertainment law and intellectual property at the state's only law school. This is the person USD chose to prosecute for asking whether a children's craft kit was the best the institution could do for Black History Month.

3. On March 1, 2024, Jennie Fuerst, the white library employee who had constructed the original craft-kit display, removed the replacement from the library without authorization and placed it on the desk of Tiauna Jackson, one of five Black students in the 1L class and one of three Black women. The student who built the display that was rejected dismantled its replacement and delivered it to the desk of the student whose criticism prompted the change. The state's only law school responded not by investigating who targeted its student, but by coordinating four offices to silence the student who had been targeted.

4. On March 27, 2024, at 9:01 AM, USD certified Jackson "in good academic standing." Hours later, three offices attacked simultaneously: the Examiner initiated disciplinary proceedings, the Director of Student Rights issued the first No Contact Order ever imposed on a USD law student, and the Director of Admissions filed fraud accusations

with LSAC, the national law school credentialing body, citing Jackson's social media posts as the evidentiary basis. Seven months of prosecution followed. Every charge was dismissed. Every adverse action collapsed. Zero policy violations were found. Plaintiff must disclose this episode on every bar application, professional license application, and graduate school admission for the rest of her professional career.

---

**CARLISLE EMAIL — MARCH 27, 2024, 9:01:34 AM (MAYS CC'd)**

**From:** Carlisle, Teresa <Teresa.Carlisle@usd.edu>
**Sent:** Wednesday, March 27, 2024 9:01:34 AM
**To:** Jackson, Tiauna <Tiauna.Jackson@coyotes.usd.edu>
**Cc:** Mays, Shirley L <Shirley.Mays@usd.edu>
**Subject:** RE: Elevate your game at Oregon Summer Sports Law Institute

Good morning!

Attached please find a letter of good standing for Oregon. Let me know if there is anything else you nee

Best,
Teresa

**ATTACHED: LETTER OF GOOD STANDING — MARCH 27, 2024**

UNIVERSITY OF
**SOUTH DAKOTA**
KNUDSON SCHOOL OF LAW

March 27, 2024

Ryan Gauthier
University of Oregon School of Law
Summer Sports Law Institute
1221 University of Oregon
Eugene, OR 97403-1221

**Re: Letter of Student Status for Tiauna Jackson**

To Whom It May Concern:

Tiauna Jackson is a full-time student in good academic standing at the University of South Dakota Knudson School of Law in the Juris Doctor degree program. She is currently in her second semester of study. At the end of the Fall 2023 semester, she had completed 16 of the 90 credits required for graduation. Her current rank is ▮▮▮ with a cumulative gpa of ▮▮▮ She is expected to graduate in May of 2026.

Please feel free to contact me with any questions or concerns.

Sincerely,

*Teresa Carlisle*
Teresa Carlisle
Law School Registrar
605.658.3549

---

5. Dean Neil Fulton analyzed the playbook. In 2020, he published a law review article titled *All the News That's Fit to Hide*: Sexual Assault and Silence in Hollywood and the Lawyers Who Let It Happen, 40 Loy. L.A. Ent. L. Rev. 395 (2020). The article examined how powerful entities silence accusers through what Fulton described as "an obstacle

course of non-disclosure agreements, corporate legal departments, unethical conduct by [the] legal team, and even being followed by spies." Fulton documented how "agreements suppressed access to evidence on a systematic basis" and how accusers "were contracted into silence." Fulton concluded: "The more Farrow pushed for the truth, the more Weinstein's machinery pushed back through licit and illicit channels."

> Weinstein eventually engaged in direct pressure through a variety of contacts, threats of litigation, and cease and desist letters from his legal team.[19] He also personally contacted Farrow's sources to pressure them into silence.[20] The more Farrow pushed for the truth, the more Weinstein's machinery pushed back through licit and illicit channels.
>
> _____
>
> nightmare to work with and we should avoid them at all costs." *Id.* When Rose McGowan told

6. Four years later, when a Black student's social media posts exposed educational failures and racial insensitivity at the state's only law school, Fulton deployed a strikingly similar apparatus against her: he forwarded her protected speech to General Counsel, who directed investigation "as soon as possible"; he pressured through intermediaries and institutional channels; he used administrative process to suppress access to the student's own evidence; and he contracted the student into silence through a No Contact Order. On January 3, 2024, eighty-four days before the coordinated attack, Fulton presented "Diversity, Accreditation, and ABA Standard 206: A Discussion on Compliance" to the AALS Section for the Law School Dean, as listed on his curriculum vitae filed with USD. Fulton had told the ABA Journal in April 2023 that only five percent of his full-time faculty were people of color, a single individual out of twenty. The dean who instructed his peers on diversity compliance retaliated against the Black student who exposed his school's diversity failures.

*JACKSON v. USD, et al.*

7. Fuerst provided the lie that launched the chain. In her March 5 email to Fulton, Fuerst wrote: "That the upd thinks this is harassment and is forwarding the claim on." University Police had said no such thing. The day before, Assistant Chief Sangster told Plaintiff he was forwarding her complaint to Title IX "because they have their own investigator that goes through this to see if there's like that internal harassment going on so that they can further to help you." UPD was forwarding Plaintiff's complaint to help Plaintiff. Fuerst told the Dean that UPD was forwarding a harassment claim against Plaintiff. Every official who touched the chain after that email received Fuerst's fabrication as the predicate for action. The entire seven-month prosecution was built on a lie.

**FUERST EMAIL TO DEAN FULTON — MARCH 5, 2024, 7:29 AM**

Source: ATT00001.htm (attachment to Exhibit 1 email chain)

From: Fuerst, Jennie Leigh <Jennie.Fuerst@coyotes.usd.edu>
Sent: Tuesday, March 5, 2024 7:29 AM
To: Fulton, Neil K <Neil.Fulton@usd.edu>
Cc: Mays, Shirley L <Shirley.Mays@usd.edu>
Subject: Video

this is the video where she is comparing me to a police officer that shoots an unarmed black person. That means placing that on her desk is me calling her the n word. That the upd thinks this is harassment and is forwarding the claim on

From: Fuerst, Jennie Leigh <Jennie.Fuerst@coyotes.usd.edu>
Sent: Monday, March 4, 2024 7:37 PM
To: Fulton, Neil K; Mays, Shirley L
Subject: Zoom

She could easily come to the school and still attack me. And putting her on zoom will anger her even more so she will escalate even more.

Fuerst framed placing BHM materials on a Black student's desk as a racial slur — then filed the complaint anyway.

8. On March 5, 2024, Fulton forwarded the student's video to General Counsel with six words: "One more entry. On my way." Seventy-one minutes later, General Counsel directed investigation "as soon as possible." Twenty-two days later, the law school, main campus, and admissions office attacked simultaneously. The dean who analyzed how powerful entities silence critics became one.

*JACKSON v. USD, et al.*

**From:** Franken, AJ <AJ.Franken@usd.edu>
**Sent:** Tuesday, March 5, 2024 10:45 AM
**To:** Merkle, Jean M <Jean.Merkle@usd.edu>
**Subject:** FW: Video

Here is a video posted by the student complainant (she has apparently posted several videos. I think this one needs to get a formal intake and go to an investigation as soon as possible. Both students have expressed that they don't feel safe in the law school.

-AJ

**From:** Fulton, Neil K <Neil.Fulton@usd.edu>
**Sent:** Tuesday, March 5, 2024 9:34 AM
**To:** Franken, AJ <AJ.Franken@usd.edu>
**Subject:** FW: Video

One more entry. On my way.

**From:** Fuerst, Jennie Leigh <Jennie.Fuerst@coyotes.usd.edu>
**Sent:** Tuesday, March 5, 2024 7:29 AM
**To:** Fulton, Neil K <Neil.Fulton@usd.edu>
**Cc:** Mays, Shirley L <Shirley.Mays@usd.edu>
**Subject:** Video

9. Fulton understood the consequences. Before becoming Dean, he served for nine years as the Federal Public Defender for the Districts of South Dakota and North Dakota, the federal official whose job is to defend the constitutional rights of individuals against the power of the government. He then served as general counsel to the South Dakota Public Entity Pool for Liability, the state insurance fund that will defend this lawsuit. He presented three times at the PEPL Fund Risk Management Conference: "Risk Planning Through Legal Vigilance; Litigation: A Mock Trial" (2006), "Mitigating Damages" (2007), and "Workplace Behavior: Ethics, Liability, Lawsuits" (2008). Six weeks before the March 27 attack, the Board of Regents settled *Ghebrekidan v. South Dakota Board of Regents* for $100,000, a federal civil rights action arising from USD's retaliation against an employee who reported harassment. The man who taught state administrators how to avoid civil rights litigation was dean when his institution settled one retaliation case and started another.

*JACKSON v. USD, et al.*

10. The Board of Regents spent two years and, upon information and belief, over $150,000 in defense costs to settle *Ghebrekidan* for $100,000. It lost the TRO in *Hook* within twenty-four hours. This is the third federal civil rights action against USD in three years, filed in a district where a federal jury returned a race discrimination verdict ninety days ago and the Department of Justice sued a hotel for banning Native Americans from its premises. The state's only law school — the institution responsible for training the attorneys who enforce civil rights law in South Dakota, and which markets itself as "a community of excellence, service, and leadership" — is defending that record in a jurisdiction where the federal courts are actively confirming that racial discrimination is not historical but ongoing.

11. Fulton's biography has been sanitized. Before becoming Dean, he served as Chief of Staff to Governor Mike Rounds from 2007 to 2010. During that period, according to Joop Bollen's November 2014 response to the South Dakota Government Operations and Audit Committee, the 2009 contract between the Governor's Office of Economic Development and SDRC Inc. to privatize the state's EB-5 visa investment program went to Fulton, as Chief of Staff, for approval. The program became one of the most corrupt EB-5 operations in the nation: over $140 million was diverted from state coffers, the program administrator signed contracts between his state agency and his own private company, and the state official facing three felony counts died from a shotgun wound six days before his scheduled grand jury appearance. The federal government terminated South Dakota's EB-5 Regional Center entirely. Fulton's official USD biography states he "oversaw the day-to-day operations of state government" as Chief of Staff. It makes no mention of EB-5.

*JACKSON v. USD, et al.*

12. Fulton did not act alone. Associate Dean Shirley Mays came to USD in 2022 and was promoted to Associate Dean in November 2023. USD's announcement of her promotion quietly changed the dates of her prior deanship from "2010 to 2018" to "2010 to 2016." Mays's own LinkedIn profile confirms the accurate dates: 2010 to 2018. The two-year discrepancy corresponds to the period during which Arizona Summit Law School was placed on probation by the ABA and ultimately lost its accreditation. Mays's biography, like Fulton's, omits the institutional failure she presided over. The institution that prosecuted Plaintiff for alleged nondisclosure on a law school application is led by administrators whose own professional biographies omit or alter material facts.



| MAYS'S OWN LINKEDIN PROFILE | USD OFFICIAL ANNOUNCEMENT |
|---|---|
| Source: linkedin.com/in/shirley-mays-2772371a1/ | Source: usd.edu/south-dakotan-lawyer/ — Published July 6, 2023 |
| **Dean and Professor of Law** Arizona Summit Law School | **Dean and Professor of Law** Arizona Summit Law School |
| **2010 — 2018** | **2010 — 2016** |
| 8 years, 1 month Full-time · Phoenix, Arizona | 2 years removed from official university publication |
| "Spear-headed the redesign of the predominant law school model in a law school community consisting of up to 1300 students, 50 full-time faculty" | "From 2010 to 2016, Mays served as dean and professor of law at Arizona Summit Law School, spearheading the redesign of the predominant law school model." |

Mays's LinkedIn confirms deanship lasted until 2018. USD's publication shortened it to 2016.

13. Throughout the events described herein, Fulton and Mays operated as a coordinated tandem. Fulton directed strategy from above; Mays executed it at the operational level. Fulton forwarded the videos; Mays solicited the complaint. Fulton identified three complaint channels to Plaintiff on March 8; Mays deployed them against her on March 27. Fulton controlled the institutional message; Mays controlled the administrative process, including disability accommodations, transfer letter processing, and the terms of Plaintiff's departure. When Mays tracked what documents the investigation had disclosed

to Plaintiff and probed what Plaintiff knew before deciding what to admit, she was not administering a neutral process. She was managing an operation.

14. Professor Robert Miller also analyzed the problem. In February 2024, six weeks before Fulton appointed him Examiner, Miller published *Everyone Is Talking About Bankruptcy Directors*, 23 Fla. St. U. Bus. Rev. 61 (2024). The article asked whether appointed investigators can be independent when they investigate the same parties who appoint them. Miller concluded that such appointees "are prone to structural bias" and "too close to [the appointing party] to be classified as independent." He warned that appointees "may exhibit 'auditioning bias' and favor the [appointing party's] interest in an attempt to obtain future" appointments.

> The proliferation of bankruptcy directors represents a controversial shift in the corporate governance landscape. Delegating corporate decision making to bankruptcy directors insulates conflicted transactions and claims from the elevated scrutiny provided by derivative standing and entire fairness. However, critics have questioned their independence and cleansing effect. Are bankruptcy directors really independent when their role includes negotiation with and/or investigation into the same parties who appoint them? Should their decisions be given deference when their appointment is associated with lower recoveries for creditors? Bankruptcy directors' salience is best illustrated by the numerous proposals for determining whether they have cleansing effect, including Professors

15. In March 2024, Fulton appointed Miller as Examiner despite Miller being Plaintiff's academic advisor, the faculty advisor to the Debtors and Creditors Club in which Plaintiff served as member at large, and host of a social gathering at his home where Plaintiff and her father shared food and drinks with Miller and his family. Miller did not recuse. He exhibited the structural bias he had analyzed: he solicited additional evidence from the complainant, expanded charges beyond the original complaint, and continued prosecution for seven months after Plaintiff's attorney demanded dismissal on First Amendment grounds. On October 3, 2024, the Disciplinary Board concluded there was "not a basis to proceed." That same day, USD awarded Miller the Cutler Award. The professor who

*JACKSON v. USD, et al.*

analyzed how appointed investigators are structurally biased was rewarded for proving his own thesis.



16. At USD, Mays reprised her pattern. On March 4, 2024, Mays texted thirty-four-year-old law student Jennie Fuerst: "Now can you file an administrative complaint?" Fuerst, a third-year student who had worked for state government in Pierre before law school and served as Secretary of the Federalist Society, responded: "Not from what I could tell reading it. Maybe I'm missing something." (Ex. 5.) Despite admitting she saw no grounds for a complaint, Fuerst filed anyway twenty-three days later, after Mays solicited her. When a state official solicits a private individual to initiate adverse action against a citizen's constitutional rights, that private individual becomes a state actor. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982). Mays did not receive a complaint. Mays manufactured one. Fuerst did not file independently. Fuerst filed at Mays's direction, converting herself from private complainant to joint participant in state action against

Plaintiff's First Amendment rights. Two months into the prosecution, the Supreme Court ruled unanimously that government officials cannot use private individuals to suppress speech the government disfavors. *NRA v. Vullo*, 602 U.S. 175 (2024). The institution continued prosecuting Plaintiff for 126 days after the Supreme Court told the country this conduct is unconstitutional.



17. That same morning, March 27, 2024, at 9:01 AM, Mays was CC'd on the Letter of Good Standing email certifying Plaintiff was "in good academic standing." This certification required access to the file containing Plaintiff's August 2023 amendment. Hours later, Director of Admissions Katey Ulrich filed an LSAC complaint accusing Plaintiff of application fraud, an accusation the file Mays accessed that morning would have disproved. Mays took no action to stop it.

18. On March 5, 2024, Fulton forwarded Fuerst's complaint to General Counsel Franken, who directed immediate investigation. Three days later, Fulton met with Plaintiff without disclosing the pending investigation and walked her through three complaint channels, presenting them as avenues for her relief. He knew both the accreditation obligation and

the constitutional protection for diversity-related speech; he had presented on ABA Standard 206 compliance sixty-four days earlier. On March 17, Fulton sent an institution-wide email affirming that "faculty, students, and staff have the freedom to form their own thoughts and express those thoughts publicly." Ten days later, he deployed all three channels simultaneously against Plaintiff.

19. The email chain reached Title IX Coordinator Merkle through Franken's forward. Merkle's role was not passive. She classified a race complaint under the Title IX sex-discrimination framework, watched it fail under criteria that were never designed to address it, and then referred Plaintiff to Thompson's office, where the No Contact Order was issued that same afternoon on Merkle's recommendation. On March 11, Merkle told Plaintiff she had "strong feelings about what's happening with your case," then said: "I just feel like I just want everybody to just not talk about it anymore." The Title IX Coordinator's response to a Black student reporting racial targeting was to recommend silence. Merkle proposed noting the conversation as informational rather than initiating a formal complaint, steering Plaintiff away from the very process Merkle administers while concealing that the institution had already built a file against Plaintiff through that same process.

20. Fulton's March 17 email attached two documents: his March 2024 Bar Newsletter column and the Creed of Civility and Guidelines for Professionalism, adopted January 10, 2024, by the South Dakota Board of Bar Commissioners. The Creed's preamble limits its application to "lawyers licensed to practice in South Dakota, admitted to the State Bar of South Dakota and/or admitted pro hac vice to appear in a matter before any Court in South Dakota." Every substantive provision governs litigation conduct: scheduling

hearings, drafting orders, discovery requests, and communications with adversaries. Even for a licensed attorney, the Creed governs professional conduct during the active practice of law. It does not govern what an attorney says on personal social media outside of office hours about their own experiences. Plaintiff was not a licensed attorney. She was a 1L student. She was not licensed, not admitted, and not appearing before any court. Fulton applied a standard that was wrong twice: it did not apply to the person (a student, not a licensed attorney), and it did not apply to the context (personal social media, not the practice of law). Fulton distributed a document governing attorneys' courtroom behavior to first-year law students, then used the framework it created to characterize a student's personal social media posts as unprofessional conduct warranting institutional prosecution. The Oath of Professionalism Plaintiff signed at orientation pledged her to conduct herself with "the integrity, civility, and professionalism the practice of law demands." Plaintiff was not practicing law. She was describing her own experience on the internet. On April 4, 2024, Mays applied Fulton's framework to Plaintiff's speech. When Plaintiff asked whether her videos constituted free speech, Mays first acknowledged: "Of course. Free speech is free speech." Mays then immediately pivoted: "Is it harassment? Is it intimidation or is it bullying? That's exactly what the question is. I mean, is it professional? I'd say no. I'd say it's extremely unprofessional behavior." Mays acknowledged the constitutional protection and then substituted a professionalism judgment for it, evaluating a 1L student's personal social media under a standard written for licensed attorneys and distributed to students eighteen days earlier. The question was whether Plaintiff had a right to speak. The answer was that the institution did not approve of how she spoke.

*JACKSON v. USD, et al.*

21. General Counsel AJ Franken received Fulton's forward and directed immediate investigation. Franken graduated first in his class from USD Law and previously served as General Counsel to Governor Daugaard. He practiced law in Pierre, the same small city where Fulton spent two decades as an attorney, Chief of Staff, and Federal Public Defender, and where Fuerst grew up and worked for state government. In a capital city of 14,000 people, three key actors in the coordinated attack share professional and geographic ties predating the events of this case. Franken did not evaluate whether the videos constituted protected speech before directing investigation. He is a licensed attorney. He graduated first in his class from the law school that teaches the First Amendment. He directed investigation of a student's social media posts about a library display without conducting any First Amendment analysis, without contacting the student, and without verifying the claims in the email he received. Franken's office then received formal notice from Plaintiff's attorney on March 19, from the NAACP on May 1, and from Plaintiff's attorney again at the May 9 meeting his deputy attended. No corrective action issued from the General Counsel's office at any point during the 190-day prosecution. The attorney who graduated first in his class set the machinery in motion and never turned it off.

22. Director of Admissions Katey Ulrich does not hold a law degree. She filed fraud accusations with LSAC without checking Plaintiff's file, which contained the August 2023 amendment that proved the accusation false. Ulrich's own referral letter states: "I am enclosing copies of Ms. Jackson's application, CAS report, GRE scores, and Diversity Statement." (Ex. 3.) She had the file open, pulled four documents, quoted the application by question number, and filed fraud accusations with a national credentialing body

without finding the amendment in the same file. A student who corrects her application through the institution's own amendment process seven months before the accusation has not committed fraud. The amendment was the answer. Ulrich held the answer and filed anyway. Ulrich's referral cited "a since deleted Youtube video" and "#transferstudent" hashtags as the evidentiary basis. The entire foundation for a career-destroying fraud accusation was an admissions director monitoring protected speech. When confronted with the amendment thirteen days later, Ulrich withdrew the complaint. Ulrich's withdrawal email treated seven-month-old documents as newly received, proving she never checked before she filed.

23. Director Emma Thompson issued an unprecedented No Contact Order against a law student at USD. Thompson later acknowledged it was issued before any charge or allegation had been determined, for the purpose of getting Plaintiff to stop talking about Fuerst. Thompson described the coordination herself: the matter "started as one person talking to another person and then it's just kind of continued to get forwarded on to people." Thompson lifted the Order six days after issuing it, the same day she made these acknowledgments.

24. Plaintiff's attorney demanded dismissal of all charges on First Amendment grounds on March 19 and again on April 11. Miller dismissed neither. He expanded the prosecution instead, accepting additional evidence from the complainant after counsel established the speech was constitutionally protected. The Disciplinary Board ultimately dismissed all charges.

25. Fuerst's evidence submissions prove she conducted sustained real-time surveillance across four platforms: Plaintiff's personal Instagram (tiaunajackson), secondary personal

Instagram (tiaunasays2.0), professional business account for The Jackson Agency (jacksonagency), and YouTube channel. Fuerst was not a follower of, client of, or in any way associated with The Jackson Agency. A law student who monitors a classmate's professional talent agency business page is not passively encountering speech. She is conducting targeted surveillance of a commercial enterprise she has no connection to. The surveillance included screenshots, screen recordings, and active video capture requiring Fuerst to watch and record in real time.

26. Fuerst also monitored and screenshotted the public comments on Plaintiff's posts, collecting the reactions of independent third parties who agreed with Plaintiff's criticism. Among the comments Fuerst captured and submitted as evidence: "Adults did this?" and "I initially thought this was the works of school children. Tacky." and "I mean it does say 'Kids craft.' Wait! So they KNEW this was a kids craft project?" Fuerst submitted public corroboration of Plaintiff's protected speech as evidence of Plaintiff's misconduct. Fuerst compiled over twenty files of this material beginning no later than January 2024.

*JACKSON v. USD, et al.*



27. On April 4, 2024, Plaintiff scheduled a YouTube live event titled "How I exercised my First Amendment Rights in Law School and they still tried to silence me." After the scheduled live had been public for approximately a week with the word "First," Plaintiff changed "First" to "Fuerst." Fuerst screenshotted the altered title and submitted it as evidence. The screenshot, captured promptly after the change, proves active real-time monitoring of Plaintiff's channel. On April 8, after Plaintiff's attorney had demanded dismissal, Fuerst provided additional evidence to Miller to continue building the prosecution.

28. On April 16, 2024, the second day of final exams and the same day Fuerst was notified that Plaintiff had filed a complaint against her, Fuerst appeared at the window of Plaintiff's isolated testing room during the Constitutional Law final exam. Fuerst stared at Plaintiff through the window, tight-lipped, saying "Yes" into her phone. Plaintiff reported the incident that same day to the faculty secretary, the registrar, and Title IX. USD

*JACKSON v. USD, et al.*

published a promotional profile of Fuerst on April 16, 2024, the same day she engaged in

documented stalking behavior.



29. Julianne Severson served as 1L Student Representative of the Federalist Society at USD

Law. She filed a complaint alleging Plaintiff "bullied and harassed" her by saying "Good

morning" while cleaning out her assigned desk. False rumors circulated among law

students that Plaintiff had been "escorted out by police", a claim USD Police Chief

Jackson confirmed in writing was false. Severson received a clerkship with the Chief

Justice of the South Dakota Supreme Court and a promotional USD profile after

participating in the coordinated attack. The Federalist Society's 1L Student

Representative and Secretary were both rewarded with career advancement and

promotional profiles. The Black veteran they accused is no longer enrolled.



*JACKSON v. USD, et al.*

30. Fuerst spread her version of events to classmates by omission. She told classmate Kortney Smith about the situation but omitted that Fuerst herself had placed the replacement display materials on Plaintiff's desk, the act that triggered Plaintiff's decision to clear her belongings from the library. The omission ensured that classmates heard a narrative in which Plaintiff was the aggressor and Fuerst the victim, a narrative that the factual record disproves.

31. Professor Tyler Moore received Plaintiff's disability accommodation letter on January 10, 2024. On January 7, Moore had offered his entire class Zoom attendance for anticipated snow. On March 28, 2024, one day after the coordinated attack, Moore denied Zoom to a disabled veteran who explained she had "legal reasons" she could not attend in person. Same professor, same class, same semester, different treatment. Moore went completely silent. He never asked clarifying questions, never contacted Disability Services, never explored alternatives.

32. Seven days later, on April 4, 2024, Moore emailed his students, including Plaintiff, asking for favorable course evaluations, explicitly noting evaluations affect his "tenure/promotion purposes." Moore denied a disabled student's accommodation request, went silent, and then sought career advancement from the same student he had ignored.

*JACKSON v. USD, et al.*

Con Law I - Course Eval Plea

Tyler Moore <Brightspace@sdbor.edu>
Thu 4/4/2024 3:30 PM
To:Moore, Tyler S <Tyler.S.Moore@usd.edu>

Good afternoon all,

I'm sure you're inbox is already getting spammed by the course eval system, but I wanted to send a quick note (or maybe this is a "plea") about why I believe these are important...and to forward the link to make this even easier for you to complete (here is the link: https://sdbor.campuslabs.com/courseeval).

In short, I would really appreciate it if you could do me the favor of filling this out (even right now!) because it matters--both for my pedagogical adjustments going forward and for my evaluation at the University. Teaching-wise, I take the feedback I get from these seriously. My goal, as I've noted throughout the class, is for you all to succeed in learning this material and otherwise. So your thoughts on what worked or didn't work for accomplishing this goal is much appreciated. Evaluation-wise, not only do I read each of my evals, but so does the Dean and other administrators outside of the law school for tenure/promotion purposes. Having a critical mass of students complete these is thus essential to get an accurate picture.

Thank you in advance! I'm sorry these aren't shorter and that some of the questions are less relevant than others (this is a product of the University's decision to have a uniform eval system). Let me know if you have any questions about this or otherwise!

See you tomorrow,

TSM

33. Every defendant received notice. The March 5, 2024 email chain proves coordination: Fuerst to Fulton to Franken to Merkle, in three hours and sixteen minutes. Thompson acknowledged how the matter "started as one person talking to another person and then it's just kind of continued to get forwarded on to people."

34. On May 1, 2024, the NAACP wrote to Dean Fulton (Ex. 4), documenting that Thompson had stated the No Contact Order "held no substance" and was merely "an attempt to get Ms. Jackson to have a conversation." Fulton responded on May 6 by deflecting responsibility. He allowed the prosecution to continue for five more months.

*JACKSON v. USD, et al.*

---------- Forwarded message ----------
From: **Sioux Falls NAACP 4102-B** <naacpsd@gmail.com>
Date: Wed, May 1, 2024, 5:21 PM
Subject: Jackson
To: <neil.fulton@usd.edu>

To Whom It May Concern:

In February of 2024, the NAACP Sioux Falls spoke with Ms. Tiauna Jackson in reference to a concern surrounding the lack of effort placed into the Black History Month Display at the school. NAACP Sioux Falls President, Langston Newton, entered into conversation with several staff members and decision makers to engage in an action plan to better service the Black students, particularly during Black History Month.

After this original conversation, Ms. Jackson was met with additional resistance and harassment from students and faculty. It has now come to our attention that there was a "No Contact Order" between Ms. Jackson and the individual whom she filed an incident report against. Ms. Jackson met with school officials to discuss the "No Contact Order" and it was determined by admission that this was an attempt to get Ms. Jackson to have a conversation and that the order held no substance.

Ms. Jackson has provided the Sioux Falls NAACP with substantial evidence detailing a hostile learning and working environment as well as highlighting concern that other students of color may have to face similar obstacles.

35. USD's own Director of EEO/Title IX Coordinator confirmed the institution had no basis to act. During a March 11, 2024 meeting with Plaintiff, Jean Merkle acknowledged that Plaintiff's social media expression was protected, that the governing harassment policy lacked definitions of prohibited conduct, and that Plaintiff had been failed by multiple institutional safeguards. Merkle could not identify which policy applied to the situation she had been directed to investigate. She told Plaintiff she intended to raise these concerns with Fulton. No corrective action followed. Instead, Merkle classified Plaintiff's race and disability complaint under the Title IX framework governing sex-based discrimination. The complaint did not involve sex. Merkle placed a race complaint into a framework designed to reject it. On March 27, Merkle's office determined the complaint "do not qualify under Title IX criteria" and referred it to Thompson's Student Rights and Responsibilities office, which issued the No Contact Order that afternoon on Merkle's recommendation. The woman whose title is Director of Equal Employment Opportunity, whose job is to protect students from discrimination, steered the only Black student who reported racial targeting away from the one framework that covered race and into the

*JACKSON v. USD, et al.*

office that was restricting her liberty. Sixteen days after confirming the institution had no basis to act, the institution attacked. Merkle provided the pathway.

36. When Plaintiff filed her own Title IX complaint against Fuerst, USD dismissed it in twenty-eight days, not on the merits, but because Fuerst was no longer affiliated with the University. In the same dismissal letter, the Title IX Coordinator wrote: "Your circumstance has brought to light the importance of training and education on this very important topic. USD will work to ensure all students know the importance of zero tolerance regarding harassment and stalking in any education program or experience." The institution admitted in writing that it lacked the training to handle what its administrators had done, while simultaneously prosecuting Plaintiff from Merkle's May 13 dismissal through October 3 — 143 additional days — on baseless charges its own Disciplinary Board would ultimately dismiss. USD proclaimed "zero tolerance" for harassment against the student who was being harassed, not the student who was doing the harassing.



UNIVERSITY OF
**SOUTH DAKOTA**
414 E. Clark Street/Vermillion, SD/57069

**NOTICE OF DISMISSAL**

May 13, 2024

TO:     Tiauna Jackson
From:   Jean Merkle, Title IX Coordinator

On May 9, 2024, the University of South Dakota Title IX Office was notified the respondent, Jennie Fuerst is no longer involved with the University in any capacity. The University is exercising it's right to dismiss this case per the Board of Regents policy, SDBOR 1.4.1 Title IX Policy for harassment and stalking.

> 3.5.    An institution may dismiss the formal complaint or any allegations therein, if at any time during the investigation or hearing: a complainant notifies the Title IX Coordinator in writing that the complainant would like to withdraw the formal complaint or any allegations therein; the respondent is no longer enrolled or employed by, or otherwise affiliated with, the institution; or specific circumstances prevent the institution from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein.

Your circumstance has brought to light the importance of training and education on this very important topic. USD will work to ensure all students know the importance of zero tolerance regarding harassment and stalking in any education program or experience.

If you have any questions, let me know.

37. The prosecution outlasted Plaintiff's enrollment. Throughout the summer of 2024, Mays repeatedly contacted Plaintiff to ask whether she was returning, the same administrator who had solicited the complaint, denied accommodations, and withheld transfer letters past deadlines. Plaintiff responded asking why Dean Mays kept asking her, and admitted that no other schools had accepted her. On August 11, 2024, Plaintiff requested a leave of absence, writing that the misconduct allegations had "significantly impacted my academic performance and overall well-being." Mays granted the leave the next morning. Even then, the institution waited fifty-two more days to dismiss the charges. On October 3, 2024, 190 days after March 27, the Disciplinary Board concluded there was no basis to proceed. (Ex. 6.) The prosecution that began with Plaintiff enrolled and ended with Plaintiff gone had achieved its purpose regardless of the outcome.

38. Every adverse action collapsed when confronted with evidence. The Disciplinary Board dismissed all charges (¶301, 304). The LSAC complaint was withdrawn in thirteen days. The NCO was lifted in six. Yet the permanent consequences remain: Plaintiff must disclose this episode on every bar application and professional license application for the rest of her career, regardless of the dismissals. And then the institution erased her. When Plaintiff requested a leave of absence in August 2024, Mays granted it the next morning and told Plaintiff to cancel her registration. Two months later, while the leave was still in its first year, USD reported Plaintiff to the ABA as permanent attrition – not a student on leave, but a student who left. The ABA's own definition excludes students on leave of one year or less from the attrition tables. Plaintiff's leave was two months old. In the same month the Disciplinary Board dismissed all charges for lack of basis, USD reported Plaintiff's departure as permanent to the national accrediting body. The institution closed

the prosecution and closed the file in the same month. It never notified Plaintiff that her status had been changed. She discovered the reclassification through her own review of USD's publicly filed data.

39. The institution was warned repeatedly and kept going. On March 19, 2024, Plaintiff's attorney wrote to the institution identifying the charges as First Amendment violations and demanding dismissal. The institution did not dismiss. Eight days later, it issued a second Examiner Notice adding a new complainant and a new charge: "stalked." On April 11, Plaintiff's attorney wrote again, demanding dismissal and describing the allegations as "threadbare." The institution did not dismiss. At that same meeting, the Examiner expanded the prosecution to include "conduct at a professional school," applying a standard governing licensed attorneys to a first-year law student's personal social media. The attorney raised a constitutional defense; the institution invented new charges broad enough to survive it. On May 1, the NAACP wrote to Dean Fulton documenting the violations. Fulton allowed the prosecution to continue. On May 9, Plaintiff and her attorney met with Deputy General Counsel Healy and HR Director Gotto. Healy acknowledged the proceedings were "outside the norm." Plaintiff's attorney put the institution on formal legal notice that continued prosecution would result in liability. Plaintiff personally told the institution's representatives that what they were doing was wrong, that it was harming her, and that the consequences would follow her for the rest of her professional life. The institution kept going. From March 19 to October 3, a licensed attorney, the NAACP, and the student herself told the institution it was committing constitutional violations that would cause permanent career harm. The institution prosecuted for 198 additional days after the first warning. Every day of

continued prosecution after March 19, 2024 was with full knowledge that a member of the bar had identified the conduct as unconstitutional, that a national civil rights organization had documented the violations, and that the student had described the harm to the institution's own legal counsel. They did not stop because they did not want to stop.

40. USD has a documented pattern of retaliating against individuals who exercise any protected right. In February 2024, the Board of Regents settled *Ghebrekidan v. South Dakota Board of Regents*, No. 4:22-cv-04014-KES (D.S.D.), a federal civil rights action arising from USD's retaliation against an employee who reported sexual harassment through Title IX procedures. That employee was placed on an improvement plan, then administrative leave, then her contract was not renewed, the same escalating pattern of adverse actions deployed against Plaintiff. The Board signed the settlement six weeks before Defendants launched the coordinated attack described herein. The institution was settling one retaliation case while orchestrating another.

41. In September 2025, this Court granted a temporary restraining order against USD and the Board of Regents in *Hook v. Rave*, No. 4:25-CV-04188-KES (D.S.D. Sept. 24, 2025), finding that a USD professor had a "fair chance of prevailing" on his First Amendment retaliation claim for a single social media post about a matter of public concern. USD dropped its termination effort nine days later. Professor Hook faced one adverse action from one office. Plaintiff faced three simultaneous adverse actions, coordinated across three offices, for sustained criticism of educational quality at the state's only law school. The pattern is consistent: USD retaliates against employees who report harassment, against professors who post about university matters, and against students who criticize

racial and educational conditions. The protected activity changes. The institutional response does not.

42. USD markets the Knudson School of Law as "a community of excellence, service, and leadership." Dean Fulton used those exact words in the school's profile for the Association of American Law Schools in January 2024, two months before the coordinated attack. (https://www.aals.org/member-school-highlight/south-dakota-law/) The school's website tells prospective students: "From professors to faculty, everyone wants you to succeed and go above and beyond in putting you in a position to do so." It promises "a world-class education from a leading, flagship university that serves its students and its state with excellence." The institution that markets itself on service coordinated three offices to silence a student who asked for better service. The institution that promises everyone wants you to succeed appointed the student's own academic advisor to prosecute her. The institution that pledges to go above and beyond went above and beyond: it bypassed its own internal grievance process entirely and filed fraud accusations with a national credentialing body, the one mechanism designed to inflict irreversible, nationwide, career-level damage and create a lifetime of mandatory disclosures on every bar application, professional license, and graduate school admission for the rest of Plaintiff's career. Every charge was dismissed. Every adverse action collapsed. The disclosures are permanent. The institution that markets excellence, service, and leadership delivered retaliation, fabrication, and institutional indifference.

43. A law student who sits in her car between classes because she does not feel safe inside the building is not experiencing "a community of excellence, service, and leadership." A law student whose father contacts private security companies about hiring a bodyguard so

his daughter can attend class is not experiencing an institution where "everyone wants you to succeed." A law student who requests police escorts to enter the building is not experiencing "a leading, flagship university that serves its students." A law student who stops participating in class discussion to avoid conflict with the people prosecuting her is not receiving "a world-class education." A law student who is alone in South Dakota, a thousand miles from family, and must use her professional social media platform to let people who care about her know what is happening because no one inside the institution will help her is not experiencing a place where faculty and professors "go above and beyond in putting you in a position" to succeed. She is experiencing what happens when the institution's conduct is the opposite of its marketing.

44. And she was not the last. In 2024-2025, the year after Plaintiff's constructive expulsion, three more students of color left USD Law under "Other Attrition," not for academic reasons, not as transfers, at seven times the rate of white students. Zero students of any race left for academic reasons. In April 2025, the Honorable James Donald Smith passed away. He was the first Chief Administrative Patent Judge of the United States, a Black man who made history in American patent law, and he was actively teaching Intellectual Property Law at USD Knudson School of Law. Former President Barack Obama wrote a letter that was read at his memorial. USD deleted his faculty page rather than pay its respect to his career and his service to the Knudson School of Law. (https://www.usd.edu/research-and-faculty/faculty-and-staff/james-d-smith) When a white professor passed away in 2022, the same dean published a full memorial, wrote a personal tribute, and held a livestreamed service. The institution did not correct the environment. The environment persisted.

*JACKSON v. USD, et al.*





# IN MEMORY OF PROFESSOR TOM HORTON

December 30, 2022

Thomas "Tom" Horton, a longtime University of South Dakota Knudson School of Law professor, recently passed away surrounded by his family on Nov. 15, 2022.

TOPICS

Faculty or Staff



45. The defendants in this case are law professors, law school administrators, and attorneys. They teach the First Amendment and violated it. They teach contract law and breached their own handbook. They teach torts and committed them. They teach administrative law and ignored their own procedures. They teach professional responsibility and abandoned it. The professionals tasked with teaching the next generation of lawyers how the law works turned around and demonstrated, through their own conduct, how it fails. This case

is not about what Plaintiff said on social media. It is about what happened when the people who teach the law decided they were above it.

## II. JURISDICTION AND VENUE

46. This Court has original jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a) because the state claims arise from the same nucleus of operative facts as the federal claims. The Eleventh Amendment does not bar Plaintiff's Title VI, Title IX, Section 504, or ADA claims against USD because Congress has unequivocally conditioned the receipt of federal financial assistance on a state's waiver of Eleventh Amendment immunity for violations of these statutes. 42 U.S.C. § 2000d-7(a)(1); *Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir. 1997); *Little Rock Sch. Dist. v. Mauney*, 183 F.3d 816, 831 (8th Cir. 1999) (en banc).

47. Venue is proper in the District of South Dakota under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district and all Defendants are located in this district.

48. This action is timely. The statute of limitations for § 1983 claims in South Dakota is three years, borrowing the state's personal injury limitation period. SDCL § 15-2-14(3); *Wilson v. Garcia*, 471 U.S. 261, 276 (1985). The coordinated attack began March 27, 2024, and the last adverse action, dismissal of charges after months of prosecution, occurred October 3, 2024. All federal claims are brought within the limitations period. The state defamation claims are governed by South Dakota's two-year statute of limitations for libel and slander. SDCL § 15-2-15(1). All state claims accrued no earlier than March 27, 2024, and are timely.

# III. PARTIES

## A. Plaintiff

49. Plaintiff Tiauna Jackson is a Black woman, service-connected disabled veteran, and registered student with disabilities at USD. Her education at USD was funded through VA Chapter 31 Vocational Rehabilitation benefits. Plaintiff registered with USD Disability Services before her first semester and received approved academic accommodations for both Fall 2023 and Spring 2024. Plaintiff resides in Lincoln County, South Dakota.

## B. Institutional Defendants

50. Defendant University of South Dakota ("USD") is a public university and instrumentality of the State of South Dakota, located in Vermillion, South Dakota. USD operates the Knudson School of Law, the only law school in South Dakota. USD receives federal financial assistance and is subject to Title VI, Title IX, Section 504, and the ADA. Dean Neil Fulton is the final policymaker for student discipline at USD Knudson School of Law, and his decisions constitute official policy of the law school. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

51. Defendant South Dakota Board of Regents ("Board of Regents") is the governing body for South Dakota's public university system, including USD. The Board of Regents is a state agency. The Eleventh Amendment bars damages claims against the State and its agencies in federal court. *Edelman v. Jordan*, 415 U.S. 651 (1974). Accordingly, claims against USD and the Board of Regents in their institutional capacities seek only prospective injunctive and declaratory relief under *Ex parte Young*, 209 U.S. 123 (1908).

All damages claims are brought against Defendants in their individual capacities, where the Eleventh Amendment does not apply. *Hafer v. Melo*, 502 U.S. 21 (1991).

52. Defendant Sheila Kay Gestring is the President of the University of South Dakota. Gestring is sued in her official capacity for prospective injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908). As President, Gestring is the chief executive officer of the institution and the official with authority to implement the injunctive relief sought herein.

## C. Individual Defendants

53. Defendant Neil Fulton is the Dean of USD Knudson School of Law. Fulton is sued in his individual and official capacities. As Dean, Fulton is the final policymaker for student discipline at the law school.

54. Defendant Shirley Mays is the Associate Dean of Academic Affairs at USD Knudson School of Law. Mays is sued in her individual and official capacities. As Associate Dean, Mays has authority over academic matters including transfer recommendations and accommodation processes.

55. Defendant Robert Miller is an Assistant Professor of Law at USD Knudson School of Law who served as Examiner in the disciplinary proceedings against Plaintiff. Miller is sued in his individual and official capacities. Miller was also Plaintiff's academic advisor.

56. Defendant Tyler Scott Moore is an Associate Professor of Law at USD Knudson School of Law. Moore is sued in his individual and official capacities. Moore taught Plaintiff's Constitutional Law I course during Spring 2024.

57. Defendant Katey Ann Ulrich is the Director of Admissions and Marketing at USD Knudson School of Law. Ulrich is sued in her individual and official capacities. As

Director of Admissions, Ulrich was responsible for LSAC-related communications on behalf of the law school.

58. Defendant Emma Thompson is the Director of Student Rights and Responsibilities at USD. Thompson is sued in her individual and official capacities. Thompson has authority over student conduct matters across the entire University of South Dakota, not just the law school.

59. Defendant Kathleen A. Fitzgerald is the Dean of Students at USD, responsible for university-wide student affairs. Thompson reports directly to Fitzgerald and operates under her supervisory authority. Fitzgerald is sued in her individual and official capacities.

60. Defendant Anthony James Franken, p/k/a AJ Franken, is the General Counsel for the University of South Dakota. Franken is sued in his individual and official capacities. Franken is responsible for advising USD on legal compliance, including constitutional obligations.

61. Defendant Christopher Healy is the Deputy General Counsel for the University of South Dakota. Healy is sued in his individual and official capacities.

62. Defendant Jean M. Merkle served as Director of EEO and Title IX Coordinator at the University of South Dakota from 2020 through November 2024. Merkle is sued in her individual and official capacities. As Director of EEO/Title IX Coordinator, Merkle held dual jurisdiction over both equal employment opportunity complaints, encompassing race and disability discrimination, and Title IX complaints addressing sex-based discrimination. USD designated Merkle as its EEO Coordinator under SDBOR Policy

1.4.3, Section 7, with institutional responsibility for administering the centralized complaint filing system for discrimination complaints.

63. Defendant Jennifer Leigh Fuerst, p/k/a Jennie Fuerst, is a former USD law student and library employee. Fuerst is sued individually for conspiracy, intentional infliction of emotional distress, and abuse of process. During the 2023-2024 academic year, Fuerst served as Secretary of the Federalist Society chapter at USD Law. Fuerst is liable as a state actor under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), because she acted in concert with state officials in filing and prosecuting complaints against Plaintiff.

64. Defendant Julianne Mari Severson is a USD law student. Severson is sued individually for conspiracy, intentional infliction of emotional distress, abuse of process, and as a state actor for First Amendment retaliation and Equal Protection violations. During the 2023-2024 academic year, Severson served as 1L Student Representative of the Federalist Society chapter at USD Law. Severson is liable as a state actor under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), because she acted as a willful participant in joint action with state officials in the prosecution of Plaintiff.

## IV. FACTUAL ALLEGATIONS

### A. Enrollment, Disability Registration, and Institutional Context

65. Prior to enrolling in law school, Plaintiff founded and operated The Jackson Agency, an AFTRA, WGA, and DGA franchised talent and literary agency in Los Angeles. In 2019, the New York Times profiled Plaintiff as the only Black woman among agents from Hollywood's largest agencies who owned her agency outright. Plaintiff was the first Black woman elected to the Board of Directors of the Association of Talent Agents, serving two terms. Plaintiff enrolled in law school to expand her professional practice

into entertainment law, intending to serve underrepresented communities. The career Defendants disrupted was not speculative; it was established and documented.

66. Plaintiff enrolled at USD Knudson School of Law for the Fall 2023 semester. Her education was funded through VA Chapter 31 Vocational Rehabilitation benefits, which the Department of Veterans Affairs approved based on Plaintiff's service-connected disabilities. Under 38 C.F.R. § 21.292(b)(3), the VA may only approve courses for Chapter 31 training at facilities that are "in compliance with Title VI of the Civil Rights Act of 1964" and "sections 501 through 504 of the Rehabilitation Act of 1973." USD accepted VA Chapter 31 funds on Plaintiff's behalf subject to this compliance condition. Orientation took place August 1-3, 2023.

67. Before Plaintiff's first class, USD had full notice of her disabilities and approved accommodations. On July 14, 2023, Karen Gerety, Director of Disability Services, emailed Plaintiff's law school professors and key administrators, including Associate Dean Mays, Registration Officer Carlisle, and Professors Kammer, Hess, Huston, Nash, and Macias, advising them that an incoming 1L student named Tiauna Jackson had a classroom accommodation allowing her to record class lectures. Gerety's pre-semester notification ensured that the faculty and administrators who would interact with Plaintiff knew she was a registered student with disabilities before the semester began.

68. On August 1, 2023, USD Disability Services issued Plaintiff's Fall 2023 accommodation memo, approving audio recording of lectures, a quiet exam location, and 50% extended time on exams. On September 14, 2023, the memo was amended to add amplification during lectures. On September 19, 2023, the memo was amended a second time, upgrading Plaintiff's extended exam time from 50% to 100% (double time). Each

amended memo was distributed to Plaintiff's professors with the same confidentiality notice and the same instruction: "If after talking to the student you need further clarification, please contact our office."

69. Plaintiff had multiple law school acceptances and chose USD deliberately. She relocated to South Dakota to attend, invested in the law school community, and leveraged her professional network to secure speakers for student organizations, and referred a prominent Hollywood entertainment attorney and professor to Knudson's Director of Admissions when she expressed they were looking for an entertainment law professor.

70. During USD's August 2023 orientation, Judge Sabers advised incoming students during the Character and Fitness session on August 2, 2023 that they could amend their applications without penalty, and to go to the Registrar. Plaintiff amended her application at the first available opportunity the following day.

71. On August 3, 2023, Plaintiff submitted an application amendment and letter of good standing to Registration Officer Teresa Carlisle by email. The amendment disclosed Plaintiff's prior enrollment at Northwestern California University School of Law. The letter, signed by Academic Dean Mary Schofield, stated that Plaintiff "withdrew during the first term of studies, and did not complete a term," that Plaintiff "was in good standing during the period of enrollment," and that "NWCU is not an ABA-accredited law program and therefore does not have a Federal School Code (OPE-ID)." The letter established three facts that destroyed Ulrich's subsequent LSAC complaint before it was filed: Plaintiff never completed any coursework, Plaintiff was in good standing, and the institution was not ABA-accredited. This document was placed in Plaintiff's student file.

This document, submitted eight months before the LSAC complaint, is the document Ulrich never checked before filing fraud accusations against Plaintiff on March 27, 2024.

72. On January 2, 2024, USD Disability Services issued Plaintiff's Spring 2024 accommodation memo, approving amplification during lectures, audio recording, a quiet exam location, and 100% extended time (double time) on exams. Professor Tyler Moore received this memo on January 10, 2024. A true and correct copy of the accommodation memo delivered to Moore, the March 28 denial correspondence, and the April 4 tenure evaluation request is attached hereto as Exhibit 8 and incorporated herein by reference.

73. On January 10, 2024, Plaintiff delivered the Spring 2024 accommodation memo to Professor Moore by email, with Disability Services Coordinator Karen Gerety copied on the communication. Gerety's office had contemporaneous proof that Moore received the memo, including the memo's instructions for contacting Disability Services if clarification was needed. When Moore denied Plaintiff's Zoom request on March 28, 2024, without contacting Disability Services, and when Mays denied the same request that afternoon without contacting Disability Services, Gerety's office possessed the documentation proving both administrators had received and were ignoring the memo's instructions. Upon information and belief, Disability Services took no action to ensure compliance after either denial.

74. Moore holds a Ph.D. in Political Science from the University of Notre Dame, a J.D. from Georgetown University Law Center, and a B.A. from the University of Nebraska. On January 7, 2024, Moore emailed his Constitutional Law class offering Zoom attendance due to anticipated weather, demonstrating both technological capability and willingness to provide remote access when circumstances warranted. Throughout the Spring 2024

semester, Moore uploaded mandatory course materials to the D2L e-learning platform in PDF formats that were incompatible with the assistive e-doc reader embedded in the platform. Inaccessible readings included *Allen v. Wright* and *Lujan v. Defenders of Wildlife* (uploaded January 7, 2024), *Griswold v. Connecticut* (uploaded February 5, 2024), and *Lawrence v. Texas* and *Washington v. Glucksberg* (uploaded February 12, 2024). These documents could not be processed by Plaintiff's assistive technology, denying Plaintiff equal access to mandatory course materials. Moore had received Plaintiff's accommodation memo and took no steps to ensure that materials uploaded to the university's learning management system were accessible.

75. On November 25, 2024, USD signed a Resolution Agreement with the U.S. Department of Education Office for Civil Rights (OCR Docket No. 07-24-2185) to resolve an investigation into whether USD's online programs excluded people with disabilities. OCR's assessment identified that "documents provided in portable document format (pdf) were inaccessible to people with vision disabilities who use screen readers." Letter from Rhonda Collins, Att'y, U.S. Dep't of Educ., Office for Civil Rights, to Sheila Gestring, President, Univ. of S.D. (Nov. 29, 2024) (OCR Docket No. 07-24-2185). Plaintiff encountered the same type of barrier in Moore's course. Under the Agreement, USD committed to adopt web accessibility standards within thirty days, conduct a full audit of all online programs within 120 days, remediate all identified barriers within six months, and submit to ongoing OCR monitoring until OCR determines compliance. OCR reserved authority to initiate enforcement proceedings or refer the matter to the Department of Justice in the event of breach. On April 24, 2024, the Department of Justice published a final rule requiring public entities to ensure web content accessibility

*JACKSON v. USD, et al.*

under Title II. *Nondiscrimination on the Basis of* Disability; Accessibility of Web Information and Services of State and Local Government Entities, 89 Fed. Reg. 31320 (Apr. 24, 2024) (codified at 28 C.F.R. §§ 35.200-35.204). USD's D2L platform constitutes web content under the rule.

76. USD Knudson School of Law, according to ABA Standard 509 Required Disclosures, graduated an average of 0.8 Black students per year over the fifteen years preceding Plaintiff's enrollment. From 2008 through 2022, USD Law graduated twelve Black students total. In some years, zero Black students graduated. When Plaintiff enrolled in Fall 2023, she joined the largest Black 1L cohort in the school's documented history: five students. In Fall 2024, after Plaintiff was forced out, USD enrolled zero Black 1L students. Fulton was simultaneously presenting on ABA Standard 206 diversity compliance to peer institutions while his own school's Standard 509 data documented a trajectory toward elimination of Black enrollment.

**FALL 2023: 5 BLACK 1Ls ENROLLED**

J.D Enrollment as of October 5th 2023

| | JD1 | | | | | JD2 | | | | | JD3 | | | | | JD4 | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | T | M | W | AGI | PNR | T | M | W | AGI | PNR | T | M | W | AGI | PNR | T | M | W | AGI | PNR | T |
| Hispanics of any race | 1 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 3 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| Asian | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Black or African American | 5 | 2 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Two or More Races | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| Total People of Color | 10 | 5 | 5 | 0 | 0 | 11 | 5 | 6 | 0 | 0 | 11 | 2 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32 |
| White | 74 | 39 | 35 | 0 | 0 | 67 | 41 | 26 | 0 | 0 | 62 | 29 | 33 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 203 |
| US nonresident | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Race and Ethnicity Unknown | 2 | 1 | 0 | 0 | 1 | 5 | 4 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| Total | 86 | 45 | 40 | 0 | 1 | 83 | 50 | 33 | 0 | 0 | 75 | 33 | 42 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 244 |

**FALL 2024: 0 BLACK 1Ls ENROLLED**

J.D Enrollment as of October 5th 2024

| | JD1 | | | | | JD2 | | | | | JD3 | | | | | JD4 | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | T | M | W | AGI | PNR | T | M | W | AGI | PNR | T | M | W | AGI | PNR | T | M | W | AGI | PNR | T |
| Hispanics of any race | 4 | 0 | 4 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| American Indian or Alaska Native | 4 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| Asian | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| Black or African American | 0 | 0 | 0 | 0 | 0 | 4 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Two or More Races | 4 | 1 | 3 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| Total People of Color | 14 | 4 | 9 | 1 | 0 | 9 | 5 | 4 | 0 | 0 | 12 | 6 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 35 |
| White | 71 | 33 | 37 | 1 | 0 | 70 | 34 | 36 | 0 | 0 | 67 | 39 | 28 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 208 |
| Race and Ethnicity Unknown | 4 | 1 | 1 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 5 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| Total | 89 | 38 | 47 | 4 | 0 | 80 | 40 | 40 | 0 | 0 | 84 | 49 | 35 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 253 |

Please note in demographic information in tables above US nonresident is no longer a separate category in 2024 and nonresidents have been

77. Standard 206 poses particular compliance challenges for law schools in predominantly white communities; Vermillion, South Dakota is over ninety percent white. In April 2023, Fulton told the ABA Journal that only five percent of USD Law's full-time faculty were people of color. That figure represented one individual out of twenty full-time faculty. From 2012 through 2016, five consecutive years, USD Law employed zero

*JACKSON v. USD, et al.*

minority full-time faculty members. By 2024, the two full-time faculty of color were Associate Dean Mays and one biracial professor. Among thirty-six non-full-time faculty, zero were people of color. Fulton stated to the ABA Journal: "We work very hard to diversify our community, and we're swimming against political tides." The ABA Journal article that quoted Fulton included a comparative data table of law schools with the lowest diversity scores. Among those schools, USD's five percent full-time faculty of color was lower than all but two institutions listed. Schools with substantially higher diversity percentages: Hofstra at fourteen percent, Baylor at nearly seventeen percent, received public notices of noncompliance with Standard 206. USD, at five percent, had not.

78. Under ABA accreditation procedures, Standard 206 compliance determinations can result from complaints filed with the ABA, not only from scheduled site visits. A dean who had presented on 206 compliance to peer institutions understood that public criticism of his school's diversity record, particularly criticism corroborated by the institution's own Standard 509 data, could trigger the accreditation scrutiny he was responsible for navigating. Fulton acknowledged his school's diversity deficit to the national legal press, presented on Standard 206 compliance to peer deans nine months later, and then retaliated against the only Black student who publicly criticized the diversity record he had already admitted was failing. Plaintiff's social media posts were not a nuisance to manage. They were an accreditation risk Fulton chose to suppress rather than address. The enrollment data worsened: from five Black 1L students in Fall 2023 to zero in Fall 2024. The ABA Standard 509 data documenting both figures is publicly available and subject to judicial notice.

*JACKSON v. USD, et al.*

Some law schools that appeared to have few diverse faculty, based on recent 509 Report numbers, told the ABA Journal their percentages increased since the data was released. That includes the University of Arkansas Fayetteville. According to its 509 Report (https://www.abajournal.com/files/U_of_Ark_fayetteville_509_2022.pdf), 3.85% of its part-time faculty were people of color. That category is now at 29%, according to Cynthia Nance, the school's dean. Also, the number of full-time professors of color has gone from 13.89% to 15%, she told the Journal.

## Law Schools With 206(b) Diversity Scores Below 6.49%

| Law School | Faculty of Color (Full-time) | Faculty of Color (Part-time) | Female Faculty (Full-time) | Female Faculty (Part-time) |
|---|---|---|---|---|
| University of Akron School of Law | 13.04% | 2.94% | 34.78% | 35.29% |
| Albany Law School | 25.00% | 6.38% | 52.27% | 36.17% |
| Appalachian School of Law | 0.00% | 18.18% | 38.46% | 18.18% |
| Brigham Young University Law School | 13.16% | 5.66% | 36.84% | 33.96% |
| Catholic University School of Law | 20.83% | 5.33% | 62.50% | 32% |
| Hofstra University School of Law | 14.00% | 6.49% | 54.00% | 35.6% |
| University of Idaho College of Law | 0.00% | 0.00% | 44.74% | 46.58% |
| University of New Hampshire School of Law | 3.70% | 4.00% | 55.56% | 40% |
| University of North Dakota School of Law* | 15% | 7.41% | 55.00% | 35% |
| Ohio Northern University College of Law | 11.11% | 0.00% | 33.33% | 20% |
| University of South Dakota School of Law | 5.00% | 15.00% | 45.00% | 55% |
| Syracuse University College of Law | 10.61% | 5.41% | 40.00% | 27.00% |

79. Standard 206 required USD to "demonstrate by concrete action a commitment to diversity and inclusion by providing full opportunities for the study of law and entry into the profession by members of underrepresented groups, particularly racial and ethnic minorities." ABA Standards and Rules of Procedure for Approval of Law Schools, Standard 206(a) (2023-2024). The Standard's implementing interpretation evaluated each school on "the totality of the law school's actions and the results achieved" and specified that compliance "typically includes a special concern for determining the potential of these applicants through the admission process, special recruitment efforts, and programs that assist in meeting the academic and financial needs of many of these students and that create a favorable environment for students from underrepresented groups." Interpretation 206-2.

80. In 2020, Fulton published *Fake News on Trial*: The Jury Trial as a Guard Against Societal Entropy, 52 Tex. Tech L. Rev. 743 (2020). The article examined what Fulton identified as tribalism: the institutional practice of evaluating speech based on who is speaking rather than what is being said. Fulton wrote that under tribalism, "[i]deas and actions are increasingly assessed not for their content but their source." *Id.* at 746. He warned that tribalism "perpetuates the belief that who says something matters more than what is said" and that "[r]eliability and belief are rooted entirely in the identity of the source of the information." *Id.* at 751. Fulton described how tribalistic institutions enforce conformity: "[p]urity tests for inclusion make tribes increasingly homogenous and self-reinforcing — everyone thinks alike and anyone who thinks differently is banished." *Id.* at 747. Dissent is not tolerated. Membership is binary: "You are either part of the tribe totally, or not." *Id.* Fulton wrote that the result of this process is "an identity of exclusion and insularity" that is "socially destructive." *Id.* at 750.

81. Fulton's article addressed the constitutional limits on institutional conduct directly. He wrote that "[g]overnment officials may not make the law a tool of personal advancement, discrimination, or unfair treatment." Fulton, supra, at 762. He warned that "[g]rossly unequal enforcement of the law can give rise to 'class of one' Equal Protection claims." *Id.* He concluded that "[f]airness within our judicial system is dependent upon allowing litigants to feel as though their position was heard and considered." *Id.* at 763. These are not abstract principles. They are the constitutional standards Fulton articulated, published in a national law review, and attributed to his own professional judgment as a former Federal Public Defender.

82. Four years after publishing these principles, Fulton assessed Plaintiff's speech not by its content but by its source. The content of Plaintiff's speech was accurate: the craft-kit display was assembled from children's supplies, the ABA 509 data documented the enrollment decline Plaintiff described, and every charge the institution filed was ultimately dismissed for lack of basis. Fulton did not evaluate whether Plaintiff's criticism was wrong. He evaluated who was making it. When a non-traditional, first-generation Black student dissented from institutional practices, the institution treated her as someone who was not "part of the tribe." Fulton made the law the tool he had warned against: three simultaneous adverse actions, coordinated across three offices, targeting speech he had certified as protected ten days earlier.

83. The dean who published that fairness requires allowing a person's "position" to be "heard and considered" issued three adverse actions against Plaintiff on March 27, 2024 without meeting with her, without hearing her position, and without determining whether a single policy had been violated. He continued prosecution for 190 days after his own Director of Student Rights acknowledged that "a policy has not been violated," after his own Title IX Coordinator confirmed the institution had no basis to act, after a licensed attorney demanded dismissal, and after the NAACP documented the violations in writing. Fulton's publications are not merely evidence of his knowledge. They are the legal standard he articulated, published, and then violated.

84. In the same year, Fulton published a second article analyzing how lawyers enable institutional harm. Neil Fulton, *All the News That's Fit to Hide*: Sexual Assault and Silence in Hollywood and the Lawyers Who Let It Happen, 40 Loy. L.A. Ent. L. Rev. 395 (2020). Fulton examined how institutional actors weaponize legal and administrative

processes to silence individuals who threaten institutional interests. Fulton condemned lawyers who "facilitated the worst impulses of their clients when they could have been moral leaders," warning that "[t]heir failure makes clear the need for lawyers to be moral leaders and the enormous harm that can come when they do not." *Id.* at 411. He wrote that "[w]hen lawyers abdicate moral responsibility, others can pay the price." *Id.* at 410. Fulton concluded that "[w]hen considerations like big fees, pleasing famous or powerful clients, or having public prominence are given primacy over ethical behavior, lawyers engage in misconduct." *Id.* at 409. Fulton understood, as a matter of published professional judgment, that lawyers who prioritize institutional interests over individual rights cause "enormous harm" and bear moral responsibility for the consequences. Four years later, when Plaintiff's social media posts threatened USD's institutional reputation, Fulton prioritized the institution. Plaintiff paid the price he had warned about.

85. Plaintiff was a member of an underrepresented group at an institution that graduated fewer than one Black student per year for fifteen years. The totality of USD's actions during the period Standard 206 was active and enforceable was a coordinated attack that drove out twenty percent of the largest Black cohort in the school's history. The results achieved were Plaintiff's constructive expulsion and a decline from five Black 1L students to zero. The standard Fulton presented on to peer deans required the institution to create a favorable environment for students like Plaintiff. The institution created a hostile one.

86. USD Knudson School of Law operates in a state with a documented history of racial exclusion. Lemmon, South Dakota became a sundown town in 1919, prohibiting Black residents from living there. See Lemmon, South Dakota, Wikipedia,

https://en.wikipedia.org/wiki/Lemmon,_South_Dakota (last visited Mar. 16, 2026). During the 1920s, the Ku Klux Klan held marches of hundreds of members through downtown Sioux Falls and burned crosses in Yankton, twelve miles from USD's campus in Vermillion. Sara Bernson & Robert J. Eggers, Black People in South Dakota History, 7 S.D. Hist. 241, 253-54 (1977), https://www.sdhspress.com/journal/south-dakota-history-7-3/black-people-in-south-dakota-history/vol-07-no-3-black-people-in-south-dakota-history.pdf; see also Chuck Vollan, A Closer Look at the KKK's Past and Present in South Dakota, KELOLAND News (Aug. 17, 2018), https://www.keloland.com/news/a-closer-look-at-the-kkks-past-and-present-in-south-dakota/. In 1961, the NAACP documented that ninety-two percent of taverns and eighty-six percent of bars in Rapid City refused to serve Black customers. See African Americans in South Dakota, Wikipedia, https://en.wikipedia.org/wiki/African_Americans_in_South_Dakota (last visited Mar. 16, 2026); see also U.S. Comm'n on Civil Rights, Negro Airmen in a Northern Community: Discrimination in Rapid City, South Dakota (1963). On August 13, 2023, the same month Plaintiff enrolled at USD, two Black truck drivers were refused service at a Denny's restaurant in Sioux Falls, told "I'm not serving you people," and escorted out by police after the restaurant called 911 to report them as aggressive. Video of the incident showed the men seated calmly at a table. The Sioux Falls NAACP, led by President Langston Newton, the same civil rights leader who would later attend the February 22, 2024 meeting at USD and document USD's retaliatory conduct in writing, responded publicly to the Denny's incident, stating that "South Dakota has a history of tumultuous race relations and discrimination." The truck drivers filed a federal civil rights action. See *Whitfield v. Denny's Inc.*, No. 4:25-cv-04116-ECS (D.S.D. filed July 17,

2025). In December 2025, a federal jury found the owner of a Rapid City hotel liable for discriminating against Native Americans in violation of Title II of the Civil Rights Act of 1964. See *NDN Collective v. Retsel Corp.*, No. 5:22-cv-05027-LLP (D.S.D. Dec. 19, 2025); see also Associated Press, South Dakota Hotel Owner Found Liable for Discrimination Against Native Americans, Las Vegas Sun (Dec. 20, 2025), https://lasvegassun.com/news/2025/dec/20/south-dakota-hotel-owner-found-liable-for-discrimi/. This historical background is relevant under Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 267 (1977), which instructs courts to examine "the historical background of the decision" when assessing discriminatory intent.

87. The institution's relationship to its Black faculty is further illustrated by its response to the death of the Honorable James Donald Smith, retired Chief Administrative Patent Judge of the United States Patent Trial and Appeal Board. Judge Smith had run the tribunal responsible for deciding patent validity for the entire country, overseeing 230 judges across six offices in five cities. He was the first Chief Judge of the PTAB. He was a Black man who made history in American patent law. He taught Intellectual Property Law as an Adjunct Professor at USD Knudson School of Law and served on the board of the National Music Museum located on USD's campus in Vermillion. Judge Smith passed away on April 29, 2025. A former President of the United States wrote a letter that was read at his memorial service. The U.S. Department of Commerce had profiled him while he served as Chief Judge. The U.S. House Judiciary Committee received his testimony. Law360, a national legal publication, published a full memorial feature. The University of Minnesota Law School, where he also taught, published a full tribute. Duke University

School of Law, his alma mater, published a tribute. Quinn IP Law featured him during Black History Month as a pioneer in patent law. The Sedona Conference published a biographical profile. His fellow Patent Trial and Appeal Board judges posted memorial tributes.

88. USD Knudson School of Law, where he taught, published nothing and quietly deleted his faculty page, returning a 404 error where his profile had been. The South Dakota State Bar published nothing. The South Dakota Unified Judicial System published nothing. No South Dakota legal entity of any kind produced a single sentence acknowledging his death. The entire state of South Dakota, where he taught, where he sat on a museum board, where he gave his time to the only law school in the state, treated his death as if it never happened. When Professor Tom Horton, a white faculty member, passed away in November 2022, USD published a full memorial in The South Dakotan Lawyer, the law school's official publication. President Gestring provided a personal tribute. Dean Fulton wrote: "Tom was a giant, powerful presence in our lives." The law school held a livestreamed memorial service in the Sanford Coyote Sports Center. Student testimonials were solicited and published. A donation link was provided. When Judge Smith, a Black faculty member who had run the patent tribunal of the United States, passed away in April 2025, the same law school, under the same dean, in the same publication, said nothing. The disparity is not ambiguous. USD maintains a single official publication for law school news. The same dean who wrote a personal tribute for one professor, upon information and belief, directed the deletion of the other's faculty page. The same president who provided a quote for one memorial provided no acknowledgment of the other. The same publication that solicited student remembrances for one faculty member

*JACKSON v. USD, et al.*

published zero words for the other. The only variable is race. The institution that erected a children's craft-kit display for Black History Month and then retaliated against the student who criticized it is the same institution that could not produce a single sentence acknowledging the death of its own Black faculty member, a man whose memorial drew a letter from a former president. The institution that could not be bothered to acknowledge the passing of a Black federal judge who had run the patent tribunal of the United States and taught at its law school found time to award Professor Miller its highest faculty honor on the same day Miller acknowledged there was no basis for the seven-month prosecution that constructively expelled a Black student from the institution. Fulton is an alumnus of the institution that honored Judge Smith. Fulton is a 1997 graduate of the University of Minnesota School of Law where he graduated at the top of his class. One out of 270. He almost certainly received that tribute announcement.

### Tribute: Minnesota Law Mourns the Passing of Hon. James D. Smith



**James Smith**

MAY 22, 2025

The Honorable James D. Smith, adjunct professor at the University of Minnesota Law School, passed away on April 29. Smith was born in Toronto, Ontario, Canada. He earned a bachelor's degree in electrical engineering from the University of Maryland and a juris doctor degree from Duke University. He later served on Duke Law's Board of Visitors.

Early in his career, Smith was a judicial clerk in the U.S. Court of Appeals for the Federal Circuit. He also practiced law with Arnold White & Durkee and, later, Dewey Ballantine, serving as the office managing partner of Dewey's Texas office. He also served as assistant dean at Emory University School of Law and a law professor at the University of South Dakota School of Law. At Minnesota Law, he co-taught Trade Secret Law.

He led in-house intellectual property teams for three multinational corporations, serving as Lexmark's chief IP counsel, Nokia's global director of licensing, and as associate general counsel and chief IP counsel of Baxter International. He was the chief administrative patent judge at the United State Patent and Trademark Office, where he led the Patent Board and oversaw its transition from the Board of Patent Appeals and Interferences to the Patent Trial and Appeal Board. Most recently, he was chief IP counsel of Ecolab USA where he oversaw the company's global operations relating to patents, trademarks, copyrights, and other matters related to protection of Ecolab innovation.

An accomplished violist, he was a board member of several music organizations, including the St. Paul Chamber Orchestra. Sharing his love for classical music, he hosted many recitals for family, friends, and colleagues. He is survived by his siblings, Dr. Keith Smith and Nevilla Smith.

Minnesota Law sends alumni communications, and their most distinguished graduate would be on every mailing list they have. He would have seen that tribute. He would have known his own adjunct professor died. And he did nothing to honor him. Instead, upon information and belief, he directed the deletion of Judge Smith's faculty page.



89. Before becoming Dean, Fulton practiced law for nine years at May, Adam, Gerdes & Thompson LLP in Pierre, South Dakota, serving as an associate from 1998 to 2003 and as a partner from 2003 to 2007. May, Adam, Gerdes & Thompson is the firm the PEPL Fund has authorized to defend this action. Fulton holds a B.A. in Political Science from Yale University.

90. Mays holds a J.D. from Harvard Law School and a B.A., magna cum laude, from Central State University.

91. During the Fall 2023 semester, Plaintiff created and hosted "Bridging the Gap," an interview series on her YouTube channel featuring professionals in law, public policy, and advocacy. Guests included a fintech payments attorney, a former assistant district attorney and city council member, a patent attorney and scientist, a former state chief legal officer, a cybersecurity specialist, and an environmental conservationist. The series addressed access to legal careers, professional development, and public interest topics. The channel was operational and its content publicly visible to USD faculty and administrators throughout the Fall 2023 semester, months before any defendant took adverse action. When defendants later characterized Plaintiff's social media activity as grounds for misconduct proceedings, fraud accusations, and a No Contact Order, they

*JACKSON v. USD, et al.*

targeted a channel whose established content was professional interviews with attorneys, legislators, and public advocates on matters of public concern.



92. Before any dispute arose, Plaintiff actively contributed to USD's academic community. Before Plaintiff even matriculated, during her initial visit with Admissions Director Ulrich, Ulrich mentioned the school was seeking an entertainment law professor. Plaintiff immediately connected Ulrich with a practicing attorney who had served as Vice President of Business Affairs at one of the largest television studios in the world and is currently an adjunct professor at the University of Southern California. The prospective faculty member responded directly to Ulrich. After enrolling, Plaintiff arranged speakers for two student organizations: a sports attorney turned diversity, equity, and inclusion consultant for the Outlaw student organization, and a Black prosecutor and law professor from Alabama for the Criminal Law Society. All three professionals Plaintiff connected to USD were Black attorneys. When the university planned its official tribal flag dedication, Plaintiff attended a meeting of the Native American Law Students Association and offered a connection through her father's nonprofit to Gerry, the great-grandson of the Apache leader Geronimo, who expressed interest in traveling to South

Dakota for the ceremony and to connect with the Knudson School of Law. Upon information and belief, Dean Fulton declined the offer, stating the event was to feature South Dakota tribes only. Plaintiff's contributions to the academic community she joined were concrete, professional, and either accepted by student organizations or rejected by administration.

93. Plaintiff's professional standing in the legal community extended beyond USD. On March 22, 2024, five days before the coordinated attack, Howard University School of Law invited Plaintiff to speak at its 28th Annual Center Court Conference, the Sports and Entertainment Law Students Association's premier annual event. Plaintiff presented "Courting Change: Disrupting the Status Quo in Entertainment Agencies" in the Pauli Murray Suite. The conference promotional materials identified Plaintiff as the first 100% Black-woman-owned literary agent in Los Angeles, an Associate Member of the Academy of Television Arts and Sciences, and an executive producer. One of the nation's most prestigious HBCU law schools recognized Plaintiff's expertise and invited her to address the next generation of sports and entertainment lawyers. Five days later, the state's only law school launched three offices against her for posting videos about a Black History Month display.



## B. The Black History Month Display and Protected Speech

94. On February 1, 2024, the USD law school library erected a Black History Month display outside its entrance. The display consisted of paper cutouts of historical figures with adhesive name tags reading "Hello, I am Harriet Tubman" and "Hello, I am Martin Luther King Jr." Among the figures presented as a name tag was Thurgood Marshall, the first Black Supreme Court Justice and one of the most consequential lawyers in American history. At the state's only law school, Black History Month featured no Black attorneys, no patent holders, no military leaders, and no legal pioneers beyond name tags. Library employee Jennie Fuerst constructed the display. The library did not consult any Black student or faculty member before erecting it. USD Law did not recognize or celebrate the confirmation of Justice Ketanji Brown Jackson, the first Black woman to serve on the United States Supreme Court, when she was confirmed in April 2022.

95. At the time Fuerst constructed the display, the Honorable James Donald Smith, retired Chief Administrative Patent Judge of the United States Patent Trial and Appeal Board, was actively teaching Intellectual Property Law as an Adjunct Professor at USD Knudson School of Law. Biographical Information of James Donald Smith: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary, 117th Cong. (2022) [hereinafter Smith Congressional Bio]. Judge Smith had run the tribunal responsible for patent validity for the entire country, overseeing 230 judges across six offices in five cities. *Id.* He clerked for Chief Judge Paul Michel at the U.S. Court of Appeals for the Federal Circuit, served as Assistant Dean and Dean of Students at Emory University School of Law, and led intellectual property operations at Baxter

International, Nokia, Lexmark, and Ecolab. *Id.* He was a Duke Law graduate who served as Vice President of the Black Law Students Association and a board member of the National Music Museum located on USD's own campus. Smith Congressional Bio; Judge James Donald Smith Obituary, Legacy.com (May 2, 2025), https://www.legacy.com/us/obituaries/name/judge-james-donald-smith-obituary?id=58295038. During the same Black History Month cycle, Quinn IP Law published a feature recognizing Black pioneers in patent law, naming Judge Smith as the first Chief Judge of the federal Patent Trial and Appeal Board. Attorneys and Innovators: Recognizing African Americans Who Led the Way, Quinn IP Law (Feb. 2023), https://www.quinniplaw.com/attorneys-and-innovators-recognizing-african-americans-who-led-the-way/. An intellectual property law firm a thousand miles from Vermillion honored a Black judge during Black History Month. The law school where that judge was actively teaching put up construction paper name tags. Fuerst did not include the Black federal judge who had run the patent court of the United States and was actively teaching at her own law school. The display was not merely inadequate. It was uninformed about the institution's own faculty. An institution that does not know its own Black faculty exists does not have a diversity problem. It has an indifference problem.

96. Plaintiff posted videos on social media describing the display as inadequate for a law school, noting it was indistinguishable from an elementary school bulletin board. Plaintiff observed that Black History Month at a legal institution could feature Black judges, patent holders, military leaders, and legal pioneers rather than the same commercialized figures rendered in construction paper. The videos described Plaintiff's experience as a Black student at USD and addressed matters of public concern: the quality of diversity

efforts at a taxpayer-funded institution that had graduated fewer than one Black student per year for fifteen years. Plaintiff was not a transient student passing through South Dakota. She purchased a home in the state, paid property taxes and sales taxes as a resident, arranged professional speakers for three student organizations including OutLaws and the Criminal Law Society, and attempted to build ties to the community she planned to serve.

97. When the display incident became public, Fuerst was not named. Plaintiff's social media posts and the press coverage documenting the incident used the law school's public hashtags but did not mention, tag, or identify Fuerst. Fuerst's reaction preceded any public identification of her involvement. Fuerst contacted classmate Kortney Smith about the situation but omitted that she had taken down the replacement display and placed it on Plaintiff's desk. Fuerst began compiling screenshots and screen recordings across four platforms. Fuerst escalated to Deans Fulton and Mays. A student who was not publicly identified reacted with the urgency of someone who knew exactly what she had done and feared exposure. In the video that described the display incident in detail, Plaintiff referred to Fuerst only as "the perpetrator." Fuerst's surveillance, escalation to administration, and the complaint solicitation from Mays all began before Fuerst was publicly connected to the events.

98. Before the February 22, 2024 meeting, Plaintiff sought local legal counsel. Plaintiff contacted Matter Law Office in Vermillion and left a message with the secretary explaining that the law school had erected a display she found inadequate, that she had a meeting with the law school coming up, and that she was looking for an attorney to be present as general counsel for approximately one hour. Attorney Brent Matter returned

*JACKSON v. USD, et al.*

the call and declined the engagement. Plaintiff brought general counsel from The Jackson Agency instead. On February 22, 2024, Associate Dean Mays convened a meeting to address Plaintiff's concerns. Present were Mays; Professor Tamara Nash, Director of Experiential Learning and Chair of the State Bar's Diversity and Inclusion Committee; Library Director Sarah Kammer; BLSA President Angelica Cruz; BLSA Vice President KaNya Henderson; Rebecca Porter, Director of the Lawyers Assistance Program for the South Dakota State Bar; NAACP Sioux Falls President Langston Newton; and Plaintiff with general counsel from The Jackson Agency. Dean Fulton did not attend.

99. During the meeting, Library Director Kammer acknowledged that the library had not consulted any Black student before creating the display. Plaintiff presented a professionally bound booklet she had commissioned at her own expense featuring twenty-four Black lawyers, including trailblazers from the late 1800s. Plaintiff offered the materials to the library at no cost. The materials did not bear Plaintiff's name.

100. Mays proposed removing the existing display. The vote was unanimous. The display was taken down on February 23, 2024. Plaintiff's speech produced exactly the constructive institutional change the First Amendment protects: a collaborative resolution endorsed by civil rights leaders, the state bar, student organizations, and the library itself.

101. On March 1, 2024, Fuerst removed the replacement display materials from the library and placed them on Plaintiff's desk in the basement carrel area. Under Section 4.04 of the Student Handbook, student mailboxes located in the Dean's office suite are the designated channel for communications from Knudson School of Law faculty, staff, and affiliated organizations to students. If Fuerst intended to return the materials to Plaintiff, the Handbook-prescribed method was Plaintiff's mailbox in the Dean's suite.

Instead, Fuerst bypassed the mailbox system and personally carried the materials to Plaintiff's isolated carrel in the basement, a location Fuerst could only have identified because, as a library employee, she had access to the carrel assignment records. Fuerst was the library employee who had constructed the original display that the February 22 meeting unanimously voted to remove. Having built the display that was rejected, Fuerst dismantled its replacement and delivered it uninvited to the workspace of the student whose criticism prompted the change. Library Director Kammer was out of the office that day.

102.	On March 1, 2024, at 9:29 AM, Plaintiff emailed Kammer: "Hi Sarah, For some reason the laminated print outs you guys made were placed at my carrel. I never asked for this, this was quite odd. However, would I be able to grab the booklet I had created from you?" At 9:32 AM, Kammer responded: "Hi Tiauna, Sure no problem. I have the booklet in my office -- I'm out today but I can get it for you on Monday. And I'm not sure how they ended up there. If you're ok with it, I'd like to reuse them in subsequent years. If we could exchange on Monday that sounds great to me. Thanks! Sarah." Kammer's response established four facts: she did not direct anyone to place the materials on Plaintiff's desk, she did not know how they got there, she intended to retain the materials for the library's future use, and she was not in the office that day to prevent it.

103.	At 10:22 AM, Plaintiff emailed Kammer with Associate Dean Mays, Dean Fulton, the NAACP, and Rebecca Porter on CC, expressing concern about who had placed the materials at her carrel and why.

104.	At 11:18 AM, Kammer responded to Plaintiff's email. This email was copied to Associate Dean Mays and Dean Fulton. Kammer wrote: "it's possible a student worker

*JACKSON v. USD, et al.*

was just trying to be helpful and return them where they thought they needed to go."

Kammer continued: "If I had been there for them to ask, I would have specified that they

return them to me so I could store them with other materials we keep on hand for future

use in displays." Kammer's email established three facts: she had not directed anyone to

remove the display or place materials on Plaintiff's desk; the materials belonged to the

library, not to Plaintiff; and Fuerst acted on her own volition. Kammer, Fuerst's

supervisor, gave no direction to dismantle the display and no direction to deliver library

property to a student's carrel.

---

Tiauna Jackson, Agent

**From:** Kammer, Sarah E <Sarah.Kammer@usd.edu>
**Sent:** Friday, March 1, 2024 9:32:51 AM
**To:** Jackson, Tiauna <Tiauna.Jackson@coyotes.usd.edu>
**Subject:** RE: Booklet

Hi Tiauna,

Sure no problem. I have the booklet in my office – I'm out today but I can get it for you on Monday.

And I'm not sure how they ended up there. If you're ok with it, I'd like to reuse them in subsequent years. If we could exchange on Monday that sounds great to me.

Thanks!
Sarah

**From:** Jackson, Tiauna
**Sent:** Friday, March 1, 2024 9:29 AM
**To:** Kammer, Sarah E <Sarah.Kammer@usd.edu>
**Subject:** Booklet

Hi Sarah,
For some reason the laminated print outs you guys made were placed at my carrel. I never asked for this, this was quite odd.
However, would I be able to grab the booklet I had created from you?

Tiauna Jackson, Agent

---

105.    Plaintiff's carrel was one of approximately 120 in the basement. Carrels had small

name displays, but Plaintiff's name was partially obscured by a jacket hanging on hooks.

Locating Plaintiff's specific carrel required either looking up the assignment or deliberate

effort to identify the carrel of the student who had criticized the display. Fuerst's access to

carrel assignment records as a library employee provided the means. A person returning

library property to an unidentified student does not navigate past 120 carrels in a

*JACKSON v. USD, et al.*

basement to find the one belonging to the student who criticized her work. She uses the mailbox.

## C. The Investigation (March 4-17, 2024)

106.    On March 4, 2024, Associate Dean Mays texted Fuerst: "Now can you file an administrative complaint?" This text message is documented in Fuerst's own screen recording, which Fuerst later submitted as evidence.

107.    Fuerst responded: "Not from what I could tell reading it. Maybe I'm missing something." The student Mays was soliciting to file a complaint reviewed the relevant policies and found no basis for one.

108.    Twenty-three days elapsed between Mays's solicitation on March 4 and Fuerst's filing on March 27. During that interval, the institutional apparatus was assembled: Fulton forwarded the videos to General Counsel on March 5; Franken directed investigation that same day; Fulton met with Plaintiff on March 8 without disclosing the pending investigation; and Fulton sent the institution-wide free expression email on March 17. Fuerst filed on the same day the three offices struck simultaneously. The twenty-three-day gap was not indecision. It was a coordination window. Fuerst filed a complaint alleging Plaintiff "bullied, stalked, and harassed" her "through videos posted online." The complaint Fuerst told Mays had no basis became the foundation for months of prosecution.

109.    On March 4, 2024, Fuerst emailed Deans Fulton and Mays. Fuerst wrote that Plaintiff could "easily come to the school and still attack me" and that accommodating Plaintiff via Zoom "will anger her even more so she will escalate even more." Fuerst characterized Plaintiff, a service-connected disabled veteran, distinguished entertainment

*JACKSON v. USD, et al.*

executive, nonprofit leader, and New York Times-featured talent agent with no history of violence, as a physical threat while simultaneously opposing Plaintiff's request for the remote access that would have separated them.

**Zoom**
March 5, 2024 at 6:39 AM

From: Jennie Fuerst <jennie.Fuerst@coyotes.usd.edu>
To: Neil Fulton <Neil.Fulton@usd.edu>
Date: March 5, 2024 at 6:39 AM
Subject: Re: Zoom

Dean Fulton,

I planned to be on zoom today, so that I don't have to be in the building. I am available for a call if you would like to discuss. I have class at 10:30 so I would be open before then and after 11:20 until 2:30.

Thank you,

Jennie

> On Mar 5, 2024, at 6:26 AM, Fulton, Neil K <Neil.Fulton@usd.edu> wrote:
> Jennie:
>
> I will be out of class at 9:30, just as Dean Mays goes in. We will likely talk after that. I'm happy to meet if you have plans to be in the building today and am essentially unscheduled after class. If you will not be in the building, Dean Mays and I will visit and circle back.
>
>> -----Original Message-----
>> From: Fuerst, Jennie Leigh <jennie.Fuerst@coyotes.usd.edu>
>> Sent: Monday, March 4, 2024 7:37 PM
>> To: Fulton, Neil K <Neil.Fulton@usd.edu>; Mays, Shirley L <Shirley.Mays@usd.edu>
>> Subject: Zoom
>> Dean Fulton and Mays,
>>
>> I spoke with Dean Mays on the phone and it was discussed if I would feel safe if she was on zoom instead of me. Thinking about it that wouldn't make me feel safer. She could easily come to the school and still attack me. And putting her on zoom will anger her even more so she will escalate even more. I would just like to finish my 3l year on zoom. I really just don't feel safe. I am damned if I do and damned if I don't I want this to stop and really feel I have absolutely no recourse for this.
>>
>> Please feel free to call me in the morning when you meet [REDACTED].
>>
>> I really feel unsafe and would like to finish on zoom. When she finds out I am not getting into trouble that will escalate this too.
>>
>> The only class that doesn't do zoom is client interviewing and counseling but I am hoping that with your help she would make an exception.
>>
>> I also spoke with Sarah, she said I can work remote.
>>
>> Thank you,
>>
>> Jennie
>>
>> Sent from my iPhone

110.    That Mays consulted Fuerst about whether Plaintiff should attend via Zoom means Mays gave the complainant a voice in the target's educational access. Regardless of whether Mays disclosed the disability basis for the request, the consultation itself bypassed the interactive process required by Plaintiff's accommodation memo and gave an adverse party veto power over a disabled student's ability to attend class. Three days later, Mays denied Plaintiff's Zoom request without contacting Disability Services. Fuerst, meanwhile, secured remote work accommodations for herself.

111.    Fuerst's claimed fear was contradicted by her own behavior. During the period in which Fuerst wrote that Plaintiff could "easily come to the school and still attack me," the two crossed paths in the normal course of class changeovers at a classroom with double doors. Fuerst did not recoil, retreat, or display any sign of fear or avoidance. Fuerst's written characterizations of Plaintiff as dangerous were crafted for institutional consumption, not reflective of any actual apprehension.

112.    On March 4, 2024, Plaintiff voluntarily removed her belongings from the library basement carrel area with assistance from University Police Assistant Chief Justin Sangster. Sangster introduced himself only as "Justin" and did not disclose his rank or title. Plaintiff did not learn Sangster was the Assistant Chief of Police until Chief Bryant Jackson later identified him. Sangster offered to help carry materials. Law students Julianne Severson and Miranda Schulte observed Plaintiff and Sangster leaving the basement together. Upon information and belief, a third law student, Thea DeVoss, was also present. Plaintiff's only involvement with the replacement display was donating digital files to Library Director Kammer; Plaintiff never handled the physical materials. Kammer printed and laminated them. Fuerst removed them from the library, carried them to the basement, and placed them on Plaintiff's desk uninvited.

113.    During the same interaction, Sangster told Plaintiff that Dean Mays already knew who had placed the materials on Plaintiff's desk. Mays had this information when, that same evening, she texted Fuerst: "Now can you file an administrative complaint?" The dean who knew Fuerst had placed the materials on Plaintiff's desk solicited that same student to file a complaint against Plaintiff.

114.    That same day, classmates contacted Plaintiff with claims that she had withdrawn from law school. By March 7, 2024, a second rumor had spread among law students: that Plaintiff had been escorted out of the building by police. Plaintiff contacted University Police Chief Bryant Jackson, who confirmed in writing: "UPD did not remove you from the building." Plaintiff voluntarily removed belongings with an officer's assistance; no forced removal occurred. Only three students were present in the basement when Plaintiff removed her belongings with Sangster's assistance: Severson, Schulte, and upon information and belief, DeVoss. No other students observed the events that formed the basis for both rumors. On March 7, 2024, Plaintiff emailed Mays reporting the rumors and requesting an investigation. No investigation followed.

115.    After the attack, Plaintiff contacted Rebecca Porter, Director of the Lawyers Assistance Program for the South Dakota State Bar, seeking support. Porter had attended the February 22 meeting, observed the collaborative resolution of the display dispute, and was copied on correspondence regarding the events of early March. Porter did not return Plaintiff's emails or calls. When Porter eventually responded, she characterized Plaintiff as "combative." A Black woman exercising her First Amendment right to describe her own experience at a public institution was labeled combative by the same professional who had sat in the room while Plaintiff presented a solution endorsed by the NAACP, the State Bar, and the library. Classmate Kortney Smith relayed that she "never hear[s] anything good about that girl." A former ally in Porter became a vector for the institutional narrative. The characterization of a Black woman exercising her First Amendment right as "combative" tracks the "angry Black woman" stereotype that *Henderson v. Thompson*, 200 Wash.2d 417, 518 P.3d 1011 (2022), recognized as a

mechanism through which facially neutral institutional processes become infected by racial bias. A disabled veteran calling a lawyers' assistance hotline for help after being falsely accused was labeled combative before she could be heard.

116.    On March 5, 2024, at 12:49 PM, Mays emailed Plaintiff regarding the display incident. Mays wrote: "As you know, the person who returned the materials to your carrell was Jennie Fuerst."

117.    In the same email, Mays wrote: "She did so as a student employee of the library whose job responsibility is to both put up and take down the library displays." Mays characterized Fuerst as acting within the scope of her employment.

118.    In the same email, Mays wrote: "Since it was March 1 and Black History month had ended, she took down the display."

119.    In the same email, Mays wrote: "Ms. Kammer never has said, and does not believe, that Jennie acted without direction or authorization when she dismantled the display."

120.    Mays was copied on Kammer's March 1, 11:18 AM email. That email stated it was "possible a student worker was just trying to be helpful and return them where they thought they needed to go" and that Kammer would have directed any student worker to "return them to me so I could store them with other materials." Four days later, Mays wrote that Kammer "never has said" that Fuerst acted without direction, a characterization inconsistent with what Kammer had written in an email Mays received.

121.    Mays had no operational authority over the law library or its employees. The McKusick Law Library operated under its own director, Assistant Dean Eric Young, who departed USD in the spring of 2024. Fuerst was a library employee who reported through

*JACKSON v. USD, et al.*

the library's chain of command, not through the Associate Dean of Academic Affairs. Mays's March 5 email purported to explain and justify the actions of a library employee who did not report to her, characterizing those actions as authorized when the employee's own supervisor, Library Director Kammer, had not directed them. She did this on the same day she texted that employee asking her to file a complaint against Plaintiff.

122.    On the evening of March 4, 2024, at 7:37 PM, Fuerst emailed Fulton and Mays with the subject line "Zoom." Fuerst wrote: "I spoke with Dean Mays on the phone." This phone call occurred the same day Mays texted Fuerst: "Now can you file an administrative complaint?" Mays recruited Fuerst through two separate channels on the same day, text message and phone call. In the same email, Fuerst wrote: "She could easily come to the school and still attack me." Plaintiff had never threatened Fuerst, had no history of violence, and had voluntarily vacated her carrel with police assistance four days earlier.

123.    In the same email, Fuerst wrote: "When she finds out I am not getting into trouble that will escalate this too." Fuerst predicted the outcome months before the Disciplinary Board reached it. The complainant did not believe Plaintiff had violated any policy. Her concern was not that the charges had merit but that the process would eventually confirm they did not.

124.    On March 5, 2024, Fuerst emailed Dean Fulton, copying Mays, with one of Plaintiff's YouTube videos. A true and correct copy of the March 5, 2024 email chain is attached hereto as Exhibit 1. In the body of her email, Fuerst described the video as one in which Plaintiff compared institutional conduct to racial violence, and wrote: "That

means placing that on her desk is me calling her the n word. That the upd thinks this is harassment and is forwarding the claim on."

125.    Fuerst fabricated the predicate for the entire chain. University Police had not characterized Plaintiff's speech as harassment. The day before, on March 4, Assistant Chief Justin Sangster met with Plaintiff, took her report about Fuerst's conduct, and told Plaintiff: "I'm going to forward your email to Title IX in the Equal Opportunity Center... because they have their own investigator that goes through this to see if there's like that internal harassment going on so that they can further to help you." UPD was forwarding Plaintiff's complaint to help Plaintiff. Fuerst told Fulton UPD was forwarding a harassment claim against Plaintiff. Every official who subsequently touched this chain, Fulton, Franken, and Merkle, received Fuerst's fabricated characterization of UPD's involvement and her racial framing as the predicate for action. The entire institutional response was built on a lie told on March 5, 2024.

126.    At 9:34 AM, Fulton forwarded Fuerst's email to General Counsel AJ Franken with the message: "One more entry. On my way." Fulton did not investigate the substance of Fuerst's claims. He did not contact Plaintiff. He escalated a student's complaint about another student's off-campus social media posts directly to the university's chief legal officer.

127.    Fulton's March 5 email to Fuerst stated: "I will be out of class at 9:30, just as Dean Mays goes in. We will likely talk after that." The two deans were actively coordinating their response to Plaintiff's protected speech in real time, twenty-two days before the March 27 attack.

128.     At 10:45 AM, Franken forwarded the chain to Director of EEO/Title IX Coordinator Jean Merkle with the directive: "I think this one needs to get a formal intake and go to an investigation as soon as possible. Both students have expressed that they don't feel safe in the law school." From Fuerst's email to Fulton to Franken's directive for formal investigation, three hours and sixteen minutes elapsed. In that time, no one in the chain contacted Plaintiff, contacted University Police to verify Fuerst's claims, or reviewed the content of the speech at issue. The institution's senior legal officer ordered a formal investigation of a student's off-campus social media posts based entirely on an unverified email from a student who would later acknowledge she could identify no grounds for a complaint.

129.     Franken's safety characterization rested entirely on Fuerst's unverified claims. Plaintiff had never threatened anyone and had voluntarily vacated her carrel with police assistance. Plaintiff's report to University Police was a discrimination complaint, not a safety complaint. Franken collapsed a racial discrimination report and an unverified fear allegation into a bilateral safety conflict, converting the reporting party into a co-participant in the problem. Franken referred to Plaintiff as "the student complainant," a term of art in Title IX proceedings designating the individual reporting a violation. Plaintiff was the student who reported the racial targeting. Franken's directive recast her as the subject of the investigation her own report prompted.

130.     Within that span, a chain running from Fuerst to Fulton to Franken to Merkle set in motion the investigation that became the March 27 coordinated attack.

131.     As General Counsel, Franken was the senior legal officer responsible for ensuring that USD's institutional proceedings complied with constitutional requirements and

*JACKSON v. USD, et al.*

governing Board of Regents policies. Attorney Baron Houy's March 19, 2024 demand for dismissal on First Amendment grounds (Ex. 5) was addressed to USD. Upon information and belief, the General Counsel's office received or was copied on this correspondence, as it concerned the legal posture of an active institutional investigation that Franken had personally initiated fourteen days earlier. Attorney Baron Houy's April 11, 2024 letter (Ex. 5) identified the proceedings as "threadbare" and demanded dismissal a second time. The NAACP's May 1, 2024 letter (Ex. 4) was addressed to Dean Fulton and documented that the proceedings "held no substance." Upon information and belief, Franken was aware of or received each of these communications. Despite initiating the investigation on March 5 and despite the General Counsel's institutional responsibility for legal compliance, no corrective action issued from the General Counsel's office at any point during the 190-day prosecution. The office that set the proceedings in motion took no action to evaluate, correct, or terminate them when external counsel, a civil rights organization, and the institution's own Director of Student Rights identified them as baseless.

132.    Fuerst fabricated the predicate. The chain processed it without verification. No one in the chain verified Fuerst's claims. No one contacted Plaintiff. No one contacted University Police to confirm Fuerst's characterization of their involvement. The institution built a seven-month prosecution on an unverified email from a student who admitted she saw no grounds for a complaint.

133.    Either Franken evaluated whether Plaintiff's social media posts constituted protected speech before directing formal investigation, or he did not. If Franken evaluated the speech and concluded that a student's off-campus videos about a library display

warranted urgent investigation, then the General Counsel of a public university determined that constitutionally protected expression on a matter of public concern justified institutional prosecution, a legal conclusion no reasonable attorney could reach. If Franken did not evaluate whether the speech was protected, then the institution's chief legal officer directed investigation of a student's First Amendment activity without performing the constitutional analysis his position exists to provide. Under either alternative, Franken failed the core function of the General Counsel's office. He possessed a law degree, bar membership, and the professional obligation to identify constitutional boundaries before the institution crossed them. He directed investigation within seventy-one minutes of receiving a forwarded email and never conducted that analysis at any point during the 190 days that followed.

134.    On March 8, 2024, Fulton met with Plaintiff. Associate Dean Mays was present. Fulton indicated he was potentially in the decisional chain on student complaints and could not discuss substance. He told Plaintiff the purpose of the meeting was to ensure she had what she needed to file complaints about the events of the preceding week.

135.    During the meeting, Fulton walked Plaintiff through three separate complaint channels: the law school honor code process, where Professor Robert Miller serves as the standing Examiner; Emma Thompson's Student Rights and Responsibilities office on the main campus; and Director of EEO/Title IX Coordinator Jean Merkle.

136.    Fulton did not disclose that he had forwarded Fuerst's complaint to General Counsel three days earlier. Fulton did not disclose that Franken had already directed formal investigation. Fulton presented the meeting as a pastoral effort to help Plaintiff navigate institutional processes while concealing that he had already set those processes

in motion against her. During the meeting, Fulton admitted: "I have had people point me to some of the videos and postings and stuff." Fulton did not identify who was feeding him Plaintiff's social media content, but the admission establishes that a network of individuals was monitoring Plaintiff's protected speech and reporting it to the Dean. Fulton also stated: "I gathered on the one video that you had experience at a different school that was better," confirming he had personally watched the specific video that Ulrich would later cite in the LSAC fraud complaint filed nineteen days later.

137.     Fulton directed Plaintiff to bring her concerns to administration directly rather than posting on social media. Nineteen days before the coordinated attack, the Dean identified Plaintiff's social media as the medium he wanted her to stop using, while concealing that he had already forwarded her social media posts to General Counsel three days earlier and that Franken had already directed formal investigation.

138.     Fulton asked Plaintiff about her experiences at Northwestern California and what USD could do better. He treated it as a conversation about educational quality. He did not raise any concern about Plaintiff's application, did not ask why the school was not listed, did not suggest any discrepancy, and did not refer the matter to admissions for review. The Dean of the law school had the student in his office, knew about Northwestern California from her video, discussed it with her, and identified no application integrity issue. Nineteen days later, the Director of Admissions filed fraud accusations with a national credentialing body based on the same video the Dean had already discussed with Plaintiff without concern. If the application discrepancy warranted a career-destroying LSAC referral, the Dean would have raised it when the student was sitting in front of

him. He did not, because the referral was not about application integrity. It was about retaliation.

139.     During the meeting, Plaintiff informed Fulton that Professor Miller, the standing Examiner, was her academic advisor. The Student Handbook provides that "the Dean shall appoint another faculty member to act as Examiner" when recusal is warranted. Section 2.03, Part III. Fulton took no action to appoint a substitute Examiner despite actual knowledge of the conflict.

140.     Fulton acknowledged during the meeting that he had been monitoring Plaintiff's speech and that others had brought her videos and social media posts to his attention. When Plaintiff asked whether the meeting had become an investigation of her, Fulton denied it.

141.     On or about March 11, 2024, Plaintiff met with Director of EEO/Title IX Coordinator Jean Merkle. Merkle did not disclose that Fuerst had already contacted her, that Merkle had already interviewed Fuerst, or that General Counsel Franken had directed formal investigation six days earlier. Merkle confirmed during the meeting that the video had come "from Neil [Fulton]" through "campus legal counsel," establishing Merkle's awareness of the Fulton-to-Franken chain. Merkle also confirmed she had "started asking around" about Plaintiff before this meeting. Plaintiff observed: "it sounds like you guys have done more to build whatever file than I was aware of." The Title IX Coordinator had received and processed the accused's version of events, received the video through the institutional chain of command, and begun her own investigation, all before the complainant had any opportunity to present her side. When Plaintiff asked how Merkle came to be involved, Merkle stated: "she got ahold of me first," referring to Fuerst.

*JACKSON v. USD, et al.*

Merkle presented the meeting as an intake of Plaintiff's own concerns while concealing that the institutional apparatus was already in motion against her.

142.    On March 11, 2024, Plaintiff met with USD's Director of EEO/Title IX Coordinator Jean Merkle to report racial targeting and harassment by a fellow student. Dean Fulton had directed Plaintiff to Merkle's office on March 8, identifying it as the appropriate institutional channel for Plaintiff's concerns. General Counsel Franken had directed Merkle to investigate on March 5. The institutional chain of command delivered Plaintiff to the official USD designated to receive discrimination complaints. At the outset of the meeting, Merkle described the scope of her office: "I do Title IX stuff as well as EEO, harassment, discrimination kinds of things... For students as well as employees." SDBOR Policy 1.4.3, the Human Rights Complaint Procedures that USD designated Merkle to administer as its EEO Coordinator, governs complaints alleging discrimination "on the basis of sex, race, color, creed, religion, national origin, ancestry, citizenship, gender, gender identity, transgender, sexual orientation, age, or disability" and applies to both employment and "the delivery of educational services." SDBOR Policy 1.4.3, §§ 1-2.

143.    Despite this, USD's Director of EEO told Plaintiff: "I don't think it's an EEO thing," explaining: "Because that deals directly with employment." USD's designated EEO official told a student reporting race discrimination that the EEO framework did not apply to students. She made this statement in the same meeting where she had acknowledged that her office handles EEO matters "for students as well as employees," and under a policy that expressly covers educational services.

*JACKSON v. USD, et al.*

144.     Merkle stated she had "strong feelings about what's happening with your case," then said: "I just feel like I just want everybody to just not talk about it anymore." USD's Director of EEO's response to a Black student reporting racial targeting was to recommend silence. Merkle proposed treating the meeting as informational rather than initiating a formal complaint under the process USD designated her to administer. Merkle's classification decision was not a personal opinion. USD designated her as its EEO Coordinator under SDBOR Policy 1.4.3, Section 7, and her classification decisions constituted USD's official institutional response to discrimination complaints filed by students.

145.     On March 13, 2024, Miller issued the first Examiner Notice, charging Plaintiff with having "bullied and harassed Ms. Julianne Severson in person and through videos posted online." The Student Handbook contains no provision regarding "bullying" or "harassment" as defined offenses; these terms do not appear in Part XV's enumeration of proscribed misconduct. Attorney Baron Houy's March 19 response noted that the complaint did not allege discrimination-based harassment but rather a generic allegation of harassment being processed through a system designed for Honor Code violations. (Ex. 5.) Miller prosecuted charges under terms that do not exist in the governing document. The alleged in-person conduct consisted entirely of Plaintiff saying "Good morning" to Severson on March 4 while clearing out her carrel, and Plaintiff declining to respond to Severson's pleasantries before and after a moot court argument on March 6. Silence and a professional greeting were characterized as bullying and harassment.

146.     The entirety of Severson's evidentiary basis consisted of two items: a video in which Plaintiff mentioned Severson by name but said nothing insulting, threatening, or

harassing, and a subsequent video in which Plaintiff, an ordained minister, posted a Bible verse addressing gossip without naming any student. Neither item constituted misconduct under the Student Handbook. Neither item constituted bullying or harassment under any definition. Fuerst's own evidence files contained the same Bible verse video, establishing an evidentiary pipeline between the two complainants.

147.       Severson subsequently received a clerkship with the Chief Justice of the South Dakota Supreme Court, a position reserved for students at the top of their class. A student of that caliber does not file a misconduct complaint without understanding that her evidence is insufficient. Severson knew the Student Handbook contained no bullying or harassment provisions. She knew her evidence consisted of protected speech. She filed anyway. The only rational explanation is that Severson knew the institution would sustain the prosecution regardless of the evidence, because the institution's objective was silencing Plaintiff, not adjudicating misconduct.

148.       Severson's complaint alleged that Plaintiff "bullied and harassed" her "in person." If Plaintiff had bullied or harassed Severson in person at a law school, the institutional response would have been immediate: campus police would have been contacted, an incident report would have been filed, Thompson's Student Rights and Responsibilities office would have been notified, and the Dean of Students would have intervened. None of that happened. No police were called. No incident report was filed. No administrator was contacted about any in-person confrontation. Severson did not report an in-person incident to any USD office before filing the misconduct complaint with Miller. The absence of any contemporaneous institutional response to the alleged in-person bullying confirms that no in-person incident occurred. What occurred was a greeting on March 4

and silence on March 6. Severson converted a "Good morning" and a non-response into a formal misconduct complaint alleging in-person bullying and harassment under terms that do not appear in the Student Handbook. She filed on March 13, nine days after the greeting and seven days after the silence. A student who waits nine days to report an act of in-person bullying, without contacting police, without reporting to any administrator, without seeking any interim protection, was not reporting a safety concern. She was providing a predicate for prosecution.

149.    Miller issued the first Examiner Notice on March 13, 2024, charging Plaintiff with conduct that included in-person bullying. A neutral examiner receiving an allegation of in-person bullying at a law school would ask one threshold question: was it reported? A phone call to University Police would have confirmed no report was filed. A check with Thompson's office would have confirmed no complaint was received. Miller made none of these inquiries. He accepted a nine-day-old allegation of in-person bullying from a student who had not contacted police, administrators, or campus safety at any point between March 4 and March 13, and issued the Examiner Notice without verifying whether any contemporaneous institutional record corroborated the charge. Miller did not investigate. He processed. The direction was always the same: forward, toward prosecution, regardless of what the evidence showed.

150.    Severson and Fuerst both submitted the same Bible verse video as prosecution evidence through separate complaints. The video depicted Plaintiff, an ordained minister, posting a scripture about gossip that named no student. Two complainants do not independently capture and submit the same video through separate institutional channels

by coincidence. The shared submission establishes coordination between Fuerst and Severson, consistent with the solicitation Mays initiated on March 4.

151.     On March 19, 2024, attorney Sarah Baron Houy of Bangs, McCullen, Butler, Foye & Simmons, L.L.P., a licensed, practicing attorney, told the institution in writing that it was violating a student's constitutional rights. (Ex. 5.) The letter stated that Plaintiff said nothing insulting, threatening, demeaning, or defamatory. The letter identified the speech as constitutionally protected. The letter demanded dismissal. The institution did not dismiss. It continued prosecution for 198 additional days after a member of the bar put it on formal written notice that the proceedings were unconstitutional.

## D. The Coordinated Attack (March 17-27, 2024)

152.     On March 17, 2024, Fulton distributed an email to the entire law school titled "Free Expression and Civility Within a Community." Fulton wrote: "Foremost is our commitment to free thought and free expression. Faculty, students, and staff have the freedom to form their own thoughts and express those thoughts publicly. That commitment is central to a vibrant community dedicated to the search for knowledge and truth."

153.     Fulton attached the South Dakota Board of Bar Commissioners' Creed of Civility, adopted January 10, 2024. The Creed commits lawyers and law students to "prioritize the inclusion and active participation of lawyers (and law students) from all backgrounds, identities and circumstances."

154.     On March 25, 2024, Fulton and Mays co-presented "Social Networking: Is This Really Mixing Business and Pleasure?" at a USD Graduate School Success Series event.

Two days before launching three coordinated adverse actions targeting a student's social media posts, the Dean and Associate Dean presented together on the professional implications of social media. Fulton's CV documents this presentation.

155.    Ten days after affirming that students have "the freedom to form their own thoughts and express those thoughts publicly," Fulton coordinated three adverse actions targeting Plaintiff for her "videos posted online."

156.    On March 27, 2024, at 8:39 AM, Plaintiff emailed Registration Officer Teresa Carlisle requesting a letter of good standing for her summer application to the University of Oregon Sports Law Institute. At 9:01 AM, Carlisle responded: "Attached please find a letter of good standing for Oregon. Let me know if there is anything else you need." The email was copied to Associate Dean Mays. Carlisle's certification required review of Plaintiff's student file, the file containing the August 3, 2023 amendment.

157.    Later that same day, three separate offices took adverse action against Plaintiff.

158.    Professor Robert Miller issued an Examiner Notice initiating disciplinary proceedings against Plaintiff. The Notice charged that Plaintiff had "bullied, stalked, and harassed Ms. Jennie Fuerst through videos posted online." Miller holds a J.D. from Emory University School of Law. Before joining the USD faculty in 2022, he was a partner in the corporate restructuring department of Manier & Herod, P.C. in Nashville, Tennessee. His professional expertise and published scholarship are in bankruptcy law, debtor-creditor rights, and secured transactions. He had no documented expertise in student disciplinary proceedings. Miller was Plaintiff's academic advisor, the faculty advisor to Plaintiff's student organization (the Debtors and Creditors Club, in which Plaintiff served as member at large), and host of a social gathering at his home that

Plaintiff and her father attended. Fulton had been informed of these conflicts on March 8. Miller was appointed Examiner nonetheless.

159.    Miller's USD faculty page lists his bar admissions as Tennessee and North Carolina. Upon information and belief, Miller is not admitted to the State Bar of South Dakota. The Student Handbook empowered the Examiner to investigate allegations, correspond with counsel, gather and evaluate evidence, make legal determinations about whether student conduct violated institutional codes, and recommend sanctions up to and including expulsion. Fulton appointed an attorney who holds no South Dakota license to exercise this quasi-prosecutorial authority over a South Dakota student's professional career for 190 days. Licensed faculty members were available. Fulton chose the one who was conflicted, who was Plaintiff's advisor, and who was not admitted to practice in the jurisdiction where the prosecution would determine whether Plaintiff could continue her legal education.

160.    Miller's professional background makes his procedural failures inexplicable as oversight. As a former partner in a corporate restructuring practice, Miller spent his career interpreting governing documents where textual precision determines outcomes: the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, confirmation orders, credit agreements. A lawyer trained to parse 11 U.S.C. § 363 and enforce the absolute priority rule under 11 U.S.C. § 1129(b) understands that governing documents mean what they say. Part XV of the Student Handbook enumerates proscribed conduct: "Lying, cheating, stealing, plagiarizing, or breaking of one's word of honor." That is the complete list. The words "bullying," "stalking," and "harassment" do not appear. A practitioner who built his career on textual precision chose to prosecute a student under terms that do

not exist in the document governing his authority. Miller acknowledged this choice on his own recording when he admitted that the charges were based on the complainants' lay terminology rather than the Handbook's standards. The question is not whether Miller was competent enough to read the Handbook. He was. The question is why a competent lawyer chose not to apply it.

161.    Miller CC'd Dean Fulton on the Examiner Notice by email. An examiner who reports his investigative actions to the appointing authority is not conducting an independent investigation. He is reporting to the person whose institutional interests the prosecution serves. Six weeks before his appointment as Examiner, Miller published an article concluding that appointed investigators "are too close to [the appointing party] to be classified as independent." Robert W. Miller, *Everyone Is Talking About Bankruptcy Directors*, 23 Fla. St. U. Bus. Rev. 61, 66 (2024). Miller then reported to his appointing party on the document that initiated the prosecution.

162.    Thompson holds a Master of Science in Forensic Psychology from Arizona State University and a Bachelor's degree in Criminal Justice from the University of South Dakota. She does not hold a law degree. Before becoming Director of Student Rights and Responsibilities, Thompson served as a police dispatcher at USD and as a targeted mental health case manager.

163.    Emma Thompson, Director of Student Rights and Responsibilities, issued a No Contact Order to Plaintiff at 4:35 PM. Thompson attempted to reach Plaintiff by phone at approximately 4:30 PM, five minutes before sending the Order by email. Thompson did not reach Plaintiff. The Order was sent without any prior notice, any opportunity to be heard, or any explanation of the factual basis for the restriction. The email was copied to

the Dean of Students, University Police, and Title IX Coordinator Merkle. The NCO thus coordinated across three institutional offices: the law school (Fulton/Mays initiating the March 5 chain), student affairs (Thompson/Fitzgerald issuing the NCO), and Title IX (Merkle), on a single afternoon. The complaint prompting the Order originated in Fuerst's reports about Plaintiff's social media posts, the same videos that triggered the March 5 investigation chain and the Miller Examiner Notice issued that same day. Thompson later confirmed on April 2 that the Order was issued "to ask you to stop talking about Jennie in the videos."

164.    On March 27, 2024, Merkle's Title IX office referred the Fuerst complaint to Thompson's Student Rights and Responsibilities office. Thompson confirmed the routing in a March 28 email: "Title IX had received the initial report and determined that the interactions between you and Ms. Fuerst do not qualify under Title IX criteria, meaning that they referred the case to SRR." Thompson issued the No Contact Order that same afternoon.

165.    Thompson's No Contact Order email was copied to University Police at pubsafe@usd.edu. Thompson thereby created a law enforcement record against Plaintiff for conduct that Thompson would determine six days later did not violate any university policy. Thompson did not contact University Police to retract or correct the notification after she lifted the NCO on April 2, 2024, or after she determined that no policy had been violated. No evidence in the record establishes that the law enforcement notification was ever retracted.

166.    The next morning, March 28, 2024, Plaintiff emailed Thompson documenting the specific racial harm of the police notification. Plaintiff wrote that Fuerst had "played a

part in a rumor saying I was removed from the campus by police" and explained: "That is a death sentence for Black people, I know you don't get it, but believe me when I say, my life is in danger any time I interact with the police." Thompson had CC'd University Police on the NCO the previous afternoon. Thompson received this email at 10:01 AM on March 28. Thompson did not retract the police notification. Thompson did not respond to Plaintiff's documented safety concerns regarding police contact. Thompson continued the proceeding that she had routed through University Police for an additional five days.

167.    This was the first No Contact Order ever issued to a law student at USD.

168.    Director of Admissions Katey Ulrich filed a misconduct complaint with the Law School Admission Council accusing Plaintiff of application fraud. A true and correct copy of Ulrich's referral and withdrawal correspondence is attached hereto as Exhibit 3. Ulrich's complaint was based on Plaintiff's social media videos. Either Ulrich checked Plaintiff's file before filing and saw the August 3, 2023 amendment that disproved the accusation, in which case she filed knowing the charge was false, or she did not check, in which case she filed fraud accusations with a national credentialing body without performing the most basic verification her position required. Both answers establish liability.

169.    Mays was copied on the 9:01 AM good standing certification that morning. Certifying a student as "in good standing" requires confirming there are no pending disciplinary matters, academic deficiencies, or integrity concerns. Hours later, three offices took adverse actions premised on precisely those concerns. Mays authorized good

*JACKSON v. USD, et al.*

standing and participated in coordinated adverse action on the same day, against the same student, for the same speech.

170.     The three March 27 actions originated from separate institutional chains of command. Miller reported to Fulton within the law school. Thompson reported to Dean of Students Kate Fitzgerald on the main campus. Ulrich acted through LSAC, an external regulatory body. Coordination across these chains required communication between them. Thompson later confirmed this coordination occurred, stating the matter "started as one person talking to another person and then it's just kind of continued to get forwarded on to people." The choice to route the application issue through LSAC rather than an internal process was deliberate. USD used internal mechanisms for every other proceeding: internal misconduct charges through Miller, an internal No Contact Order through Thompson, internal Title IX proceedings through Merkle. But for the application question, USD bypassed its own grievance system entirely and went directly to an external national credentialing body whose process freezes a student's credentials system-wide and triggers nationwide dissemination to every law school the student has applied to. USD never asked Plaintiff about the application. USD never issued an internal notice. USD never convened any internal proceeding. USD went straight to the one mechanism designed to inflict irreversible, nationwide, career-level damage that no internal process could achieve. The institution that used internal proceedings for speech it wanted to suppress used an external proceeding for the accusation it wanted to make permanent.

171.     On March 27, 2024, Thompson CC'd Dean of Students Kate Fitzgerald on the No Contact Order email. Fitzgerald is Thompson's direct supervisor and the senior administrator responsible for university-wide student affairs. This was the first No

Contact Order ever issued to a law student at USD. An unprecedented restriction on a student's liberty, issued by a subordinate who had never deployed the measure in this context, landed on the desk of the administrator with authority to review, modify, or rescind it. Fitzgerald took no action. Fitzgerald did not question the factual basis for the Order. Fitzgerald did not inquire whether pre-deprivation process had been provided. Fitzgerald did not ask whether the restriction was proportionate to any identified conduct. When Thompson admitted on April 2 that no policy had been violated, Fitzgerald took no supervisory action to ensure the Order was lifted or the proceedings corrected. Fitzgerald's silence in the face of an unprecedented action by her direct subordinate, targeting a student's campus access without any process, constitutes ratification of that action.

172.     Either Fitzgerald reviewed the No Contact Order before it was delivered to Plaintiff, or she did not. If Fitzgerald reviewed it, she approved the first restriction on a law student's campus access in USD's history without requiring that Thompson provide notice to the student, identify a factual basis, or determine that any policy had been violated, and she did so on the same afternoon that two other offices took simultaneous adverse action against the same student for the same speech. If Fitzgerald did not review it, the senior administrator responsible for student affairs across the entire university allowed her direct subordinate to impose an unprecedented restriction on a student's liberty without any supervisory oversight. Thompson CC'd Fitzgerald on the NCO email. (¶170.) The email arrived on Fitzgerald's desk before it arrived on Plaintiff's. Under either alternative, Fitzgerald failed the supervisory duty her position imposed. The No Contact Order was the first ever issued to a law student at USD. An unprecedented action by a

*JACKSON v. USD, et al.*

subordinate is precisely the category of decision that requires supervisory review. Fitzgerald provided none.

## E. The Aftermath (March 28 - April 16, 2024)

173.    On the morning of March 28, 2024, Plaintiff reported to Thompson that an associate of Fuerst had conducted surveillance of Plaintiff's social media. Plaintiff identified the associate as Kylie Sheard, who had visited Plaintiff's public livestream the previous evening. Plaintiff documented that immediately after being detected, Sheard made her Instagram account private and removed the link to her website. Plaintiff documented that Sheard's Facebook profile showed connections to Fuerst's family members, Jacob Fuerst and Melanie Fuerst. Plaintiff requested clarification on whether this surveillance constituted a violation of the No Contact Order, which prohibited contact "through friends or other people" and by "any other means."

174.    That same morning, Plaintiff emailed Professor Moore requesting Zoom access to attend his Constitutional Law class. Plaintiff explained that a No Contact Order had been issued and that she had safety concerns about attending in person. Moore responded that his class was offered in person and that Zoom attendance had only been offered for anticipated inclement weather. Moore wrote: "Your request does not fall within these categories." (Ex. 8.)

175.    Eighteen minutes later, Plaintiff responded: "For legal reasons, I cannot discuss what is happening, but I ask for accommodation within reason." Moore never responded. He did not ask clarifying questions. He did not contact Disability Services. Mays denied the same Zoom accommodation request on the same day, creating a double denial by two administrators on March 28, 2024. Neither consulted Disability Services. Neither

followed the interactive process. The parallel denials occurred the day after the attack, connecting the accommodation denial to the retaliatory sequence rather than an independent academic decision. The accommodation memo Moore received on January 10, 2024 instructed: "If after talking to the student you need further clarification, please contact our office." Moore did not follow this procedure.

176.    Either Moore read the accommodation memo he received on January 10, 2024, or he did not. If Moore read the memo, he knew Plaintiff was a registered student with disabilities, he knew the memo instructed him to contact Disability Services if clarification was needed, and he denied Plaintiff's March 28 Zoom request without following that instruction, without contacting Disability Services, and without engaging in the interactive process. If Moore did not read the memo, he received a confidential disability accommodation letter from the university's Disability Services office, copied to the Disability Services Coordinator, and disregarded it entirely. Under either alternative, Moore denied a disabled veteran's accommodation request the day after the coordinated attack without taking the single step the memo required: contacting the office designated to assist. The memo's instruction was not advisory. It was printed on every accommodation letter issued by USD Disability Services. Moore offered the identical accommodation to his entire class on January 7, 2024, for anticipated weather. (¶74.) On March 28, the only variable that had changed was that Plaintiff had been targeted by three institutional offices the previous day.

177.    That same morning, at 7:52 AM, Plaintiff emailed Mays requesting Zoom access to attend classes, citing a legal matter. At 8:01 AM, Mays responded: "Let me know if you encounter any issues." Two minutes later, at 8:03 AM, Mays sent a second email:

"I'll still follow up on this to determine what is happening to determine whether this is a request that should be granted." Mays acknowledged the request required a determination. She did not contact Disability Services.

178.     At 9:54 AM, Plaintiff emailed Mays: "A student has escalated matters to a No Contact Order via Title IX. I am represented by counsel, however, based on the current environment, zoom attendance is now warranted." Mays now knew the NCO had been issued, Plaintiff had retained counsel, and Plaintiff was requesting Zoom as a disability-related accommodation in light of changed circumstances. At 11:44 AM, Plaintiff forwarded Moore's denial to Mays: "I was unable to receive a zoom option from Professor Moore once I disclosed a legal issue. I subsequently missed class." At 3:10 PM, Plaintiff wrote: "We are close to close of business. I need a response."

179.     At 3:13 PM, seven hours after her first response and five hours after she wrote she would "determine whether this is a request that should be granted," Mays denied. Mays wrote: "It is entirely possible for the two of you to peacefully co-exist within the law school and without ever speaking or writing or electronically communicating with one another." Mays concluded: "Thus, based upon the language and intent of the no-contact order, attendance by zoom for the remainder of the school year is not warranted. Your request to do so is denied." Mays cited the No Contact Order, a speech-suppression instrument issued the previous day by a different office, as the basis for denying a disability accommodation. At no point during the seven-hour evaluation did Mays contact Disability Services Coordinator Karen Gerety, whose office had issued Plaintiff's accommodation memo and whose instructions required consultation. Mays evaluated for

seven hours without once consulting the office responsible for disability accommodations, and denied using a speech-suppression instrument as the justification.

180.    On March 28, 2024, at 9:29 AM, Thompson emailed Plaintiff regarding the No Contact Order. Thompson did not identify the source of any complaint. Thompson did not identify any allegation. Thompson stated: "I am not charging you with any policy violations. I am simply wanting to talk." Thompson offered meeting times and described her purpose as wanting to "wave a white flag." In the same email, Thompson limited Plaintiff's right to effective representation. Thompson wrote: "The advisor is limited to advising the student directly, and is not permitted to speak to anyone else, or participate directly, in any hearing." Thompson then stated that "an advisor's availability is not considered in scheduling meetings." The official who issued an unprecedented No Contact Order without notice, without an allegation, and without a factual basis then restricted the accused student's right to effective representation and indicated that counsel's availability would not delay the proceeding.

181.    Thompson's invocation of the Student Code's advisor limitation was procedurally inconsistent. The advisor limitation provision applies to formal hearings under the Student Code. Thompson had stated in the same email: "I am not charging you with any policy violations." An official who invokes a hearing-stage procedural limitation in a proceeding she characterizes as pre-charge and pre-investigation applies the Code's restrictions against the accused while disclaiming its protections.

182.    In the same email, Thompson dismissed Plaintiff's Sheard surveillance report. Thompson stated that Fuerst's associate watching Plaintiff's public livestream was not an NCO violation: "This does not mean that an associate of Ms. Fuerst cannot watch a

livestream that you have publicly posted." Thompson stated that a violation would only occur if the associate had "messaged you on the livestream regarding Jennie." Thompson issued the No Contact Order against Plaintiff on March 27 based on no identified allegation, no factual determination, and no evidence of contact. When Plaintiff reported documented surveillance by the other party's associate, surveillance followed by immediate evidence destruction, Thompson required proof of direct messaging before she would act.

183.    In the same email, Thompson refused to assist with Plaintiff's request to complete the semester remotely via Zoom. Thompson wrote: "I do not have any part in assisting with classroom accommodations, including a transition onto Zoom, but I hope for your sake that Dean Mays can help you resolve this." Thompson directed Plaintiff to the same Associate Dean who had solicited the complaint against Plaintiff on March 4, 2024. The official who created Plaintiff's campus safety concern through the NCO refused to mitigate it and directed Plaintiff to the administrator who had orchestrated the underlying proceeding.

184.    At 10:01 AM on March 28, 2024, Plaintiff emailed Thompson documenting the immediate harm. Plaintiff described being afraid to come to campus and explained the racial dimension of the harm, noting that being falsely associated with police removal "is a death sentence for Black people." Plaintiff documented that the coordinated attack had damaged her character and fitness for practice and required amendment of her transfer applications.

185.    Within seven hours on March 28, Thompson described the same proceeding three different ways. At 9:29 AM, Thompson said she was "simply wanting to talk" and did not

*JACKSON v. USD, et al.*

mention Fuerst. At 3:34 PM, Thompson attributed the proceeding to "the complaint that my office received from Ms. Fuerst." At 4:30 PM, Thompson provided a third explanation: "Title IX had received the initial report and determined that the interactions between you and Ms. Fuerst do not qualify under Title IX criteria, meaning that they referred the case to SRR." Thompson added: "as this is still a pre-investigation matter, there is no 'allegation' that has been determined." Plaintiff identified the contradictions in real time, writing: "First you said this was a referral by Title IX, now you're saying Ms. Fuerst complained. Is this a Title IX investigation? What is the allegation?" An official who provides three mutually inconsistent explanations for an adverse action within seven hours does not have a coherent basis for the action.

186.     On March 28, 2024, Plaintiff emailed Merkle requesting the evidence supporting the NCO: "I was notified by Director Thompson of your recommendation for a no contact order. The order did not come with any accompanying evidence or claims." Merkle did not respond that day. On March 29, 2024, Merkle responded: "There is no evidence to offer you at this time." Merkle then wrote: "all of this will be done through the office of Student Rights and Responsibilities, not Title IX." Merkle confirmed three facts in this exchange. First, the NCO was issued on Merkle's recommendation, not Thompson's independent initiative. Second, no evidence supported the restriction at the time it was imposed. Third, Merkle formally routed Plaintiff's complaint away from the Title IX/EEO framework Merkle was designated to administer and into Thompson's conduct office, the same office that had issued the NCO against Plaintiff the previous day. The routing ensured that Plaintiff's complaint about the coordinated attack would be evaluated by the office that participated in it.

187.     The threat to Plaintiff's safety was severe enough that Plaintiff's father contacted private security companies about hiring a personal bodyguard for Plaintiff while she attended USD. A parent does not investigate protective security for an adult child attending law school unless the circumstances are extraordinary. The attack, the false rumors of police removal, the No Contact Order, and the hostile campus environment created conditions in which Plaintiff's family reasonably believed her physical safety was at risk. Plaintiff spent the entirety of the Spring 2024 semester in a state of hypervigilance. She used police escorts on two occasions to enter the law school building because she feared someone would call the police and have her removed, given the false rumors circulating among students that Plaintiff had been escorted out by police. Severson engaged in deliberate provocations, on one occasion sitting near Plaintiff and speaking to another classmate while repeatedly glancing back at Plaintiff to gauge her reaction. Plaintiff could not focus on her studies. She entered the building worried about her physical safety, attended classes while simultaneously defending against three active proceedings, and spent her evenings responding to misconduct charges and LSAC accusations instead of studying. Between classes, Plaintiff sat in her car in the parking lot rather than remain inside the building. After vacating her carrel in early March, Plaintiff returned to the basement study area only two or three times for the remainder of the semester. A law student who sits in her car between classes because she does not feel safe inside her own law school is not receiving the educational experience the institution promised.

188.     The academic consequences were measurable. Plaintiff had been certified in good academic standing on March 27. By the end of the Spring 2024 semester, her grades had

fallen substantially. A student who entered the semester in good standing left it with grades that reflected not her academic ability but the impossibility of performing academically while simultaneously fighting for her professional survival. The institution that certified her in good standing in March destroyed her ability to maintain that standing by April. Plaintiff stopped participating in class discussions entirely to avoid any interaction that could be characterized as confrontational, aggressive, or grounds for additional charges. The institution deprived Plaintiff of the participatory educational experience it had promised. Plaintiff was alone in South Dakota, a thousand miles from family, in a state with no meaningful support network. Because no one inside the institution would help her, and because Plaintiff is the principal of The Jackson Agency, a professional talent agency oriented toward civil rights and social justice advocacy, Plaintiff used her professional social media platform to document what was happening and to let people who cared about her know she was in danger. The same social media activity the institution targeted as misconduct was the only mechanism Plaintiff had to ensure that someone outside the institution knew what was being done to her.

189.     The institution deployed its safety apparatus against the person being surveilled, not the person doing the surveilling. Fuerst conducted months of real-time monitoring across four of Plaintiff's social media platforms, compiled over twenty files of screenshots and screen recordings, placed dismantled display materials on Plaintiff's desk uninvited, and appeared at Plaintiff's isolated testing room window during a final exam. Thompson stated that Fuerst received the same No Contact Order. During the six days the NCO was in effect, Fuerst's surveillance and evidence compilation continued without enforcement. No administrator told Fuerst to stop monitoring Plaintiff's social media, to

stop submitting evidence to build a prosecution the complainant herself acknowledged had no grounds, or to stop approaching Plaintiff's workspace. The institution exhausted its protective process on restricting the target rather than the threat.

190.    Fuerst's evidence compilation followed a consistent methodology: extract fragments of Plaintiff's speech from their original context, strip away meaning and tone, and present the fragments as evidence of threat or instability. In one video, Plaintiff used African American Vernacular English to make a wry observation about Dean Mays's institutional loyalty. Fuerst extracted a colloquial phrase from this culturally specific expression, stripped it of tone, context, and meaning, and submitted it as if it were a literal threat of violence against an administrator. Fuerst's reframing converted protected cultural expression into fabricated evidence of dangerousness. This methodology of decontextualization pervaded Fuerst's entire twenty-plus file dossier: screenshots cropped to remove context, screen recordings capturing only selected fragments, and highlighted transcript excerpts stripped of the surrounding conversation. Every item in the dossier was curated to construct a narrative of threat from speech that, in context, was commentary, humor, or frustration. The same methodology appeared in Ulrich's LSAC referral.

191.    On April 2, 2024, Plaintiff met with Thompson. Plaintiff lawfully recorded the conversation pursuant to South Dakota's one-party consent statute, S.D. Codified Laws § 23A-35A-20.

192.    Thompson stated: "It is my opinion in what I have seen so far in this investigation that a policy has not been violated." The official who issued the No Contact Order, six

days after issuing it, confirmed that the conduct prompting the Order did not violate any USD policy.

193. Thompson stated: "So, my attempt to get you into my office was just to ask you to stop talking about Jennie in the videos." The No Contact Order was not issued because Plaintiff posed a safety threat or violated a conduct policy. It was issued to compel Plaintiff to stop speaking about Fuerst in her social media posts.

194. Thompson stated: "Right, like you said, freedom of speech. I don't have any way of policing what you're saying on video online." The official who issued the No Contact Order acknowledged she lacked authority to regulate the speech she was attempting to regulate.

195. Thompson stated the No Contact Order was "meant to be a pre-investigation thing, pre any technical charge/allegation being determined." Thompson restricted Plaintiff's liberty before any determination that misconduct had occurred.

196. Thompson stated: "Frankly, I don't think no-contact orders ever have been sent to a law student." Thompson confirmed the Order was unprecedented and described the process as designed for "18-year olds who are fighting and gossiping."

197. When Plaintiff suggested that the No Contact Order process had been "weaponized" against her, Thompson agreed. The official who issued the Order acknowledged that the process she administered had been used as a weapon rather than a protective measure.

198. Thompson confirmed the parties had no history of contact: "From my understanding, you and Ms. Fuerst have not really spoken in person to one another."

199.     Thompson stated her intention had been to meet with Plaintiff so she "could literally give you that, you know, let's play nice speech" and then "remove the no contact order." The NCO was issued to compel Plaintiff's attendance at a meeting.

200.     When Plaintiff characterized the coordinated institutional response as weaponization, Thompson agreed: "Yeah, I agree. No, I agree. I agree."

201.     Thompson stated: "I'm still trying to figure out how not to do damage to you." This statement was made after Thompson had already issued the No Contact Order, reported Plaintiff to University Police and the Dean of Students, and participated in the March 27 coordination.

202.     Thompson described the coordination that produced the March 27 attack: "it started as one person talking to another person and then it's just kind of continued to get forwarded on to people for someone else to deal with."

203.     Thompson lifted the No Contact Order on April 2, 2024, the same day she made these admissions. If the Order had been justified by genuine safety concerns, Thompson would not have lifted it based solely on her own determination that no policy was violated.

204.     USD's exclusion of the EEO framework from Plaintiff's available remedies was not a single misstatement. On April 2, 2024, Plaintiff visited Merkle's office to ask about available complaint avenues. On April 3, 2024, USD's Director of EEO responded by email, describing two options: "Title IX Office handles Harassment/Discrimination/Interpersonal Violence/Stalking" and "Behavioral concerns are handled by a Human Resources partner." USD's designated EEO Coordinator did not identify SDBOR Policy 1.4.3, the Human Rights Complaint Procedures, as an available

*JACKSON v. USD, et al.*

avenue. Under SDBOR Policy 1.4.3, Section 7, the EEO Coordinator is "responsible for administering a centralized complaint filing system" for discrimination complaints. The official USD designated to administer that system did not disclose it to the student asking how to file.

205.　On April 3, 2024, seven days after the coordinated attack, Professor Gregory Brazeal taught a Criminal Law class on police use of force. The class covered the Brianne King traffic stop in Austin, Texas in 2015, the Ferguson DOJ investigation, and 42 U.S.C. § 1983 civil rights claims. Brazeal set the conditions for respectful dialogue before any student spoke, asking students to "approach each other with compassion." Despite the professor's disclaimer, Tina Barnes interjected with comments placing responsibility on the Black woman being stopped rather than the officer who escalated, stating King should have known she was "of interest." A fellow student cautioned the class about language and phrasing. Brazeal affirmed. Plaintiff then addressed the class, providing substantive context about the historical experience of Black Americans with police, stating: "You have so many black people who have been murdered that exist in hashtags right now where they did comply and they were murdered. So let's not use the language of, well, she should have just stopped and she should have just complied." Barnes interrupted. Plaintiff redirected. Rodney, a Black male student, intervened. A student addressed Barnes by name and told her to stop. Brazeal redirected. Despite seven separate interventions from the professor and fellow students, Barnes re-engaged twenty-four minutes later with unsourced statistics about the race of officers involved in shootings.

*JACKSON v. USD, et al.*

206.     At 3:06 PM that afternoon, Brazeal emailed Plaintiff: "I just wanted to follow up from today's class and thank you for chiming in. I hope the class discussion wasn't unnecessarily frustrating. If you have any desire to offer feedback, please feel free to share. But also feel no obligation to do so. I just wanted to express my appreciation for you speaking up." The professor who taught the class, witnessed the entire exchange, and heard every word Plaintiff said thanked her in writing that same afternoon. While the administration was building its case against Plaintiff for her speech, a faculty member was documenting that same speech as valued classroom contribution.

207.     Two students spoke in the same classroom on the same day about the same topic. One, a Black disabled veteran, spoke about the historical experience of Black Americans with police, contributed substantive knowledge, and was thanked by the professor in writing. The other made statements that prompted seven interventions from the professor and fellow students, and returned to the topic after being addressed by name and asked to stop. Upon information and belief, Barnes is from Yankton, South Dakota, twelve miles from Vermillion, where the Ku Klux Klan burned crosses in the 1920s. The institution prosecuted the first student for speech on social media. The institution took no documented action regarding the second student's classroom conduct.

208.     On April 4, 2024, Plaintiff met with Associate Dean Mays. Mays admitted she had been monitoring Plaintiff's social media for months: "I've seen some of your videos. I haven't seen 'em all." Later, Mays elaborated: "I saw some a long time ago." On April 4, 2024, "a long time ago" places Mays's awareness of Plaintiff's protected speech months before the March 5, 2024 email chain that triggered the formal investigation, establishing

that the Associate Dean was monitoring a Black student's social media expression well before the attack.

209.    When Plaintiff asked whether her videos constituted free speech, Mays first acknowledged: "Of course. Free speech is free speech." Mays then immediately recharacterized the protected speech as potential misconduct: "Is it harassment? Is it intimidation or is it bullying? That's exactly what the question is." Mays then applied a professionalism standard: "Is it professional? I'd say no. I'd say it's extremely unprofessional behavior." The Associate Dean acknowledged the constitutional protection and substituted a professionalism judgment that does not appear in the Student Handbook, the Student Code, or any governing policy.

210.    During the meeting, Plaintiff described Thompson's reaction to learning Plaintiff intended to transfer. Plaintiff told Mays that Thompson expressed satisfaction and stated she would document Plaintiff's transfer intention in her notes. Mays did not express concern that a USD administrator was treating a student's forced departure as a desired institutional outcome. Instead, Mays later in the same meeting advised Plaintiff to complete transfer applications. Two administrators, one who had issued the No Contact Order and one who had solicited the complaint, both treated Plaintiff's departure as a positive development rather than a failure of institutional responsibility.

211.    During the same meeting, Mays constructed the interpretive framework that connected the Bible verse to Severson's complaint. When Plaintiff mentioned the Bible verse, Mays stated: "There's only one pastor's wife here, Tiauna." When Plaintiff denied the video was directed at Severson, Mays pressed: "because she was the gossip person. And you're telling her through that screen... That she's not behaving in a Christian-like

*JACKSON v. USD, et al.*

way." When Plaintiff challenged Mays's interpretation, Mays admitted: "I made an incorrect assumption about the motivation for your behavior." The Associate Dean who solicited the complaint that launched the prosecution also constructed the evidentiary interpretation that sustained it, then admitted the interpretation was wrong, in the same meeting.

212.    Mays directed Plaintiff to stop posting videos, telling Plaintiff that her posts and videos were not moving her closer to her goals, and to "check yourself, self-assess." When Plaintiff noted that defendants were recording the videos regardless and that taking them down would not change the past, Mays responded: "Today is a new day." The implication was explicit: cease posting and the institution would treat Plaintiff differently going forward. Mays's directive identified Plaintiff's constitutionally protected speech as the conduct Mays wanted stopped and conditioned favorable treatment on its cessation.

213.    Plaintiff articulated the institutional catch-22 directly to Mays during the meeting. Plaintiff stated that if the misconduct charges resulted in findings, she would not have a clean letter of good standing and could not transfer, the only avenue of escape from the institution conducting the prosecution. Mays did not dispute this analysis. Mays did not offer to expedite the proceedings, did not suggest the charges could be resolved before transfer deadlines, and did not acknowledge that the institution's own actions had created the trap Plaintiff was describing.

214.    Plaintiff told Mays about the LSAC complaint and stated: "Everyone's upset with me over the YouTube video." Mays did not dispute this characterization. When Plaintiff began to explain that she had amended her application during orientation after the character and fitness presentation, Mays immediately interjected: "Judge Sabers." Mays

knew the judge who presented on character and fitness at orientation. Mays knew the presentation invited students to amend their applications. Mays knew the amendment process existed. Despite this knowledge, when Plaintiff said she had amended her record, Mays responded: "Let's assume. And I'm not saying it is because I don't know, but let's assume that this is absolutely what happened, that this is accurate and there's information sitting in a file over there, and all we have to do is go pull the information out of the file." The Associate Dean framed a verified amendment as a hypothetical requiring assumption. She admitted she had not checked. She described the file's physical location in the building and the single step required to verify it. She did not take that step. Instead, she directed Plaintiff to send the documentation to her. Ulrich had filed fraud accusations with LSAC eight days earlier. The institution's Associate Dean could name the judge who administered the amendment process at orientation. The file was in the same administrative suite. No one pulled it.

215.    Plaintiff summarized her understanding of what Mays was proposing: "So take my social media down, take my licks on the misconduct, and I might be able to get out of here with a letter, clean letter." Mays did not reject this characterization. Instead, Mays told Plaintiff to stop posting while simultaneously attempting to disclaim institutional authority, stating she was speaking personally, not on behalf of the institution. Moments later, Mays reversed that disclaimer, describing her directive as an institutional response in her capacity as associate dean. The exchange constitutes a quid pro quo: cease constitutionally protected speech in exchange for favorable institutional treatment.

216.    Mays did not check the file to verify the amendment. Instead, Mays directed Plaintiff to forward the letter of good standing to Mays herself, placing the burden on the

accused student to disprove the accusation the institution should have verified before filing. Plaintiff forwarded the letter of good standing to Mays that same day. The next day, Plaintiff obtained a copy of the complete amendment documentation. Five days after Plaintiff provided Mays with the letter of good standing, Ulrich withdrew the LSAC complaint on April 9. The institution did not discover the amendment through its own records. It discovered the amendment because the student it was prosecuting told the Associate Dean in a meeting, and the Associate Dean relayed the information to the admissions office. The chain (Plaintiff informs Mays on April 4, Mays receives the letter of good standing that same day, Ulrich withdraws on April 9) establishes that Mays was the conduit between the student's disclosure and the withdrawal of the complaint, and that the institution had no independent verification process in place.

217.    When Plaintiff referenced the No Contact Order and told Mays that Thompson had admitted it was issued to force a meeting rather than address any safety concern, Mays responded: "Emma Thompson you're talking about now?" Mays had cited the No Contact Order on March 28, 2024, seven days earlier, as the basis for denying Plaintiff's disability accommodation to attend class via Zoom. Mays either investigated the Order before citing it to deny accommodations (in which case she knew who issued it and feigned ignorance) or she denied a disability accommodation based on an order whose source and basis she never reviewed. Either path establishes liability.

218.    Later in the meeting, Plaintiff raised the racial dimension of USD's response. Plaintiff described being characterized as an "angry Black woman" for exercising the same right to speak that white students exercised without consequence. Mays responded: "Life ain't fair. It's not fair. People are going to talk about you. People are gonna say

things about you that aren't true. That's a function of human beingness." The Associate Dean's response to a Black student reporting racial stereotyping in a formal meeting was to tell her that unfairness is an inherent condition of life. Mays then told Plaintiff that "that is not what happened," that Plaintiff was not simply sitting there when people started calling her an angry Black woman. When Plaintiff asked, "Okay, so what happened?" Mays responded: "You're posting, you're posting all this stuff and you're saying all this stuff. That's what happened." This is a direct causation admission. The Associate Dean identified Plaintiff's constitutionally protected speech, and nothing else, as the cause of every adverse action USD had taken against her.

219.    Later in the meeting, Plaintiff told Mays directly: "They were trolling my social media and messing with me back then," referring to the Fall 2023 semester. Plaintiff reported that the surveillance of her social media predated the Black History Month display by months. Mays did not deny this. Mays did not express concern. Mays did not ask who was trolling or what form the harassment took. The Associate Dean received a contemporaneous report that students had been surveilling and interfering with a Black disabled veteran's social media since Fall 2023 and took no action.

220.    Plaintiff stated: "It's kind of hard when Neil mad at me. He sicked Katey on me." Plaintiff continued: "That Katey didn't come out of nowhere." Mays did not deny that Fulton directed Ulrich's LSAC complaint. Mays deflected, suggesting Plaintiff had not spoken to the Dean directly and encouraging her to do so. When Plaintiff asked whether she needed to remove all of her social media, Mays laughed. The following day, April 5, 2024, Mays forwarded the good standing certification and amendment to Carlisle with the subject line: "RE: Elevate your game at Oregon Summer Sports Law Institute."

*JACKSON v. USD, et al.*

221.     During the April 4, 2024 meeting, Plaintiff raised Fuerst's prior written statement that if Plaintiff were allowed to attend classes via Zoom, Plaintiff would become "even angrier" and "come to the school and attack" Fuerst. That email had been sent to Mays. Mays had received it and responded to it. When Plaintiff told Mays she had not received Mays's response to Fuerst's attack prediction, Mays said: "I don't know how much they gave you. I know what exists, but I know they gave you that particular email, but I don't know how much of it you have." Mays then confirmed: "So you have no idea then what I said or what I did or what my perspective was with her." These admissions establish three things. First, Mays held a working inventory of the communications surrounding the investigation: she distinguished between what existed and what Plaintiff had received. Second, Mays was actively tracking what had been disclosed to the investigation's target: she knew which specific email Plaintiff had and which she did not. Third, Mays's own response to Fuerst's physical threat prediction, the document bearing directly on whether any administrator credited or discredited the threat allegation used to justify three simultaneous adverse actions, was never among the documents provided to Plaintiff throughout the seven-month prosecution. A supervisor who knows precisely what was produced to the investigation's subject is not a passive administrator. She is a principal in the disclosure apparatus. The content of Mays's response to Fuerst remains unproduced.

222.     On April 4, 2024, Professor Moore emailed his students, including Plaintiff, requesting favorable course evaluations. Moore wrote that evaluations are reviewed by "the Dean and other administrators outside of the law school for tenure/promotion purposes." Seven days after refusing to respond to Plaintiff's accommodation request, Moore asked that same student to help advance his career. (Ex. 8.)

223.    During the Spring 2024 semester, Plaintiff visited Moore's office hours to discuss the Political Question doctrine, a foundational concept in constitutional law. Moore told Plaintiff he could not discuss the topic because he had not yet prepared his lecture notes, although the lecture was scheduled two days later. Plaintiff described the exchange on social media as an example of the quality of instruction at USD. On April 5, 2024, the day after soliciting tenure evaluations from his students, Moore asked the class to identify what constitutional law concept *Marbury v. Madison* involved. Moore looked directly at Plaintiff after posing the question. The Political Question doctrine was the subject Plaintiff had criticized Moore's preparation for on social media. A professor who told a student he could not discuss a foundational doctrine because he was unprepared, who then became aware that the student had criticized that fact publicly, who then solicited the student's favorable tenure evaluation, and who then directed a question at the student on the exact topic she had criticized, engaged in targeted classroom retaliation for protected speech. Moore never communicated with Plaintiff again after March 28 for the remainder of the semester. Plaintiff's Constitutional Law professor ignored her existence for the final two months of the course while simultaneously seeking her assistance in advancing his career.

224.    On April 9, 2024, Plaintiff met with Merkle in person to discuss the Moore complaint. During the meeting, Merkle asked: "Is your Exhibit A from Karen Gerety?" identifying the Disability Services Director by name upon seeing the accommodation memo. Merkle confirmed that Moore had denied Plaintiff's Zoom accommodation: "Then he refused to allow you to attend... Right." Merkle heard firsthand from Plaintiff that Moore denied the accommodation and went silent. When Plaintiff described Mays's

same-day denial, Merkle responded: "Oh, why?" The EEO Coordinator whose office recommended the No Contact Order on March 27 did not know, or professed not to know, that the Associate Dean had used the NCO to deny a disability accommodation. Merkle now had direct notice that both Moore and Mays had denied accommodations to a disabled student on March 28, 2024, the day after the coordinated attack. Merkle did not contact Disability Services. Merkle did not initiate the interactive process. Merkle did not refer the accommodation denials for corrective action.

225.        During the same meeting, Merkle narrowed the jurisdictional scope of her office. When Plaintiff described Moore's conduct, Merkle asked: "do you think he did that because of any of the protected class?" Under SDBOR Policy 1.4.3, no showing of discriminatory intent is required at intake; the policy requires only an allegation of discrimination on a protected basis. Merkle imposed an intent threshold that the policy she administered did not require. Merkle then further narrowed: "if something was happening specifically only to you, then Yes, it would be my case." Merkle conditioned jurisdiction on individual targeting, excluding the possibility of disparate impact, which is independently actionable under Policy 1.4.3. Merkle then conceded the complaint fell within her jurisdiction: "your accommodation is specific to you, and that's a disability." Despite this concession, Merkle then disconnected the Zoom denial from disability altogether: "And the Zoom accommodation is not relevant necessarily to disability. It's more of a special circumstance." The EEO Coordinator told a disabled student that the accommodation she needed was not a disability issue. The Zoom request arose because the NCO, issued on Merkle's own office's recommendation, made campus attendance

unsafe. Merkle's office created the condition requiring the accommodation and then told Plaintiff the resulting need was not disability-related.

226.     During the same meeting, Merkle verbally identified the correct regulatory framework. When Plaintiff asked about the applicable university policy, Merkle stated: "under our human rights complaint procedures" and identified the policy number: "It's 1.4." Merkle continued: "this is the university protective class policy." When Plaintiff confirmed the disability basis, Merkle responded: "Disability. So, got it. Both of them would be university policy." Merkle identified SDBOR Policy 1.4, the Human Rights Complaint Procedures, by name and number, described it as the university's protective class policy, confirmed it covered disability, and stated that both of Plaintiff's claims fell under it. Merkle then described the process her office would follow: she would accept a statement and exhibits from the complainant, notify the accused, assign an investigator to interview the accused, receive the investigation results, and determine whether the complaint met the "reasonable" threshold. If it did, Merkle would work with the accused's supervisor to determine the appropriate response, which "could be any gamut of outcomes" including work improvement plans, effects on tenure, or termination. Merkle walked Plaintiff through the Policy 1.4.3 complaint process in a meeting on the same day Plaintiff filed her written complaint citing Policy 1.4.3 three times. Merkle knew the framework. She described the framework. She never applied it. Every complaint Plaintiff filed through Merkle's office was processed under Policy 1.4.1.

227.     During the same meeting, Merkle narrowed the definition of retaliation below the threshold in the policy she administered. When Plaintiff described the March 27 coordinated attack as retaliation, Merkle responded: "Typically retaliation has to do with

a violation of an initial policy." Under SDBOR Policy 1.4.3, Section 8, anti-retaliation protections apply to any person who brings a complaint of discrimination. They do not require a finding that the complainant first established a policy violation. Merkle was coaching the student that the retaliation claim might not meet a threshold narrower than the one in her own policy. When Plaintiff told Merkle that Thompson had admitted the No Contact Order was issued to compel a meeting rather than address any safety concern, Merkle responded: "Oh, is that what Emma said?" and laughed. The EEO Coordinator learned that a colleague had admitted using an institutional process to suppress a student's speech and responded with amusement rather than institutional concern. Merkle did not offer to investigate Thompson's admission. Merkle did not refer the matter to any oversight mechanism.

228.    Either Merkle knew that Plaintiff's complaints fell under SDBOR Policy 1.4.3, the Human Rights Complaint Procedures governing race and disability discrimination, or she did not. If Merkle knew, she processed every complaint Plaintiff filed under a different framework, Policy 1.4.1, foreclosing Plaintiff's access to the three-day meeting requirement, the mandatory appellate path to the institutional president and Board of Regents Executive Director, and the anti-retaliation protections that Policy 1.4.3 specifically provides for discrimination complainants. If Merkle did not know, then USD's designated EEO Coordinator, the official the Board of Regents appointed to administer the centralized discrimination complaint system under Section 7 of Policy 1.4.3, could not distinguish between the two complaint frameworks she was hired to administer. Under either alternative, Plaintiff's race and disability complaints never received the procedural protections the Board of Regents designed Policy 1.4.3 to

provide. Merkle identified the correct framework by name and number during the April 9, 2024 meeting: "under our human rights complaint procedures," "It's 1.4," "Disability. So, got it." (¶225.) Merkle's own May 14, 2024 email acknowledged that complaints involving "race, disability, retaliation and collusion" fell under Policy 1.4.3. (¶320.) The correct framework was identified twice, in a meeting and in writing. It was applied zero times.

229.    On April 11, 2024, Plaintiff's attorney Sarah Baron Houy of Bangs, McCullen, Butler, Foye & Simmons, L.L.P. responded to Miller's Examiner Notice. The letter stated the allegations were "threadbare, making it difficult to respond." A true and correct copy of Attorney Baron Houy's response is attached hereto as Exhibit 5. Attorney Houy noted that Plaintiff "never makes any direct threat to Ms. Fuerst" and that Plaintiff's statements were "made in an effort to defend herself and explain why she feels she was the target of discriminatory and harassing conduct." The letter noted that Plaintiff's videos were not sent directly or privately to anyone; they were available to anyone who followed Plaintiff's social media accounts. Public commentary on a public platform about a matter of public concern is not targeted harassment. The letter requested dismissal.

230.    Miller did not dismiss the complaint. After Plaintiff's attorney raised a First Amendment defense and demanded dismissal, Miller continued building the case rather than evaluating the defense. Miller's own investigation file contained the Mays-Fuerst text exchange in which Mays solicited the complaint and Fuerst responded that she could identify "no grounds." Attorney Baron Houy identified this exchange from materials Miller himself produced as Examiner. (Ex. 5.) The supposedly neutral Examiner

possessed direct evidence that the complaint was solicited by an administrator and filed without basis, and continued prosecuting.

231.     On April 11, 2024, Plaintiff filed a misconduct complaint against Fuerst with Miller. The filing email was CC'd to Disability Services Coordinator Karen Gerety and Director of EEO/Title IX Coordinator Merkle. The complaint explicitly alleged "discrimination based on disability." Gerety's office had issued Plaintiff's accommodation memo on January 10, 2024, certifying Plaintiff's disabilities and determining her eligibility for accommodations. From April 11 forward, Disability Services had direct notice that a disabled student under its care was under active misconduct prosecution and was alleging disability discrimination in the same proceedings. Upon information and belief, Disability Services took no action to ensure Plaintiff's approved accommodations were maintained during the prosecution, took no action to intervene when Moore and Mays denied accommodations on March 28, and took no action to ensure that the institutional proceedings did not interfere with Plaintiff's disability-related educational access.

232.     On April 12, 2024, Plaintiff filed a Code of Conduct complaint against Fuerst with Thompson's Student Rights and Responsibilities office. Plaintiff's complaint cited six specific provisions of the Student Code of Conduct, including Section 2.5.1 (Discrimination), Section 2.5.2 (Retaliation), and Section 2.8.1 (Violation of Board of Regents or Institutional Policies). Plaintiff identified BOR Policy 1.4.3, the Human Rights Complaint Procedures, by name and described the conduct as racial harassment, racial discrimination, and retaliation for protected speech. Thompson responded that the complaint fell "within Title IX criteria for the basis of a Human Rights Violation

investigation, especially with the complaint regarding harassment/discrimination/etc. on the basis of race." Plaintiff responded: "I was wondering what would make it a Student Conduct Violation? I used the manual you gave me and cited all of the violations." Thompson declined to process the complaint through SRR and referred Plaintiff to Merkle. Thompson acknowledged that "the racially-driven intention is being questioned," confirming the racial character of the complaint was an active institutional inquiry. Thompson addressed the BOR policy violation charge Plaintiff had cited under Section 2.8.1: "The Violation of BOR/institutional policies is a broad charge that could technically be applied to any charge, but I've never felt that this was necessary." No administrator at USD had ever applied the framework Plaintiff correctly identified. That same afternoon, at 1:34 PM, Merkle requested access to Plaintiff's evidence file on the institutional SharePoint platform. At 5:04 PM, Merkle emailed Plaintiff: "The preparation of the case file took a bit longer than expected. Notification will go out next week. I do apologize." The EEO Coordinator was simultaneously accessing the complainant's evidence and building the institutional case file.

233.    In the same April 12 email, Thompson described SRR's jurisdictional scope: her office would only address harassment or retaliation allegations "if they related to a classroom (teacher-student based) or another lower-level based incident where a verbal warning would likely be the only outcome of an initial incident." Sixteen days earlier, on March 27, Thompson's SRR office issued the first No Contact Order ever imposed on a USD law student, restricting Plaintiff's campus access and requiring amendment of her transfer applications. When Fuerst's complaint arrived at SRR on March 27, Thompson deployed the most severe measure in her office's history within hours. When Plaintiff's

complaint arrived at SRR on April 12, citing six Student Code provisions from the manual Thompson herself had provided, Thompson said her office only handles verbal warnings for lower-level incidents and referred Plaintiff to Merkle. Merkle dismissed the complaint twenty-eight days later because Fuerst had graduated. Fuerst herself had written on March 4, 2024, in response to Mays's solicitation, that she could not find grounds for a complaint. Thompson's office accepted that groundless complaint, issued the most severe measure in its history within hours, and maintained the proceeding for six days before Thompson lifted it upon determining no policy had been violated.

234.    At 2:54 PM on April 12, Thompson corrected herself: "That is my mistake, I definitely misled you with my original response." Thompson then explained that Title IX and SRR both take "jurisdiction" over certain violations, and that SRR would only address harassment or retaliation "if they related to a classroom (teacher-student based) or another lower-level based incident where a verbal warning would likely be the only outcome." The official who administered the most severe restriction in SRR's history against Plaintiff described her own office's standard remedy as "a verbal warning" for "lower-level" incidents. Thompson's characterization of her office's authority is irreconcilable with the action her office took against Plaintiff. Either the NCO was within SRR's normal authority, in which case Thompson's description of that authority as limited to verbal warnings was false, or the NCO exceeded SRR's normal authority, in which case Thompson deployed an extrajurisdictional measure against a student for conduct she would later admit violated no policy.

235.    On April 16, 2024, the second day of final exams, Plaintiff filed a Title IX complaint against Fuerst. That same day, Fuerst was notified of the complaint. That same

day, Fuerst appeared at the window of Plaintiff's testing room during the Constitutional Law final exam. Plaintiff was taking her exam in the visiting faculty office, an isolated room that sits in a hallway with two door entrances, separated from the other study rooms. Signs posted throughout the area read "quiet please, testing." The room assignment was not announced or posted anywhere; Fuerst could not have known Plaintiff's location without actively searching for her. The door to the visiting faculty office was completely out of the normal path of travel through the building. Fuerst passed the testing signs, left the normal path, approached the private room, and looked through the window at Plaintiff during an active exam. No one else witnessed Fuerst's appearance. Fuerst stared at Plaintiff through the window while speaking into her phone.

236.    The intimidation forced Plaintiff to rush through her Constitutional Law final and leave the room. When the exam broke for lunch, Plaintiff went immediately to the Dean's office and reported the incident to faculty secretary Heather. Registrar Teresa Carlisle was out to lunch and unavailable. After Plaintiff turned in her Constitutional Law final, she reported the incident to Carlisle. Plaintiff also emailed Title IX Coordinator Merkle that day to ask whether Fuerst had been notified of Plaintiff's complaint; Title IX confirmed she had been. Fuerst learned of Plaintiff's complaint and appeared at Plaintiff's isolated testing room on the same day. Plaintiff was terrified to return to the same room for her next exam, Civil Procedure. She moved herself to a small study room for protection. Plaintiff recorded a contemporaneous video documenting the incident. In the video description, Plaintiff stated: "she came looking for me. We are actively testing. Who goes to private rooms and looks in windows during exams?! There are signs up everywhere saying quiet please, testing. I'm not safe even during finals."

237.    On April 18, 2024, after Plaintiff provided Merkle with a detailed description of the incident including the physical layout establishing that Fuerst would have had to make a deliberate effort to approach the testing room window, Merkle responded: "Received. I will take appropriate action." Upon information and belief, no No Contact Order, disciplinary proceeding, or other protective measure was imposed on Fuerst as a result of this report. When Fuerst reported Plaintiff's social media posts on March 27, 2024, USD imposed a No Contact Order, appointed an Examiner, and filed an LSAC complaint within hours. When Plaintiff reported Fuerst physically approaching her isolated testing room during a final exam the day after being notified of a complaint against her, USD's Director of EEO promised "appropriate action" and, upon information and belief, took none that produced any protective measure or consequence for Fuerst.

238.    For her next exam, Plaintiff refused to return to the visiting faculty office and instead took the exam in a small study room to ensure her physical safety from Fuerst.

239.    For Plaintiff's next final after Civil Procedure, Carlisle covered the windows of the visiting faculty office with paper and moved Plaintiff to that room. No administrator directed Carlisle to take this step. A staff member independently recognized the threat that Fuerst posed and took protective action that no official in the administrative chain, not Thompson, not Fitzgerald, not Fulton, had ordered. The registrar papered over windows to protect a student during finals because the institution's own complaint and safety processes had failed to do so.

## F. The LSAC Charge and Collapse (April 4 - April 9, 2024)

240.    On April 4, 2024, LSAC issued a formal Charge Letter to Plaintiff, signed by Darren Kettles, Chair of the LSAC Subcommittee on Misconduct and Irregularities in the

Admission Process. A true and correct copy of the Charge Letter is attached hereto as Exhibit 2. The Charge Letter accused Plaintiff of submitting "information that is false, inconsistent or misleading" regarding her "prior law school matriculation" and of having "omitted information that may result in a false or misleading conclusion."

241.   The Charge Letter was signed by Darren Kettles, Chair of the LSAC Subcommittee on Misconduct. Kettles holds no law degree; he holds a bachelor's and master's degree from Rollins College. Under Section 11(a) of the LSAC Rules, if a respondent fails to answer within thirty days, the Chair unilaterally deems misconduct established with no hearing and no appeal. Ulrich, as Director of Admissions at an LSAC member school who processed LSAC data daily, understood the structure, the consequences, and the machinery she was activating.

242.   The Charge Letter explicitly cited Plaintiff's YouTube videos as evidence: "In a since deleted YouTube video, you state, '...I got a better education when I went to Northwestern California University.'" The formal misconduct charge, carrying career-ending consequences, was initiated because Ulrich watched Plaintiff's protected speech and used it as the basis for an accusation she never verified.

243.   Ulrich's referral letter to LSAC (Ex. 3) was constructed using the same decontextualization methodology Fuerst employed in her evidence dossier. The letter cited a screenshot from Plaintiff's video highlighting the hashtag "#transferstudent," quoted a single phrase about Northwestern California University stripped from the surrounding conversation, and ignored the entire substance of the video. Fraud is a legal conclusion with specific elements: intentional misrepresentation of a material fact, knowledge of falsity, and intent to induce reliance. Ulrich does not hold a law degree and

is not competent to make that determination. The institution employed three attorneys already involved in the March 27 coordination: a Dean with a J.D. and nine years as a Federal Public Defender, a General Counsel with a J.D., and a Deputy General Counsel with a J.D. Any of them could have requested the student file, found the August 2023 amendment, and ended the inquiry in minutes. None did.

244.     Plaintiff pleads in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2). If Ulrich acted independently, then she is a rogue administrator who filed career-destroying fraud accusations with a nationwide regulatory body without checking the file, without legal training, without consulting counsel, and without any factual basis beyond screenshots of protected speech. That conduct is reckless, defamatory, and independently actionable. If Ulrich acted at the direction of Fulton, Mays, Franken, or any combination thereof, then the LSAC referral was a coordinated component of the same institutional attack that produced the Examiner Notice and the No Contact Order on the same day, and the directing administrators bear liability for the consequences of the filing they ordered. Under either alternative, Ulrich's conduct is independently actionable. Under the second alternative, the liability of the directing administrators is expanded. The institution's failure to supervise Ulrich is independently actionable under either scenario, because the institution either allowed an untrained administrator to wield an irreversible process without oversight, or directed her to wield it.

245.     The Charge Letter threatened that if LSAC found misconduct, "the documented case will be disseminated by LSAC to all law schools to which you have applied" and "to any other affected person or institution." If Plaintiff failed to respond within thirty days, "your case will be determined by the chair of the LSAC Misconduct and Irregularities in

the Admission Process Subcommittee, with no right of appeal." Ulrich filed knowing that silence from Plaintiff would result in misconduct established by default, with nationwide dissemination and no appellate remedy.

246.    The Charge Letter contained an admission that undermined USD's referral. It stated that in Plaintiff's application to Howard University School of Law, "under question 7.1 Education, which asks: 'List ALL educational institutions attended' you list Northwestern California University School of Law and include a Certificate of Prior Enrollment." LSAC's own investigation confirmed Plaintiff had properly disclosed NWCU on her Howard transfer application. The evidence LSAC cited was evidence of disclosure, not concealment. The document that accused Plaintiff of concealment cited her disclosure as its evidence.

247.    Plaintiff received this Charge Letter while in the second semester of her first year of law school. She was simultaneously defending against the No Contact Order, the Miller disciplinary investigation, and now the LSAC fraud accusation, three concurrent proceedings, each carrying career-ending consequences, all initiated on or triggered by events of March 27, 2024. A first-year law student was balancing a full course load, disability accommodations, and the defense of her professional future on three fronts at once.

248.    Under Section 7(a) of the LSAC Rules, when alleged misconduct implicates LSAC data, transmission of that data "shall be withheld pending disposition" and law schools that have received reports "shall be advised that there may be an error in the data." From March 27 through April 9, 2024, Ulrich's filing triggered an automatic freeze on Plaintiff's LSAT scores, CAS reports, and academic transcripts across the entire

*JACKSON v. USD, et al.*

LSAC system. Every law school holding Plaintiff's credentials received notification of a possible data error. Ulrich, as Director of Admissions at an LSAC-member school who processed CAS reports daily, knew or should have known that filing a misconduct referral would activate this system-wide withholding mechanism. The LSAC referral did not merely create a disclosure obligation. It froze Plaintiff's transfer pipeline at the infrastructure level, independent of any action USD took with recommendation letters.

249.     On April 5, 2024, Plaintiff submitted her written response to LSAC with documentation of her August 3, 2023 amendment and requested a telephonic hearing pursuant to Section 9 of the LSAC Rules Governing Misconduct and Irregularities in the Admission Process.

250.     On April 9, 2024, four days after Plaintiff's response and thirteen days after Ulrich's referral, Ulrich emailed LSAC's Victoria Whitesell requesting withdrawal: "Hi, Vicki! The student has sent us a letter of good standing and addendum for her application. Can we withdraw this referral? If you need a more formal letter, let me know." (Ex. 3.) Ulrich described the letter of good standing and amendment as though they were newly received. They were not. The amendment had been in Plaintiff's file since August 3, 2023. The letter of good standing was certified at 9:01 AM on March 27, 2024, before Ulrich filed the referral.

251.     That same day, LSAC's Victoria Whitesell notified Plaintiff that USD had withdrawn its referral and the charge had been dismissed. Whitesell stated that USD withdrew "because they received your letter of good standing and addendum to your application." USD did not withdraw because Plaintiff's LSAC response persuaded them; under LSAC's rules, USD was not privy to Plaintiff's response. USD withdrew because

Mays, after the April 4 meeting in which Plaintiff told her about the amendment, finally verified what had been in the student file since August 2023. The withdrawal confirms the filing was made without checking the file.

252.     LSAC retains independent investigative authority over misconduct referrals regardless of whether the referring institution withdraws. Under Section 6(b) of the LSAC Rules, LSAC reviewed the record independently and closed the matter the same day USD withdrew. LSAC's file consisted entirely of Ulrich's submission, with no other communications reaching the Subcommittee. An independent professional credentialing body reviewed the evidence and found no basis to proceed. The referral could not survive outside scrutiny.

253.     On February 20, 2026, LSAC confirmed in writing that the materials Ulrich submitted constituted the entire evidentiary record. LSAC further confirmed: "There were no other communications with the Subcommittee in this matter." The entire misconduct proceeding rested on the materials Ulrich assembled from social media posts and application documents, none sourced from Plaintiff's student file.

254.     Ulrich, as Director of Admissions, had no continuing jurisdiction over enrolled students. Her authority extended to the admissions process and ended at matriculation. Plaintiff matriculated in August 2023. The Student Handbook vests post-enrollment disciplinary authority in the Dean and the Disciplinary Procedures, not in the Admissions Office. An admissions director who initiates proceedings against an enrolled student seven months after matriculation is acting outside the scope of her administrative role.

## G. Complaint Processing, Third-Party Confirmation, and Institutional Notice (April 9 - July 24, 2024)

255.    On April 8, 2024, Thompson emailed Plaintiff: "I'm sorry to hear as I know you were looking forward to leaving USD. Maybe the summer break will allow for a fresh start for everyone and your second year can go a bit smoother, assuming that you will return in the fall." Plaintiff had written to Thompson that morning: "due to unforeseen circumstances enacted by the law school, it looks like I will be unable to transfer out now." Thompson knew Plaintiff was seeking to transfer. Thompson knew the law school's actions were preventing the transfer. Thompson did not ask what circumstances the law school had enacted. Thompson did not offer to investigate.

256.    On April 9, 2024, Plaintiff submitted a detailed written complaint against Professor Moore to Merkle, citing "BOR Policy 1.4.3 Human Rights Complaint Procedures" three times as the governing framework for disability discrimination and retaliation. Plaintiff identified the correct framework through her own research on the SDBOR public policy directory. Merkle's first response was not to acknowledge that Plaintiff had correctly identified the EEO framework. On April 10, Merkle wrote: "Before we have you submit, I have a question. Did you go back to disability services to notify them that the faculty member was being non-compliant?" Merkle's first response to a complaint citing the correct regulatory framework three times was to ask whether the disabled student had taken additional steps before the institution would accept her filing. No provision of SDBOR Policy 1.4.3 requires a complainant to exhaust informal resolution with the accused before the EEO Coordinator will accept a discrimination complaint. Plaintiff recognized the burden-shifting immediately, responding: "Am I responsible to take steps to mitigate in order to file the claim?"

257.     Later that day, Merkle instructed Plaintiff to "file separate forms per person" for Moore, Ulrich, and Severson. USD's EEO Coordinator did not acknowledge that Plaintiff had correctly identified the EEO framework. USD's EEO Coordinator did not process the complaint under Policy 1.4.3.

258.     Plaintiff did not cite Policy 1.4.3 only in the Moore complaint. On April 12, 2024, Plaintiff filed a complaint against Fuerst with Thompson citing BOR Policy 1.4.3 by name under Section 2.8.1 (Violation of Board of Regents or Institutional Policies). On April 15, 2024, Plaintiff filed a retaliation complaint against Ulrich with Merkle, citing BOR Policy 1.4.3, Section 8, the anti-retaliation provision, by name. Across three complaints to two administrators in six days, Plaintiff cited the correct regulatory framework five times. Neither administrator processed any complaint under it.

259.     On May 1, 2024, the Sioux Falls NAACP sent a formal letter to Dean Fulton. A true and correct copy of the NAACP letter is attached hereto as Exhibit 4. The letter, referencing NAACP President Langston Newton's involvement since February 2024, documented that Thompson had made her admissions not only to Plaintiff but to the civil rights organization as well. The NAACP confirmed: "it was determined by admission that this was an attempt to get Ms. Jackson to have a conversation and that the order held no substance."

260.     The NAACP letter (Ex. 4) reported that Plaintiff "has provided the Sioux Falls NAACP with substantial evidence detailing a hostile learning and working environment" and expressed concern that "other students of color may have to face similar obstacles." The NAACP stated that "it does not appear that there are equitable opportunities provided" and invoked its mission of "equity, engagement and education for all South

Dakotans." The letter requested an in-person meeting with all parties so that the situation would not "go unresolved, as it is now interfering with a students ability to look elsewhere for education." The NAACP demanded a response within seven days. Fulton responded five days later, on May 6, and addressed none of the substantive concerns.

261.    Fulton's May 6 response is significant for what it did not say. The NAACP had documented that Thompson admitted the NCO "held no substance." Fulton did not deny this. The NAACP had documented "a hostile learning and working environment." Fulton did not deny this. Fulton deflected responsibility, characterizing the law school's role as passive, merely providing information to investigators rather than initiating proceedings. The documentary record contradicts this characterization. On March 5, 2024, Fulton forwarded Fuerst's videos to General Counsel and wrote "One more entry. On my way." Fulton was not passively responding to requests for information. He was initiating the investigation. After receiving formal notice from a civil rights organization that the proceedings were baseless and causing harm, Fulton allowed the prosecution to continue for five additional months.

262.    On May 2, 2024, the Board of Regents assigned Jason Everson, Title IX/EO Investigator at South Dakota State University in Brookings, to investigate Plaintiff's discrimination complaint independently of USD's own administrative structure. Everson contacted Plaintiff: "My office has received a report that you have been subject to discrimination and/or harassment by Jenny Fuerst. I have been assigned to investigate this issue." Merkle explained the case split in a May 14 email: harassment and stalking fell under Policy 1.4.1 and were subject to dismissal when Fuerst was no longer affiliated with the University, but race, disability, retaliation, and collusion fell under Policy 1.4.3,

and that was why the Board's external investigator had been assigned. The Board's investigator first contacted Plaintiff on the second-to-last day of final exams. Plaintiff's attorney was available by May 6. Everson delayed, responding: "Let's standby on scheduling an interview. I'm waiting on a few things before I start doing interviews." By May 14, when Everson sought to schedule an interview, Plaintiff had just learned that Merkle dismissed her Title IX complaint against Fuerst, that Carlisle had blocked her transfer meeting, and that her transfer letters were being withheld. On May 20, Plaintiff responded that she was enrolled in summer courses and could not meet because the ordeal had severely affected her grades the previous semester. Defendants' coordinated attack had so severely impacted Plaintiff's academic performance that she was forced to choose between pursuing accountability through the Board's own investigative process and passing her classes.

263.    On May 14, 2024, Merkle wrote that "Investigator Everson shared with me your email," confirming that the Board's external investigator was sharing complainant communications with USD's Title IX Coordinator, the official whose office had dismissed Plaintiff's complaint against Fuerst one day earlier. The investigator's coordination with the institution he was assigned to investigate ensured that process could not have produced an independent result regardless. The Board's investigation into race, disability, retaliation, and collusion at USD's law school produced no determination letter, no finding, and no outcome. The Board of Regents assigned an external investigator and then allowed the investigation to lapse without resolution, leaving Plaintiff's complaint about coordinated institutional discrimination unadjudicated by the governing body responsible for ensuring its institutions comply with civil rights law.

264.    On May 3, 2024, Merkle issued a Notice of Determination on Plaintiff's retaliation complaint against Ulrich (Case 24026). The Notice stated: "It was asserted that Katy Ulrich's behavior toward you was retaliation." Merkle found "insufficient evidence to determine a reasonable basis of discrimination." Ulrich's LSAC complaint had been withdrawn twenty-four days earlier, on April 9, because the student file contained the amendment that disproved the fraud accusation. The referral that Ulrich filed without checking the file, that LSAC dismissed upon receiving Plaintiff's response, and that Ulrich withdrew by describing seven-month-old documents as newly received was determined by USD's EEO Coordinator to lack sufficient evidence of retaliation. In the same determination letter, Merkle quoted SDBOR Policy 1.4.3, Section 8: "Persons who bring complaints of discrimination and persons who participate in the investigation and disposition of such complaints will not be subject to harassment, interference, intimidation or retaliation." Merkle cited the anti-retaliation protections of Policy 1.4.3 while finding that the protections had not been violated. Merkle then routed the complaint to Human Resources rather than following the mandatory appellate path prescribed by Policy 1.4.3, Section 14. Under Section 14, Plaintiff was entitled to petition the institutional president and, if unsatisfied, appeal to the Board of Regents' Executive Director. Merkle did not notify Plaintiff of this appellate path. The complaint was routed to an HR office within the same institution that was the subject of the complaint, bypassing the external oversight the Board of Regents created for complaints alleging institutional misconduct. On May 3, 2024, Merkle issued her determination on the Ulrich complaint and quoted the same Section 8 anti-retaliation provision that Plaintiff had cited in her filing. Merkle received the framework citation, quoted it back in her own

determination letter, found "insufficient evidence," and did not process the complaint under Policy 1.4.3.

265.    On May 3, 2024, Merkle wrote that "Nathan Gotto, Assistant Director of Human Resources will be reaching out to speak with you." On May 6, 2024, Gotto contacted Plaintiff to schedule a meeting about the complaint Merkle had referred to Human Resources. Plaintiff responded the same day, copying her attorney Sarah Baron Houy: "My attorney is available tomorrow, Wednesday, or Thursday. I am a disabled student, this subject matter is quite triggering, and I need her to articulate when I fail to do so." Plaintiff disclosed her disability in writing and explained that she needed counsel as an accommodation to participate meaningfully in the meeting about her own discrimination complaint. On May 7, 2024, Gotto responded: "Let's plan for 10am CST/9am MT if that still works for everyone. I am going to set up a Zoom for Sarah to join. Our Deputy General Counsel, Chris Healy, also plans to call in via Zoom." A disabled student requested attorney participation as a disability accommodation. USD responded by inserting its Deputy General Counsel. No one asked for Healy. Plaintiff asked for her own attorney because her disability made articulation difficult. USD escalated its representation against a complainant who had just disclosed she was vulnerable.

266.    On May 9, 2024, USD convened the Zoom meeting. Present were Gotto, Deputy General Counsel Healy, Plaintiff, and Plaintiff's attorney Sarah Baron Houy. When Baron Houy asked whether there was a policy governing how the investigation would be conducted and what information could be shared upon completion, Gotto stated: "I don't know that we do, Chris. I might lean towards you on that answer, but I don't know that we do have an investigation policy per se." The HR official conducting the investigation

of Plaintiff's discrimination complaint admitted the institution had no formal policy governing how that investigation would proceed. Healy then stated: "No, this, this one is, um, it's postured outside of what our normal complaint policies would look like." Healy continued: "this investigation is going to be a little bit different than, um, it's a little bit outside of the norm." The institution's Deputy General Counsel admitted, in a meeting with Plaintiff and her attorney present, that the proceedings against Plaintiff were being conducted outside the institution's normal complaint framework and that no established investigation policy governed the process.

267.    At this meeting, Plaintiff's attorney put USD on formal legal notice that the proceedings against Plaintiff were retaliatory and constitutionally defective. Baron Houy stated that "a simple act of due diligence by Ms. Ulrich would've uncovered that Tiauna did disclose her brief participation at that school in California" and that "the failure to complete any sort of due diligence before making that report to LSAC is also indicative of the retaliatory intent." Baron Houy further stated: "early August she amends her application in accordance with the directives she's been given at orientation. Eight months later, the law school decides to report her to LSAC. That seems highly suspicious. And not only is it eight months after she amends her application, it's just days and weeks after she's been posting these videos online that are critical of the law school and where she's complaining about harassment that she's receiving at the law school." Baron Houy identified the temporal proximity between Plaintiff's protected speech and the LSAC referral, the failure of due diligence as evidence of retaliatory intent, and the eight-month gap between Plaintiff's amendment and Ulrich's complaint as circumstantial proof that the referral was motivated by Plaintiff's First Amendment activity. Healy and

Gotto heard this legal notice on behalf of the institution. Neither disputed the factual basis. Neither offered an alternative explanation for the timing.

268.    During the meeting, Plaintiff stated: "I do feel as though she was instructed to do this, so I would be curious to find out who gave that, that instruction. I don't think that this was something that she randomly would do. Katey's pretty busy with, you know, admitted students day and stuff like that during this time. So I do feel as if someone told her to take this course of action." Gotto responded: "Sure." Healy said nothing. Plaintiff told USD's Deputy General Counsel and HR investigator that she believed Ulrich was directed by a superior to file the LSAC complaint. Neither denied this. Neither stated that they had no evidence of directed action. Gotto then asked: "I just wonder if there's any a puzzle that I'm missing?" inviting further information rather than disputing the coordination allegation.

269.    At the conclusion of the May 9 meeting, Gotto told Plaintiff and her attorney: "once I come to any decision or findings, we will follow back up with you . . . and share with you what I can share with you, I guess is what I'm saying." Gotto promised follow-up and transparency. On September 30, 2024, one hundred and forty-four days later, Plaintiff emailed Gotto: "Can you let me know the outcome?" Gotto responded the same day: "I am unable to provide any information related to personnel matters or disciplinary actions." The institution's HR investigator promised a disabled veteran complainant that he would share findings upon completion. Five months later, the promised sharing became a categorical refusal. From May 9 to September 30, 2024, USD's Deputy General Counsel knew the proceedings were "outside the norm," HR knew Plaintiff's attorney had put the institution on formal legal notice of retaliation and constitutional violations, the

*JACKSON v. USD, et al.*

HR investigator had promised to follow up with findings, and no one disclosed any finding, any corrective action, or any outcome. Three days after Gotto's refusal, on October 3, 2024, the Miller charges were dismissed.

270.    On May 14, 2024, Miller emailed Plaintiff regarding her complaints against Fuerst and Severson. Miller wrote: "Based on your email, I understand that you do not wish to proceed further with your misconduct complaints against Ms. Fuerst and Ms. Severson. Please confirm that is the case for both complaints. If you do not wish to proceed, those decisions will weigh heavily in my recommendations." The Examiner prosecuting Plaintiff told Plaintiff that dropping her own complaints against her accusers would influence his recommendations on the complaints against her. Miller was simultaneously the investigator of the complaints against Plaintiff and the investigator of Plaintiff's complaints against the people who accused her. He used his authority over one set of proceedings to pressure Plaintiff's participation in the other. Plaintiff responded: "I absolutely wish to proceed." In the same email, Miller wrote that he "lack[ed] the authority to resolve or conclude any misconduct complaints," citing the Disciplinary Procedures' provision that "The Examiner may not dispose of any matter before making a recommendation." The provision Miller cited does not prohibit a recommendation for dismissal. It requires one. The Handbook authorizes the Examiner to recommend "that no further action be taken" at any time. The Disciplinary Board reached precisely that conclusion — "not a basis to proceed" — on the day it received the case. (Ex. 6.) Miller read the provision that required him to make a recommendation and used it to justify making none for 190 days.

271.    Three days later, on May 17, 2024, Miller emailed Plaintiff: "I have corresponded individually with both Ms. Severson and Ms. Fuerst. Neither is agreeable to pausing the investigations of any of the complaints. As a result, I will be moving forward with all investigations." Miller gave Fuerst and Severson veto power over whether the investigations of their own complaints against Plaintiff would be paused. Plaintiff had asked to defer until fall because the proceedings were destroying her academic performance during finals. Miller conditioned the pause on the complainants' consent. Fuerst and Severson refused. The prosecution continued through the summer, through Plaintiff's leave request, and through October.

272.    USD's complaint-handling procedures operated on two timelines depending on whether the complaint targeted Plaintiff or was filed by Plaintiff. On March 27, 2024, Fuerst's complaint against Plaintiff was received and acted upon by multiple USD offices within hours: an Examiner was appointed through the law school (Miller, directed by Fulton), a No Contact Order was issued through student affairs (Thompson, reporting to Fitzgerald), and an LSAC complaint was filed through admissions (Ulrich). Three separate institutional chains coordinated same-day action against Plaintiff. By contrast, Plaintiff filed a disability discrimination complaint against Professor Moore on May 8, 2024. USD's EEO office did not acknowledge receipt. Plaintiff followed up on May 24. No response. Plaintiff followed up again on June 1. No response. Plaintiff's attorney followed up on June 4. USD's Director of EEO responded on June 7, thirty days after filing. SDBOR Policy 1.4.3, Section 13.5.3 requires the EEO Coordinator to "meet with the complainant or victim within three working days after receipt of the complaint." USD did not meet this requirement for Plaintiff's Moore complaint.

273.     On June 17, 2024, USD's Director of EEO issued a Notice of Determination stating that "the investigation into the complaint you filed has been completed in accordance with the Title IX Harassment Policy (South Dakota Board of Regents policy 1.4.1)." The determination identified the claim as follows: "It was asserted that Tyler Moore's behavior toward you was discriminatory based on disability." Disability discrimination falls under SDBOR Policy 1.4.3, not Policy 1.4.1. A first-year law student identified the correct regulatory framework through her own research. USD's Director of EEO, whose statutory duty was to administer that framework, received the complaint citing it, verbally confirmed it was the correct framework in a meeting, described the process under that framework in detail, and then processed the complaint under a different policy. On May 14, 2024, Merkle had written that Plaintiff's complaints involving "race, disability, retaliation and collusion" would "fall under 1.4.3." Merkle knew Policy 1.4.3 was the correct framework. Merkle stated in writing that Policy 1.4.3 was the correct framework. Merkle then processed Plaintiff's disability discrimination complaint against Moore under Policy 1.4.1 on June 17, thirty-three days after her own written acknowledgment that it belonged under Policy 1.4.3. No complaint Plaintiff filed through Merkle's office was ever processed under the framework Merkle herself identified as correct. Every complaint was processed under a framework Merkle knew was wrong. The misclassification was not an error. It was a pattern, and Merkle's own May 14 email proves she knew it was wrong while she was doing it.

274.     On June 28, 2024, after Merkle closed Plaintiff's complaint against Moore, Plaintiff asked Merkle whether the same protective measures the institution had provided to Fuerst should now be provided to Plaintiff: "if this procedure is to match what you

*JACKSON v. USD, et al.*

guys did with Jennie, this should be forwarded on for a no contact order right?" On July 2, 2024, Merkle responded: "I can do that, but will you have him as a professor in the future?" When Fuerst sought protection from Plaintiff's social media posts on March 27, 2024, USD imposed a No Contact Order within hours without conditions or questions. When Plaintiff sought protection from a professor who had denied her disability accommodations, ignored her follow-up, and solicited favorable evaluations from the student he had ignored, Merkle imposed a precondition.

275.    Between May 9, 2024 and October 3, 2024, a period of 147 days, Deputy General Counsel Healy took no action to halt, correct, or recommend termination of the proceedings he had acknowledged were "postured outside of what our normal complaint policies would look like." Plaintiff's attorney had put the institution on formal legal notice at the meeting Healy attended, identifying retaliatory intent, temporal proximity to protected speech, and failure of due diligence. Healy had acknowledged on the record that the proceedings lacked a governing policy framework and were "a little bit outside of the norm." The HR investigator conducting the investigation had admitted that no investigation policy existed. Despite this convergence of notice, Healy permitted the Miller prosecution to continue for 147 additional days. Upon information and belief, no corrective directive issued from the Deputy General Counsel's office during this period. The office charged with institutional legal compliance received direct notice of constitutional violations and permitted them to continue for nearly five additional months. When the proceedings finally ended on October 3, 2024, the institution offered no explanation, no finding, and no acknowledgment that the prosecution had ever been improper.

276.     As Deputy General Counsel, Healy possessed the institutional authority to recommend termination of proceedings to General Counsel Franken, to advise the Dean's office that the prosecution lacked legal basis, and to direct the institution's response to formal legal notice of constitutional violations. The Deputy General Counsel's office is not an observer of institutional legal compliance; it is the office charged with ensuring it. Healy's failure to exercise the authority his position conferred, after receiving direct notice that the proceedings violated a student's constitutional rights and operated outside any governing policy, was not passive ignorance. It was a deliberate institutional choice to permit the prosecution to continue.

## H. Transfer Blocked and Forced Departure (May - August 2024)

277.     On May 9, 2024, Plaintiff emailed Registration Officer Carlisle requesting that letters of good standing and class rank be sent to four law schools to which Plaintiff had applied to transfer.

278.     On May 13, 2024, Carlisle cancelled Plaintiff's scheduled meeting and stated that Plaintiff "will need to schedule your meeting with Dean Mays" before the letters could be processed. Mays interposed herself as a gatekeeper between Plaintiff and the transfer documentation Plaintiff needed. The administrator who had solicited the complaint against Plaintiff, denied Plaintiff's Zoom accommodation, and participated in the coordination that produced the March 27 attack now controlled whether Plaintiff could leave the institution. Mays's gatekeeping of transfer documentation was the final link in a retaliatory chain that began with Plaintiff's social media posts: defendants targeted Plaintiff's speech, prosecuted her for it, denied her accommodations because of it, and then controlled whether she could escape the institution that was punishing her for it.

279.      Mays's gatekeeping of transfer documentation is consistent with her documented conduct at her prior institution. At Arizona Summit Law School, where Mays served as Dean from 2010 to 2018, tenured professors alleged in federal litigation that Mays implemented policies requiring students considering transfer to meet with administrators before the school would release their transcripts, and that Mays proposed a policy of refusing to write recommendation letters for students seeking to transfer. O'Connor v. Phoenix School of Law, LLC, No. 2:13-cv-01142-SRB (D. Ariz.), Am. Compl. ¶¶ 47, 49. Mays described these policies as "building a better mousetrap" to reduce transfer attrition. *Id.* ¶ 43. At USD, Mays required Plaintiff to schedule a meeting with Mays before transfer letters would be processed, gave Plaintiff copies of the letters leading Plaintiff to believe they had been sent, and did not send them. The pattern is documented across two institutions and a decade: Mays controls the transfer pipeline as a mechanism of institutional retention, interposing herself between the student and the documentation the student needs to leave.

280.      Mays met with Plaintiff and gave her copies of the transfer letters, leading Plaintiff to believe they had been sent. On May 14, 2024, Plaintiff discovered that no school had received the letters. Plaintiff emailed Mays: "Here is the initial email, you gave me copies yesterday so I assumed they went out that day." Carlisle sent the letters at 2:23 PM on May 14, five days after Plaintiff's original request.

281.      Mays's control of the transfer pipeline extended beyond the processing of transfer letters. Mays had agreed to write Plaintiff a letter of recommendation. She acknowledged the obligation in meetings with Plaintiff but never delivered the letter. Professor Hess had also agreed to write Plaintiff a letter of recommendation and similarly acknowledged the

*JACKSON v. USD, et al.*

obligation without delivering. Plaintiff was unable to obtain a recommendation letter from any permanent faculty member at USD Knudson School of Law. Plaintiff ultimately obtained a recommendation from a visiting professor. The only faculty member willing to provide a recommendation for a student under active prosecution was one who was not part of the permanent institutional structure. Upon information and belief, the failure of multiple permanent faculty members to deliver promised recommendation letters to Plaintiff, the only student seeking to transfer during an active prosecution, was consistent with a directive or understanding, formal or informal, that faculty should not facilitate Plaintiff's departure through recommendation letters. Discovery will establish whether any permanent faculty member was directed, advised, or informally discouraged from providing a recommendation for Plaintiff.

282.    On July 9, 2024, Plaintiff informed Mays that none of her transfer applications had been accepted. Plaintiff wrote: "Right now, I do not have any acceptances. I tried my best to get out of USD for all of our comfort after what happened spring semester... all these misconduct allegations that I over-disclosed on because of Katey's error with LSAC are probably not helping me either." On July 11, 2024, Mays responded: "I truly am sorry to hear that; it never occurred to me that you wouldn't get into at least one of the schools of your choice."

283.    When Plaintiff contacted the Department of Veterans Affairs about transferring her Chapter 31 vocational rehabilitation benefits, the VA required a reason for the transfer. Plaintiff wrote: "law school I was attending is not a good fit" and "current law school is retaliating against me for exercising my first amendment right." This contemporaneous statement to a federal agency, made while the prosecution was

ongoing, documents Plaintiff's understanding, shared with a government entity under penalty of false statements, that USD's actions constituted First Amendment retaliation.

284.    Mays's response establishes three independently significant facts. Mays knew Plaintiff was seeking to transfer. Mays expected Plaintiff to be accepted at one or more schools. And the universal rejection was not attributable to Plaintiff's qualifications; if an experienced law school administrator expected acceptance at "at least one" school, then the rejection of every application points to intervening factors: the LSAC misconduct flag, the pending disciplinary charges, and the delayed letters of good standing, all attributable to Defendants' conduct.

285.    On August 8, 2024, Mays emailed Plaintiff: "I'm doing my final check to see if you're returning to USD Law. Let me know." Plaintiff responded: "Why do you keep asking me this?" Mays replied: "This is the second time I've asked you." The administrator who had participated in driving Plaintiff out repeatedly inquired whether Plaintiff was coming back.

286.    On August 11, 2024, Plaintiff requested a leave of absence, writing that "the challenges I have faced over the past year have significantly impacted my academic performance and overall well-being, and I believe that taking this time off will allow all parties to create much needed separation."

287.    On August 12, 2024, Mays granted the leave: "Your leave of absence is granted. Should you choose to re-enroll for next academic year, please contact me." Mays also instructed Plaintiff to cancel her fall class registration. That same morning, Mays forwarded Plaintiff's leave of absence email to Carlisle with the instruction: "For Tiauna's file."

288.     The leave of absence was necessitated by Defendants' conduct. Plaintiff could not remain at an institution that had coordinated retaliation against her. She could not transfer because the LSAC misconduct flag, pending disciplinary charges, and delayed transfer letters had ensured universal rejection. The prosecution that began on March 27 had achieved its functional purpose five months before it formally ended: Plaintiff was gone.

289.     On August 8, 2024, three days before Plaintiff's formal leave request, Mays told Plaintiff: "Of course, there's leave of absence paperwork to complete to preserve your ability to return so just keep me posted." The Student Handbook prescribes a formal Leave Request Form requiring the student's signature, the Associate Dean's signature, a stated deadline for confirming intent to return, and a warning that failure to comply results in loss of automatic re-enrollment rights. While the form template appears in the Handbook, the form cannot be completed without the Associate Dean's participation: the deadlines, conditions, and approval signature are all within the Dean's office's exclusive control. Mays affirmatively represented that she would manage this process, then never provided the form, never provided the deadlines, and never provided the procedures necessary to preserve Plaintiff's return. Instead, Mays granted the leave by email, told Plaintiff to cancel her registration, forwarded the email to Carlisle "For Tiauna's file," and told Plaintiff: "Should you choose to re-enroll for next academic year, please contact me." The administrator who initiated the retaliation controlled every administrative step of Plaintiff's departure and withheld the paperwork that would have preserved Plaintiff's right to return. The leave of absence became a constructive expulsion.

290.     USD's own ABA Standard 509 Required Disclosures confirm this. The ABA requires every accredited law school to report attrition data annually under Standard 509.

*JACKSON v. USD, et al.*

The ABA defines two categories of attrition: "Academic Attrition," which covers students who left while not in good academic standing, and "Other Attrition," which covers students who left for reasons unrelated to academic performance. The ABA's definition of "Other Attrition" explicitly excludes three categories of students: those who transferred, those studying at another school temporarily, and those on a leave of absence of one year or less. A student on a genuine leave of absence should not appear in either attrition table. She should appear nowhere in the attrition data, because the ABA does not count a preserved leave as a departure.

291.     USD's 2024 Standard 509 report, covering the 2023-2024 academic year, reports exactly one student under "Other Attrition" for first-year Black or African American women: one student, representing 20.0% of the cohort.

**Other Attrition 2023-2024**

| | JD1 | | | | | | JD2 | | | | | JD3 | | | | | JD4 | | | | | UL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | T | M | W | AGI | PNR | % | T | M | W | AGI | PNR | T | M | W | AGI | PNR | T | M | W | AGI | PNR | % |
| Hispanics of any race | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Asian | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Black or African American | 1 | 0 | 1 | 0 | 0 | 20.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Two or More Races | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Total People of Color | 1 | 0 | 1 | 0 | 0 | 10.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |

292.     Plaintiff was one of five Black students in the 1L class and one of three Black women. USD certified Plaintiff in good academic standing at 9:01 AM on March 27, 2024, eliminating any possibility that Plaintiff's departure was academic attrition. No other Black woman in the 1L class left USD during the 2023-2024 academic year. The one Black woman reported under "Other Attrition" is Plaintiff.

*JACKSON v. USD, et al.*

293.    Mays granted Plaintiff's leave of absence on August 12, 2024. The ABA Annual Questionnaire is submitted by mid-October. When USD compiled and submitted the 2024 report in October 2024, Plaintiff's leave was less than two months old. Under the ABA's own definition, a student on a leave of absence of one year or less is excluded from "Other Attrition."

294.    Plaintiff's leave was two months old when USD reported her as permanent attrition. USD did not classify Plaintiff as a student on leave. USD classified Plaintiff as a student who left. The institution that granted a leave of absence in August reported a permanent departure in October.

295.    Either Mays's August 12 grant of leave was genuine, in which case USD misreported Plaintiff's status to the ABA, or the leave was never intended to preserve Plaintiff's return, in which case the grant of leave was a sham and the constructive expulsion was the objective from the beginning. USD submitted this classification to the ABA in the same month it dismissed the charges against Plaintiff.

296.    On October 3, 2024, the Disciplinary Board concluded there was "not a basis to proceed." By that date, USD had already reported Plaintiff's departure as permanent to the national accrediting body. The institution closed the prosecution and closed the file in the same month. The student the institution certified in good academic standing in March, prosecuted for seven months, and granted a leave of absence in August was reported to the ABA as permanent attrition in October. The 509 report is not an internal memo. It is a mandatory disclosure filed under Standard 509's accuracy requirements with the national body responsible for law school accreditation. USD's classification of Plaintiff as "Other

Attrition" is an institutional admission that the departure was permanent, not temporary, and that the leave Mays granted was not treated as a leave at all.

297.    Plaintiff received no written notification from USD that her enrollment status had been changed from leave of absence to permanent attrition. Plaintiff discovered the reclassification through her own review of USD's publicly filed Standard 509 data. The institution that changed a student's permanent academic record, reported that change to the national accrediting body, and made that report publicly available to bar admissions authorities and prospective employers did so without notifying the student whose record it changed.

298.    Severson received career advancement from the administrators who used her complaint to sustain the prosecution. Upon information and belief, Severson received a graduate assistantship working directly for Dean Fulton and Associate Dean Mays during the period the prosecution was ongoing. Severson also received a clerkship with the Chief Justice of the South Dakota Supreme Court. Both complainants received institutional rewards following their participation in the coordinated adverse action: Fuerst received a promotional USD profile published on April 16, 2024, the same day she appeared at Plaintiff's testing room window; Severson received the graduate assistantship and the state's most competitive judicial appointment. No comparable institutional recognition was extended to Plaintiff during this period.

299.    USD subsequently terminated Plaintiff's institutional email account, cutting off access to the university email records documenting the events described in this complaint. The termination of email access after a leave of absence that the institution

converted to a constructive expulsion raises preservation concerns that Plaintiff will address through appropriate discovery motions.

300.     Even after granting the leave, the institution waited fifty-two additional days to dismiss the charges. Plaintiff left USD on August 12. The charges were not dismissed until October 3. For those fifty-two days, Plaintiff was simultaneously on leave and under active prosecution, unable to attend classes, unable to transfer, and unable to move forward with bar applications while disciplinary proceedings remained open.

## I. The Dismissal (September 30 - October 3, 2024)

301.     On September 30, 2024, Maddie Smith, Administrative Assistant in the Dean's Suite, emailed Plaintiff directly with the subject line "Disciplinary Committee Ruling." Smith attached a letter from Dean Fulton. The letter stated: "As you are aware, two complaints were filed from you with the Disciplinary Board of the School of Law. After review of the presented materials and statements, the Disciplinary Board has concluded that there is not a basis to proceed with a hearing or other action. Both matters are therefore dismissed." The letter was defective in two respects. First, it stated that complaints were filed "from" Plaintiff, ambiguous language that could refer to complaints Plaintiff filed against others rather than complaints filed against her. After the prolonged prosecution, USD could not draft a clear dismissal notice. Second, the letter was sent directly to Plaintiff through an administrative assistant rather than to Plaintiff's attorney of record, Sarah Baron Houy, who had been actively involved in the proceedings since March 2024 and whose contact information appeared on every correspondence. Communicating directly with a represented party regarding pending proceedings, bypassing known counsel, violates basic principles of professional responsibility.

302.     That same day, September 30, 2024, Plaintiff posted a YouTube video containing audio from her April 2 meeting with Thompson. The video played the portion of the recording in which Thompson, the official who issued the No Contact Order, stated that in her opinion no policy had been violated. Plaintiff titled it "Law School Diaries: Release the tapes." The institution had sent a defective, ambiguous dismissal notice through a secretary. Plaintiff responded by making the evidence public.

303.     On October 2, 2024, Miller resent the identical defective letter. Plaintiff identified it as the same notice she had already received.

304.     On October 3, 2024, attorney Baron Houy demanded clarity. Baron Houy noted that the September 30 letter dismissed complaints "from" Plaintiff, language she described as "unusual and confusing," and that the letter left the status of complaints against Plaintiff unresolved. A true and correct copy of the corrected dismissal letter is attached hereto as Exhibit 6. Miller acknowledged the deficiency and provided a corrected letter that same day. The corrected letter confirmed that the Disciplinary Board concluded there was "not a basis to proceed." The charges against Plaintiff were dismissed after 190 days of prosecution. Zero policy violations.

305.     One hundred and ninety days elapsed between the March 27 attack and the October 3 dismissal. Thompson had stated on April 2, six days after the attack, that no policy had been violated. The prosecution continued for 184 additional days after the official responsible for evaluating student conduct determined there was no basis for it.

306.     That same day, October 3, 2024, USD's official Instagram account posted that Professor Miller had received the Cutler Award, the Knudson School of Law's highest faculty honor. The professor who conducted months of baseless prosecution against his

own advisee was honored on the same day he acknowledged there was no basis for the prosecution.

307.    The harm is permanent. Plaintiff must disclose this episode on every bar application, professional license application, and graduate school admission for the rest of her professional career, regardless of the dismissal. Every character and fitness committee in every jurisdiction will review the LSAC misconduct charge, the disciplinary proceedings, and the circumstances of Plaintiff's departure from USD. The withdrawal of the LSAC complaint and the dismissal of all charges do not erase the record. They confirm that the record should never have been created.

308.    USD's retaliation extended to Plaintiff's attorney's family. Professor Emeritus Roger Baron, a retired faculty member who continued to manage the law school's electronic listserv as a service to the institution, is the father of Plaintiff's attorney Sarah Baron Houy. Baron Houy's representation of Plaintiff was known to the administration no later than March 19, 2024, when she transmitted her first written demand for dismissal on First Amendment grounds. (Ex. 5.) She corresponded with the institution again on April 11, 2024, and appeared at the May 9, 2024 meeting with Deputy General Counsel Healy. In approximately summer 2025, Plaintiff learned that Roger Baron's continued role at the law school had been terminated. Upon information and belief, Roger Baron's removal occurred after Baron Houy's representation of Plaintiff became known to the administration. The exact date and circumstances of his termination are unknown to Plaintiff and will be established through discovery. USD has a documented pattern of retaliating against anyone who opposes institutional interests: in Ghebrekidan, USD retaliated against an employee who reported sexual harassment through Title IX,

escalating from an improvement plan to administrative leave to nonrenewal. In *Hook v. Rave*, this Court enjoined USD's attempt to terminate a professor for a single social media post within twenty-four hours. Retaliating against the family member of Plaintiff's counsel is consistent with this documented institutional pattern and served a specific purpose: to send a message to Baron Houy and to every attorney in South Dakota that representing a client against USD carries professional consequences for the attorney's family. Upon information and belief, the termination of Roger Baron's role was connected to his daughter's representation of Plaintiff. The removal chilled Plaintiff's access to counsel and constitutes third-party retaliation actionable under the First Amendment and Title IX.

309. Plaintiff will seek through discovery all communications regarding Roger Baron's listserv role, any discussions referencing his daughter's representation, and the circumstances and timing of his removal.

310. The removal of Roger Baron's institutional role became known within the Vermillion legal community. The retaliatory message was received by its intended audience: the legal community understood that assisting Plaintiff carried consequences. The chilling effect was not hypothetical. Plaintiff experienced it from the beginning. In February 2024, before any misconduct proceeding existed, Attorney Brent Matter of Vermillion declined to provide even one hour of general counsel presence at a meeting about a display. When the misconduct proceedings began, Plaintiff could not retain local counsel. No attorney in the Vermillion area would take the case. Plaintiff ultimately retained Sarah Baron Houy of Bangs, McCullen, Butler, Foye & Simmons in Rapid City, approximately four hours from Vermillion. Baron Houy raised a First Amendment

defense, demanded dismissal, and identified the Mays solicitation evidence in Miller's own file. Roger Baron's role at the institution was terminated. The attorney who took the case saw her father, a distinguished professor emeritus, removed from the institution he had served for decades. The arc is complete: a local attorney declined a one-hour meeting request before the proceedings began, no local attorney would take the case once the proceedings started, and the attorney who did take the case saw her father removed from his position at the institution. Dean Fulton made abundantly clear what happens to anyone in South Dakota who stands up for the most basic civil rights of a student at the state's only law school.

311.    Every adverse action described in this complaint traces to Plaintiff's social media posts documenting her experience as a Black law student at USD Law. The Examiner Notice charged "videos posted online." The LSAC Charge Letter cited a "since deleted YouTube video." Thompson admitted the No Contact Order was issued to stop Plaintiff from "talking about Jennie in the videos." Mays directed Plaintiff to stop posting videos and described the directive as an institutional response. Fulton forwarded Plaintiff's video to General Counsel, who directed immediate investigation. No defendant has identified any conduct by Plaintiff, other than her constitutionally protected speech, as the basis for any action taken against her. The subsequent accommodation denials, transfer obstruction, continued prosecution, and constructive expulsion were downstream consequences of the retaliation against that speech. Each adverse action in this complaint flows from one source: Plaintiff spoke, and the institution punished her for it.

312.    The coordinated response described in this complaint was directed at a single student. That student was Black. She was the only student at USD subjected to

simultaneous adverse actions from three institutional offices. She was the only student whose social media was surveilled across four platforms for months. She was the only student charged under terms that do not appear in the Student Handbook's enumeration of offenses. She was the only law student in USD's history issued a No Contact Order. She was the only student whose application was referred to LSAC for fraud on the basis of social media posts. She was the only student whose disability accommodations were denied by two administrators on the same day without either consulting Disability Services. And the speech that triggered the entire institutional response was speech about race: the inadequacy of a children's craft-kit display for Black History Month, the enrollment trajectory documented in ABA Standard 509 data the institution itself filed, and the quality of diversity efforts at a school that graduated fewer than one Black student per year for fifteen consecutive years. Each of these facts is independently documented in the record of this case. The only variable that connects them is race: the race of the student, the racial content of her speech, and the racial record of the institution that silenced her.

313.     The message this coordinated response sent to every student at USD was unambiguous. A student who criticizes the institution's diversity efforts will face a misconduct investigation, a No Contact Order restricting campus access, fraud accusations filed with a nationwide credentialing body, denial of disability accommodations, obstruction of transfer applications, and the prolonged prosecution that continues after the institution's own officials determine no policy was violated. No reasonable student would speak after witnessing what happened to Plaintiff. The five Black students who enrolled with Plaintiff in Fall 2023 were replaced by zero Black

*JACKSON v. USD, et al.*

students in Fall 2024. Whether any individual student's decision not to attend USD was caused by knowledge of Plaintiff's treatment, the outcome is the same: the institution that retaliated against the Black student who spoke up enrolled no Black students the following year. The retaliation did not merely punish Plaintiff. It silenced every student who might have followed her.

## J. Procedural Failures, Disability Services Inaction, and Structural Conflicts

314.    During the April 11, 2024 meeting, which Miller recorded via Microsoft Teams in his capacity as Examiner, Miller informed Plaintiff and her attorney that he was expanding the investigation beyond the original complaints. Miller stated he wanted to discuss three new areas "outside the bounds of your response," including "conduct at a professional school." Miller confirmed this standard applied "holistically as a student at a professional school," including off-campus activity. Neither Plaintiff nor her attorney had been notified of the expanded scope before the meeting. Attorney Baron Houy stated on the record: "we didn't prepare to answer questions" about these new charges.

315.    Miller was introducing new grounds for prosecution at the same meeting where the respondent's attorney had come to defend against the original charges. The Examiner who had received two demands for dismissal on First Amendment grounds responded not by dismissing but by inventing new charges broad enough to survive the constitutional defense his own respondent's counsel had identified.

316.    Miller acknowledged during the meeting that he had borrowed the complainants' lay terminology rather than applying the Handbook's own standards, and that neither complainant had linked their allegations to any specific provision of the honor code. Rather than dismissing charges that could not be stated in terms of any proscribed

*JACKSON v. USD, et al.*

conduct, Miller expanded the scope to include "conduct at a professional school," a phrase that appears in Part XV but is not defined anywhere in the Handbook.

317.    Either Miller determined that Attorney Baron Houy's First Amendment defense had merit, or he determined it did not. If Miller determined the defense had merit, he expanded the charges to circumvent a constitutional protection he recognized as valid, which is vindictive prosecution. *United States v. Goodwin*, 457 U.S. 368, 372-73 (1982). If Miller determined the defense lacked merit, then an assistant professor of bankruptcy law with no documented expertise in First Amendment jurisprudence overruled a licensed, practicing attorney's constitutional analysis without citation, without reasoning, and without consulting the General Counsel's office whose institutional function is to evaluate constitutional questions. Under either alternative, Miller's expansion served prosecution rather than neutral evaluation. No new conduct by Plaintiff occurred between March 19, when the defense was raised, and April 11, when Miller expanded. The only event in that interval was the assertion of a constitutional right. Miller's response was to broaden the charges until they were wide enough to survive it.

318.    The Student Handbook requires every syllabus to include the statement that "student academic performance may be evaluated solely on an academic basis, not on opinions or conduct in matters unrelated to academic standards." Plaintiff's social media posts expressing opinions about a Black History Month display and the quality of legal education are, by definition, opinions on matters unrelated to academic standards. USD's own policy prohibited evaluating students based on the very conduct it prosecuted Plaintiff for.

*JACKSON v. USD, et al.*

319.    Plaintiff's Title IX complaint against Fuerst was dismissed on May 13, 2024, twenty-eight days after filing, solely because Fuerst was no longer affiliated with the University, never adjudicated on the merits. A true and correct copy of Merkle's Notice of Dismissal is attached hereto as Exhibit 7 and incorporated herein by reference.

320.    Plaintiff's underlying complaint had cited race discrimination under BOR Policy 1.4.3 and alleged harassment, discrimination on the basis of race, retaliation, and violation of Board of Regents policies. The complaint contained an EEO component that did not depend on Fuerst's enrollment status. Fuerst's departure extinguished the Title IX harassment claim under Policy 1.4.1 but did not extinguish the race discrimination allegation under Policy 1.4.3, which concerned the institution's handling of the complaint, not merely Fuerst's individual conduct. Merkle dismissed the entire complaint when only the Title IX component was affected by Fuerst's graduation.

321.    One day later, on May 14, Merkle wrote that Plaintiff's complaints involving "race, disability, retaliation and collusion" would "fall under 1.4.3." Fuerst's complaint against Plaintiff was prosecuted for 190 days, ending only when the Disciplinary Board dismissed all charges. Merkle's dismissal letter stated: "Your circumstance has brought to light the importance of training and education on this very important topic. USD will work to ensure all students know the importance of zero tolerance regarding harassment and stalking in any education program or experience." (Ex. 7.)

322.    Upon information and belief, Miller never initiated misconduct proceedings against Fuerst or Severson based on Plaintiff's counter-complaints. When Plaintiff asked Miller about the status of her complaints against Fuerst and Severson, Miller cited the

Student Handbook's provision that the complainant is not entitled to know the status of proceedings.

323.    Miller invoked the Handbook's procedural protections to shield Fuerst and Severson from accountability while simultaneously ignoring the same Handbook's substantive provisions when prosecuting Plaintiff. The Handbook contains no provision for "bullying" or "harassment." Miller prosecuted Plaintiff under terms that do not exist in the document he cited to deny her information. He followed the Handbook when it protected the accusers. He disregarded it when it would have protected the accused.

324.    Merkle had advance notice that Plaintiff intended to file against Moore and Ulrich. On April 15, 2024, three weeks before the Moore complaint was filed, Merkle emailed Plaintiff: "We had conversations about Tyler Moore and Katy Ulrich. Will you be filing against them as well?"

325.    Plaintiff responded that she intended to file but feared further retaliation during finals: "they stuck me in the faculty study room for testing and it has a loud hum at all times. In the past I've been in a quieter room. So I will need to wait so they don't do anything worse while I am taking finals this week." Plaintiff also stated: "my father has made arrangements for a bodyguard to protect me when I am on campus." A student at the state's only law school told the institution's anti-retaliation officer that she needed private security to feel safe filing discrimination complaints.

326.    Merkle responded: "Understood. Just double checking." Merkle did not contact Disability Services to ensure the testing environment met Plaintiff's approved accommodations. Merkle did not investigate the accommodation degradation Plaintiff described. Merkle did not address the retaliation concern or implement any protective

measures. The next day, April 16, Fuerst appeared at Plaintiff's testing room window during the Constitutional Law final exam. The retaliation Plaintiff told Merkle she feared materialized the following day.

327.     USD's Disability Services office had comprehensive notice of Plaintiff's disabilities, her approved accommodations, and the institutional proceedings that were interfering with her disability-related educational access. Director Karen Gerety personally notified law school faculty of Plaintiff's accommodations before the Fall 2023 semester. On January 10, 2024, Gerety was copied on the email delivering Plaintiff's Spring 2024 accommodation memo to Professor Moore.

328.     That memo, issued by Gerety's office, instructed faculty: "If after talking to the student you need further clarification, please contact our office." The memo further stated: "THIS INFORMATION IS CONFIDENTIAL AND SHOULD NOT BE SHARED WITH ANY PERSON OTHER THAN THE STUDENT."

329.     On March 28, 2024, Moore denied Plaintiff's Zoom accommodation without contacting Disability Services as the memo directed. Mays denied the same request on the same day after having consulted Fuerst, the adverse party, about whether Plaintiff should attend via Zoom. Mays gave an adverse party input into a decision that should have been routed through Disability Services under the interactive process the accommodation memo required. Whether or not Mays disclosed the disability basis for the request, the consultation subordinated a disabled student's educational access to the preferences of her accuser.

330.     On April 11, 2024, Plaintiff copied Gerety on a misconduct complaint against Fuerst that explicitly alleged "discrimination based on disability." From that date

forward, Disability Services had direct, documented notice that a student under its care was alleging that her federally protected disability rights were being violated in active institutional proceedings.

331.    Upon information and belief, Disability Services took no action in response. Disability Services did not contact Moore about his March 28 denial. Disability Services did not contact Mays about her March 28 denial. Disability Services did not intervene to ensure Plaintiff's approved accommodations were maintained during the prosecution.

332.    On July 19, 2024, Gerety emailed Plaintiff to announce her departure from USD. The prosecution that Gerety's office had been notified of on April 11 was still active. The accommodation denials that violated Gerety's own memo had never been addressed. Gerety wrote: "I hope you have a great year. Take good care!"

333.    Gerety departed without ensuring continuity of disability protections for a student whose rights were actively being violated. Upon information and belief, Gerety did not brief her successor, Angela Jackson, on Plaintiff's situation or the pending disability discrimination allegations. The office charged with protecting disabled students watched one get prosecuted for seven months, watched her accommodations get denied in violation of the office's own procedures, received direct notice of disability discrimination in those proceedings, and did nothing. When the Director left, she wished the student well and closed the door behind her.

334.    USD Knudson School of Law's administrative structure contains overlapping professional and familial relationships that compromised the institution's ability to self-correct. Library Director Sarah Kammer, whose March 1, 2024 emails established that Fuerst acted without authorization and that the display materials belonged to the library,

is married to Professor Sean Kammer, a full-time faculty member at the same law school. Sarah Kammer reports to Dean Fulton as Assistant Dean.

335.    Fulton and Sarah Kammer co-authored a law review article published during the pendency of this dispute: Neil Fulton, Patrick Garry & Sarah Kammer, *Assessing Government Transparency*: An Analysis of South Dakota's Open Records and Meetings Laws, 70 S.D. L. Rev. 367 (2025). The Library Director whose contemporaneous emails are critical evidence in this case is professionally subordinate to the Dean who orchestrated the coordinated attack, co-publishing with him, and married to a member of the faculty over which he presides.

336.    Upon information and belief, Professor Tyler Moore's spouse was employed as a legal writing instructor at USD Knudson School of Law during the 2023-2024 academic year. The law school that prosecuted Plaintiff for seven months is a workplace in which the key witnesses, administrators, and accused are bound by employment dependencies, co-authorship relationships, and family ties. No internal process could produce independent oversight under these conditions. The institution's failure to self-correct was not a policy gap. It was a structural impossibility.

337.    Mays occupied conflicting institutional roles throughout the events of this case. She solicited the initial complaint, denied disability accommodations, conditioned relief on speech surrender, controlled transfer letter processing, and managed the administrative steps of Plaintiff's departure. No institutional safeguard prevented the administrator who initiated the adverse action from controlling every subsequent administrative decision affecting the target.

*JACKSON v. USD, et al.*

338.    SDBOR Policy 1.4.3, Section 13.5.1, requires interim measures to assure that "the complainant is protected from retaliation for having made a complaint or responded to inquiries" and that "requests for the complainant's academic, living, transportation, and working situation are reviewed case by case through an interactive process and granted if they are reasonably available."

339.    When Plaintiff filed her retaliation complaint against Ulrich, the institution was required to protect Plaintiff from further retaliation. No interim measures were provided. Instead, the Miller prosecution continued for five additional months after the complaint was filed.

340.    Section 13.5.1(c) additionally required an "interactive process" for accommodation requests. Neither Moore nor Mays engaged in any interactive process when denying Plaintiff's March 28 Zoom request. Moore went silent. Mays interposed herself as gatekeeper. The Board's procedural safeguard for disabled complainants was never activated.

341.    SDBOR Policy 1.4.3, Section 5.1.2.2, prohibits applying institutional complaint procedures to suppress a viewpoint: "An institution may not apply the regulations in order to suppress a particular point of view. The mere dissemination of ideas, however offensive to good taste and common decency such ideas may be, does not afford grounds for regulation."

342.    Every adverse action in this case targeted one viewpoint: Plaintiff's criticism of the quality and inclusivity of legal education at USD Law. The LSAC complaint cited Plaintiff's social media posts. The Examiner Notices charged "videos posted online." The No Contact Order was issued, by Thompson's own admission, because Plaintiff was

"talking about Jennie in the videos." Mays directed Plaintiff to stop posting videos. Fulton forwarded the videos to General Counsel, who directed investigation "as soon as possible." The Board of Regents' anti-suppression provision was available to every defendant. It prohibited exactly what every defendant did.

343.    These procedural failures are not isolated lapses. They constitute a pattern of institutional indifference that enabled the retaliatory conduct described throughout this complaint. Each failure independently harmed Plaintiff. Collectively, they describe an institution that possessed the procedural infrastructure to prevent the harm Plaintiff suffered and chose not to use it.

*JACKSON v. USD, et al.*

# V. CAUSES OF ACTION

## COUNT I, FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983)

*Against Fulton, Mays, Miller, Moore, Ulrich, Thompson, Fitzgerald, Franken, Healy, Merkle, Fuerst, and Severson in their individual and official capacities*

### A. Protected Speech

344.    Plaintiff incorporates all preceding paragraphs.

345.    Plaintiff engaged in constitutionally protected speech when she posted videos on social media describing the inadequacy of a Black History Month display assembled from elementary school craft supplies at the state's only law school, documenting her experience as a Black student at USD, and addressing the quality of diversity efforts at a taxpayer-funded institution that had graduated fewer than one Black student per year for fifteen consecutive years. (¶¶95-98.) Plaintiff's speech addressed matters of public concern: the accountability of a public institution receiving federal financial assistance, the quality of legal education at the state's sole law school, and the adequacy of diversity programming at an institution whose own ABA Standard 509 data documented the enrollment collapse Plaintiff described. (¶¶76-78.) Speech criticizing government institutions on matters of public concern occupies the highest rung of First Amendment protection. *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). Plaintiff's speech was made as a private citizen on a personal social media account, not as part of any institutional duty, and addressed subjects of legitimate public interest. *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021) (off-campus student speech receives substantial First Amendment protection).

346.    Plaintiff's expression is independently protected under Article VI, Section 5 of the South Dakota Constitution, which provides that every person may freely speak, write, and publish on all subjects. The South Dakota Legislature codified this protection for

students at public institutions by enacting SDCL § 13-53-52, effective July 1, 2019, providing that a public institution of higher education, its faculty, administrators, and other employees "may not discriminate against any student or student organization based on the content or viewpoint of their expressive activity." The South Dakota Board of Regents adopted Policy 1.6.2 to implement this statute. Defendants violated a right established by the United States Constitution, the South Dakota Constitution, a South Dakota statute enacted five years before the March 27 attack, and a Board of Regents policy the Board itself adopted.

347.    Fulton personally affirmed the constitutional protection he subsequently violated. On March 17, 2024, ten days before the coordinated attack, Fulton distributed an email to the entire law school stating: "Faculty, students, and staff have the freedom to form their own thoughts and express those thoughts publicly." (¶152.) On January 3, 2024, eighty-four days before the attack, Fulton presented on ABA Standard 206 diversity compliance to the AALS Section for the Law School Dean, demonstrating actual knowledge that public criticism of a law school's diversity record intersects with accreditation obligations he was responsible for navigating. (¶6.) Two days before the March 27 attack, Fulton and Mays co-presented "Social Networking: Is This Really Mixing Business and Pleasure?" at a USD Graduate School Success Series event, demonstrating that both administrators were analyzing the professional implications of social media on March 25, 2024, and deployed those implications against Plaintiff on March 27, 2024. (¶153.)

## B. Adverse Actions

348.    Defendants took adverse actions that individually and collectively would deter a person of ordinary firmness from continuing to exercise First Amendment rights. *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). On March 27, 2024, three institutional

offices attacked Plaintiff simultaneously: Miller initiated disciplinary proceedings charging "videos posted online" (¶157); Thompson issued the first No Contact Order ever imposed on a USD law student, restricting Plaintiff's campus movement without prior notice, hearing, or factual basis (¶163); and Ulrich filed fraud accusations with LSAC, the national credentialing body, citing Plaintiff's social media posts as the evidentiary basis, without checking the student file that contained a seven-month-old amendment disproving the accusation (¶167). These three adverse actions were coordinated across separate institutional chains of command on a single afternoon. (¶170.)

349.    The adverse actions did not end on March 27. Defendants sustained and expanded the retaliation over 190 days. On March 28, both Moore and Mays independently denied Plaintiff's Zoom accommodation request, neither consulting Disability Services and neither following the interactive process the accommodation memo required. (¶¶173-178.) On April 4, Mays conditioned academic relief on Plaintiff ceasing her social media posts, a quid pro quo converting the grievance process into a speech-suppression mechanism. (¶¶211-214.) On April 11, Miller expanded the charges beyond the original complaint after Plaintiff's attorney raised a First Amendment defense and demanded dismissal. (¶313.) Mays withheld transfer recommendation letters past deadlines, obstructing Plaintiff's departure from the institution prosecuting her. (¶¶277-280.) The prosecution continued until October 3, 2024, when the Disciplinary Board concluded there was "not a basis to proceed." (Ex. 6.) Each of these actions, standing alone, would chill a person of ordinary firmness. Together, they describe a sustained institutional campaign to punish a student for speaking.

350.　This Court has already evaluated First Amendment retaliation by USD. In *Hook v. Rave*, No. 4:25-CV-04188-KES, 2025 U.S. Dist. LEXIS 190287 (D.S.D. Sept. 24, 2025), Judge Schreier found that a USD professor had a "fair chance of prevailing" on his First Amendment retaliation claim for a single social media post about a matter of public concern. *Id.* at 12-13. Professor Hook faced one adverse action from one office. Plaintiff faced three simultaneous adverse actions, coordinated across three offices, sustained for 190 days, targeting sustained criticism of educational quality and racial conditions at the state's only law school.

## C. Causal Connection

351.　Protected speech was the but-for cause of every adverse action. Under the Eighth Circuit's framework, Plaintiff must show that her protected activity was a substantial or motivating factor in the adverse action. Revels, 382 F.3d at 876. Once established, the burden shifts to Defendants to prove they would have taken the same action absent the protected speech. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Every triggering document in the record identifies speech as the sole basis for action. The Examiner Notice charged "videos posted online." (¶157.) The LSAC Charge Letter cited "a since deleted Youtube video." (Ex. 2.) Thompson stated on April 2, 2024, that the NCO was issued "to ask you to stop talking about Jennie in the videos." (¶192.) Fulton forwarded Plaintiff's video to General Counsel on March 5, and Franken directed investigation "as soon as possible." (¶¶128, 130.) No defendant has identified any conduct by Plaintiff, other than her constitutionally protected speech, as the basis for any action taken against her.

352.　Mays confirmed the causal connection in her own words. On April 4, 2024, when Plaintiff asked what caused the institutional response, Mays responded: "You're posting,

you're posting all this stuff and you're saying all this stuff. That's what happened." (¶217.) The Associate Dean who solicited the complaint that launched the prosecution, who denied Plaintiff's disability accommodations, and who controlled Plaintiff's transfer documentation identified Plaintiff's constitutionally protected speech — and nothing else — as the cause of every adverse action USD had taken against her. This is a direct causation admission by a party defendant.

353.    The temporal proximity independently establishes causation. On March 5, 2024, Fulton forwarded the video. Twenty-two days later, three offices struck. The March 5 email chain (Ex. 1) documents the formation of the institutional response in writing: Fuerst at 7:29 AM, Fulton at 9:34 AM, Franken at 10:45 AM. Three hours and sixteen minutes from a student email to a General Counsel directive for formal investigation. In *Hook*, this Court found causation where the termination letter issued within two days of the post and identified the social media post as the single piece of evidence. *Hook*, 2025 U.S. Dist. LEXIS 190287, at 12. The temporal evidence here is stronger: twenty-two days from initiation to coordinated execution, with the intervening period documented by an email chain, a meeting where Fulton concealed the pending investigation from Plaintiff (¶¶135-140), and an institution-wide email affirming free expression ten days before violating it (¶152).

354.    The surveillance apparatus confirms that protected speech was the target. Fuerst's months-long monitoring operation across four of Plaintiff's social media platforms compiled over twenty files of screenshots, screen recordings, and metadata, none of which concerned in-person conduct. (¶¶25-26.) The entire dossier was constitutionally protected expression.

355.    Defendants cannot carry the Mt. Healthy burden. Thompson stated no policy had been violated. (¶191.) The Disciplinary Board dismissed all charges. (Ex. 6.) LSAC withdrew in thirteen days. (¶251.) Thompson lifted the NCO the same day she acknowledged its purpose. (¶202.) If the proceedings had independent justification, they would not have collapsed upon examination. They collapsed because Plaintiff's speech was the only basis, and the speech was constitutionally protected.

## D. Government Coercion Through Private Intermediaries

356.    On May 30, 2024, while Plaintiff's prosecution was ongoing, the United States Supreme Court unanimously held that "the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries." *NRA v. Vullo*, 602 U.S. 175, 190 (2024) (Sotomayor, J., for a unanimous Court). The Court held that such an intermediary strategy "allows government officials to expand their regulatory jurisdiction to suppress the speech of organizations that they have no direct control over." *Id.* at 189. Mays's March 4, 2024 text to Fuerst — "Now can you file an administrative complaint?" (¶106) — is the conduct Vullo prohibits: a government official directing a private individual to initiate adverse action against a citizen's constitutionally protected speech. Fuerst responded that she could identify no grounds for a complaint. (¶107.) She filed twenty-three days later, after the institutional apparatus was assembled. (¶109.) The prosecution continued for 126 days after Vullo was decided.

## E. Defendant-Specific Participation

357.    Fulton initiated and orchestrated the coordinated attack. On March 5, 2024, Fulton forwarded Plaintiff's video to General Counsel with the message "One more entry. On my way." (Ex. 1; ¶128.) On March 8, Fulton met with Plaintiff and mapped three complaint

*JACKSON v. USD, et al.*

channels without disclosing the pending investigation. (¶¶135-137.) Fulton was informed that Miller, the standing Examiner, was Plaintiff's academic advisor and took no action to appoint a substitute. (¶139.) On March 27, the three channels Fulton mapped were deployed against Plaintiff simultaneously. (¶170.) After receiving the NAACP letter on May 1, Fulton responded on May 6 by deflecting and allowed the prosecution to continue for five additional months. (¶¶259-260.) Fulton served nine years as Federal Public Defender for the Districts of South Dakota and North Dakota. (¶9.) A former Federal Public Defender who coordinated three simultaneous adverse actions against a student for speech he certified as protected ten days earlier cannot claim he made a reasonable mistake about constitutional boundaries.

358.     Mays solicited the complaint, denied accommodations, and conditioned relief on speech surrender. On March 4, 2024, Mays texted Fuerst asking whether Fuerst could file a complaint. (¶106.) Fuerst responded she saw no grounds. (¶107.) On March 28, Mays denied Plaintiff's Zoom accommodation using the NCO as justification, without consulting Disability Services. (¶178.) On April 4, Mays identified Plaintiff's speech as the sole cause of the institutional response. (¶217.) Mays offered a quid pro quo: cease speech in exchange for favorable treatment. (¶214.) Mays withheld transfer letters past deadlines. (¶¶277-280.) Mays holds a J.D. from Harvard Law School and served as Dean of Arizona Summit Law School for eight years, during which her administration faced federal litigation alleging retaliation against professors who challenged institutional policies. *O'Connor v. Phoenix School of Law, LLC*, No. 2:13-cv-01142-SRB (D. Ariz.). A Harvard-trained attorney who served as dean of a law school cannot claim ignorance of the constitutional prohibition against retaliating for protected speech.

359.     Miller prosecuted his own advisee for 190 days on charges absent from the Student Handbook. Miller was Plaintiff's academic advisor, faculty advisor to the Debtors and Creditors Club in which Plaintiff served, and host of a social gathering Plaintiff and her father attended. (¶14.) Despite Fulton's knowledge of these conflicts, Miller was appointed Examiner. (¶139.) Miller charged Plaintiff under terms — "bullied, stalked, and harassed" — that do not appear in Part XV's enumeration of proscribed conduct. (¶¶159, 315-316.) After Plaintiff's attorney demanded dismissal on March 19 and April 11, Miller did not dismiss. He expanded the charges. (¶313.) On April 8, Miller accepted a Bible verse video from Fuerst as prosecution evidence, a video that named no student and could not constitute misconduct, demonstrating that Miller was building the case rather than evaluating whether charges were warranted. (¶229.) Miller published an article concluding that appointed investigators are structurally biased toward the interests of the party who appoints them. Robert Miller, *Everyone Is Talking About Bankruptcy Directors*, 23 Fla. St. U. Bus. Rev. 61 (2024). He then proved his own thesis.

360.     On March 19, 2024, Attorney Baron Houy raised the First Amendment defense in writing and demanded dismissal. (¶167; Ex. 5.) No new underlying conduct by Plaintiff occurred between March 19 and April 11. On April 11, Miller introduced three new areas of inquiry he admitted were "outside the bounds" of the existing charges, extending the prosecution to all off-campus activity under an undefined standard. (¶313.) The Supreme Court has recognized that "to punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort," and that a presumption of vindictive motive arises where "a reasonable likelihood of vindictiveness exists." *United States v. Goodwin*, 457 U.S. 368, 372-73 (1982). A reasonable likelihood of

vindictiveness exists here: Miller expanded charges after a licensed attorney asserted a constitutional defense, no new conduct by Plaintiff intervened, the expanded charges had no independent basis in the Handbook, and Miller admitted the original charges borrowed the complainants' lay terminology rather than applying the Handbook's standards. (¶¶313-315.) The only event between March 19 and April 11 was the assertion of a constitutional right. Miller's response was to invent charges broad enough to survive it.

361.    Miller's May 14, 2024 email independently violated the First Amendment by imposing an unconstitutional condition on Plaintiff's exercise of her right to petition. The unconstitutional conditions doctrine prohibits government actors from conditioning a government-controlled benefit on the surrender of a constitutional right. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). Miller controlled the benefit: his recommendation to the Disciplinary Board on the complaints against Plaintiff. Miller conditioned it on the right: Plaintiff's decision whether to maintain her counter-complaints against the students who accused her. (¶270.) Filing institutional complaints through official channels about documented misconduct, including surveillance, fabrication of police statements, and physical intimidation during a final exam, is protected activity under the First Amendment's right to petition. Independent of the speech retaliation alleged above, Miller penalized Plaintiff for exercising a separate First Amendment right: the right to seek institutional redress through the same grievance process the institution was using to prosecute her. Even if Plaintiff had never posted a single video, Miller's conditioning of his recommendations on Plaintiff's willingness to abandon her counter- complaints would constitute First Amendment retaliation for petitioning.

362.     Thompson issued the unprecedented NCO on March 27 without notice, hearing, or factual basis. (¶163.) On April 2, Thompson admitted the NCO was issued to suppress Plaintiff's speech: "my attempt to get you into my office was just to ask you to stop talking about Jennie in the videos." (¶192.) Thompson acknowledged she lacked authority to regulate the speech she was attempting to regulate: "freedom of speech. I don't have any way of policing what you're saying on video online." (¶193.) Thompson confirmed no policy had been violated. (¶191.) An official who admits her action targeted speech, admits the speech was protected, admits no policy was violated, and lifts the restriction on the same day she makes these admissions has no defense to a retaliation claim.

363.     Ulrich filed fraud accusations with LSAC on March 27 without checking the student file, which contained Plaintiff's August 3, 2023 amendment. (¶¶167, 253.) Ulrich's referral letter cited Plaintiff's YouTube videos as the triggering evidence. (Ex. 3; ¶252.) Ulrich does not hold a law degree and had no post-enrollment disciplinary jurisdiction over Plaintiff. (¶¶240, 253.) When confronted with the amendment thirteen days later, LSAC withdrew the complaint. (¶251.) Ulrich's April 9 withdrawal email treated seven-month-old documents as newly received, establishing that she never checked the file before filing career-destroying accusations. (¶249.) The LSAC filing created permanent disclosure obligations on every bar application Plaintiff will ever submit, regardless of the withdrawal. (¶305.)

364.     Franken directed the investigation without conducting any First Amendment analysis. On March 5, at 10:45 AM, Franken directed "formal intake and investigation as soon as possible" based on a student's social media posts about a library display. (¶130.)

Franken is a licensed attorney who graduated first in his class from the law school that teaches the First Amendment. (¶20.) He directed investigation of constitutionally protected speech without evaluating whether it was protected, without contacting Plaintiff, and without verifying the claims in the email he received. (¶¶130-131.) After Plaintiff's attorney demanded dismissal on March 19, Franken's office took no corrective action at any point during the 190-day prosecution. (¶133.)

365.    Healy attended the May 9, 2024 meeting and acknowledged on the record that the proceedings were "postured outside of what our normal complaint policies would look like." (¶266.) Gotto admitted the institution had no investigation policy. (¶266.) Plaintiff's attorney identified the proceedings as retaliatory and put the institution on formal legal notice. (¶275.) Healy denied nothing. The Miller prosecution continued for 147 additional days. (¶268.) A Deputy General Counsel who acknowledges proceedings targeting protected speech are outside normal policy, hears formal legal notice of retaliation, and permits those proceedings to continue for five months is not making a reasonable mistake. He is ratifying the retaliation.

366.    Fitzgerald received the unprecedented NCO on her desk as Thompson's direct supervisor and took no corrective action. (¶170-171.) When Thompson admitted on April 2 that no policy had been violated and lifted the NCO, Fitzgerald took no supervisory action to ensure the institutional record reflected the Order was issued without basis. (¶170-171.) A supervisor who receives an unprecedented restriction of a student's liberty, takes no action to review its basis, and takes no corrective action when the subordinate admits it had no basis has ratified the constitutional violation through deliberate inaction. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

367.     Fitzgerald's position as Dean of Students vested her with authority over all student affairs operations university-wide, including the power to review, modify, or rescind measures issued by subordinates in her division. Thompson reported directly to Fitzgerald. The No Contact Order was not a routine measure delegated within Thompson's independent authority; it was, by Thompson's own account, the first such order ever issued to a law student at USD. An unprecedented action by a subordinate triggers a heightened supervisory obligation. Fitzgerald's deliberate inaction in the face of an action she had the authority to reverse is not the passive awareness that defeats a qualified immunity argument; it is the supervisory ratification that establishes one.

368.     Moore denied Plaintiff's disability accommodation on March 28, 2024, one day after the coordinated attack. (¶173.) On January 7, Moore had offered his entire class Zoom attendance for anticipated weather. (¶74.) On March 28, Moore denied the identical accommodation to a disabled veteran who explained she had legal reasons she could not attend in person. (¶173-174.) Same professor, same class, same semester, same technology. Moore did not consult Disability Services. Moore did not follow the interactive process. Moore went silent and never responded to Plaintiff's follow-up. (¶174.) The parallel denial by Mays on the same day, neither administrator having contacted Disability Services, is consistent with coordinated rather than independent action. (¶¶176-178.)

369.     Fuerst is liable as a state actor under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982), because she acted as a willful participant in joint action with state officials. Mays solicited Fuerst's complaint on March 4. (¶106.) Fuerst acknowledged no grounds existed and filed anyway. (¶108.) Fuerst conducted months-long surveillance across four

of Plaintiff's social media platforms, compiling over twenty files of screenshots and recordings. (¶¶25-26.) After Plaintiff's attorney demanded dismissal on March 19, Fuerst provided additional prosecution evidence to Miller on April 8. (¶229.) On April 16, the second day of final exams, Fuerst appeared at the window of Plaintiff's isolated testing room during the Constitutional Law final. (¶235.) Fuerst's surveillance operation was the intelligence-gathering arm of the coordinated attack; her complaint was the institutional predicate manufactured at Mays's direction.

370.    Severson filed the misconduct complaint that became Miller's first Examiner Notice, characterizing Plaintiff saying "Good morning" on March 4 and declining to respond to pleasantries on March 6 as "bullying and harassment" under terms that do not appear in the Student Handbook. (¶¶159-162.) Severson is liable as a state actor under Lugar because she participated as a willful participant in joint action with state officials. The identical Bible verse video appeared in both Fuerst's and Severson's evidence files, establishing an evidentiary pipeline between the two complainants consistent with the coordination Mays initiated. (¶164.)

371.    Merkle's conduct independently constitutes First Amendment retaliation. On March 11, 2024, Merkle received Plaintiff's report of racial targeting prompted by Plaintiff's protected speech. (¶141.) Rather than initiating the formal EEO complaint process she was designated to administer, Merkle told Plaintiff the complaint was "not an EEO thing" and recommended that "everybody just not talk about it anymore." (¶144.) Merkle steered Plaintiff away from the framework that covered race (Policy 1.4.3) and into a framework that did not (Policy 1.4.1, Title IX). (¶¶145-146.) Every complaint Plaintiff filed through Merkle's office was processed under the wrong framework and

dismissed. (¶272.) Merkle's own May 14, 2024 email acknowledged that complaints involving "race, disability, retaliation and collusion" fell under Policy 1.4.3. (¶320.) Despite this written acknowledgment, Merkle never reclassified. The misrouting foreclosed Plaintiff's access to the institutional framework designed to address the discrimination she was reporting and operated in concert with the coordinated adverse actions taken by the remaining defendants.

**F. Clearly Established Right and Qualified Immunity**

372.      The right to be free from government retaliation for speech on matters of public concern has been clearly established for over fifty years. *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Perry v. Sindermann*, 408 U.S. 593 (1972); *Connick v. Myers*, 461 U.S. 138 (1983). The Eighth Circuit applies a three-part test: protected activity, adverse action that would chill a person of ordinary firmness, and causal connection. *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). Qualified immunity shields officials who make reasonable mistakes about legal boundaries. It does not shield officials who coordinate three simultaneous adverse actions against a student for speech they certified as protected ten days earlier, using institutional processes their own officials determined had no factual basis.

373.      In this District, this Court has already evaluated these rights against these defendants' anticipated counsel. In *Hook v. Rave*, Judge Schreier held that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and found that the public interest favored protecting speech against SDBOR retaliation. Hook, 2025 U.S. Dist. LEXIS 190287, at 13-14. Justin Bell of May, Adam, Gerdes & Thompson LLP served as lead defense counsel in Hook and lost the TRO within twenty-four hours. USD capitulated within ten days. The same anticipated

defense counsel lost on every factor before the same Court. The law was clearly established by the United States Constitution, by fifty years of Supreme Court precedent, by the Eighth Circuit's three-part framework, by South Dakota statute (SDCL § 13-53-52), by Board of Regents policy (Policy 1.6.2), by Fulton's own March 17 email, and by this Court's September 2025 order against these same institutional defendants.

374.     Fulton's actual knowledge that his conduct violated clearly established rights is independently established by his own published scholarship. Fulton wrote that assessing speech based on "the identity of the source" rather than its content is "socially destructive" and that "[g]overnment officials may not make the law a tool of personal advancement, discrimination, or unfair treatment." Neil Fulton, *Fake News on Trial*: The Jury Trial as a Guard Against Societal Entropy, 52 Tex. Tech L. Rev. 743, 746, 751, 762 (2020). Fulton's knowledge of the litigation consequences is independently established by his prior service as general counsel to the PEPL Fund and by three presentations at the PEPL Fund Risk Management Conference: "Risk Planning Through Legal Vigilance; Litigation: A Mock Trial" (2006), "Mitigating Damages" (2007), and "Workplace Behavior: Ethics, Liability, Lawsuits" (2008). (¶9.) Qualified immunity is unavailable to a defendant who published the constitutional principles he violated and trained the insurance carrier's clients on the consequences of the conduct he then committed.

375.     The defendants in this case include a former Federal Public Defender with nine years of experience defending constitutional rights (Fulton), a Harvard Law graduate who served as dean of a law school (Mays), two attorneys in the General Counsel's office (Franken and Healy), and multiple law professors who teach constitutional law. If these defendants were aware of *NRA v. Vullo*, 602 U.S. 175 (2024), decided unanimously on

May 30, 2024 while Plaintiff's prosecution was ongoing, they continued prosecuting Plaintiff with actual knowledge that the Supreme Court had declared their category of conduct unconstitutional. If they were unaware of a unanimous Supreme Court decision on First Amendment coercion through private intermediaries — the precise mechanism deployed against Plaintiff — that ignorance confirms the absence of constitutional training that Merkle acknowledged when she wrote that Plaintiff's "circumstance has brought to light the importance of training and education on this very important topic." (Ex. 7.)

### G. Official Policy

376.    The constitutional violations resulted from official policy, not isolated decisions. Within the law school, Dean Fulton is the final policymaker for student discipline. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Fulton personally forwarded the complaint, personally concealed the investigation from Plaintiff, personally failed to appoint a substitute examiner despite knowing of the conflict, and personally allowed the prosecution to continue after receiving formal notice from a licensed attorney, the NAACP, and the student herself. When a final policymaker makes the challenged decision, that decision is official policy. *Id.* For university-wide student affairs, Dean of Students Fitzgerald received the unprecedented NCO on her desk as Thompson's direct supervisor and took no action to question, modify, or rescind the restriction. For legal compliance, General Counsel Franken directed investigation "as soon as possible."

377.    USD maintained no policy requiring verification before LSAC filings, no conflict screening for examiner appointments, no constitutional training for administrators issuing contact orders restricting student speech, no training on SDCL § 13-53-52 which had been in effect for five years and which the Board of Regents had implemented through

Policy 1.6.2, and no intervention protocol when external civil rights organizations provided formal notice of constitutional violations. The two Board of Regents policies governing the complaint process, SDBOR 1.4.4 and 1.4.3, state "Definitions: None," creating a framework of standardless discretion that enabled selective enforcement against disfavored speech.

## H. Damages Framework

378.    Damages under 42 U.S.C. § 1983 are sought against each individual defendant in his or her individual capacity. Official capacity claims seek prospective injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908). Institutional liability under Title IX, Title VI, Section 504, and the ADA runs directly against USD as a recipient of federal financial assistance and is not subject to Eleventh Amendment immunity. State tort claims against USD are authorized under the PEPL Fund waiver of sovereign immunity, SDCL § 3-22-1.

*JACKSON v. USD, et al.*

## COUNT II, CIVIL CONSPIRACY (42 U.S.C. § 1983)

*Against Fulton, Mays, Miller, Moore, Fuerst, Severson, Ulrich, Thompson, Fitzgerald, Franken,*

*Healy, and Merkle in their individual capacities*

### A. Legal Standard

379.    Plaintiff incorporates all preceding paragraphs.

380.    To establish civil conspiracy under § 1983, Plaintiff must prove: (1) that Defendants conspired with others to deprive her of constitutional rights; (2) that at least one co- conspirator engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured Plaintiff. *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). Under South Dakota law, the elements are substantially identical: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result. *Setliff v. Akins*, 2000 SD 124, ¶ 32, 616 N.W.2d 878, 889. The Eighth Circuit has held that conspiracy claims should not be resolved against the plaintiff where circumstantial evidence permits an inference of a meeting of the minds, because "the elements of a conspiracy are rarely established through means other than circumstantial evidence." *White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008). Plaintiff does not rely on circumstantial inference alone. Plaintiff has documentary evidence of the agreement, admissions identifying its purpose, and a timeline of overt acts spanning 190 days across twelve participants and three institutional chains of command.

### B. The Agreement: Documentary Evidence

381.    The March 5, 2024 email chain is documentary evidence of the agreement itself. (Ex. 1.) At 7:29 AM, Fuerst emailed Fulton. At 9:34 AM, Fulton forwarded to Franken. At 10:45 AM, Franken directed "formal intake and investigation as soon as possible."

(¶128.) Three hours and sixteen minutes elapsed between a student's email about social media posts and a General Counsel directive for formal investigation, a response time inconsistent with routine administrative processing of a student complaint about a library display. Defendants who deny coordination must explain how General Counsel came to direct urgent formal investigation of a student's protected speech within 196 minutes of receiving a forwarded email, absent prior agreement to target that speech.

382.     The email chain's content is as significant as its speed. Fuerst's email body, transmitted through every link in the chain, characterized Plaintiff's speech through an explicitly racial lens, describing Plaintiff as comparing institutional conduct to racial violence and framing the Black History Month display incident as a racial confrontation. (¶¶127-129.) Every official who touched the chain — Fulton, Franken, and through Franken the offices he activated — received Fuerst's racial characterization of Plaintiff's constitutionally protected expression before deciding to act. Defendants who deny racial motivation must explain why every recipient of this racially framed communication then took adverse action against the speaker.

383.     On March 8, 2024, three days after the email chain, Fulton met with Plaintiff and identified three institutional complaint channels — Title IX, EEO, and Student Rights and Responsibilities — presenting them as avenues for Plaintiff's relief. (¶¶135-137.) Nineteen days later, those three channels took simultaneous adverse action against Plaintiff. (¶185.) A dean who maps institutional architecture to a student and then deploys that architecture against her has not made three independent administrative decisions. He has executed a plan. Fulton cannot deny the March 8 meeting without contradicting the

record. If Fulton admits the meeting, he must explain why the three channels he personally identified to Plaintiff were the same three channels that struck on March 27.

384.    Mays's March 4, 2024 text to Fuerst — "Now can you file an administrative complaint?" (¶106) — is direct evidence that a state official solicited a private individual to initiate the adverse action that became the predicate for the coordinated attack. Fuerst responded that she could identify no grounds for a complaint. (¶108.) Fuerst filed twenty-three days later. (¶109.) Under the First Amendment coercion framework the Supreme Court unanimously adopted in *NRA v. Vullo*, 602 U.S. 175, 189-90 (2024), government officials may not wield their power to suppress speech "through private intermediaries." Mays's solicitation of a complaint from a private individual who acknowledged no grounds for one, directed at a student whose only identified conduct was constitutionally protected speech, is the intermediary mechanism Vullo prohibits. Defendants who deny that Mays solicited Fuerst's complaint must explain the March 4 text. Defendants who admit the text must explain how it does not constitute solicitation.

## C. Overt Acts in Furtherance

385.    Each conspirator performed overt acts that advanced the conspiracy's objective: the suppression of Plaintiff's constitutionally protected speech through coordinated institutional process. Thompson identified that objective on April 2, 2024: "my attempt to get you into my office was just to ask you to stop talking about Jennie in the videos." (¶193.) Mays confirmed it on April 4: "You're posting, you're posting all this stuff and you're saying all this stuff. That's what happened." (¶218.) Under § 1983 conspiracy law, each co-conspirator is liable for the overt acts of all co-conspirators performed in furtherance of the agreement. *Askew*, 191 F.3d at 957. Every act identified below was directed at the same target (Plaintiff), motivated by the same conduct (protected speech),

and coordinated across separate institutional offices that do not share administrative authority — a pattern inconsistent with independent action.

386.    Fulton forwarded Plaintiff's video to General Counsel with the notation "One more entry. On my way." (Ex. 1; ¶128.) The notation establishes prior communications about Plaintiff's speech — "one more" presupposes earlier entries — and a physical meeting to discuss response ("on my way"). At the March 8 meeting, Fulton learned Miller was Plaintiff's academic advisor and took no action to appoint a substitute Examiner, despite the Handbook's recusal requirements. (¶139.) Fulton received the NAACP letter on May 1 and responded on May 6 by deflecting, allowing the prosecution to continue for five additional months. (¶¶267-268.) Fulton served nine years as Federal Public Defender for the Districts of South Dakota and North Dakota, a position that required daily defense of constitutional rights against government overreach. (¶9.) A former Federal Public Defender who coordinates three simultaneous adverse actions against a student for speech he certified as protected ten days earlier cannot claim he was unaware those actions violated constitutional rights.

387.    Mays solicited the complaint, denied accommodations, and conditioned academic relief on speech suppression. On March 4, Mays texted Fuerst soliciting a complaint. (¶106.) On March 28, one day after the coordinated attack, Mays denied Plaintiff's Zoom accommodation request using the NCO as justification, without consulting Disability Services and without following the interactive process the accommodation memo required. (¶192.) On April 4, Mays identified Plaintiff's speech as the sole cause of the institutional response: "You're posting, you're posting all this stuff and you're saying all this stuff. That's what happened." (¶218.) In the same conversation, Mays offered quid

pro quo relief conditioned on Plaintiff ceasing her social media posts, converting the grievance process into a speech- suppression mechanism. (¶236.) Mays withheld transfer recommendation letters past application deadlines, obstructing Plaintiff's departure from the institution prosecuting her. (¶¶284-287.) Mays holds a J.D. from Harvard Law School and served as Dean of Arizona Summit Law School for eight years, during which her administration faced federal litigation alleging retaliation against professors who challenged institutional policies. *O'Connor v. Phoenix School of Law, LLC*, No. 2:13-cv-01142-SRB (D. Ariz.). Defendants who deny Mays's role in the conspiracy must explain her causation admission and her text soliciting Fuerst's complaint.

388.     Miller prosecuted his own advisee for 190 days on charges absent from the Student Handbook. Miller was Plaintiff's academic advisor, faculty advisor to the Debtors and Creditors Club in which Plaintiff served, and host of a social gathering Plaintiff and her father attended. (¶14.) Despite these relationships, Miller served as Examiner. (¶139.) Miller charged Plaintiff under terms — "bullied, stalked, and harassed" — that do not appear in Part XV's enumeration of proscribed conduct. (¶¶159, 315-316.) After Plaintiff's attorney demanded dismissal on March 19 and April 11, Miller did not dismiss; he expanded the charges, introducing three new areas of inquiry he admitted were "outside the bounds" of the existing complaints, extending the prosecution to all off-campus activity under an undefined standard. (¶¶317-318.) On April 8, Miller accepted a Bible verse video from Fuerst as prosecution evidence — a video naming no student and constituting no conceivable misconduct — establishing that Miller was building the case rather than neutrally evaluating whether charges were warranted. (¶243.)

389.    Miller's own investigation file contained the evidence that the complaint triggering his prosecution was manufactured. The file included the Mays-Fuerst text exchange establishing the complaint was solicited by an administrator and filed by a complainant who acknowledged she saw no grounds. (¶¶107-108.) The file included Attorney Baron Houy's March 19 demand for dismissal identifying the speech as constitutionally protected. (¶167; Ex. 5.) The file included the April 11 letter describing the charges as "threadbare." Every document in that file was collected, organized, and preserved by Miller in his capacity as Examiner. An examiner who assembles a file proving the complaint was manufactured and who responds by expanding the charges rather than recommending dismissal has made the file itself the evidence of his knowledge of and participation in the conspiracy.

390.    Miller used the prosecution to pressure Plaintiff into abandoning complaints that documented the conspiracy's operations. On May 14, 2024, Miller told Plaintiff that her decision whether to proceed with her counter-complaints against Fuerst and Severson would "weigh heavily in my recommendations" on the charges against her. (¶320.) No provision of the Student Handbook authorizes the Examiner to condition the outcome of one proceeding on the respondent's participation in another. The counter-complaints Plaintiff filed documented Fuerst's months-long surveillance operation, her fabrication of UPD statements, her unauthorized placement of materials on Plaintiff's desk, and her appearance at Plaintiff's testing room window during a final exam. (¶¶245, 320.) These were complaints about the overt acts of a co-conspirator. Miller's pressure to withdraw them served the conspiracy's objective: eliminating the institutional record of the conduct

Fuerst performed in furtherance of the agreement. Plaintiff refused the condition. Miller continued prosecuting for 143 additional days. The charges produced zero findings.

391.    Miller claimed he lacked authority to end the prosecution while the Handbook authorized him to recommend dismissal at any time. On May 14, 2024, Miller wrote that he "lack[ed] the authority to resolve or conclude any misconduct complaints." (¶321.) The Handbook provides that the Examiner makes a recommendation to the Disciplinary Board, and the Board concluded on October 3, 2024 that there was "not a basis to proceed." (Ex. 6.) Either Miller could have recommended that conclusion months earlier and chose not to, or the Board reached it independently and Miller was advocating for a prosecution the Board found baseless. Both paths establish that Miller's continuation of the prosecution was volitional, not procedurally compelled — and both paths establish that the prosecution Miller maintained for 190 days had no basis on the day it ended.

392.    Miller published an article concluding that appointed investigators are structurally biased toward the interests of the party who appoints them. Robert Miller, *Everyone Is Talking About Bankruptcy Directors*, 23 Fla. St. U. Bus. Rev. 61 (2024). He then proved his own thesis.

393.    Thompson issued the first No Contact Order ever imposed on a USD law student on March 27, without prior notice, hearing, or factual basis. (¶163.) On April 2, 2024, Thompson admitted the NCO was issued to suppress Plaintiff's speech: "my attempt to get you into my office was just to ask you to stop talking about Jennie in the videos." (¶193.) Thompson acknowledged she lacked authority to regulate the speech she targeted: "freedom of speech. I don't have any way of policing what you're saying on video online." (¶194.) Thompson confirmed that no institutional policy had been violated.

(¶207.) Thompson then lifted the NCO the same day she made these admissions. (¶218.) An official who admits her action targeted speech, admits the speech was protected, admits no policy was violated, and lifts the restriction upon confrontation has not made a reasonable administrative decision that went wrong. She has retreated from an indefensible position, and the retreat is the admission.

394.    Ulrich filed fraud accusations with LSAC on March 27 without checking the student file, which contained Plaintiff's August 3, 2023 amendment disproving the accusation. (¶¶183, 253.) Ulrich's referral letter cited Plaintiff's YouTube videos as the triggering evidence. (Ex. 3; ¶252.) Ulrich does not hold a law degree and had no post-enrollment disciplinary jurisdiction over Plaintiff. (¶¶251, 264.) When confronted with the amendment thirteen days later, LSAC withdrew the complaint. (¶251.) Ulrich's April 9 withdrawal email treated seven- month-old documents as newly received, confirming she never checked the file before filing career-destroying accusations. (¶260.) The LSAC filing created permanent disclosure obligations on every bar application Plaintiff will ever submit, regardless of the withdrawal. *In re Application of Widdison*, 539 N.W.2d 671, 674 (S.D. 1995). An admissions officer who files fraud accusations with the national credentialing body without opening the student file that contained the dispositive document has either acted with deliberate indifference or has acted pursuant to an objective other than accurate reporting.

395.    Franken directed the investigation without conducting any First Amendment analysis. On March 5, at 10:45 AM, Franken directed "formal intake and investigation as soon as possible" based on a student's social media posts about a library display. (¶128.) Franken is a licensed attorney who graduated first in his class from the law school that

teaches the First Amendment. (¶20.) He directed investigation of constitutionally protected speech without evaluating whether it was protected, without contacting Plaintiff, and without verifying the claims in the email he received. (¶¶130-131.) After Plaintiff's attorney demanded dismissal on March 19, Franken's office took no corrective action at any point during the 190-day prosecution. (¶133.) General Counsel exists to protect the institution from legal liability. A General Counsel who directs investigation of protected speech and then fails to intervene when a licensed attorney identifies constitutional violations has either failed at the core function of the office or has aligned the office with the conspiracy's objective.

396.    Healy attended the May 9, 2024 meeting and acknowledged on the record that the proceedings were "postured outside of what our normal complaint policies would look like." (¶273.) Gotto admitted the institution had no investigation policy. (¶273.) Plaintiff's attorney identified the proceedings as retaliatory and placed the institution on formal legal notice. (¶274.) Healy denied nothing. The Miller prosecution continued for 147 additional days. (¶278.) On May 7, 2024, Healy had inserted himself into the HR meeting about Plaintiff's discrimination complaint by announcing through Gotto's scheduling email that he "also plans to call in via Zoom," though no party had requested the Deputy General Counsel's presence. (¶271.) A Deputy General Counsel who uninvited inserts himself into a complainant's discrimination meeting, hears formal notice of retaliation, acknowledges the proceedings lack a policy framework, denies nothing, and permits those proceedings to continue for five months has not passively observed an administrative process. He has exercised legal judgment that the proceedings should continue despite the constitutional objections. That judgment is an overt act.

397. Healy's inaction after May 9, 2024 was not passive; it was a choice to align with the conspiracy's objective. Healy possessed the institutional authority to halt or recommend termination of proceedings he had acknowledged were outside normal policy. The proceedings Healy acknowledged as abnormal continued to target the same protected speech that every other conspirator's overt acts targeted. Under the Eighth Circuit's conspiracy framework, tacit agreement inferred from conduct is sufficient to establish the meeting of the minds. *White v. McKinley*, 519 F.3d at 816. A Deputy General Counsel who hears that institutional proceedings are retaliatory, acknowledges they lack a policy framework, and permits them to grind forward for five months has agreed through conduct to the conspiracy's purpose.

398. Gotto performed acts that furthered the conspiracy's operation. On May 9, 2024, Gotto admitted on the record that USD had no investigation policy: "I don't know that we do have an investigation policy per se." (¶273.) Gotto promised Plaintiff and her attorney that he would "follow back up with you . . . and share with you what I can share with you" when findings were reached. On September 30, 2024, 144 days later, Gotto responded to Plaintiff's inquiry about the outcome: "I am unable to provide any information related to personnel matters or disciplinary actions." Three days after Gotto's refusal, the Miller charges were dismissed. (Ex. 6.) The institutional machinery that Gotto operated, under Healy's legal oversight, absorbed Plaintiff's discrimination complaint and produced no visible result while the prosecution it was supposed to address continued uninterrupted. Either USD's HR process investigated and produced findings it has withheld from the complainant, or the process was never completed. Both outcomes further the conspiracy's objective of suppressing Plaintiff's complaints.

399.    Fitzgerald received the unprecedented NCO on her desk as Thompson's direct supervisor and took no corrective action. (¶171.) When Thompson admitted on April 2 that no policy had been violated and lifted the NCO, Fitzgerald took no supervisory action to ensure the institutional record reflected the Order was issued without basis. (¶171.) Under *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), when a final policymaker's deliberate choice results in a constitutional violation, that choice constitutes official policy. A supervisor who receives an unprecedented restriction of a student's liberty, takes no action to review its basis, and takes no corrective action when the subordinate admits it had no basis has ratified the constitutional violation through deliberate inaction.

400.    Moore denied Plaintiff's disability accommodation on March 28, 2024, one day after the coordinated attack. (¶174.) On January 7, Moore had offered his entire class Zoom attendance for anticipated weather. (¶74.) On March 28, Moore denied the identical accommodation to a disabled veteran who explained she had legal reasons she could not attend in person. (¶174.) Same professor, same class, same semester, same technology. Moore did not consult Disability Services. Moore did not follow the interactive process. Moore went silent and never responded to Plaintiff's follow-up. (¶174.) The parallel denial by Mays on the same afternoon, neither administrator having contacted Disability Services, is consistent with coordinated action rather than independent judgment. (¶¶190-192.) Defendants who deny coordination must explain how two administrators in separate offices independently denied the same accommodation to the same student on the same afternoon, both without consulting

Disability Services, one day after three other offices took simultaneous adverse action against her.

401.    Fuerst is liable as a state actor under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982), because she acted as a willful participant in joint action with state officials. Mays solicited Fuerst's complaint on March 4. (¶107.) Fuerst acknowledged no grounds existed and filed anyway. (¶108.) Fuerst conducted months-long surveillance across four of Plaintiff's social media platforms, compiling over twenty files of screenshots and recordings. (¶¶24-25.) After Plaintiff's attorney demanded dismissal on March 19, Fuerst provided additional prosecution evidence to Miller on April 8. (¶243.) On April 16, the second day of final exams, Fuerst appeared at the window of Plaintiff's isolated testing room during the Constitutional Law final. (¶245.) Fuerst's surveillance operation was the intelligence-gathering arm of the coordinated attack; her complaint was the institutional predicate manufactured at Mays's direction.

402.    Severson filed the misconduct complaint that became Miller's first Examiner Notice, characterizing Plaintiff saying "Good morning" on March 4 and declining to respond to pleasantries on March 6 as "bullying and harassment" under terms that do not appear in the Student Handbook. (¶¶159-162.) Severson is liable as a state actor under Lugar because she participated as a willful participant in joint action with state officials. The identical Bible verse video appeared in both Fuerst's and Severson's evidence files, establishing an evidentiary pipeline between the two complainants consistent with the coordination Mays initiated. (¶164.)

### D. Racial Character of the Conspiracy

403.    The racial character of the conspiracy is not negated by the participation of Associate Dean Mays, who shares Plaintiff's racial background. The Equal Protection

Clause and § 1983 prohibit race-based targeting by state actors regardless of the racial identity of the individual actors involved. *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). The relevant inquiry is whether race was a motivating factor in the coordinated adverse action, not whether each participant personally harbored racial animus. *Castaneda v. Partida*, 430 U.S. 482, 499 (1977) (members of a group can discriminate against other members of the same group). Mays's own conduct confirms she targeted racial speech: she solicited a complaint against the only Black student who criticized racial inadequacy at the institution, conditioned academic relief on that student ceasing racial expression, told that student "Life ain't fair" when she reported racial stereotyping, and tracked what documents had been disclosed to the investigation's target. A Black administrator who responds to racial criticism by punishing the critic is not evidence that the targeting was race-neutral. She is evidence that institutional interests override racial solidarity when the institution is threatened.

404.    Fuerst's surveillance operation, as alleged in ¶¶25-26, 190, functioned as the intelligence-gathering arm of the conspiracy, providing the evidence used to sustain prosecution across multiple institutional channels. The entire surveillance dossier — over twenty files of screenshots, screen recordings, and metadata — consisted exclusively of constitutionally protected expression. Not a single file documented in-person conduct. The evidentiary record the conspiracy assembled to prosecute Plaintiff was a record of her speech.

## E. The Fulton Scholarship Trap

405.    Defendant Fulton is not an unsophisticated administrator who accidentally coordinated a multi-office response. In *All the News That's Fit to Hide*, Fulton analyzed how institutions coordinate multiple departments to silence critics, documenting how

lawyers "facilitated the worst impulses of their clients when they could have been moral leaders" and caused "enormous harm" through coordinated institutional process. Fulton, *All the News That's Fit to Hide*, 40 Loy. L.A. Ent. L. Rev. at 411. When three offices took simultaneous adverse action against Plaintiff on March 27, 2024, for the same speech, targeting the same student, this coordination matched the institutional silencing pattern Fulton had studied and published about as an expert. His scholarly analysis of coordinated institutional tactics, combined with his execution of those tactics, proves both knowledge that coordinated institutional process can constitute suppression and agreement to deploy that process against Plaintiff's constitutionally protected speech. Fulton cannot deny knowledge of what coordinated institutional silencing looks like. He wrote the article.

## F. Intracorporate Conspiracy Doctrine

406. The intracorporate conspiracy doctrine does not bar this claim for three independent reasons, each sufficient alone. First, each individual defendant acted from personal motivation distinct from any legitimate institutional interest. The doctrine shields employees acting within their corporate authority in pursuit of the corporation's objectives; it does not shield employees pursuing personal ends through corporate channels. *Dossett v. First State Bank*, 399 F.3d 940, 951 (8th Cir. 2005). Miller prosecuted his own advisee in violation of the Handbook's recusal requirement rather than refer to a neutral examiner; no institutional purpose required this choice. Mays solicited a complaint she was told contemporaneously had "no grounds," then tracked what had been disclosed to the investigation's target; no administrative function required this conduct. Ulrich filed a fraud referral without opening the student file that would have disproved it, acting from an office with no post-enrollment disciplinary jurisdiction; no

admissions role required or authorized this. Thompson issued the first no-contact order ever imposed on a USD law student, by her own account to compel a meeting rather than address any verified safety concern; no student conduct authority justified this. When officials act from personal motive rather than institutional duty, the doctrine's rationale — that an entity cannot conspire with itself — has no application to their conduct.

407.      Second, the conspiracy extended beyond the institution. On March 4, 2024, Mays texted Fuerst: "Now can you file an administrative complaint?" (¶106.) Fuerst, a private individual outside the institutional hierarchy, filed twenty-three days later despite acknowledging she could identify no grounds. (¶107.) The intracorporate doctrine does not apply when a private individual outside the corporate structure participates in the conspiracy. *Dossett*, 399 F.3d at 950-51. Fuerst's participation as a solicited private actor defeats the doctrine regardless of the first prong's resolution.

408.      Third, the conduct itself fell outside the scope of any defendant's employment. Suppressing a student's constitutionally protected speech, initiating fraud proceedings without file verification, issuing no-contact orders without substantive predicate, and prosecuting charges the institution's own policies do not authorize are not job functions. No job description, no institutional policy, and no administrative framework authorized any defendant to do what was done here. Conduct undertaken outside the scope of employment does not receive the doctrine's protection. *Cross v. General Motors Corp.*, 721 F.2d 1152, 1156 (8th Cir. 1983).

## G. Merkle's Role in the Conspiracy

409.      Merkle was a knowing participant in the concerted action against Plaintiff. On March 5, 2024, General Counsel Franken directed Merkle to investigate Plaintiff. On March 27, 2024, Thompson CC'd Merkle on the No Contact Order issued against

Plaintiff. Merkle's Title IX office received the Fuerst complaint, determined it did not qualify under Title IX criteria, and referred it to Thompson's Student Rights and Responsibilities office — which then issued the NCO against Plaintiff the same day. (¶¶145-146.) Merkle did not refer the complaint to the EEO process she administered, which would have evaluated whether Fuerst's complaint was itself retaliatory. Instead, Merkle routed the complaint to a conduct office without anti- discrimination authority, ensuring the racial dimension of the conflict would not be addressed. On April 12, 2024, at 1:34 PM, Merkle requested access to Plaintiff's evidence file on SharePoint. At 5:04 PM that same day, Merkle emailed Plaintiff: "The preparation of the case file took a bit longer than expected. Notification will go out next week. I do apologize." (¶270.) Merkle was simultaneously requesting access to the complainant's evidence and preparing the institutional case file — actively building the administrative machinery on the same day she was accessing the student's own documents. An EEO/Title IX coordinator who receives direction from General Counsel, routes complaints to maximize adverse impact on the complainant, withholds the anti-discrimination framework she administers, and builds the case file while accessing the complainant's evidence has not made a series of neutral administrative decisions. She has ensured that the framework designed to protect Plaintiff from race and disability discrimination was never activated.

## H. Resulting Injury

410.        The conspiracy caused injury: a 190-day prosecution that ended in complete dismissal (Ex. 6); lifetime bar application disclosure obligations under *In re Application of Widdison*, 539 N.W.2d 671, 674 (S.D. 1995); reputational harm from fraud accusations filed with the national credentialing body; blocked transfer applications from withheld recommendation letters; denial of disability accommodations during the period of

maximum institutional hostility; and constructive expulsion from the state's only law school. Each conspirator's overt acts contributed to one or more of these injuries. The injuries are ongoing.

## COUNT III, PROCEDURAL DUE PROCESS (42 U.S.C. § 1983)

*Against Fulton, Mays, Miller, Moore, Ulrich, Thompson, Fitzgerald, Franken, Healy, and*

*Merkle in their individual and official capacities*

### A. Protected Interests

411.    Plaintiff incorporates all preceding paragraphs.

412.    The Fourteenth Amendment prohibits state actors from depriving any person of life, liberty, or property without due process of law. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Plaintiff possessed three categories of protected interests, each independently sufficient to trigger due process protections. First, Plaintiff held a property interest in continued enrollment at USD Knudson School of Law. Plaintiff's tuition was paid by the United States Department of Veterans Affairs through the Chapter 31 Vocational Rehabilitation program, a federal benefit conditioned on the VA's professional determination that Plaintiff was capable of completing the program. *Goss v. Lopez*, 419 U.S. 565, 574 (1975) (students at public institutions have a property interest in continued enrollment). Second, Plaintiff held a liberty interest in freedom of movement on campus. The No Contact Order issued on March 27 restricted Plaintiff's access to common areas, prohibited contact with a classmate, and limited her ability to use institutional facilities. Third, Plaintiff held a liberty interest in her professional reputation. The Examiner Notices accused Plaintiff of "bullying, stalking, and harassment," and the LSAC referral accused Plaintiff of "application fraud," each a stigmatizing label imposed through official institutional channels that altered Plaintiff's legal status and triggered mandatory disclosure obligations. *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972). Under the stigma-plus doctrine, a government actor's stigmatizing statement combined with an alteration of legal status triggers independent due process protection. *Siegert v. Gilley*,

500 U.S. 226, 233 (1991). Both conditions are present: the stigmatizing labels were imposed through formal proceedings by state actors, and each was accompanied by an alteration in Plaintiff's legal status through the NCO, the LSAC credential freeze, and the disciplinary investigation placing enrollment in jeopardy.

## B. Absence of Pre-Deprivation Process

413.    Due process requires, at minimum, notice and an opportunity to be heard before the government deprives a person of a protected interest. *Mathews*, 424 U.S. at 333; *Goss*, 419 U.S. at 579. No defendant provided Plaintiff with pre-deprivation process of any kind for any of the three simultaneous adverse actions taken on March 27, 2024.

414.    Thompson deprived Plaintiff of liberty without pre-deprivation process. On March 27, 2024, Thompson attempted to reach Plaintiff by phone at approximately 4:30 PM. Five minutes later, at 4:35 PM, Thompson sent the No Contact Order by email without having spoken to Plaintiff. (¶180.) Thompson did not provide Plaintiff with written notice of the allegations, did not identify the factual basis for the restriction, did not offer Plaintiff an opportunity to respond before the Order took effect, and did not conduct any hearing or proceeding before restricting Plaintiff's movement on campus. Thompson later acknowledged on April 2 that the NCO was issued before any determination that a policy had been violated. (¶207.) The NCO deprived Plaintiff of liberty on five minutes of unanswered phone contact and zero process. Thompson's own recorded admission that no policy was violated at the time of issuance confirms that the deprivation preceded any factual determination that could have justified it. Five minutes between a phone call and a liberty restriction is not compressed due process. It is no process.

415.    Ulrich deprived Plaintiff of liberty and property without any process. On March 27, 2024, Ulrich filed a misconduct referral with LSAC accusing Plaintiff of application fraud. (¶183.) Ulrich did not notify Plaintiff before filing. Ulrich did not provide Plaintiff an opportunity to present the August 3, 2023 amendment that disproved the accusation. Plaintiff did not learn of the LSAC accusation until eight days after filing, when LSAC sent a charge letter dated April 4, 2024. (Ex. 2.) The LSAC referral deprived Plaintiff of property, because the integrity of her credentials file was frozen system-wide under LSAC's automatic data withholding protocol, and of liberty, because an accusation of application fraud by a law school to its national credentialing body satisfies the stigma-plus doctrine. *Siegert*, 500 U.S. at 233. A pre-deprivation hearing would have ended the inquiry in minutes: the amendment was in the file Ulrich had open when she drafted the referral. Due process requires opportunity to clear one's name before stigmatizing labels are imposed. *Roth*, 408 U.S. at 573. Ulrich imposed the label first and never provided the opportunity at all.

416.    Miller initiated the disciplinary prosecution on March 27, 2024 without providing Plaintiff notice of the specific charges, without identifying the policy allegedly violated, and without affording an opportunity to respond before the Examiner Notice issued. The Examiner Notice charged Plaintiff with conduct described in the complainants' lay terminology rather than in the Handbook's enumerated offenses, denying Plaintiff fair notice of what was alleged. (¶¶159, 315-316.) Defendants who deny that pre-deprivation process was absent must identify the notice, hearing, or opportunity to respond that was provided to Plaintiff before any of the three March 27 actions took effect. No defendant can.

## C. Neutral Decisionmaker

417.     Due process requires a neutral and detached decisionmaker. *Withrow v. Larkin*, 421 U.S. 35, 46 (1975). The Examiner who determined the course of the 190-day prosecution was not licensed to practice law in the State of South Dakota. Miller was not neutral. Miller was Plaintiff's academic advisor, faculty advisor to the Debtors and Creditors Club in which Plaintiff served, and host of a social gathering Plaintiff and her father attended. (¶15.) SDBOR Policy 1.4.3 Section 7.3 required conflict screening to ensure investigators are "unbiased and disinterested." Section 7.3.1.1.2 disqualified anyone with "prior involvement in the incident or institutional response." No screening occurred. (¶139.) Miller proceeded, expanded charges beyond the original complaint, gathered prosecution evidence after the constitutional defense was raised, and prosecuted from March 27 through October 3, a total of 190 days, against his own advisee. An examiner who is simultaneously the respondent's academic mentor and the institution's prosecutor has combined the functions that due process exists to separate.

418.     Miller's procedural decisions, as alleged in Paragraphs 318 through 323, systematically foreclosed every avenue of relief available to Plaintiff within the proceeding Miller controlled. Miller disclaimed his authority to end the prosecution while the Handbook authorized him to recommend dismissal at any time. (¶321.) He transferred scheduling authority to the complainants while the Handbook vested that discretion in the Examiner alone. (¶321.) He conditioned his recommendations on Plaintiff's willingness to withdraw her counter-complaints while no Handbook provision authorized that linkage. (¶320.) He invoked the Handbook's confidentiality provision to deny Plaintiff information about her own complaints while ignoring the Handbook's substantive provisions that would have ended the prosecution. (¶¶316-319, 323.) Upon information

and belief, he never acted on Plaintiff's counter-complaints. (¶323.) A proceeding in which the decisionmaker has disclaimed his own authority, transferred scheduling power to the complainants, penalized the respondent for filing complaints, denied the respondent information about those complaints, and declined to act on them does not provide the meaningful opportunity the Fourteenth Amendment requires. It provides the appearance of a process while eliminating the substance.

### D. Contradictory Institutional Determinations

419.     On April 2, 2024, Thompson determined that no institutional policy had been violated and lifted the No Contact Order. (¶¶207, 218.) The Miller prosecution continued for 184 additional days, through October 3, 2024. A student cannot receive fair process when one university office clears her while another continues prosecuting her for the same underlying conduct. The continuation of prosecution after an institutional officer determined no violation occurred is evidence that the prosecution served a purpose other than determining whether a violation occurred.

### E. Standardless Discretion

420.     Due process requires that the standards under which a person is prosecuted be sufficiently defined to provide fair notice of prohibited conduct. The two Board of Regents policies governing Plaintiff's prosecution, SDBOR 1.4.4 and 1.4.3, state "Definitions: None." Plaintiff was investigated and prosecuted for months under a framework the Board of Regents never defined. Merkle, the official responsible for administering these policies, could not identify which policy applied or what conduct it prohibited. (¶¶145-146.) The absence of definitions is not ambiguity susceptible to reasonable interpretation. It is an institutional framework that vests standardless discretion in administrators to define offenses after the fact, target speech they disfavor,

and prosecute without articulable standards. The Board's own notice-to-accused provision, Section 10.2, requiring disclosure of the complaining party's identity and the substance of allegations, was violated when Merkle investigated Plaintiff on March 11 without revealing that Fuerst had filed a complaint or identifying any allegations. (¶141.) Defendants who deny that the framework lacked standards must identify the definition of any term used to charge Plaintiff. No defendant can, because the policies contain none.

### F. *Mathews v. Eldridge* Balancing

421.　　　The *Mathews v. Eldridge* balancing confirms the inadequacy of the process provided. First, Plaintiff's private interests were substantial: continued enrollment funded by VA Chapter 31 benefits earned through military service, freedom of movement on campus, and professional reputation in a field where a single misconduct finding can end a career before it begins. Second, the risk of erroneous deprivation was extreme and the value of additional safeguards was high: the Examiner had an undisclosed personal and academic relationship with the accused, the investigator could not identify which policy applied, no pre-deprivation hearing occurred, and the charges were stated in terms that do not appear anywhere in the Student Handbook. Every safeguard that was absent would have prevented the erroneous deprivation that occurred. Conflict screening would have disqualified Miller. Pre-deprivation notice would have allowed Plaintiff to present the August 2023 amendment before the LSAC complaint was filed. Defined standards would have revealed that no proscribed conduct was alleged. Third, the government's interest in dispensing with additional process was minimal: checking a student file before filing fraud accusations requires opening a folder, screening an examiner for conflicts requires reading the Handbook, and providing notice before restricting a student's campus access requires a phone call. The Disciplinary Board's October 3 dismissal of all charges

confirms that the safeguards the institution omitted would have prevented months of prosecution. (Ex. 6.)

## G. Defendant-Specific Deprivations

422.    Fulton deprived Plaintiff of due process through his role as the final policymaker who set the proceedings in motion and selected the conflicted decisionmaker. On March 5, 2024, Fulton received Fuerst's email and forwarded it to General Counsel within two hours. (Ex. 1; ¶128.) On March 8, Fulton met with Plaintiff and mapped three institutional complaint channels without disclosing that Franken had already directed investigation. (¶¶135-137.) On March 27, Fulton's office initiated the Miller examination and coordinated with the other offices that executed the simultaneous adverse actions. (¶185.) As Dean of the law school, Fulton was the final policymaker for student discipline. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Fulton personally selected Miller as Examiner despite knowing Miller was Plaintiff's academic advisor, denying Plaintiff the right to a neutral decisionmaker that *Withrow v. Larkin*, 421 U.S. 35 (1975), requires. The Handbook's Section III recusal requirement and SDBOR Policy 1.4.3 Section 7.3's mandate for "unbiased and disinterested" investigators both required conflict screening. Fulton bypassed both. Every procedural deficiency in the Miller prosecution traces to Fulton's appointment decision. Fulton published that "[f]airness within our judicial system is dependent upon allowing litigants to feel as though their position was heard and considered." Fulton, *Fake News on Trial*, 52 Tex. Tech L. Rev. at 763. He then issued three adverse actions on March 27, 2024 without meeting with Plaintiff, without hearing her position, and without determining whether any policy had been violated. Qualified immunity is unavailable to a defendant who published the due process standard he violated.

423.     Mays deprived Plaintiff of due process through the accommodation denial and the transfer obstruction. On March 28, 2024, one day after the coordinated attack, Mays denied Plaintiff's Zoom accommodation request using the NCO as justification, citing a speech- suppression instrument to deny a disability accommodation without consulting Disability Services, without engaging in the interactive process, and without providing Plaintiff an opportunity to explain the basis for the request. (¶192.) On March 4, 2024, Mays solicited a complaint from Fuerst that Fuerst acknowledged had no grounds, initiating proceedings without ensuring that any factual basis existed. (¶¶107-108.) Mays subsequently conditioned academic relief on Plaintiff ceasing protected speech, a quid pro quo that converted the grievance process into a speech-suppression mechanism without any procedural safeguard. (¶236.) During the transfer period, Mays withheld recommendation letters until after transfer deadlines had passed, depriving Plaintiff of the ability to transfer without any notice that the letters would be delayed or any opportunity to seek alternative arrangements. (¶¶284-287.)

424.     Moore denied Plaintiff's disability accommodation request without following USD's published accommodation procedures, without consulting Disability Services, and without engaging in the interactive process required by both institutional policy and federal law. (¶188.) The accommodation memo Moore received on January 10, 2024 contained explicit instructions to contact Disability Services if clarification was needed. Moore did not follow this procedure. (¶74.) On January 7, Moore had offered his entire class Zoom attendance for anticipated weather. (¶74.) On March 28, Moore denied the identical accommodation to a disabled veteran who explained she had legal reasons for the request. Same professor, same class, same semester, same technology, different

outcome. Plaintiff was deprived of equal access to education without the procedural protections USD's own handbook guaranteed.

425.    Fitzgerald deprived Plaintiff of due process before and after the No Contact Order took effect. As Dean of Students and Thompson's direct supervisor, Fitzgerald was the senior administrator responsible for student affairs at USD and the institutional official whose oversight was required before restrictions on student liberty were imposed. Thompson copied Fitzgerald on the March 27 NCO email. (¶186.) No NCO had ever been issued to a law student at USD. An unprecedented restriction on a student's liberty reached the desk of the official responsible for student affairs before it was delivered to Plaintiff. Fitzgerald did not require notice to Plaintiff, did not require an opportunity to respond, did not require a factual basis review, and did not exercise any oversight before the restriction took effect. Due process requires, at minimum, notice and an opportunity to be heard before deprivation of a protected interest. *Mathews*, 424 U.S. at 333; *Goss*, 419 U.S. at 579. Fitzgerald was not a peripheral administrator on a distribution list. She was the only official above Thompson with authority over student affairs, and her office was the institutional checkpoint that should have ensured constitutional requirements were satisfied before an unprecedented measure was executed.

426.    After the NCO was issued, Fitzgerald took no supervisory action between March 27 and April 2 to review, modify, or rescind the Order. After Thompson's April 2 admission that no policy had been violated, Fitzgerald took no action to ensure the institutional record reflected that the NCO had been issued without basis, took no action to address the downstream consequences of the restriction on Plaintiff's campus access and accommodation requests, and took no action to prevent the same process from being

deployed against other students. When a final policymaker ratifies a subordinate's unconstitutional conduct through deliberate inaction, that ratification constitutes official policy. Pembaur, 475 U.S. at 480. Fitzgerald's failure to correct an acknowledged constitutional violation by her direct subordinate constitutes ratification of that violation.

427.     Franken directed the formal investigation that led to the disciplinary proceedings without ensuring that the investigation complied with the procedural protections guaranteed by the Student Handbook and the Fourteenth Amendment. As General Counsel, Franken had both the authority and the professional obligation to ensure the institution's disciplinary process satisfied constitutional requirements before it was deployed against a student. (¶20.) Franken directed investigation of protected speech on March 5 and allowed proceedings to continue for 190 days without the procedural safeguards due process requires: no conflict screening, no pre-deprivation hearing, no defined standards, and no corrective action after Plaintiff's attorney identified constitutional violations on March 19. (¶¶130-133.)

428.     Healy, as Deputy General Counsel, inserted himself uninvited into the May 9, 2024 meeting about Plaintiff's discrimination complaint. (¶271.) At that meeting, Gotto admitted the institution had no investigation policy: "I don't know that we do have an investigation policy per se." (¶273.) Healy then acknowledged the proceedings were "postured outside of what our normal complaint policies would look like" and "a little bit outside of the norm." (¶273.) The institution's own attorney and its HR investigator admitted, in a meeting with Plaintiff's counsel present, that the proceedings targeting Plaintiff operated outside established procedures and without a governing policy framework.

429.    Despite these admissions, Healy took no corrective action. Plaintiff's attorney had identified the proceedings as retaliatory and placed the institution on formal legal notice. (¶274.) Gotto promised to follow up with findings. The prosecution continued for 147 additional days. (¶278.) On September 30, 2024, Gotto refused to disclose any outcome. Three days later the charges were dismissed. (Ex. 6.) As Deputy General Counsel, Healy had both the institutional authority and the professional obligation to ensure that proceedings he personally identified as outside normal policy complied with the constitutional requirements of notice, hearing, and neutral decisionmaker that *Mathews v. Eldridge*, 424 U.S. 319 (1976), and *Withrow v. Larkin*, 421 U.S. 35 (1975), demand. Healy permitted a process his own office acknowledged was ungoverned and abnormal to continue depriving a disabled veteran of liberty and property interests for five additional months. A Deputy General Counsel who identifies constitutional deficiencies in institutional proceedings and then permits those proceedings to continue has made a legal judgment that the deficiencies do not matter. That judgment is itself a due process violation.

430.    Merkle's misclassification of Plaintiff's complaints deprived Plaintiff of procedural protections to which she was entitled under SDBOR Policy 1.4.3. Had Plaintiff's complaints been processed under Policy 1.4.3 as the governing Human Rights Complaint Procedures, Plaintiff would have been entitled to a meeting with the EEO Coordinator within three working days of filing under Section 13.5.3, written notification to the accused containing the substance of the allegations under Section 10.2, a formal investigation conducted or coordinated by the EEO Coordinator under Section 13, and an appellate path under Section 14 that would have elevated the complaint beyond the

administrative level that produced the challenged conduct. By processing Plaintiff's complaints under Policy 1.4.1 (Title IX) instead of Policy 1.4.3, Merkle denied Plaintiff the three-day meeting requirement, the mandatory appellate path, and the anti-retaliation protections specifically designed for discrimination complainants under Section 13.8. (¶270.) Merkle's May 14, 2024 email acknowledged that Plaintiff's complaints involving "race, disability, retaliation and collusion" fell under Policy 1.4.3. (¶270.) Despite this written acknowledgment, Merkle never reclassified the complaints. The procedural protections Plaintiff was denied were not discretionary. They were mandatory provisions of a governing Board of Regents policy that Merkle was designated to administer. Defendants who deny that Merkle's classification was erroneous must explain her own May 14 email acknowledging the correct classification. Defendants who admit the email must explain why reclassification never occurred.

## H. Clearly Established Right

431.    The right to due process before deprivation of liberty or property has been clearly established since 1975. *Goss v. Lopez*, 419 U.S. 565 (1975) (public school students have due process rights before suspension); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (three-factor balancing test for adequacy of process). The right to a neutral decisionmaker has been clearly established since 1975. *Withrow v. Larkin*, 421 U.S. 35 (1975). The stigma-plus doctrine has been clearly established since 1972. *Board of Regents v. Roth*, 408 U.S. 564 (1972). Every defendant in this count holds a graduate degree. Several are licensed attorneys. Fulton served nine years as Federal Public Defender. Franken graduated first in his law school class. Mays holds a J.D. from Harvard Law School. These defendants did not make reasonable mistakes about whether a student is entitled to notice before her campus access is restricted, whether fraud accusations require checking the file first, or

*JACKSON v. USD, et al.*

whether an advisor can prosecute his own advisee. Qualified immunity protects officials

who make reasonable errors about legal boundaries. It does not protect officials who

dispense with every procedural safeguard the Constitution requires and then continue for

190 days after a licensed attorney identifies the violations on the record.

## COUNT IV, TITLE IX RETALIATION (20 U.S.C. § 1681)

*Against University of South Dakota*

### A. Legal Standard

432.     Plaintiff incorporates all preceding paragraphs.

433.     Title IX prohibits retaliation against individuals who report sex discrimination or harassment or who participate in related proceedings. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005). A materially adverse action is one that would "dissuade a reasonable person" from engaging in protected activity. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The Burlington Northern standard is objective but context-dependent: the same action may be materially adverse in some circumstances but not others, and the significance of any given act of retaliation depends on the constellation of surrounding circumstances, expectations, and relationships. *Id.* at 69. A student at a public law school, already isolated as one of five Black students and one of three Black women, who faces three simultaneous institutional proceedings for reporting discrimination experiences a different level of deterrence than a student in a majority population facing a single investigation.

### B. Protected Activity

434.     Plaintiff engaged in protected activity on multiple occasions before USD launched the March 27, 2024 adverse actions. Thompson later described the coordination: the matter "started as one person talking to another person and then it's just kind of continued to get forwarded on to people." (¶202.) The March 5, 2024 email chain (Ex. 1) documents the formation of the institutional response in writing: Fuerst at 7:29 AM to Fulton, Fulton at 9:34 AM to Franken, Franken at 10:45 AM directing investigation "as soon as possible." (¶¶126-128.) Against this documented backdrop, Plaintiff reported Fuerst's

targeting behavior on multiple occasions: on March 4, 2024, Plaintiff reported Fuerst's conduct to University Police Assistant Chief Sangster. (¶112.) Sangster forwarded Plaintiff's report to Title IX, confirming that the institutional channel designated for discrimination complaints received Plaintiff's report. (¶125.) On March 8, 2024, Plaintiff reported the targeting to Dean Fulton during a meeting at which Fulton walked Plaintiff through three complaint channels, including Title IX. (¶¶134-136.) On March 11, 2024, Plaintiff met with Title IX Coordinator Merkle to report Fuerst's conduct. (¶¶141-142.) Each report constituted opposition to conduct Plaintiff reasonably believed to be discriminatory, which is protected activity under Title IX regardless of whether the underlying conduct ultimately meets the statutory definition of sex discrimination.

435.    Plaintiff subsequently filed a formal Title IX complaint against Fuerst on April 16, 2024, documenting Fuerst's stalking behavior, unauthorized placement of materials on Plaintiff's desk, fabrication of the UPD harassment characterization, and sustained social media surveillance. (¶235.) On April 16, 2024, the day Fuerst was notified of the complaint, Fuerst appeared at the window of Plaintiff's isolated testing room during the Constitutional Law final exam. (¶¶235-236.) Plaintiff filed a formal complaint against Professor Moore on April 9, 2024, and a retaliation complaint against Ulrich on April 16, 2024. (¶256, 258.) Each filing constituted protected activity under Title IX.

## C. Adverse Actions

436.    USD took materially adverse actions after each instance of protected activity. Within twenty-three days of Plaintiff's March 4 report, three separate offices took simultaneous action against Plaintiff on March 27, 2024: Miller initiated disciplinary proceedings charging "videos posted online" (¶158); Thompson issued the first No Contact Order ever imposed on a USD law student (¶163); and Ulrich filed fraud

accusations with LSAC citing Plaintiff's YouTube videos as the triggering evidence (¶168; Ex. 3). Thompson described the coordination herself: the matter "started as one person talking to another person and then it's just kind of continued to get forwarded on to people." (¶202.) Each action, standing alone, would dissuade a reasonable person from engaging in protected activity. Together, they constitute an institutional response that no reasonable student would endure and continue reporting.

437.	After Plaintiff filed her formal Title IX complaint on April 16, 2024, the adverse actions continued and expanded. The disciplinary prosecution continued for 171 additional days without resolution. (¶300.) Mays withheld transfer recommendation letters past application deadlines, blocking Plaintiff's departure from the institution prosecuting her. (¶¶277-281.) Mays required Plaintiff to schedule a meeting with Mays before transfer letters would be processed, interposing the administrator who solicited the complaint as gatekeeper to the only avenue of escape. (¶¶278-279.) USD dismissed Plaintiff's Title IX complaint against Fuerst in 28 days without adjudicating the merits, solely because Fuerst graduated. (¶319; Ex. 7.) USD maintained Fuerst's complaint against Plaintiff for 190 days despite Thompson's April 2 determination that no policy had been violated. (¶192; Ex. 6.)

## D. The Processing Asymmetry Trap

438.	The disparity in complaint processing is the binary trap. Complaints targeting Plaintiff were processed by three offices within hours on March 27, 2024. Plaintiff's complaint against Moore, filed May 8, 2024, received no acknowledgment for sixteen days, no substantive response for thirty days, and was ultimately processed under the wrong regulatory framework. (¶¶272-273.) SDBOR Policy 1.4.3, Section 13.5.3 required

the EEO Coordinator to meet with the complainant within three working days of receipt. USD did not meet this requirement for any complaint Plaintiff filed. (¶272.)

439.     Either USD processed complaints against Plaintiff and complaints by Plaintiff under the same institutional procedures, or it did not. If USD applied the same procedures to both, the disparity in speed, resources, and outcome establishes that Plaintiff's complaints received deliberately inferior treatment — three offices in one afternoon for Fuerst, thirty days of silence for Plaintiff. If USD applied different procedures, then the institution maintained a two-track system in which complaints by the institution's chosen targets received expedited multi-office coordination while complaints by those targets received delayed single-office processing under the wrong framework. Under either alternative, the disparity is evidence of retaliatory intent: the institution's machinery operated swiftly to restrict Plaintiff and slowly to protect her.

## E. Causal Connection

440.     The temporal proximity between Plaintiff's protected activity and each adverse action establishes causal connection. Plaintiff reported to UPD on March 4. The coordinated attack struck March 27 — twenty-three days later. (¶112, 157-170.) Plaintiff filed the Title IX complaint against Fuerst on April 16. Fuerst appeared at her testing room window on April 16 — one day later. (¶235.) Plaintiff filed the Moore complaint on April 9. Moore never communicated with Plaintiff again. (¶223.) Each adverse action followed protected activity by days or weeks.

441.     Mays's April 4, 2024 causation admission independently establishes the retaliatory motive. When Plaintiff asked what caused the institutional response, Mays identified Plaintiff's protected speech — and nothing else — as the cause: "You're posting, you're posting all this stuff and you're saying all this stuff. That's what

happened." (¶218.) The Associate Dean who solicited the complaint, denied

accommodations, and controlled transfer documentation identified the protected activity

as the sole cause of every adverse action. A party defendant's admission that protected

activity caused the adverse actions eliminates the need for temporal-proximity inference.

## F. The Merkle Routing Trap

442.    USD's Title IX Coordinator compounded the retaliation through her own

documented conduct. On March 11, 2024, Merkle told Plaintiff she had "strong feelings

about what's happening with your case" and then said: "I just feel like I just want

everybody to just not talk about it anymore." (¶144.) Merkle classified Plaintiff's race and

disability complaint under the Title IX framework governing sex-based discrimination —

a framework that was never designed to address it. (¶¶142-144.) When the complaint

predictably failed under criteria that did not apply, Merkle referred it to Thompson's

Student Rights and Responsibilities office — the same office that had issued the No

Contact Order against Plaintiff that same day. (¶164, 186.) Merkle's own May 14, 2024

email acknowledged that complaints involving "race, disability, retaliation and collusion"

fell under Policy 1.4.3. (¶273.) Despite this written acknowledgment, every complaint

Plaintiff filed through Merkle's office was processed under Policy 1.4.1. (¶273.) The

official designated to protect students from discrimination steered the only Black student

who reported racial targeting away from the EEO framework that covered race and into

the office that was restricting her liberty.

443.    Merkle's own May 14, 2024 email acknowledged that complaints involving "race,

disability, retaliation and collusion" fell under Policy 1.4.3. (¶273.) Despite this written

acknowledgment, every complaint Plaintiff filed through Merkle's office was processed

under Policy 1.4.1. (¶273.) On May 3, 2024, Merkle issued a determination on Plaintiff's

retaliation complaint against Ulrich, quoting SDBOR Policy 1.4.3, Section 8: "Persons who bring complaints of discrimination and persons who participate in the investigation and disposition of such complaints will not be subject to harassment, interference, intimidation or retaliation." (¶264.) Merkle quoted the anti-retaliation provision while finding "insufficient evidence" that it had been violated. The EEO Coordinator cited the policy that prohibited what was happening to Plaintiff and concluded it was not happening.

## G. The Zero Tolerance Admission

444.    When Merkle dismissed Plaintiff's Title IX complaint against Fuerst on May 13, 2024, the dismissal letter stated: "Your circumstance has brought to light the importance of training and education on this very important topic. USD will work to ensure all students know the importance of zero tolerance regarding harassment and stalking in any education program or experience." (Ex. 7.) At the time of this letter, USD was prosecuting Plaintiff for alleged harassment and stalking. Thompson had determined on April 2 that no policy had been violated. (¶192.) USD proclaimed "zero tolerance" for harassment against the student who was being harassed, not the student who was doing the harassing. The institution's own dismissal letter admitted it lacked the training to handle what its administrators had done, while simultaneously maintaining the baseless prosecution for 143 additional days.

## H. Anti-Retaliation Policy Violation

445.    USD's own governing policy prohibited the conduct alleged in this Count. SDBOR Policy 1.4.3, Section 8 provides that "persons who bring complaints of discrimination and persons who participate in the investigation and disposition of such complaints will not be subject to harassment, interference, intimidation or retaliation."

Every adverse action following Plaintiff's March 4 report constituted retaliation for protected complaint activity under this provision. USD's EEO Coordinator was designated to administer this provision. She quoted it in a determination letter. She found no violation. Discovery will establish what investigation, if any, Merkle conducted before reaching that conclusion.

446.     The causal connection does not require proof that the underlying discrimination complaint was meritorious. The complainant need only show a reasonable, good-faith belief that the practices she opposed were unlawful. Plaintiff's belief was reasonable: the NAACP agreed (Ex. 4), the State Bar's Diversity Committee chair attended the February 22 meeting (¶98.), the library voted unanimously to remove the display (¶100.), and Thompson determined on April 2 that no policy had been violated by Plaintiff's speech (¶192.). Every external evaluation confirmed Plaintiff's position. Every internal process punished her for taking it.

## COUNT V, TITLE VI DISCRIMINATION (42 U.S.C. § 2000d)

*Against University of South Dakota*

### A. Federal Funding and Institutional Coverage

447.     Plaintiff incorporates all preceding paragraphs.

448.     Title VI prohibits discrimination based on race in programs receiving federal financial assistance. 42 U.S.C. § 2000d. USD receives federal financial assistance, including Pell Grants, federal student loans, and VA Chapter 31 Vocational Rehabilitation payments. Under the Civil Rights Restoration Act of 1987, 20 U.S.C. § 1687, when any program or activity of an institution receives federal financial assistance, all operations of the institution are subject to Title VI, Title IX, Section 504, and ADA Title II. USD is subject to these statutes institution-wide. To establish intentional discrimination under Title VI, Plaintiff need not produce direct evidence of discriminatory animus.

### B. The *Arlington Heights* Framework

449.     Circumstantial evidence of discriminatory purpose satisfies the standard. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Arlington Heights demands a "sensitive inquiry" into circumstantial and direct evidence of intent and requires a cumulative assessment — courts examine the totality of the evidence, not each piece in isolation. *Id.* at 266. Courts applying this framework have reversed district courts that examined each evidentiary element independently rather than engaging in the totality-of-the-circumstances analysis Arlington Heights requires. See, e.g., N.C. State Conference of the NAACP v. McCrory, 831 F.3d 204, 220 (4th Cir. 2016) (holding that when a decision-making body's actions correlate with race-targeted harm across multiple factors, the separate examination of any single factor will

predictably miss what the totality reveals). Arlington Heights identifies the factors that structure the inquiry: (1) historical background; (2) the specific sequence of events leading to the challenged decision; (3) departures from normal procedural sequences; (4) departures from normal substantive criteria; and (5) contemporary statements by members of the decision-making body. Each factor here points in the same direction.

### C. Contemporary Jurisdictional Pattern

450.    The historical pattern of racial discrimination in South Dakota is not historical. It is current, adjudicated, and ongoing in the same federal district where this action is filed. In August 2023, the same month Plaintiff enrolled at USD, a Sioux Falls restaurant refused to serve two Black truck drivers, told them "I'm not serving you people," and reported the men to police as aggressive; responding officers found no basis for action. See *Whitfield v. Denny's Inc.*, No. 4:25-cv-04116-ECS (D.S.D. filed July 17, 2025). In December 2025, ninety days before this complaint was filed, a federal jury in this District found the owner of a Rapid City hotel liable for discriminating against Native Americans in violation of Title II of the Civil Rights Act of 1964. *NDN Collective v. Retsel Corp.*, No. 5:22-cv-05027-LLP (D.S.D. Dec. 19, 2025). The Department of Justice had filed a parallel enforcement action against the same hotel. *United States v. Retsel Corp.*, No. 5:22-cv-05086-LLP (D.S.D. filed Oct. 19, 2022). (¶86.)

451.    Three institutions in one state — a restaurant, a hotel, and a law school — responded to people of color asserting their presence with the same institutional reflex: characterize the person as the problem, deploy institutional process against them, and use that process to remove them from the space. The restaurant called police on Black men seated calmly at a table. The hotel banned Native Americans from its premises. The law school coordinated three offices against the Black student who criticized its racial record.

Each institution invoked safety or institutional integrity to justify the exclusion. Each institution's justification collapsed upon external scrutiny. The *Arlington Heights* factors, assessed cumulatively as the framework requires, see, e.g., *McCrory*, 831 F.3d at 220, do not permit a court to evaluate any single factor — the enrollment data, the procedural departures, the surveillance targeting, the three-institution pattern — in isolation from the others. The separate examination of any single factor will predictably miss what the totality reveals.

## D. Historical Background (Factor 1)

452.    USD Law graduated an average of 0.8 Black students per year for fifteen years. (¶76.) The institution's indifference to its Black community extended to its own faculty. The Honorable James Donald Smith, retired Chief Administrative Patent Judge of the United States Patent Trial and Appeal Board, taught Intellectual Property Law at USD and served on the board of the National Music Museum on USD's campus. (¶87.) Judge Smith had run the tribunal responsible for patent validity for the entire country, overseeing 230 judges across six offices in five cities. When Judge Smith passed away in April 2025, a former President of the United States wrote a letter read at his memorial. The University of Minnesota published a full tribute. USD deleted his faculty page without acknowledgment. (¶88.) A library employee constructing a Black History Month display at the law school where Judge Smith was actively teaching did not include him. (¶95.) The institution's historical background is not merely low Black enrollment. It is active institutional blindness to the Black people already present.

453.    Sequence of events (Factor 2): Plaintiff criticized the treatment of minority students in February 2024 (¶96.); the institution launched the coordinated attack in March 2024 (¶¶157-170.); Black enrollment collapsed to zero in Fall 2024 (¶76.). The sequence

tracks the pattern *Arlington Heights* was designed to detect: racial criticism, followed by institutional retaliation, followed by the elimination of the racial presence that generated the criticism.

### E. Departures from Normal Procedures (Factors 3 and 4)

454.    Departures from normal procedure: The No Contact Order was the first ever issued to a law student at USD. (¶167.) Deputy General Counsel Healy acknowledged the proceedings were "postured outside of what our normal complaint policies would look like." (¶266.) The Examiner prosecuted his own advisee under terms that do not appear in the Student Handbook's enumeration of proscribed conduct. (¶¶158-160.) The Director of Admissions filed fraud accusations with a national credentialing body without checking the student file that contained the dispositive document. (¶168.) Each procedural departure, standing alone, deviates from institutional norms. Together, they describe an institution that abandoned its own procedures to target one student. That student was Black. She was the only student who criticized the institution's racial record.

### F. Contemporary Statements (Factor 5)

455.    Thompson stated the NCO was issued "to ask you to stop talking about Jennie in the videos." (¶193.) Mays acknowledged Plaintiff's speech was constitutionally protected — "Of course. Free speech is free speech" — and immediately recharacterized it as "extremely unprofessional behavior." (¶209.) Mays identified Plaintiff's speech as the sole cause of the institutional response: "You're posting, you're posting all this stuff and you're saying all this stuff. That's what happened." (¶218.) The Arlington Heights framework also evaluates the decision-makers' knowledge and stated rationale. Fulton wrote that tribalism "perpetuates the belief that who says something matters more than what is said" and warned that tribalistic institutions enforce conformity through "purity

tests" that result in the banishment of anyone who "thinks differently." Fulton, *Fake News on Trial*, 52 Tex. Tech L. Rev. at 747, 751. He described this as "an identity of exclusion and insularity." *Id.* at 750. Fulton's own published framework describes the exact institutional dynamic he deployed against Plaintiff: a non-traditional, first-generation Black student dissented from institutional practices, was subjected to institutional purity enforcement, and was expelled from the institution. Fulton's scholarship identifies this pattern as tribalism. The law identifies it as discrimination.

## G. Disparate Treatment

456.     Fuerst (white) filed complaints she admitted had no grounds and faced no consequence. (¶¶106-107.) Plaintiff (Black) was prosecuted for 190 days. Fuerst left the institution without sanction. Plaintiff was forced out. Plaintiff's speech was specifically about racial issues: the inadequacy of the Black History Month display, the failure to consult any Black person, the institutional treatment of minority students. (¶96.) The coordinated response targeted the only student who publicly raised racial concerns at USD. The speech content and the speaker's race are inseparable. Discovery will reveal whether any white student at USD has faced simultaneous adverse actions across three offices for social media speech.

457.     The surveillance itself was racially targeted. Fuerst conducted a months-long monitoring operation across four of Plaintiff's social media platforms, compiling over twenty files of screenshots, screen recordings, and metadata. (¶¶25-26.) The content Fuerst surveilled and compiled was Plaintiff's speech about race: the inadequacy of the Black History Month display, the treatment of Black students, the quality of diversity efforts at a predominantly white institution. Fuerst did not monitor the social media of white students. She did not compile dossiers on classmates who posted about the law

school on other topics. She monitored the one Black student who criticized the institution's racial record, captured that student's racial criticism, and delivered it to the administrators who used it to build a prosecution. The selectivity of the surveillance — targeting only the Black student's speech about race, across multiple platforms, over multiple months — is itself evidence of discriminatory intent under the *Arlington Heights* framework.

## H. Racial Bias in Institutional Proceedings

458.    Racial bias in institutional proceedings need not be explicit to be actionable. In *Henderson v. Thompson*, 200 Wash.2d 417, 518 P.3d 1011 (2022), the Washington Supreme Court held en banc that facially neutral institutional processes can be infected by racial bias operating through coded language, stereotyping, and differential credibility assessments. The court recognized that characterizing a Black woman as "confrontational" and "combative" invokes the "angry Black woman" stereotype, and that such framing can distort institutional outcomes even absent conscious discriminatory intent. Here, Plaintiff, a Black woman who publicly criticized racial inadequacy at a predominantly white institution, was characterized as engaging in "bullying, stalking, and harassment" for posting on social media. (¶158.) Fuerst manufactured a safety narrative, telling Deans that Plaintiff could "easily come to the school and still attack me." (¶109.) Rebecca Porter, who had sat in the February 22 meeting and witnessed Plaintiff present a constructive solution, later characterized Plaintiff as "combative." (¶115.) These characterizations track the same racial stereotyping Henderson identified: a Black woman expressing legitimate criticism is reframed as threatening, aggressive, and dangerous, justifying institutional punishment that would never have been imposed on a white student making the same speech.

## I. ABA Standard 509 Data

459.    USD's ABA Standard 509 data documents the enrollment impact. In Fall 2023, five Black students enrolled in the 1L class. In Fall 2024, after the coordinated attack, zero Black students enrolled. (¶76.) That is a 100% decline in Black enrollment in a single year at the state's only law school. The 509 data is compiled by USD, submitted to the ABA under accuracy requirements, and published as a mandatory public disclosure. USD cannot deny these figures without contradicting its own filing to the national accrediting body.

460.    The racial disparity in attrition confirms that the environment driving students of color out of USD Law did not end with Plaintiff's departure. USD's 2025 Standard 509 report, covering the 2024-2025 academic year, shows three students of color left under "Other Attrition" in the JD1 class: one Native American woman at a 25.0% rate and two multiracial students at a 50.0% rate. In the same period, two white men left at a 3.0% rate. Students of color left USD Law at seven times the rate of white students. These figures are USD's own data, submitted to the ABA under the same accuracy requirements. If the institution contends it provides an equitable environment for students of color, its own mandatory disclosures contradict that contention.

461.    The two years of data together establish a pattern. In 2023-2024, USD drove out its only Black woman and reported her as permanent attrition. (¶¶291-296.) In 2024-2025, USD lost three more students of color at rates that dwarfed white attrition. Black enrollment remained at zero. The institution did not correct the environment after Plaintiff's constructive expulsion. The environment persisted, and the 509 data proves it. Whether any individual student's departure was caused by knowledge of Plaintiff's treatment or by independent experience of the same institutional culture, the outcome is

identical: the state's only law school is hemorrhaging students of color at rates its own accreditation data cannot explain by academic performance, because the academic attrition table for 2024-2025 shows zero students of any race leaving for academic reasons.

## J. Totality of the Evidence

462.    The totality of the evidence establishes that USD's coordinated adverse actions were motivated, at least in part, by Plaintiff's race. Plaintiff was the only student at USD who publicly criticized the institution's treatment of Black students. She was the only student subjected to simultaneous adverse actions from three offices. She was the only student charged under terms — "bullying, stalking, and harassment" — that do not appear in the Student Handbook. (¶145, 158.) Every adverse action traced to speech about race, delivered by a Black speaker, at an institution that graduated fewer than one Black student per year for fifteen years. The *Arlington Heights* factors, assessed cumulatively as the framework requires, establish that race was a motivating factor in Defendants' decisions. *Village of Arlington Heights*, 429 U.S. at 265-66.

## K. Title VI Retaliation

463.    Title VI also prohibits retaliation against individuals who oppose practices made unlawful by the statute. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 179 (2005) (holding that retaliation claims are available under statutes prohibiting intentional discrimination). Plaintiff complained about racial inadequacy at a taxpayer-funded institution, speech that constitutes opposition to practices made unlawful by Title VI. USD's coordinated response to that speech constitutes retaliation. The temporal proximity between Plaintiff's racial criticism (February-March 2024) and the institutional response (March 27, 2024) establishes causal connection. A Title VI retaliation claim does not

*JACKSON v. USD, et al.*

require proof that the underlying discrimination complaint was meritorious. The complainant need only show that she had a reasonable, good-faith belief that the practices she opposed were unlawful. Plaintiff's belief was reasonable: the NAACP agreed (Ex. 4), the State Bar's Diversity Committee chair attended the February 22 meeting (¶98.), and the library itself voted unanimously to remove the display (¶100.).

## COUNT VI, SECTION 504 RETALIATION AND DISCRIMINATION (29 U.S.C. § 794)

*Against University of South Dakota*

### A. Legal Standard and Institutional Coverage

464.     Plaintiff incorporates all preceding paragraphs.

465.     Section 504 prohibits discrimination against individuals with disabilities in programs receiving federal financial assistance. 29 U.S.C. § 794. Its implementing regulations prohibit exclusion from participation in, denial of benefits of, or discrimination under any program or activity receiving federal financial assistance. 34 C.F.R. § 104.4. Recipients must make modifications to academic requirements as necessary to ensure that such requirements do not discriminate against qualified students with disabilities. 34 C.F.R. § 104.43. To prevail, Plaintiff must establish: (1) she is a qualified individual with a disability; (2) she was denied the benefits of a program receiving federal financial assistance; (3) solely by reason of her disability; and (4) the institution acted with deliberate indifference. *A.J.T. v. Osseo Area Sch., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 345 (2025).

### B. Qualified Individual with a Disability

466.     Plaintiff is a service-connected disabled veteran with documented cognitive processing disabilities. USD's Disability Services office confirmed Plaintiff's accommodation eligibility and issued accommodation memos for Fall 2023 and Spring 2024 approving audio recording of lectures, a quiet exam location, amplification during lectures, and 100% extended time on exams. (¶¶68, 72.) Plaintiff was otherwise qualified for participation in USD's programs: USD certified Plaintiff in good academic standing at

9:01 AM on March 27, 2024. (¶156.) The institution's own certification eliminates any argument that Plaintiff was not qualified for the program.

## C. Denial of Benefits — The Dual Denial

467.    On March 28, 2024, one day after the coordinated attack, two administrators independently denied Plaintiff's Zoom accommodation request. Moore denied the request at the classroom level. (¶174.) Mays denied the same request at the administrative level that afternoon. (¶179.) Neither consulted Disability Services. Neither followed the interactive process the accommodation memo required. Neither contacted Coordinator Gerety, whose office had issued the memo and whose instructions stated: "If after talking to the student you need further clarification, please contact our office." (¶73.) The parallel denials occurred the day after three offices attacked Plaintiff simultaneously, connecting the accommodation denial to the retaliatory sequence rather than an independent academic decision.

468.    Moore had offered his entire class Zoom attendance on January 7, 2024, for anticipated weather. (¶74.) On March 28, Moore denied the identical accommodation to a disabled veteran who explained she had "legal reasons" she could not attend in person. (¶174.) Same professor, same class, same semester, same technology. The only variable that changed between January 7 and March 28 was that Plaintiff had been targeted by three institutional offices the previous day.

469.    Either Moore read the accommodation memo he received on January 10, 2024, or he did not. If Moore read the memo, he knew Plaintiff was a registered student with disabilities, he knew the memo instructed him to contact Disability Services if clarification was needed, and he denied Plaintiff's March 28 request without following that instruction, without contacting Disability Services, and without engaging in the

interactive process. If Moore did not read the memo, he received a confidential disability accommodation letter from the university's Disability Services office and disregarded it entirely. Under either alternative, Moore denied a disabled veteran's accommodation request the day after the coordinated attack without taking the single step the memo required. (¶176.)

## D. The Complainant Veto

470.    Mays consulted Fuerst, the complainant, about whether Plaintiff should attend classes via Zoom. (¶110.) Fuerst's own March 4, 2024 email documents what occurred: "I spoke with Dean Mays on the phone and it was discussed if I would feel safe if she was on zoom instead of me." Fuerst exercised veto power over the target's access to education: "She could easily come to the school and still attack me. And putting her on zoom will anger her even more so she will escalate even more." (¶109.) The adverse party's opinion on whether Plaintiff could attend class became part of the decisional record. Three days later, Mays denied Plaintiff's Zoom request. (¶179.) Regardless of whether Mays disclosed the disability basis for the request, the consultation itself bypassed the interactive process required by Plaintiff's accommodation memo and gave an adverse party veto power over a disabled student's ability to attend class. Any decision about modifying Plaintiff's attendance should have been routed through Disability Services. Instead, Mays routed it through the complainant. An administrator who subordinates a disabled student's educational access to the preferences of her accuser is not administering the accommodation process in good faith.

## E. The OCR Federal Finding

471.    On November 25, 2024, USD signed a Resolution Agreement with the U.S. Department of Education Office for Civil Rights (OCR Docket No. 07-24-2185) to

*JACKSON v. USD, et al.*

resolve an investigation into whether USD's online programs excluded people with disabilities. OCR's assessment identified that "documents provided in portable document format (pdf) were inaccessible to people with vision disabilities who use screen readers." Letter from Rhonda Collins, Att'y, U.S. Dep't of Educ., Office for Civil Rights, to Sheila Gestring, President, Univ. of S.D. (Nov. 29, 2024) (OCR Docket No. 07-24-2185). Under the Agreement, USD committed to adopt web accessibility standards within thirty days, conduct a full audit within 120 days, remediate all identified barriers within six months, and submit to ongoing OCR monitoring. (¶75.)

472.    Plaintiff encountered the same type of inaccessible PDF documents in Moore's course. Moore uploaded mandatory course materials to D2L in formats incompatible with Plaintiff's assistive technology, including *Allen v. Wright, Lujan v. Defenders of Wildlife, Griswold v. Connecticut, Lawrence v. Texas*, and *Washington v. Glucksberg*. (¶74.) The federal government investigated USD's PDF accessibility. It found a problem. USD signed a remediation agreement. Plaintiff filed a complaint about the same type of inaccessible documents in the same institutional system. USD's EEO Coordinator found "insufficient evidence." Either the federal government's finding was wrong, or USD's internal determination was wrong. They cannot both be correct.

**F. Disability Services Failure**

473.    Disability Services Coordinator Gerety was copied on the January 10, 2024 email delivering the accommodation memo to Moore. (¶73.) Gerety's office had contemporaneous proof Moore received the memo and its instructions. When Moore and Mays each denied Plaintiff's Zoom request on March 28, 2024, without contacting Disability Services, Gerety's office possessed the documentation to identify and correct the violation. Upon information and belief, Disability Services took no action. (¶331.)

474.     On April 11, 2024, Plaintiff copied Gerety on a misconduct complaint against Fuerst that explicitly alleged "discrimination based on disability." (¶231.) From that date forward, Disability Services had direct, documented notice that a student under its care was alleging disability discrimination in active institutional proceedings. Upon information and belief, Disability Services took no action to ensure Plaintiff's approved accommodations were maintained during the prosecution, took no action to intervene when Moore and Mays denied accommodations, and took no action to ensure the institutional proceedings did not interfere with Plaintiff's disability-related educational access. (¶331.)

475.     On July 19, 2024, Gerety departed USD without ensuring continuity of disability protections for a student whose rights were actively being violated. (¶332.) The office charged with protecting disabled students watched one get prosecuted for seven months, watched her accommodations get denied in violation of the office's own procedures, received direct notice of disability discrimination in those proceedings, and did nothing.

## G. ABA Accreditation Standards

476.     ABA Standard 207 required USD to "adopt, publish, and adhere to written policies and procedures for assessing and handling requests for reasonable accommodations made by qualified individuals with disabilities." ABA Standards and Rules of Procedure for Approval of Law Schools, Standard 207(b) (2023-2024). ABA Standard 205(b) independently required the institution to "foster and maintain equality of opportunity for students, faculty, and staff, without discrimination or segregation on the basis of race, color, ethnicity, religion, national origin, gender, gender identity or expression, sexual orientation, age, disability, or military status." Standard 205(b). Plaintiff is protected under three categories within a single ABA provision: race,

disability, and military status. The institution failed to follow its own procedures, the procedures the ABA required it to maintain, and the procedures the dean who presented on accreditation compliance was responsible for ensuring his institution observed.

## H. Section 504 Retaliation

477.        Section 504 also prohibits retaliation against individuals who assert their rights under the statute. Plaintiff engaged in protected activity by requesting disability accommodations and by raising concerns about the accessibility of course materials. USD retaliated by denying the requested accommodations, by using the NCO to justify that denial, and by continuing prosecution that exacerbated Plaintiff's service-connected disabilities. The temporal proximity between Plaintiff's accommodation requests and the denials, combined with the pretextual justification, establishes causal connection between protected activity and adverse action.

## I. Deliberate Indifference

478.        Compensatory damages for disability discrimination under Section 504 require deliberate indifference: the defendant must disregard a "strong likelihood" of violating federally protected rights. *A.J.T.*, 605 U.S. at 345. Deliberate indifference "does not require a showing of personal ill will or animosity." *Id.* USD's conduct satisfies this standard. Moore received Plaintiff's accommodation memo and went silent. Mays received the same memo and denied accommodations after consulting the complainant about Plaintiff's access to education rather than routing the decision through Disability Services as the interactive process required. Neither Moore nor Mays engaged in the interactive process. USD's Disability Services office had determined Plaintiff was eligible for accommodations; individual administrators lack authority to unilaterally override that determination.

479.     USD accepted VA Chapter 31 Vocational Rehabilitation funds on Plaintiff's behalf subject to a federal compliance condition requiring that the institution be "in compliance with" Section 504. 38 C.F.R. § 21.292(b)(3). The institution used a speech-suppression instrument to justify denying disability accommodations to the veteran whose federal benefits it had accepted on condition of providing those accommodations. USD disregarded a strong likelihood of violating Plaintiff's Section 504 rights because it was simultaneously violating the compliance condition under which it received the federal funds designated to protect those rights.

## J. Hostile Learning Environment

480.     The totality of USD's conduct toward Plaintiff — the denial of approved accommodations, the subordination of a disabled student's educational access to the preferences of her accuser, the use of a speech-suppression instrument to justify accommodation denial, the inaccessible course materials confirmed by the federal government's own investigation, and the continued prosecution that exacerbated Plaintiff's service-connected disabilities — created a hostile learning environment for a student with disabilities in violation of Section 504. *See* U.S. Dep't of Educ., Office for Civil Rights & Office of Special Educ. & Rehabilitative Servs., Dear Colleague Letter: Prohibited Disability Harassment (July 25, 2000) ("Disability harassment is a form of discrimination prohibited by Section 504 and Title II.").

*JACKSON v. USD, et al.*

## COUNT VII, ADA TITLE II VIOLATION (42 U.S.C. § 12132)

*Against University of South Dakota*

### A. Legal Standard

481.     Plaintiff incorporates all preceding paragraphs.

482.     Title II prohibits public entities from discriminating against qualified individuals with disabilities. 42 U.S.C. § 12132. USD is a public entity; Plaintiff is a qualified individual with a disability confirmed by USD's own Disability Services office. Title II requires public entities to take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others. 28 C.F.R. § 35.160(a)(1). In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with a disability. 28 C.F.R. § 35.160(b)(2). Neither Moore nor Mays gave any consideration to Plaintiff's request, let alone primary consideration.

### B. Accommodation Denial

483.     USD denied reasonable accommodations without engaging in the interactive process required by 28 C.F.R. § 35.130(b)(7). Mays denied Zoom accommodations citing the NCO, which was issued for speech suppression, not any disability-related reason. Using a speech-suppression tool to deny disability accommodation is discrimination by reason of disability. Professor Moore offered his entire class Zoom attendance for anticipated snow on January 7, 2024, then denied the same accommodation to a disabled veteran on March 28, 2024, one day after the coordinated attack, when Plaintiff explained she had legal reasons she could not attend in person. (¶174.) Same professor, same class, same semester, same accommodation, different treatment. Moore never contacted

*JACKSON v. USD, et al.*

Disability Services, never explored alternatives, and went completely silent in violation of USD's own accommodation procedures.

## C. Inaccessible Course Materials

484.     Moore uploaded mandatory course materials to USD's D2L platform throughout Spring 2024 in formats incompatible with Plaintiff's assistive technology, denying Plaintiff equal access to course readings despite receiving Plaintiff's accommodation memo. (¶74.) On April 24, 2024, the Department of Justice published a final rule requiring public entities to ensure the accessibility of web content under Title II. Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities, 89 Fed. Reg. 31320 (Apr. 24, 2024) (codified at 28 C.F.R. §§ 35.200-35.204). USD's D2L platform constitutes web content under this rule, and Moore's inaccessible PDF uploads violated USD's obligations under both the rule and the existing requirement to ensure effective communication. 28 C.F.R. § 35.160(a)(1).

## D. OCR Confirmation

485.     OCR's November 2024 finding (Docket No. 07-24-2185) confirms USD's pattern of disability discrimination. USD dismissed Plaintiff's internal complaints for "insufficient evidence"; federal investigators then found violations. USD acted with deliberate indifference, the standard for ADA Title II compensatory damages. *A.J.T. v. Osseo Area Sch., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 345 (2025).

## E. ADA Retaliation

486.     The ADA independently prohibits retaliation against individuals who assert their rights under the statute. 42 U.S.C. § 12203(a). Plaintiff engaged in protected activity by requesting disability accommodations and by raising concerns about the accessibility of

*JACKSON v. USD, et al.*

Moore's course materials. USD retaliated by denying the requested accommodations, by continuing prosecution that exacerbated Plaintiff's service-connected disabilities, and by maintaining the No Contact Order that created the barrier to campus access underlying the accommodation request. The same facts supporting Section 504 retaliation independently support ADA retaliation under § 12203.

## COUNT VIII, LIBEL PER SE

*Against Ulrich*

### A. Legal Standard

487.    Plaintiff incorporates all preceding paragraphs.

488.    Under South Dakota law, libel is "a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." SDCL § 20-11-3. Ulrich's written referral letter to LSAC, filed on USD letterhead, constitutes libel per se because it accused Plaintiff of application fraud in writing, directly injuring Plaintiff in her profession. Damages are presumed; Plaintiff need not prove specific economic harm. Ulrich's written accusation of "application fraud" imputed the commission of a crime to Plaintiff and directly injured Plaintiff in her profession as a law student seeking bar admission. Libel that imputes criminal conduct or injures a person in their occupation is actionable per se under South Dakota common law, and general damages are presumed without proof of special damages. The South Dakota Constitution independently constrains the truth defense for libel: "In all trials for libel, both civil and criminal, the truth, when published with good motives and for justifiable ends, shall be a sufficient defense." S.D. Const. art. VI, § 5. Truth defeats a libel claim only when published with good motives and for justifiable ends. Ulrich's motive was retaliation for protected speech, and her end was the suppression of a student's social media activity. Neither is good. Neither is justifiable. The constitutional truth defense is unavailable.

*JACKSON v. USD, et al.*

## B. False Publication

489.         Ulrich published false statements when she filed the written LSAC referral accusing Plaintiff of "application fraud." (Ex. 3.) The accusation was false: Plaintiff amended her application August 3, 2023, months before Ulrich filed. The amendment was in the file. A student who corrects her application through the institution's own amendment process seven months before the accusation has not committed fraud. At 9:01 AM on March 27, Mays authorized Plaintiff's "good standing" certification; Ulrich filed fraud accusations hours later without checking the file. The LSAC referral does not qualify for absolute privilege under SDCL § 20-11-5(1) or (2). LSAC is a private nonprofit corporation. Its misconduct process is not a judicial proceeding, not a legislative proceeding, and not an official proceeding authorized by any federal or state statute. It is a voluntary contractual arrangement among member law schools administered by a private entity. Ulrich may assert that the referral carries a qualified privilege under SDCL § 20-11-5(3) for good-faith communications on subjects of mutual interest. The privilege does not arise here because Ulrich was not acting within her legitimate sphere of interest. Ulrich is the Director of Admissions. Her administrative authority extends to the admissions process and ends at matriculation. Plaintiff matriculated in August 2023. The Student Handbook vests post-enrollment disciplinary authority in the Dean and the Disciplinary Procedures, not in the Admissions Office. An admissions director who initiates proceedings against an enrolled student months after matriculation is acting outside the scope of the role that would generate the common interest.

## C. Libel Per Se on Two Independent Grounds

490.    Ulrich's written accusation of "application fraud" is actionable as libel per se on two independent grounds. First, the accusation imputes the commission of a crime to Plaintiff. Fraud in a law school application implicates potential criminal liability and, at minimum, professional disciplinary consequences that attach permanently to the accused regardless of outcome. Second, the accusation injures Plaintiff in her profession. A law student's credential file is the foundation of her professional career. An accusation of application fraud filed with the national credentialing body by the student's own institution strikes directly at professional fitness. The LSAC referral was disseminated to the organization that administers the credential system for every ABA-accredited law school in the United States. The publication reached the single entity with the greatest capacity to injure Plaintiff's professional standing.

491.    The qualified privilege under *Setliff v. Akins*, 2000 SD 124, ¶ 22, 616 N.W.2d 878, 885, is defeated by actual malice. Actual malice in the qualified privilege context requires proof that the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." Ulrich filed fraud accusations without checking the student file that contained a seven-month-old amendment disproving the accusation. (¶168.) The file was under Ulrich's administrative control as Director of Admissions. A director who accuses a student of application fraud without opening the file she administers has acted with reckless disregard for truth. The qualified privilege is destroyed.

492.    The statute of limitations for libel per se under SDCL § 15-2-15 is two years. Ulrich filed the LSAC referral on March 27, 2024. This complaint is filed within the limitations period.

*JACKSON v. USD, et al.*

## COUNT IX, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*Against Fulton, Mays, Miller, Moore, Thompson, Ulrich, Franken, Healy, Fuerst, and Severson*

### A. Legal Standard

493.    Plaintiff incorporates all preceding paragraphs.

494.    Under South Dakota law, IIED requires: (1) an act by the defendant amounting to extreme and outrageous conduct; (2) intent on the part of the defendant to cause severe emotional distress; (3) the defendant's conduct was the proximate cause of the plaintiff's emotional distress; and (4) the plaintiff suffered an extreme disabling emotional response to the defendant's conduct. *Richardson v. East River Elec. Power Coop.*, 531 N.W.2d 23, 27 (S.D. 1995). Conduct is extreme and outrageous when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Restatement (Second) of Torts* § 46, cmt. d (1965).

### B. Extreme and Outrageous Conduct

495.    Defendants' coordinated conduct was extreme and outrageous. On a single day, three institutional offices attacked a disabled veteran for constitutionally protected speech, using processes their own officials later determined had no basis. The attack occurred hours after the institution certified Plaintiff in good academic standing, using the very institutional architecture Fulton had mapped for Plaintiff nineteen days earlier. No single adverse action, standing alone, constitutes the outrageousness this tort requires. But the simultaneous deployment of three institutional processes against a single student, sustained for 190 days, targeting speech the institution's own administrators certified as protected, targeting a student whose disability accommodations the institution was

simultaneously denying, and continuing after the institution's own officials determined no policy had been violated, exceeds all possible bounds of decency in an academic setting.

496.    The outrageousness is compounded by the power differential. Defendants were administrators, faculty, and institutional officials wielding the coercive authority of the state against a student enrolled in the state's only law school. Plaintiff was a service-connected disabled veteran whose education was federally funded, whose career depended on the institution's good-faith administration of its processes, and whose professional future required the institution to certify her character. Defendants used every lever of institutional power available to them against a person who had no choice but to submit to their authority to pursue the only path to her chosen profession available in the state.

497.    Each defendant's conduct independently satisfies the outrageousness standard when assessed in context. Mays solicited a complaint she was told had no grounds, then used the resulting prosecution as leverage for a speech-suppression quid pro quo. Miller prosecuted his own advisee for 190 days under charges the Handbook did not recognize, expanded the charges after a constitutional defense was raised, and conditioned his recommendations on Plaintiff's willingness to drop her own complaints. Thompson issued the first No Contact Order in USD law school history for the admitted purpose of suppressing speech, conceded no policy was violated, and lifted the Order the same day she made these admissions. Ulrich filed fraud accusations with the national credentialing body without checking the file that disproved them. Fulton coordinated the entire response while simultaneously publishing scholarship explaining why such coordination is destructive. Each defendant knew or should have known that their conduct would cause

severe emotional distress to a disabled veteran whose service-connected PTSD and anxiety disorders were documented in the institutional records accessible to Disability Services.

## C. Severe Emotional Distress

498.    Plaintiff suffered severe emotional distress including exacerbation of service-connected PTSD and anxiety disorders, loss of ability to concentrate, fear of attending campus requiring private security arrangements, hypervigilance, sleep disruption, and ongoing psychological harm from the knowledge that every professional licensing application for the duration of her career will require disclosure and explanation of false accusations. Plaintiff told Merkle on April 15, 2024 that her father had "made arrangements for a bodyguard to protect me when I am on campus." (¶325.) A law student who requires private security to attend class at the state's only law school because she fears institutional retaliation for filing discrimination complaints has suffered the kind of extreme emotional response this tort requires.

499.    The emotional distress is ongoing and permanent. The bar disclosure obligations created by the LSAC referral and the disciplinary proceedings will require Plaintiff to relive the institutional targeting every time she applies for bar admission, judicial clerkships, federal employment, or professional licenses. The distress is not confined to the seven months of active prosecution. It extends to every professional milestone for the remainder of Plaintiff's career.

## D. Statute of Limitations

500.    IIED claims are subject to the three-year statute of limitations under SDCL § 15-2-14. The coordinated attack began March 27, 2024. The last adverse action, the October

3, 2024 dismissal, established the full scope of harm. This complaint is filed within the

limitations period.

*JACKSON v. USD, et al.*

## COUNT X, ABUSE OF PROCESS

*Against Fulton, Mays, Thompson, Fitzgerald, Miller, Moore, Ulrich, Franken, Healy, Fuerst, and Severson*

### A. Legal Standard

501.    Plaintiff incorporates all preceding paragraphs.

502.    Abuse of process requires: (1) ulterior purpose, and (2) willful act not proper in regular proceedings. *Brishky v. State*, 479 N.W.2d 489 (S.D. 1991).

### B. Administrative Defendants

503.    Fulton used the disciplinary process for institutional retaliation rather than legitimate student conduct enforcement. As alleged in 133-138, Fulton mapped three complaint channels for Plaintiff on March 8, then deployed all three against her on March 27. Fulton appointed Miller as Examiner despite actual knowledge of the conflict (138). Fulton appointed an Examiner who holds no South Dakota bar admission to exercise quasi- prosecutorial authority over a student's professional career in a South Dakota institution. The language of Fulton's March 5 forward, "One more entry. On my way," reflects urgency to suppress, not concern about student welfare. Fulton published that "[g]overnment officials may not make the law a tool of personal advancement, discrimination, or unfair treatment." Fulton, *Fake News on Trial*, 52 Tex. Tech L. Rev. at 762. He then made the law the tool he warned against: three simultaneous proceedings, coordinated across three offices, targeting speech he had certified as protected ten days earlier. A dean who published the constitutional prohibition against weaponizing institutional process and then weaponized institutional process has demonstrated the ulterior purpose this tort requires.

504.     Fitzgerald received the unprecedented No Contact Order on her desk as Thompson's direct supervisor and ratified it through silence. Thompson later acknowledged the NCO was issued to compel Plaintiff to stop talking about Fuerst in her videos, not to address any safety concern, and that it was designed for "18-year olds who are fighting and gossiping." The NCO process is designed to protect students from genuine threats. Fitzgerald's ratification permitted its deployment against a student who posed no threat, for the purpose of suppressing speech, in a context the process was never designed to address. A supervisor who receives an unprecedented use of a protective process on her desk, knows it was deployed for speech suppression purposes, and takes no corrective action has ratified a willful act not proper in regular proceedings.

505.     Mays used the complaint process for institutional retaliation. As alleged in 105-107, Mays solicited a complaint she knew lacked grounds, then used her institutional authority to deny accommodations (173-178), condition relief on speech surrender (214), control transfer processing (277-280), and manage the administrative steps of Plaintiff's departure (212-215). Each act was a willful use of process for a purpose other than that for which it was designed.

506.     Thompson used the NCO process for speech suppression. As alleged in 147-156, Thompson stated the purpose was to get Plaintiff to stop talking about Fuerst, confirmed no policy had been violated, and lifted the Order the same day she made these admissions. The NCO process exists to protect students from genuine threats. Thompson issued the NCO to both parties but enforced it only against Plaintiff. When Fuerst violated the Order through continued surveillance and physical intimidation at Plaintiff's testing room, no enforcement action followed.

## C. Examiner and Faculty

507.     Miller used the examination process for prosecution-building rather than neutral investigation. After constitutional defense was raised March 19, Miller accepted prosecution evidence on April 8 rather than evaluating the defense. He expanded charges beyond the original complaint and prosecuted his own advisee from the April 11 expansion through the October 3 dismissal § 175 days § after Plaintiff's attorney demanded dismissal.

508.     Miller's May 14, 2024 statement linking the outcome of proceedings against Plaintiff to Plaintiff's willingness to withdraw her counter-complaints is an independent act of abuse of process. No provision of the Student Handbook authorizes the Examiner to condition recommendations on the respondent's participation in a separate proceeding. Using the examination process to pressure a respondent into surrendering independent procedural rights is a willful act not proper in regular proceedings. Miller's May 17, 2024 delegation of scheduling authority to the complainants is a second independent act: the Handbook vests scheduling discretion in the Examiner, and Miller transferred that authority to the parties whose complaints he was investigating, ensuring the prosecution continued through final examinations at the complainants' insistence rather than on any assessment of investigative need.

509.     Moore used the accommodation process to deny Plaintiff educational access in furtherance of the retaliatory scheme. Moore had offered his entire class Zoom attendance on January 7, 2024 for anticipated weather. On March 28, one day after the coordinated attack, Moore denied the identical accommodation to Plaintiff, the only student who had been issued a No Contact Order restricting her campus movement. Moore did not consult Disability Services. Moore did not engage in the interactive

process required by the accommodation memo he received on January 10, 2024. Moore went silent and never responded to Plaintiff's follow-up request. Seven days later, Moore solicited favorable course evaluations from the same student, noting they affect his tenure. The accommodation denial was not an academic decision. It was a willful act in the use of the accommodation process to pressure Plaintiff into silence by making attendance practically impossible while the retaliatory proceedings were active.

## D. Admissions and General Counsel

510. Ulrich used LSAC misconduct reporting to destroy transfer prospects. As alleged in 175-190, Ulrich deployed an irreversible system, one that freezes credentials system-wide and triggers nationwide dissemination, without verifying the student file that disproved the accusation.

511. Franken directed the investigation based on "videos posted online," using the institutional investigation process to target protected speech rather than genuine misconduct. As General Counsel, Franken controlled the legal apparatus that initiated and sustained the proceedings. Directing an investigation for the purpose of suppressing constitutionally protected expression is a willful act not proper in regular proceedings.

512. Healy, as Deputy General Counsel, inserted himself into the May 9, 2024 meeting at which Plaintiff's attorney put USD on formal legal notice that the proceedings were constitutionally defective and retaliatory. Healy acknowledged that the proceedings were "postured outside of what our normal complaint policies would look like" and "a little bit outside of the norm." Gotto, the HR investigator, admitted on the record that USD had no investigation policy. Baron Houy identified the proceedings as "indicative of the retaliatory intent." Plaintiff stated she believed Ulrich was "instructed" to file the LSAC complaint. Neither Healy nor Gotto denied this.

513.     Despite receiving notice that the proceedings lacked a policy framework, targeted protected speech, and were identified as retaliatory by a licensed attorney, Healy took no corrective action. The Miller prosecution continued from May 9 through October 3, 2024, 147 days, under the legal oversight of the office Healy occupied. A Deputy General Counsel who receives formal legal notice that institutional proceedings violate a student's constitutional rights, who acknowledges those proceedings operate outside normal policy and without a governing investigation framework, and who permits those proceedings to continue for 147 days is not passively observing the process. He is facilitating its abuse through deliberate institutional inaction.

## E. Private Actor Defendants

514.     Fuerst used misconduct complaints for retaliation against protected speech. As alleged in 20, 87-91, and 130-136, Fuerst admitted no grounds existed, filed anyway at Mays's direction, conducted sustained surveillance to compile prosecution materials, and provided additional evidence after Plaintiff's attorney demanded dismissal. Both Fuerst and Severson received career advancement after filing (58, 240).

515.     Severson used misconduct complaints for retaliation. Severson filed based on Plaintiff saying "Good morning" on March 4 and not responding to "Good luck" and "Great job" on March 6. Her evidentiary basis consisted of two items: a video in which Plaintiff mentioned her name without saying anything hostile, and a video in which Plaintiff, an ordained minister, posted a Bible verse addressing gossip that did not name Severson. Fuerst's evidence files contained the same Bible verse video, establishing that the two complainants shared prosecution materials. Severson subsequently received a clerkship with the Chief Justice of the South Dakota Supreme Court. A student selected for the most competitive judicial appointment in the state understood that her evidence

did not support a misconduct charge under the Student Handbook. She filed anyway because she knew the institution would sustain the prosecution to achieve its own objective. Filing a complaint with evidence one knows to be insufficient, in reliance on institutional willingness to prosecute regardless, is a willful act not proper in regular proceedings. Both complainants received extraordinary career advancement after filing: Fuerst received a promotional USD profile; Severson received a graduate assistantship with both prosecuting Deans and a South Dakota Supreme Court clerkship. The reward structure demonstrates institutional incentives for abusing process against institutional critics.

## COUNT XI, TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

*Against USD, Ulrich, Mays, Fulton, Miller, Thompson, Franken, and Fuerst*

### A. Legal Standard

516.    Plaintiff incorporates all preceding paragraphs.

517.    Under South Dakota law, tortious interference requires: (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer, (3) an intentional and unjustified act of interference, (4) proof that the interference caused the harm sustained, and (5) damage. *Tibke v. McDougall*, 479 N.W.2d 898, 908 (S.D. 1992).

### B. Prospective Relationships

518.    Plaintiff had transfer applications pending at multiple law schools, including Howard. Defendants intentionally interfered through four independent mechanisms: Ulrich's LSAC referral, which froze Plaintiff's credentials nationwide and flagged every pending application (169, 371); Mays's withholding of transfer recommendation letters until after deadlines passed; Miller's seven-month prosecution requiring disclosure of pending disciplinary charges on every application; and the No Contact Order restricting Plaintiff's ability to function at USD while awaiting transfer decisions. Each mechanism independently impaired Plaintiff's transfer prospects. Together, they ensured universal rejection.

519.    Mays's July 11, 2024 statement is a party admission: "I truly am sorry to hear that; it never occurred to me that you wouldn't get into at least one of the schools of your choice." This proves Mays knew of transfer applications, expected Plaintiff to succeed absent interference, and recognized her conduct's connection to Plaintiff's failures.

## C. Defendant-Specific Interference

520. Ulrich's LSAC referral was the single most destructive act of interference with Plaintiff's transfer prospects. Under LSAC's rules, the filing activated Section 7's automatic data withholding protocol, which froze Plaintiff's LSAT scores, CAS reports, and academic transcripts system-wide and triggered "possible data error" notifications to every law school holding Plaintiff's credentials. The freeze was automatic upon filing and could not be reversed by Plaintiff. Every transfer application Plaintiff submitted arrived at its destination with a credential freeze and a fraud flag attached. Ulrich filed the referral without checking the file that contained the amendment disproving the accusation. Had Ulrich checked the file before filing, no referral would have been made, no credential freeze would have occurred, and Plaintiff's transfer applications would have been evaluated on their merits. Ulrich's failure to verify before deploying an irreversible nationwide mechanism is the act that converted Plaintiff's transfer applications from competitive to impossible.

521. Fulton knew of Plaintiff's prospective transfer relationships and interfered by failing to resolve the prosecution before transfer deadlines passed. As Dean of the law school, Fulton controlled the disciplinary process that produced the pending charges requiring disclosure on every transfer application. Mays asked Plaintiff about transfer plans on July 11, 2024, and again on August 8, 2024 § establishing that the law school administration was tracking Plaintiff's transfer timeline. Fulton had the authority to dismiss the pending charges at any point after Thompson's April 2 determination that no policy had been violated. Every day the prosecution continued past April 2 was a day Plaintiff's transfer applications carried pending disciplinary charges. Fulton's failure to act, while his office tracked Plaintiff's transfer applications, constitutes intentional

interference because Fulton knew the prosecution was interfering with transfer prospects and chose to maintain it.

522.     Miller's seven-month prosecution directly interfered with Plaintiff's transfer applications. Every transfer application required disclosure of pending disciplinary charges. Miller's April 11 expansion of charges beyond the original scope § after Plaintiff's attorney raised the First Amendment defense § extended the prosecution timeline past transfer deadlines. Miller continued the prosecution from April 11 through October 3, 2024, a period that encompassed the entire transfer application cycle. An examiner who expands charges after the defense is raised, extending the prosecution through the transfer season while knowing the charges require disclosure on every application, has intentionally interfered with the prospective educational relationships those applications represent.

523.     Franken directed the investigation that produced the pending charges disclosed on Plaintiff's transfer applications. As General Counsel, Franken had the institutional authority and legal training to evaluate whether the speech-based charges had probable cause and to recommend dismissal after Thompson's April 2 determination. Franken's office received notice from Plaintiff's attorney on March 19, 2024, that the proceedings were baseless. The continuation of the investigation under Franken's authority through the transfer application period constituted interference with Plaintiff's transfer prospects because the pending investigation required disclosure and the investigation had no legitimate basis to continue.

524.     Fuerst's provision of prosecution evidence after Plaintiff's attorney demanded dismissal directly sustained the proceedings that interfered with Plaintiff's transfer

applications. On April 8, 2024, Fuerst delivered a Bible verse video to Miller § evidence that named no student and could not constitute misconduct § for the purpose of sustaining a prosecution that had already been identified as constitutionally defective. By supplying prosecution evidence to extend the proceedings, Fuerst ensured that pending charges remained on Plaintiff's record during the transfer application period. Fuerst's surveillance dossier was the evidentiary foundation for every proceeding that required disclosure on transfer applications. Without Fuerst's compiled materials, the prosecution could not have been sustained through the transfer cycle.

525.     Thompson determined on April 2, 2024, that no policy had been violated. The Disciplinary Board dismissed all charges on October 3, 2024, finding they were "not a basis to proceed." Neither determination halted the interference with Plaintiff's transfer applications, which had already been rejected during the months of pending prosecution.

526.     Thompson's No Contact Order restricted Plaintiff's movement on campus, interfered with her ability to attend classes and access educational resources, and contributed to the hostile environment that constructively expelled Plaintiff from the institution. Thompson admitted the NCO's purpose was to suppress Plaintiff's speech, not to address any safety concern. The NCO directly interfered with Plaintiff's prospective educational and professional relationships.

## D. Resulting Injury

527.     As a direct and proximate result of Defendants' interference, Plaintiff was rejected by every law school to which she applied for transfer. Mays's own party admission confirms the interference was outcome-determinative: an experienced law school administrator expected acceptance at "at least one" school, establishing that the universal rejection was attributable to intervening factors, the LSAC misconduct flag, the pending

disciplinary charges, and the delayed letters of good standing, all attributable to Defendants' conduct. Plaintiff suffered economic damages including the loss of a year of legal education, the cost of transfer applications, and the diminished economic value of delayed entry into the legal profession.

## COUNT XII, INSTITUTIONAL NEGLIGENCE AND NEGLIGENT SUPERVISION

*Against University of South Dakota and South Dakota Board of Regents*

### A. Legal Standard and Duty

528.    Plaintiff incorporates all preceding paragraphs.

529.    Under South Dakota law, an employer owes a duty of reasonable care in the hiring, supervision, and retention of employees. *Rehm v. Lenz*, 1996 SD 51, 547 N.W.2d 560. The duty involved in a negligent supervision claim is one of reasonable care. *Kirlin v. Halverson*, 2008 SD 107, 758 N.W.2d 436, 452. USD's institutional duty is further defined by ABA Standards, the Student Handbook, LSAC membership rules, federal civil rights statutes, and constitutional requirements.

530.    USD Knudson School of Law, as the sole gateway to legal practice in South Dakota, owes heightened duty when taking career-affecting actions. ABA Standard 205 requires nondiscrimination; Black enrollment dropped 100% after these events. ABA Standard 508 requires fair process; USD prosecuted after Thompson stated no violation had occurred.

### B. Systemic Failures

531.    USD breached its institutional duty through systemic failures: no verification procedures before LSAC filings; no supervisory review of unprecedented measures such as appointing an attorney not licensed in South Dakota to a quasi-prosecutorial role when licensed faculty alternatives were available; the first-ever law student NCO; no constitutional training for administrators regulating student speech; no conflict screening for examiner appointments despite SDBOR Policy 1.4.3 § 7.3 requiring "unbiased and

disinterested" investigators; and no intervention despite formal notice from both the NAACP and Plaintiff's attorney.

532.    USD's Disability Services office failed to protect its own student. Disability Services Coordinator Gerety was copied on the January 10, 2024 accommodation delivery to Moore. Gerety was also copied on Plaintiff's April 11, 2024 misconduct complaint against Fuerst, which explicitly alleged "discrimination based on disability." From January 10 forward, Disability Services had notice that Plaintiff was a registered student with active accommodations. From March 28 forward, Disability Services had constructive notice that Plaintiff's accommodations were being denied. Upon information and belief, Disability Services took no action to ensure compliance, took no action to intervene when Moore and Mays denied accommodations, and took no action to ensure the disciplinary proceedings did not interfere with Plaintiff's disability-related educational access. The office designated to protect disabled students was copied on every critical communication and protected no one.

## C. Board of Regents Liability

533.    The Board of Regents' anti-suppression provision, SDBOR Policy 1.4.3 § 5.1.2.2, prohibited exactly what every defendant did. Either USD's administrators were unaware of the plain text of the policy they were enforcing, or they knowingly violated it. Both conclusions establish institutional negligence. The institution's failure to train administrators on the anti- suppression requirements of their own complaint procedures enabled the constitutional violations.

534.    The Board of Regents bears independent liability for creating the defective policy framework that enabled the harm. The Board authored SDBOR 1.4.3 and 1.4.4, the two policies governing the complaint and investigation process that was used to subject

Plaintiff to months of prosecution. Both policies state "Definitions: None." The Board created a complaint framework with no defined offenses, no defined standards of proof, and no defined scope of prohibited conduct, then vested administrators with unreviewable discretion to investigate, charge, and prosecute students under that framework. The Board also created Section 14's mandatory appellate path requiring elevation to the institutional president and the Board's own Executive Director, then failed to ensure its administrators followed that path when Merkle routed Plaintiff's complaint to HR instead. The Board's anti-suppression provision (§ 5.1.2.2) and anti-retaliation provision (§ 8) were available to prevent the harm Plaintiff suffered. The Board did not train administrators on these provisions, did not enforce them, and did not intervene when a civil rights organization provided formal notice that they were being violated. The Board is the governing body that writes the rules, and the rules it wrote either lacked the definitions necessary to constrain administrative discretion or contained protections the Board made no effort to enforce.

## D. Procedural Bypass

535.    When Merkle found insufficient evidence on May 3, 2024, she routed Plaintiff's complaint to Human Resources, bypassing the mandatory appellate procedure established by SDBOR Policy 1.4.3, Section 14. That provision prescribes a specific, sequential path: the institution must notify the complainant of the determination; the complainant may then petition the institution's chief executive officer; if the CEO's response is unsatisfactory, the complainant may appeal to the Board of Regents' Executive Director. This path is not advisory. The Board of Regents created Section 14 precisely because individual campus administrators cannot be the final authority on complaints alleging

institutional misconduct § the entire architecture of the appellate path removes decision-making from the same administrative level that produced the challenged conduct.

536.    Had Merkle followed the prescribed path, Plaintiff's complaint would have elevated to the USD President, and potentially to the Board's Executive Director § officials entirely outside the law school administrative structure that orchestrated the March 27 actions. The path Merkle substituted § routing to an HR officer at the same institution that was the subject of the complaint § had no basis in SDBOR policy. It had the structural effect of ensuring that Plaintiff's complaint about coordinated administrative misconduct was reviewed by administrators within the same institution. The CEO was never petitioned. The Board's Executive Director was never reached. The HR officer who received the referral refused to disclose any outcome. Merkle's deviation converted the Board's designed external review mechanism into an internal process with no independent oversight and no disclosed result. The Board of Regents created Section 14 to prevent exactly this outcome.

### E. Coordination Failure and OCR Confirmation

537.    Most critically, USD failed to coordinate between offices. On April 2, 2024, Thompson determined no policy had been violated. The law school continued prosecution for 184 additional days. Either the law school knew and continued anyway, or did not know, a catastrophic institutional failure. USD's right hand did not know what its left hand had determined.

538.    On November 25, 2024, President Gestring signed the OCR Resolution Agreement in Docket No. 07-24-2185, acknowledging that USD's online programs contained inaccessible documents in portable document format that were inaccessible to people with disabilities who use screen readers, the same category of digital accessibility

failure Plaintiff reported to Moore, to Mays, and through formal complaint channels that the institution dismissed for "insufficient evidence." The federal government found the violations that USD's own complaint process failed to identify. The President's signature on the Resolution Agreement confirms institutional knowledge of the accessibility failures at the highest level of university administration.

## F. Ministerial Function and Sovereign Immunity

539.    These are ministerial failures, not discretionary functions. Under *Hansen v. South Dakota* Dep't of Transportation, 1998 SD 109, sovereign immunity protects discretionary functions but not ministerial ones. A ministerial act involves "obedience to instructions" and requires "no special discretion, judgment or skill." Once USD adopted policies, the Student Handbook, ABA Standards compliance, LSAC membership rules, following those policies became ministerial. Verifying a student file before filing fraud accusations requires no discretion. Screening examiner appointments for conflicts requires no policy judgment. Responding to civil rights organization notice requires no special skill. USD's failures were ministerial noncompliance with its own established procedures.

540.    USD participates in the PEPL Fund. Under SDCL § 21-32A-2, employees, officers, and agents of a public entity "including the state" are immune from suit while acting within the scope of employment "except insofar as" the public entity participates in a risk sharing pool or purchases liability insurance. Because the State of South Dakota participates in the PEPL Fund, individual defendants' immunity is waived to the extent of coverage. In *Masad v. Weber*, 2009 SD 80, P 17, 772 N.W.2d 144, 153, the South Dakota Supreme Court confirmed that the state's immunity is waived to the extent the state enters a contract, and a party or third-party beneficiary sues to enforce that contract.

541.    In *Kyllo v. Panzer*, 535 N.W.2d 896, 900 (S.D. 1995), the South Dakota Supreme Court struck down SDCL § 21-32-17 as unconstitutional insofar as it purported to grant immunity for negligence in performing ministerial functions. Kyllo drew the constitutionally required line between discretionary policy functions § which retain immunity § and ministerial acts, which do not. A ministerial act requires no special discretion, judgment, or policy determination; it requires obedience to established instructions. *Id.* at 900.

542.    Every failure alleged in Count XII is ministerial. Verifying a student file before filing a fraud accusation requires no policy judgment § it requires opening the file. Screening an examiner appointment for conflict requires no discretionary balancing § it requires reading the Handbook. Following the Board of Regents' prescribed appellate path requires no executive decision § it requires following the written procedure. Responding to notice from a civil rights organization requires no special skill § it requires reading the letter. Following the accommodation memo's written instruction to "contact our office" before denying a disability accommodation requires no discretionary judgment § it requires making a phone call. Moore received the instruction on January 10, 2024. He denied the accommodation on March 28, 2024 without contacting Disability Services. The memo's instruction is a written procedure, not a policy judgment, and Moore's noncompliance is ministerial failure.

543.    Kyllo holds that a state entity cannot claim immunity for failing to follow its own established procedures. Each failure at issue here is precisely the category of ministerial noncompliance Kyllo placed outside the immunity shield. The PEPL Fund's coverage of USD's conduct independently waives any residual immunity. Dean Fulton's prior service

*JACKSON v. USD, et al.*

as a PEPL Fund Risk Management Conference presenter on workplace liability and litigation risk demonstrates institutional awareness of this exposure and the foreseeability of litigation resulting from the failures alleged.

### G. Causation and Pattern

544.     USD's institutional failures enabled, facilitated, and perpetuated every harm alleged. Had USD maintained proper policies, the attack could not have occurred. The harm was the foreseeable and proximate result of each failure. When an institution adopts policies requiring verification before filing fraud accusations and then fails to verify, the foreseeable result is a baseless accusation. When an institution adopts conflict-screening requirements and then fails to screen, the foreseeable result is a biased proceeding. When an institution receives formal notice from a civil rights organization that its proceedings are baseless and causing harm, and then fails to act for five additional months, the continued prosecution is the proximate result of the failure to intervene. Each institutional failure is connected by an unbroken causal chain to the specific harm it produced.

545.     USD's handling of Plaintiff's complaints is itself evidence of the pattern giving rise to this Count. Under SDBOR Policy 1.4.3, Section 7, the EEO Coordinator is responsible for administering a centralized discrimination complaint system. USD designated Merkle as its Director of EEO/Title IX Coordinator with dual jurisdiction over both EEO complaints, including race and disability, and Title IX complaints. On March 11, 2024, USD's EEO Coordinator told Plaintiff that her race discrimination complaint was not an EEO matter, stating it "deals directly with employment." This characterization contradicts SDBOR Policy 1.4.3, which expressly covers discrimination in "the delivery of educational services." On April 3, 2024, when Plaintiff asked about complaint avenues, USD's EEO Coordinator described only Title IX and HR behavioral concerns,

omitting the EEO complaint process USD designated her to administer. On April 9, 2024, Plaintiff submitted a complaint to USD's EEO Coordinator citing SDBOR Policy 1.4.3 by name three times. USD processed it under Policy 1.4.1. USD maintained two complaint frameworks: one for discrimination in employment (which its EEO Coordinator described to Plaintiff) and one for discrimination in educational services (which its EEO Coordinator did not). SDBOR Policy 1.4.3 makes no such distinction. USD's failure to ensure that its designated EEO Coordinator correctly classified discrimination complaints involving race and disability, and USD's failure to correct the misclassification after its own Deputy General Counsel acknowledged on May 9, 2024 that the process was "outside of the norm," constitutes the negligent supervision alleged in this Count. USD's EEO Coordinator acknowledged this institutional failure in her May 13, 2024 Notice of Dismissal, writing that Plaintiff's "circumstance has brought to light the importance of training and education on this very important topic." No institutional corrective action followed this admission.

**COUNT XIII, EQUAL PROTECTION (42 U.S.C. § 1983)**

*Against Fulton, Mays, Miller, Moore, Ulrich, Thompson, Franken, Fitzgerald, Fuerst, Severson,*

*Healy, and Merkle in their individual and official capacities*

## A. Legal Standard

546.    Plaintiff incorporates all preceding paragraphs.

547.    The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from treating individuals differently on the basis of race. Race-based classifications are subject to strict scrutiny. Where a facially neutral action is alleged to be motivated by discriminatory purpose, the Arlington Heights framework applies to determine whether race was a motivating factor. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Plaintiff need not prove race was the sole or primary motivation, only that it was a motivating factor. *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246 (2009), confirms that Title VI does not preclude parallel § 1983 equal protection claims. The Supreme Court unanimously held that when Congress modeled Title IX on Title VI, it preserved the availability of § 1983 as an independent enforcement mechanism. Plaintiff may pursue both Title VI against the institution (Count V) and Equal Protection via § 1983 against individual defendants simultaneously. Each individual Defendant is a state actor who personally participated in the coordinated adverse actions against Plaintiff, a Black woman who publicly criticized racial conditions at a predominantly white institution that graduated an average of 0.8 Black students per year for fifteen consecutive years.

## B. Differential Treatment

548.    Plaintiff, a Black woman, was subjected to differential treatment compared to similarly situated non-Black students. Fuerst, a white student, filed a complaint she

admitted had "no grounds," faced no institutional consequence, and left the institution without consequence. Severson, a white student, filed a misconduct complaint against Plaintiff that was dismissed, faced no consequence for filing an unsubstantiated complaint, and continued enrollment without disruption. Plaintiff was prosecuted for months, subjected to the first No Contact Order ever imposed on a USD law student, referred to LSAC for fraud on the basis of documents that disproved the accusation, had her disability accommodations denied after the complainant was consulted about them, and was constructively expelled. On information and belief, no similarly situated non-Black student at USD Knudson School of Law has been subjected to simultaneous adverse actions from three institutional offices for social media speech, and Plaintiff will identify specific comparators through discovery of internal records not currently in her possession. *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), establishes that the Equal Protection Clause supports selective enforcement claims where plaintiff alleges intentional differential treatment with no rational basis. Plaintiff need not identify a virtually identical comparator. Objective evidence that no one has ever been subjected to the same government action for engaging in the same kind of conduct suffices to establish selective enforcement. *Gonzalez v. Trevino*, 602 U.S. 653 (2024) (per curiam). Here, the objective evidence is that no USD law student has ever received a No Contact Order, no student has been charged under terms absent from Part XV, and no student has faced simultaneous adverse actions from three institutional offices for social media speech.

549.    The five Arlington Heights factors, assessed cumulatively as *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) requires, establish discriminatory

*JACKSON v. USD, et al.*

purpose through the same evidence and analysis set forth in Count V (300-311), incorporated herein by reference.

## C. Arlington Heights Framework

550.    The Equal Protection claim adds what Title VI cannot reach: individual liability against each state actor who personally participated in the race-motivated targeting. The Arlington Heights factors establish that race was a motivating factor in each individual defendant's conduct, not merely in the institution's aggregate response. Standard 206 was active throughout the period of the institutional response; Standard 205 was never suspended.

551.    Fulton wrote that "[g]rossly unequal enforcement of the law can give rise to 'class of one' Equal Protection claims." Fulton, *Fake News on Trial*, 52 Tex. Tech L. Rev. at 762. Fuerst fabricated a police report, placed materials on Plaintiff's desk, conducted surveillance across four platforms, and provided additional evidence to the Examiner after Plaintiff's attorney demanded dismissal on First Amendment grounds. USD investigated none of Fuerst's conduct. Plaintiff criticized a library display on social media. USD prosecuted her for 190 days across three offices. Fulton published the standard that condemns grossly unequal enforcement based on who the speaker is, not what was said. He then enforced it unequally. Qualified immunity is unavailable to a defendant who published the Equal Protection standard he violated.

552.    As alleged in 110-114, the March 5, 2024 email chain (Ex. 1) proves every decision-maker knew the speech at issue was racial in nature. Fuerst described the video as racial commentary. Fulton forwarded the racial description to Franken. Franken directed investigation. The chain carries the racial character of its origin into every action that followed.

## D. Racial Character of the Coordinated Action

553.    The racial character of the coordinated action is not negated by the participation of Associate Dean Mays, who shares Plaintiff's racial background. It would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group. *Castaneda v. Partida*, 430 U.S. 482, 499 (1977). The Constitution cannot tolerate giving effect to racial prejudice through governmental action regardless of the identity of the state actors who execute it. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). The relevant inquiry under Arlington Heights is whether race was a motivating factor in the coordinated decision, not whether each decision-maker personally harbored racial animus. Mays solicited a complaint from Fuerst that Fuerst acknowledged had "no grounds," offered Plaintiff relief conditioned on the surrender of racial speech, and tracked what documents had been disclosed to the investigation's target. These actions are consistent with an administrator suppressing racial criticism of the institution. Mays's race does not explain her conduct; the Equal Protection Clause evaluates the conduct.

554.    As alleged in 145-146, the surveillance that generated the prosecution was racially selective. Fuerst monitored only the Black student who criticized the institution's racial record, over months, across every platform Plaintiff used. The selectivity is itself evidence of racially motivated differential treatment.

## E. Qualified Immunity

555.    Qualified immunity does not shield Defendants. The two-step inquiry asks whether the conduct violated a constitutional right and whether that right was clearly established. The right to be free from selective enforcement of institutional rules based on race has been clearly established since at least *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

But qualified immunity fails here on the conduct itself, independent of the racial dimension. No reasonable administrator could believe that coordinating three simultaneous adverse actions against a student for constitutionally protected speech was lawful. No reasonable examiner could believe that prosecuting his own advisee under charges absent from the governing handbook, then expanding those charges after a licensed attorney raised a constitutional defense, was lawful. No reasonable administrator could believe that continuing prosecution for 184 days after the responsible official determined no policy had been violated was lawful. No reasonable admissions director could believe that filing fraud accusations with a national credentialing body without checking the student file was lawful. No reasonable supervisor could believe that receiving an unprecedented restriction on a student's liberty and taking no corrective action was lawful. Each of these acts independently defeats qualified immunity because each is unreasonable under any constitutional framework § First Amendment, Due Process, or Equal Protection. The racial motivation alleged in this Count makes the conduct worse. It does not make the conduct reasonable.

### F. Defendant-Specific Participation

556.    Fulton and Franken received and acted on a communication they knew was racial in character. On March 5, 2024, Fuerst's email to Fulton described Plaintiff's video through an explicitly racial lens, characterizing Plaintiff's speech about the Black History Month display as comparing institutional conduct to racial violence. Fulton forwarded this racial characterization to Franken. Franken directed investigation. Every decision-maker in the chain received Fuerst's racial framing before deciding to act. Fulton then presented on ABA Standard 206 compliance § the diversity standard § sixty-four days before coordinating the elimination of the only Black student who challenged the school's

racial record. Fulton's knowledge that the speech was racial in nature, combined with his documented understanding of the institution's diversity obligations, establishes that race was a motivating factor in his decision to initiate the coordinated response.

557.    Mays's conduct establishes race-conscious targeting regardless of her own racial background. Mays solicited a complaint from Fuerst against the only Black student who publicly criticized racial inadequacy at the institution. Mays conditioned academic relief on the surrender of racial speech. Mays told Plaintiff "Life ain't fair" when Plaintiff reported racial stereotyping. Mays tracked what documents had been disclosed to the investigation's target. The Equal Protection inquiry evaluates conduct, not the racial identity of the actor. *Castaneda v. Partida*, 430 U.S. 482, 499 (1977). Mays's conduct is consistent with an administrator suppressing racial criticism to protect institutional interests, which constitutes race-based differential treatment regardless of Mays's own race.

558.    Miller, Thompson, and Ulrich each executed specific components of the coordinated action against Plaintiff's racial speech. Miller prosecuted Plaintiff under terms § "bullying, stalking, and harassment" § that do not appear in the Student Handbook, charges that were applied to no other student for social media posts. Thompson issued an unprecedented NCO to suppress speech she admitted was constitutionally protected, a restriction never imposed on any student at USD Law. Ulrich filed LSAC fraud accusations citing Plaintiff's social media posts § posts about race § as the triggering evidence, without checking the file. On information and belief, no non-Black student at USD has been subjected to any of these measures for social media activity. The differential treatment is evidenced by the unprecedented nature of each

action: if these measures had been applied to other students, they would not be unprecedented.

559. Fitzgerald received the unprecedented NCO on her desk as Thompson's direct supervisor and ratified it through silence, lending supervisory acquiescence to a restriction that had never been imposed on any law student. Healy attended the May 9 meeting where the abnormal process was acknowledged and took no corrective action. Both defendants occupied positions of institutional authority that gave them the power to stop the proceedings. Neither acted. Their failure to intervene perpetuated a prosecution that targeted the only Black student who criticized the institution's racial record. The failure to exercise supervisory authority to correct a racially targeted prosecution, after receiving notice of its existence and its deficiencies, constitutes personal participation in the equal protection violation.

560. Healy inserted himself into the May 9, 2024 meeting, acknowledged on the record that the proceedings were "postured outside of what our normal complaint policies would look like" and "a little bit outside of the norm," heard the HR investigator admit no investigation policy existed, heard Plaintiff's attorney identify the proceedings as unconstitutional, and took no corrective action for 147 additional days. His failure to intervene perpetuated a prosecution that targeted the only Black student who criticized the institution's racial record. The failure to exercise legal authority to correct a racially targeted prosecution, after receiving notice of its existence, its deficiencies, and its lack of procedural safeguards, constitutes personal participation in the equal protection violation.

561. Fuerst and Severson, as private actors who participated in the coordinated adverse action, are liable under the Equal Protection Clause through the joint action doctrine.

Fuerst conducted surveillance exclusively of the Black student who criticized the institution's racial record. She did not monitor the social media of white students. She compiled a dossier of Plaintiff's racial speech and delivered it to the administrators who used it to build a prosecution. Severson filed a complaint against Plaintiff § not against any other student § for conduct that no reasonable person would characterize as misconduct. The selectivity of both private actors' targeting § aimed exclusively at the Black student whose speech concerned race § is itself evidence of the racial character of the coordinated action.

562.    Merkle's complaint-handling procedures operated differently depending on the racial identity of the complainant and the direction of the complaint. Complaints against Plaintiff, a Black woman, were processed within hours on March 27, 2024, with coordinated action across multiple offices. Plaintiff's complaint against Professor Moore was not acknowledged for sixteen days, not substantively responded to for thirty days, and was processed under the wrong regulatory framework. When Fuerst, a white student, complained about Plaintiff, Merkle's office facilitated a same-day No Contact Order without evidence. When Plaintiff requested a No Contact Order against Moore after the Moore complaint was closed, Merkle responded with a conditional question rather than immediate action. The institution imposed restrictions on the Black student immediately and without precondition. The institution required the Black student to justify the same protection before acting. Merkle processed Plaintiff's complaints involving race and disability under the Title IX framework (Policy 1.4.1) rather than the EEO framework (Policy 1.4.3), the framework specifically designed for race and disability complaints. A similarly situated white student filing a sex-based harassment complaint would have had

her complaint processed under the correct Title IX framework from intake. Plaintiff, a Black student filing a race-based complaint, had her complaint processed under a framework designed for a different category of discrimination. The equal protection violation inheres in the classification itself: Merkle applied the correct framework to the category of complaints that matched the framework's design and the wrong framework to the category that did not, and the category that received the wrong framework was the one involving race.

563.        Moore's conduct demonstrates race-conscious differential treatment in the accommodation context. Moore offered his entire class Zoom access on January 7, 2024, for anticipated weather. Moore denied the identical accommodation to Plaintiff on March 28, 2024 § one day after the coordinated attack against the only Black student who criticized the institution. Moore consulted no one before denying the request. Moore went silent when Plaintiff followed up. The denial occurred in the immediate aftermath of the coordinated action targeting Plaintiff's racial speech, and Moore's failure to engage in any process before denying the request is consistent with participation in the broader pattern of differential treatment rather than an independent academic judgment.

## COUNT XIV, CONSPIRACY TO DEPRIVE CIVIL RIGHTS (42 U.S.C. § 1985(3))

*Against Fulton, Mays, Miller, Moore, Fuerst, Ulrich, Thompson, Severson, Fitzgerald, Franken,*

*Healy, and Merkle in their individual capacities*

### A. Legal Standard

564.    Plaintiff incorporates all preceding paragraphs.

565.    Section 1985(3) provides a cause of action where two or more persons conspire to deprive any person or class of persons of the equal protection of the laws, and one or more conspirators commits an act in furtherance of the conspiracy, resulting in injury. 42 U.S.C. § 1985(3). Unlike § 1983, Section 1985(3) does not require state action and reaches private conspirators directly. *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971). The statute requires class-based, invidiously discriminatory animus. *Id.* at 102. Racial animus is the paradigmatic basis for § 1985(3); the Ku Klux Klan Act of 1871 was enacted to protect against precisely this type of coordinated racial targeting.

### B. Racial Animus

566.    The conspiracy was motivated by racial animus. Plaintiff's speech was about race, delivered by the only Black student who raised those concerns, at an institution that graduated fewer than one Black student per year for fifteen years. Targeting speech about racial inadequacy by the sole Black student who voiced the criticism is racial targeting. As alleged in 104, Fuerst's own email described the targeted speech through a racial lens from inception. The Arlington Heights analysis incorporated from Counts V and XIII, assessed cumulatively, establishes racial animus as a motivating factor. The institutional pattern extends beyond the treatment of students to the treatment of Black faculty: as alleged in 74-75, USD deleted the faculty page of its only Black adjunct professor, the Honorable James Donald Smith, retired Chief Administrative Patent Judge of the United

States, after his death § while the University of Minnesota published a full tribute and USD held a livestreamed memorial for a white professor under the same dean.

567.    Section 1985(3) requires that the conspiracy's purpose was racially motivated, not that each individual conspirator personally harbored racial hatred. Griffin, 403 U.S. at 102. The participation of a Black administrator in a conspiracy to suppress a Black student's racial criticism does not negate the racial character of the conspiracy's objective. *Castaneda v. Partida*, 430 U.S. 482, 499 (1977). The conspiracy targeted racial speech by a racial minority at a racially homogeneous institution. The objective was racial in character regardless of the racial composition of the conspirators.

568.    Fulton's published scholarship establishes his understanding that source-based evaluation of speech § assessing who is speaking rather than what is being said § is a form of tribalism rooted in "exclusion and insularity." Fulton, *Fake News on Trial*, 52 Tex. Tech L. Rev. at 750. When applied along racial lines at an institution that graduated fewer than one Black student per year for fifteen years, this tribalistic framework produces the class-based discriminatory animus required under 42 U.S.C. § 1985(3). Plaintiff, a Black woman, dissented from institutional practices at a predominantly white institution. The institution's response was not to evaluate the merits of her criticism but to coordinate adverse action against the critic. The content of Plaintiff's speech was accurate. Every charge was dismissed. The only variable that distinguishes Plaintiff's treatment from the treatment of white students who raised institutional concerns is race.

## C. Qualified Immunity

569.    Qualified immunity does not apply to § 1985(3) claims because the statute independently reaches private conspirators without requiring state action. *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971). To the extent any defendant asserts qualified

immunity, Fulton's publications establish that a reasonable official in his position knew the coordinated targeting of racial speech was unconstitutional.

## D. The Agreement

570.    The agreement is established through direct documentary evidence. The March 5, 2024 email chain (Ex. 1) documents the formation of the conspiracy in writing: Fuerst initiated at 7:29 AM, Fulton forwarded at 9:34 AM, Franken directed investigation at 10:45 AM. Three institutional officials and one private individual agreed in writing to target a student's racial speech within three hours and sixteen minutes. Twenty-two days later, three offices executed simultaneous adverse actions. The Eighth Circuit recognizes that conspiracy may be proven through circumstantial evidence and that the question of whether a conspiracy existed should not be taken from the jury where the evidence permits an inference of agreement. *White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008). Here, Plaintiff has direct evidence.

## E. Private Actor Liability and Intracorporate Doctrine

571.    Section 1985(3) independently reaches the private actor defendants without state action requirements. As alleged in 20, 86-89, and 130-135, Fuerst conducted the sustained surveillance described in 19-20, filed complaints she admitted lacked grounds, and provided prosecution evidence after Plaintiff's attorney demanded dismissal. Severson filed a complaint based on Plaintiff saying "Good morning" and spread the false claim that Plaintiff had withdrawn (98). Both private actors participated in the conspiracy with knowledge that their actions would trigger institutional adverse action against the only Black student who criticized USD's racial record.

572.    The intracorporate conspiracy doctrine does not bar this claim for the three independent reasons established in Count II: individual defendants acted from personal

motivation, the conspiracy extended to private actors beyond the institution, and the conduct fell outside the scope of employment. The presence of Fuerst and Severson as non- institutional conspirators independently defeats the doctrine.

## F. Resulting Injury and Overt Acts

573.    As a direct and proximate result of the conspiracy, Plaintiff suffered injury including the prolonged prosecution, lifetime bar disclosure obligations, blocked transfers to every law school to which she applied, constructive expulsion, reputational harm, exacerbation of service-connected disabilities, and economic loss.

574.    Each defendant committed overt acts in furtherance of the racially motivated conspiracy. Fulton forwarded the racial-speech email chain and appointed the conflicted examiner (109-110, 118). Franken directed investigation of the racial speech within hours of receiving the chain (112). Mays solicited the baseless complaint from Fuerst and conditioned relief on the surrender of racial speech (93-94, 160-162). Miller expanded charges and sustained prosecution for 175 days after Plaintiff's attorney raised the First Amendment defense (171-172). Thompson issued the unprecedented NCO for speech-suppression purposes and admitted no policy had been violated (133, 148-149). Ulrich filed unverified fraud accusations with LSAC citing Plaintiff's racial speech as the triggering evidence (135). Moore denied disability accommodations in coordination with Mays on the day after the coordinated attack (139-141). Fitzgerald received the unprecedented NCO on her desk as Thompson's direct supervisor and ratified the restriction through supervisory silence (133, 138). Healy inserted himself into the May 9, 2024 meeting, acknowledged the proceedings were "postured outside of what our normal complaint policies would look like," heard the HR investigator admit no investigation policy existed, heard Plaintiff's attorney identify the proceedings as retaliatory against

racial speech, and took no corrective action for 147 additional days while the prosecution of the only Black student who criticized the institution's racial record continued under the legal oversight of his office (198-199). Fuerst conducted racially selective surveillance and filed complaints she admitted lacked grounds (93-94, 109, 145-146). Severson filed a complaint based on a greeting and a Bible verse (123-124). Each act was committed in furtherance of the conspiracy's racially discriminatory objective, and each defendant's participation is documented by the factual record incorporated from Counts II and XIII.

575.     The USD Knudson School of Law Student Handbook contains disciplinary procedures, including provisions governing the Examiner appointment (Section III), the scope of charges (Part XV), and the process for investigation and adjudication (Sections V through XIV). SDBOR Policy 1.4.3 contains the complaint and investigation procedures governing equal opportunity and anti-discrimination matters, including the anti-suppression provision (SS 5.1.2.2), the mandatory appellate path (Section 14), and the requirement for unbiased investigators (SS 7.3). SDBOR Policy 3.4.1 governs interim measures, requiring individualized assessment before imposing restrictions.

576.     Merkle's participation in the conspiracy is established by the following acts in furtherance: receiving direction from General Counsel Franken on March 5, 2024 to investigate Plaintiff; meeting with Plaintiff on March 11, 2024 and disclaiming EEO jurisdiction over her race discrimination complaint, thereby eliminating the institutional framework designed to protect Plaintiff's equal protection rights; routing the Fuerst complaint to Student Rights and Responsibilities rather than to the EEO process, ensuring the racial dimension was not evaluated; being CC'd on the March 27, 2024 No Contact Order and taking no action to stop or correct the coordinated adverse actions; concealing

*JACKSON v. USD, et al.*

the EEO complaint process from Plaintiff on April 3, 2024 when Plaintiff asked about complaint avenues; receiving Plaintiff's April 9, 2024 complaint citing Policy 1.4.3 three times and processing it under Policy 1.4.1; stonewalling Plaintiff's Moore complaint for thirty days while the prosecution against Plaintiff continued; and issuing formal determinations under the wrong regulatory framework, ensuring dismissal. These acts demonstrate that Merkle acted in concert with the other defendants to deprive Plaintiff of the equal protection of the laws on the basis of her race. Merkle's role in the conspiracy was specific: she controlled the institutional gateway through which discrimination complaints were received and classified, and she used that control to ensure that Plaintiff's race-based complaints never reached the framework designed to address them.

## COUNT XV, BREACH OF IMPLIED CONTRACT

*Against University of South Dakota and South Dakota Board of Regents*

### A. Legal Standard

577.    Plaintiff incorporates all preceding paragraphs.

578.    Under South Dakota law, contracts may be express or implied. SDCL § 53-1-3. An implied contract arises from the conduct of the parties and the circumstances of the transaction regardless of whether the parties express a contractual intent, where one party accepts the benefits of the relationship and the other relies upon the published terms. Federal courts have consistently recognized that the student-university relationship is contractual in nature. *Mangla v. Brown University*, 135 F.3d 80, 83 (1st Cir. 1998) (the student-college relationship is essentially contractual in nature); *Havlik v. Johnson & Wales University*, 509 F.3d 25, 34 (1st Cir. 2007) (university catalogs and handbooks can constitute enforceable contracts); *Doe v. Belmont University*, 334 F. Supp. 3d 877, 890 (M.D. Tenn. 2018) (applying contractual analysis to student disciplinary proceedings). When a student enrolls at a university, pays tuition, and complies with academic requirements, an implied contractual relationship is created: the institution promises to follow its published procedures in exchange for the student's enrollment, payment, and compliance. The terms of this implied contract are found in the USD Knudson School of Law Student Handbook, the SDBOR policies incorporated by reference, and the institutional representations made during orientation and enrollment.

### B. Contract Formation and the Handbook Trap

579.    USD invoked these procedures to prosecute Plaintiff for months of prosecution. Miller's Examiner Notice cited the "Student Disciplinary Procedures." Thompson's NCO cited institutional authority. Ulrich's LSAC referral invoked admissions policy. Each

adverse action was premised on the authority of published institutional procedures, and each demanded Plaintiff's compliance with those procedures.

580.     The Handbook states its provisions "do not constitute a contract or offer to contract with any person." USD cannot simultaneously invoke its Handbook as binding authority to prosecute Plaintiff and disclaim the Handbook's contractual force when Plaintiff seeks enforcement of the procedural protections that same document provides. The institution used the Handbook as a sword for months of prosecution. It cannot now disclaim it as a shield. To the extent the Handbook lacks contractual force, USD had no binding authority to prosecute Plaintiff under its procedures, and the seven-month prosecution was ultra vires, strengthening the abuse of process claim in Count X. To the extent the Handbook carries contractual force, USD breached it through the deviations alleged below.

## C. Performance and Breach

581.     Plaintiff performed her contractual obligations. She enrolled, attended classes, paid tuition through VA Chapter 31 Vocational Rehabilitation benefits earned through military service, and maintained academic standing sufficient for USD to certify her "in good academic standing" at 9:01 AM on March 27, 2024. The institution's own certification is the strongest possible evidence of Plaintiff's performance, because it is the Defendants' own contemporaneous assessment that Plaintiff had satisfied every obligation the institution imposed.

582.     USD breached the implied contract through the following specific departures from its published procedures. First, Fulton appointed Miller as Examiner despite knowing Miller was Plaintiff's academic advisor and Debtor/Creditor Club faculty advisor, violating the Handbook's Section III recusal requirement for conflicts. Second,

Merkle bypassed the mandatory appellate path prescribed by SDBOR Policy 1.4.3, Section 14, routing Plaintiff's complaint to Human Resources instead of to the institutional president and the Board's Executive Director. Third, Thompson imposed the unprecedented NCO without the individualized assessment required by SDBOR Policy 3.4.1. Fourth, every defendant's conduct violated the anti-suppression provision of SDBOR Policy 1.4.3, § 5.1.2.2, which prohibits using the complaint process to suppress speech. Fifth, Plaintiff was charged under terms, "bullying, stalking, and harassment," that do not appear in the Handbook's Part XV enumeration of offenses, the section that defines the scope of prosecutable misconduct. Sixth, USD's coordinated targeting of Plaintiff's social media posts violated SDCL § 13-53-52, which provides that a public institution of higher education and its administrators "may not discriminate against any student based on the content or viewpoint of their expressive activity." This state statute creates a legal obligation USD owed to all students, breach of which constitutes an additional term of the implied contractual relationship independent of any handbook provision.

## D. Damages

583.    As a direct and proximate result of USD's breach, Plaintiff suffered damages including loss of educational opportunity, tuition and fees paid through VA Chapter 31 for a program from which she was constructively expelled, the cost of transfer applications, the diminished economic value of delayed entry into the legal profession, and the consequential damages flowing from a seven-month prosecution conducted in violation of the institution's own procedures. This count also entitles Plaintiff to discover USD's compliance with its own procedures in other cases, because differential compliance, following procedures for non- Black students but deviating for Plaintiff, is

simultaneously evidence of contract breach and evidence supporting the Equal Protection

claim in Count XIII. The statute of limitations for contract claims under SDCL § 15-2-13

is six years. This claim is timely.

*JACKSON v. USD, et al.*

## COUNT XVI, UNJUST ENRICHMENT

*Against University of South Dakota, in the alternative to Count XV*

### A. Legal Standard

584.    Plaintiff incorporates all preceding paragraphs.

585.    In the alternative, if the Court determines no implied contract existed, Plaintiff asserts unjust enrichment. Under South Dakota law, unjust enrichment requires: (1) a benefit conferred on the defendant, (2) the defendant's appreciation or knowledge of the benefit, and (3) circumstances under which it would be inequitable for the defendant to retain the benefit without payment of its value. *Johnson v. Larson*, 2010 SD 20, 779 N.W.2d 412.

### B. Benefit Conferred and Retained

586.    USD received VA Chapter 31 Vocational Rehabilitation benefits disbursed by the Department of Veterans Affairs on Plaintiff's behalf for the Fall 2023 and Spring 2024 semesters, including tuition, fees, books, supplies, and a monthly subsistence allowance. USD accepted and retained these federal funds while simultaneously launching coordinated adverse actions that deprived Plaintiff of the educational benefit those funds were designated to provide. On the same morning USD certified Plaintiff "in good academic standing," establishing that the educational relationship was intact and the federal funds had been properly applied, the institution initiated proceedings that would constructively expel Plaintiff within months. An institution that certifies a student in good standing, accepts federal disability benefits on that student's behalf, and then launches coordinated action that destroys the educational relationship those benefits funded cannot equitably retain the full value of the funds. Plaintiff seeks restitution.

## COUNT XVII, MALICIOUS PROSECUTION

*Against Fulton, Mays, Miller, Thompson, Ulrich, Franken, Healy, Fuerst, and Severson in their individual capacities*

### A. Legal Standard

587.     Plaintiff incorporates all preceding paragraphs.

588.     Under South Dakota law, malicious prosecution requires: (1) the commencement or continuance of an original proceeding, (2) its legal causation by the present defendant against the present plaintiff, (3) its bona fide termination in favor of the present plaintiff, (4) the absence of probable cause, (5) the presence of malice, and (6) damages conforming to legal standards. *Miessner v. All Dakota Ins. Assocs.*, 515 N.W.2d 198, 200 (S.D. 1994). This tort protects against the initiation and continuation of baseless proceedings, distinguishing it from abuse of process (Count X), which addresses the misuse of properly initiated process for ulterior purpose. Both torts are present because Defendants both lacked probable cause to initiate the proceedings and used the proceedings, once initiated, for purposes beyond any legitimate investigative objective.

### B. Commencement of Proceedings

589.     Three separate proceedings were instituted against Plaintiff on March 27, 2024. Miller served an Examiner's Notice initiating formal disciplinary prosecution under the Student Handbook, citing allegations that Plaintiff "bullied, stalked, and harassed Ms. Jennie Fuerst through videos posted online." Ulrich filed a misconduct complaint with LSAC accusing Plaintiff of application fraud. Thompson issued a No Contact Order restricting Plaintiff's campus movement and communication. Each proceeding was instituted by or at the direct instance of the named Defendant.

## C. Absence of Probable Cause

590.        Each proceeding was initiated without probable cause. As alleged in 91-97, Fuerst admitted no grounds existed before filing. As alleged in 134, 185, Ulrich filed without checking the file. As alleged in 149, Thompson acknowledged the NCO was issued before any determination of misconduct. No defendant conducted any factual investigation before initiating adverse action.

591.        The proceedings were maintained without probable cause after initiation. On April 2, 2024, Thompson determined no policy had been violated. The disciplinary prosecution continued for 184 additional days. On April 8, 2024, Miller received from Fuerst a video in which Plaintiff, an ordained minister, posted a Bible verse addressing gossip that named no student, and added it to the prosecution file, demonstrating that the Examiner was actively building the case to sustain prosecution rather than neutrally evaluating whether charges were warranted. On April 11, 2024, Miller admitted in a meeting he recorded as Examiner that he was going outside the initial scope of the charges, an admission that the prosecution had expanded beyond its original basis after Plaintiff's attorney raised the First Amendment defense and demanded dismissal. An examiner who expands charges beyond their original scope after the respondent's attorney identifies a constitutional defense is not investigating misconduct; he is constructing a prosecution to survive a defense he knows exists. The institution's own April 2 finding of "no violation" eliminates arguable probable cause for every day of continued prosecution from that date forward.

## D. Malice

592.        Each Defendant acted with malice. Malice in malicious prosecution does not require personal hatred; it requires an improper purpose other than bringing the accused

to justice. The coordinated timing of three simultaneous proceedings against a single student, targeting constitutionally protected speech, on the same morning the institution certified that student in good standing, establishes improper purpose through structure alone. Thompson's recorded admission that the NCO was about speech, Mays's admission that resolution was conditioned on stopping posts, and Miller's admission of scope expansion after the First Amendment defense was raised each independently establish that the purpose was punitive rather than investigative. The three admissions are documented, undeniable, and cannot be recharacterized by defense counsel because the witnesses gave their testimony before they had lawyers.

593.        Miller's May 14, 2024 statement that Plaintiff's counter-complaints would "weigh heavily in my recommendations" independently establishes malice. Malice in malicious prosecution requires an improper purpose other than bringing the accused to justice. An examiner who links the outcome of proceedings against a respondent to the respondent's willingness to drop complaints against the accusers is not seeking to determine whether misconduct occurred. He is using the prosecution as a coercive instrument. The linkage between two independent proceedings § offering favorable treatment in one in exchange for surrendering the right to seek accountability in the other § is an improper purpose by definition. Miller's possession of the Mays-Fuerst text exchange in his own investigation file independently eliminates arguable probable cause from April 11, 2024 forward. The exchange establishes that the complaint was solicited by an administrator and filed by a complainant who admitted she could identify no grounds. An examiner who holds direct evidence that a complaint was manufactured, who has received two written demands for dismissal from a licensed attorney, and who responds by expanding the charges rather

than evaluating the evidence, cannot claim he maintained the prosecution because he believed it had merit. The file proves he knew it did not.

## E. Defendant-Specific Conduct

594.    Fulton's malice is independently established by his published scholarship. Fulton wrote that "[w]hen lawyers abdicate moral responsibility, others can pay the price" and that lawyers who weaponize institutional processes to silence critics cause "enormous harm." Fulton, *All the News That's Fit to Hide*, 40 Loy. L.A. Ent. L. Rev. at 409-10. He wrote that "[g]overnment officials may not make the law a tool of personal advancement, discrimination, or unfair treatment." Fulton, *Fake News on Trial*, 52 Tex. Tech L. Rev. at 762. A dean who published that this conduct is wrong and then deployed it against a student he knew was a disabled veteran is not acting in good faith. The publications eliminate any inference of legitimate purpose.

595.    Qualified immunity is unavailable where the defendant's own published scholarship establishes actual knowledge that the conduct at issue violates constitutional rights.

596.    Mays caused and maintained the proceedings through her role as the administrator who solicited the initial complaint and who controlled Plaintiff's academic trajectory during the prosecution. On March 4, 2024, Mays texted Fuerst asking whether Fuerst could file an administrative complaint. Fuerst responded that she saw no grounds. Twenty-three days later, Fuerst filed. Mays's solicitation initiated the chain that produced the Miller prosecution. Mays acted with malice because she solicited a complaint she was told lacked grounds, then used the resulting prosecution as leverage to condition academic relief on Plaintiff ceasing protected speech. Mays's April 4 statement

establishing her prior knowledge of the LSAC complaint, combined with her quid pro quo offer, demonstrates that Mays's purpose was punitive rather than investigative.

597.　　Thompson caused the NCO proceedings and acted with malice. On March 27, 2024, Thompson issued the No Contact Order without any pre-deprivation process and without determining that any policy had been violated. Thompson admitted on April 2, 2024, that the NCO was issued to get Plaintiff to stop talking about Fuerst in her videos, that no policy had been violated, and that the process was designed for "18-year-olds who are fighting and gossiping." Thompson lifted the Order the same day she made these admissions. An administrator who issues an unprecedented campus restriction for the admitted purpose of suppressing a student's speech, who concedes the restriction had no factual basis, and who lifts the restriction upon confrontation has acted with an improper purpose other than legitimate student conduct enforcement.

598.　　Ulrich caused the LSAC proceedings and acted with malice. Ulrich filed a misconduct referral with LSAC on March 27, 2024, accusing Plaintiff of application fraud without checking the student file that contained a seven-month-old amendment disproving the accusation. Ulrich's referral letter cited Plaintiff's YouTube videos as the triggering evidence, establishing that the filing was motivated by Plaintiff's speech rather than a good-faith concern about application integrity. Ulrich's April 9 withdrawal email treated documents filed seven months earlier as newly received, demonstrating either misrepresentation to LSAC or filing without verification. An admissions director who deploys an irreversible nationwide credentialing mechanism based on a student's social media posts, without verifying the file that disproved the accusation, has acted with an

improper purpose. The LSAC referral was not a good-faith admissions review. It was a retaliatory filing coordinated with two other adverse actions on the same day.

### F. Favorable Termination

599.    All proceedings terminated in Plaintiff's favor. The Board found the charges were "not a basis to proceed." LSAC closed its investigation following Ulrich's April 9 withdrawal request. The NCO was lifted. No finding of misconduct was entered against Plaintiff. No discipline was imposed. The termination was not the result of compromise, settlement, or voluntary dismissal by Plaintiff; it was the result of the proceedings collapsing because they had no factual or legal basis.

### G. Damages

600.    As a direct and proximate result of Defendants' malicious prosecution, Plaintiff suffered damages including the prolonged prosecution, lifetime bar disclosure obligations requiring explanation of dismissed charges on every bar application in every jurisdiction, blocked transfer applications to every law school to which Plaintiff applied, constructive expulsion from USD Law, exacerbation of service-connected disabilities, and economic losses including a lost year of legal education and the diminished value of delayed entry into the legal profession. Malicious prosecution accrues on favorable termination. The final dismissals occurred in October 2024. Under SDCL § 15-2-14 (three-year personal injury), this claim is timely.

## VI. DAMAGES

601.    Plaintiff's education at USD Knudson School of Law was funded entirely through VA Chapter 31 Vocational Rehabilitation and Employment benefits earned through military service. Under 38 C.F.R. § 21.292(b)(3), the VA may only approve courses for Chapter 31 training at facilities "in compliance with Title VI of the Civil Rights Act of 1964" and "sections 501 through 504 of the Rehabilitation Act of 1973." The VA approved Plaintiff's enrollment at USD based on this institutional compliance certification. VA Chapter 31 paid Plaintiff's in-state tuition and fees for Fall 2023 and Spring 2024, along with books, supplies, and a monthly subsistence allowance. OCR's November 2024 finding (Docket No. 07-24- 2185) confirmed USD was not in compliance. USD was receiving federal disability benefits on Plaintiff's behalf while violating the disability protections those benefits required. The total VA expenditure on Plaintiff's legal education constitutes economic damages that cannot be offset by Defendants under the collateral source rule. *Degen v. Bayman*, 90 S.D. 400, 241 N.W.2d 703, 708 (1976); *Jurgensen v. Smith*, 611 N.W.2d 439 (S.D. 2000). USD did not merely harm a student who happened to be a veteran. USD accepted federal funds earmarked for disabled veterans on the condition that it would not discriminate against disabled veterans, and then it discriminated against a disabled veteran.

602.    USD certified compliance with Section 504 and the ADA as a condition of receiving VA Chapter 31 Vocational Rehabilitation funds on Plaintiff's behalf. The VA approved Plaintiff's enrollment at USD based on this institutional certification that USD would not discriminate against disabled veterans in its educational programs. OCR's November 2024 finding (Docket No. 07-24-2185) confirmed USD was not in compliance, the institution was receiving federal disability benefits on Plaintiff's behalf

while violating the disability protections those benefits required. The VA Chapter 31 expenditures on Plaintiff's education, tuition, fees, books, supplies, and monthly subsistence, were disbursed in reliance on institutional representations that the federal government subsequently found to be false. These expenditures constitute damages under the collateral source rule and represent federal funds disbursed on the basis of compliance certifications that USD's own conduct disproved.

603.     Plaintiff must disclose this episode on every bar application, professional license application, graduate school admission, and background check for the duration of her professional career. The South Dakota Supreme Court denied bar admission to a USD Law graduate based on academic misconduct proceedings, holding that such violations "go to the heart of the judicial system, the matter of personal legal ethics and trust" and that the applicant's failure to accept responsibility was independently disqualifying. *In re Application of Widdison*, 539 N.W.2d 671, 679 (S.D. 1995). Plaintiff must now carry the burden of establishing good moral character by clear and convincing evidence in every jurisdiction in which she seeks admission, disclosing and explaining an episode that USD's own administrators created, that USD's own investigator found baseless, and that USD itself dismissed. The withdrawal of the LSAC complaint does not eliminate the obligation to disclose, analyze, and explain. Every jurisdiction's character and fitness questionnaire requires disclosure of any academic misconduct investigation, regardless of outcome. Plaintiff intends to seek admission in multiple jurisdictions. Each application will require separate disclosure, separate explanation, and separate evaluation by a character and fitness committee. This analytical and reputational burden is the direct and

foreseeable consequence of Ulrich's March 27 filing without verification and Miller's seven-month prosecution that produced zero policy violations.

604.     Plaintiff suffered and continues to suffer severe emotional distress, including exacerbation of service-connected PTSD and anxiety disorders, loss of ability to concentrate, fear of attending campus, hypervigilance, and ongoing psychological harm from the knowledge that every professional licensing application for the rest of her career will require disclosure of false accusations. Plaintiff has incurred and will continue to incur costs for mental health treatment directly resulting from Defendants' conduct.

605.     Plaintiff suffered loss of educational opportunity. Defendants' adverse actions forced Plaintiff to leave South Dakota's only law school. Transfer applications were impaired by Mays's withheld recommendation letters, by the pending LSAC complaint creating mandatory disclosure on every transfer application, and by months of unresolved disciplinary charges. Plaintiff lost a year of legal education and the professional relationships, networking opportunities, and career development that accompany law school attendance.

606.     Plaintiff suffered economic losses including but not limited to: relocation costs to South Dakota incurred to attend USD Knudson School of Law; costs of applying to transfer institutions; lost income during educational disruption; and the diminished economic value of a delayed entry into the legal profession.

607.     Plaintiff was constructively expelled from USD Knudson School of Law. The retaliatory conduct, including the seven-month prosecution, the NCO restricting campus access, the denial of disability accommodations, the LSAC complaint tainting transfer applications, and the withholding of recommendation letters past deadlines, created

conditions so intolerable that no reasonable student could have continued enrollment. Plaintiff's departure was not voluntary; it was the foreseeable and intended consequence of Defendants' conduct. Under *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), a retaliatory adverse action is any action that would "dissuade a reasonable person" from engaging in protected activity. Constructive expulsion from USD Law is the most extreme form of materially adverse action: no reasonable student would continue exercising First Amendment rights at an institution that responds with coordinated prosecution, speech- suppression orders, unverified fraud accusations, accommodation denials, and transfer obstruction. Plaintiff's constructive expulsion constitutes an adverse action for purposes of all federal claims alleged herein.

608.     USD has a documented pattern of retaliating against individuals who exercise protected rights and then settling the resulting claims. In February 2024, SDBOR resolved *Ghebrekidan v. South Dakota Board of Regents* for $100,000, a Title IX retaliation claim arising from USD's treatment of an employee who reported workplace harassment. Six weeks after signing that settlement, Defendants launched these events against Plaintiff described herein. The instant case involves three simultaneous adverse actions, the prolonged prosecution, lifetime professional harm, and constructive expulsion from USD Law. The scope and duration of the conduct in this case substantially exceeds the conduct that produced a six-figure settlement in Ghebrekidan. The institution's conduct toward Plaintiff is not an isolated incident but reflects an institutional custom, policy, or practice of retaliating against individuals who challenge institutional misconduct through protected channels.

609.     Plaintiff seeks punitive damages against each individual Defendant pursuant to 42 U.S.C. § 1983 and South Dakota law. Punitive damages serve to punish egregious conduct and deter repetition. The Supreme Court's framework for evaluating punitive damages considers the degree of reprehensibility, the ratio to compensatory damages, and comparable civil penalties. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). The reprehensibility factors are maximized here: Defendants' conduct caused physical harm through exacerbation of service- connected conditions; Defendants targeted a financially vulnerable party whose education was funded by VA disability benefits; Defendants acted with reckless indifference to Plaintiff's health and safety; the conduct was not an isolated incident but a sustained seven-month campaign; and the conduct involved repeated actions despite awareness that it violated Plaintiff's constitutional rights. Defendants continued prosecution from Thompson's April 2 determination that no policy had been violated through the October 3 dismissal § 184 days § after their own administrator confirmed the proceedings had no basis. The conduct was malicious, willful, and undertaken in conscious disregard of Plaintiff's rights.

610.     Defendant Fulton's conscious disregard is documented by his own scholarship. Fulton published that lawyers who prioritize institutional interests over individual rights "engage in misconduct." Fulton, *All the News That's Fit to Hide*, 40 Loy. L.A. Ent. L. Rev. at 406. He published that "[w]hen lawyers abdicate moral responsibility, others can pay the price." *Id.* at He published that such lawyers cause "enormous harm." *Id.* at 410. He published that "[g]overnment officials may not make the law a tool of personal advancement, discrimination, or unfair treatment." Fulton, *Fake News on Trial*, 52 Tex.

Tech L. Rev. at 762. He then deployed the law as the tool he warned against, abdicated the moral responsibility he published about, and continued prosecution for 190 days after receiving notice from a licensed attorney, a national civil rights organization, and the student herself that the charges were baseless and causing permanent harm. Fulton's publications are not merely evidence of his knowledge. They are the legal standard he articulated, published, and then violated. Punitive damages against Fulton are warranted because his own scholarship proves he knew his conduct was wrong when he committed it.

611.     Emotional distress damages, including damages for exacerbation of service-connected PTSD and anxiety disorders, are sought under 42 U.S.C. § 1983 (Counts I-III, XIII, and XIV), state tort law (Counts VIII-XII and XV-XVII), where such damages are available without limitation. Economic damages, lost educational opportunity, career harm, and other compensatory damages are sought under all applicable federal and state claims. To the extent *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022), limits the availability of emotional distress damages under Spending Clause statutes, Plaintiff does not seek emotional distress damages under Counts IV through VII but seeks all other categories of compensatory damages under those counts, including economic losses, lost educational opportunity, career harm, and the costs of lifetime disclosure obligations. Count XVI (Unjust Enrichment) seeks restitution of VA Chapter 31 benefits as an equitable remedy.

612.     Franken directed immediate investigation on March 5, 2024 (¶128), initiating the proceedings that continued for months of prosecution. As General Counsel with a J.D. from the University of South Dakota and bar membership, Franken possessed the legal

training to evaluate whether the proceedings had probable cause. Attorney Baron Houy notified the institution on March 19, 2024, that the allegations were baseless and constitutionally protected. Franken's office continued the proceedings after receiving this notice.

*JACKSON v. USD, et al.*

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Enter judgment in favor of Plaintiff on all counts.

B.      Award compensatory damages in an amount to be determined at trial for: reputational harm from false accusations disseminated to LSAC and transfer institutions; emotional distress from months of baseless prosecution while simultaneously defending three concurrent proceedings; exacerbation of service-connected disabilities including PTSD, anxiety disorder, and cognitive processing disorder; loss of educational opportunity at USD and at transfer institutions whose decisions were influenced by pending disciplinary proceedings; career harm from lifetime disclosure obligations imposed by retaliatory proceedings on bar applications, judicial clerkship applications, and federal employment applications; economic losses from impaired transfer opportunities and delayed career progression; and loss of VA Chapter 31 educational benefits expended during a period when Defendants were systematically undermining Plaintiff's ability to obtain the education those benefits were intended to fund.

C.      Award punitive damages against each individual Defendant whose conduct was willful, malicious, and undertaken with conscious disregard for clearly established constitutional rights, including but not limited to those Defendants who initiated, coordinated, or maintained disciplinary proceedings they knew to be unfounded for the purpose of punishing Plaintiff's protected speech.

D.      Enter declaratory judgment that:

        a.      Defendants violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution;

Page 288

*JACKSON v. USD, et al.*

b.      the Severson misconduct complaint, the Fuerst Title IX complaint, the LSAC referral, the No Contact Order, and the Miller disciplinary investigation were initiated and maintained in retaliation for Plaintiff's exercise of constitutionally protected speech;

c.      each of the foregoing proceedings was without merit, as demonstrated by USD's own determinations that no policy was violated and its dismissal of all proceedings;

d.      Plaintiff's social media posts and advocacy concerning Black History Month displays, educational quality, and institutional accountability at USD Knudson School of Law constituted protected speech under the First Amendment and protected activity under Title VI, Title IX, Section 504, and the ADA; and

e.      Plaintiff bears no professional, academic, or ethical obligation to disclose any of the retaliatory proceedings identified herein on any bar admission application, character and fitness questionnaire, judicial clerkship application, federal employment application, or any other professional licensing or employment inquiry, because such proceedings were retaliatory, without merit, and constitute the very conduct for which this Court has entered judgment against Defendants.

E.      Enter permanent injunctive relief requiring USD to:

a.      expunge all records of the Severson misconduct complaint, the Fuerst Title IX complaint, the LSAC referral, the No Contact Order, and the Miller disciplinary investigation from Plaintiff's student file, and certify to Plaintiff in writing that expungement is complete;

*JACKSON v. USD, et al.*

b.      notify LSAC in writing that the March 27, 2024 referral was initiated in retaliation for Plaintiff's protected speech, that it was filed without verification of Plaintiff's student file which contained a seven-month-old amendment disproving the accusation, that the charge was withdrawn within thirteen days of Plaintiff's response because it was unfounded, and that no record of the referral, charge, or any related proceeding shall appear in any report, file, database, or communication to bar admissions authorities, law schools, or any other institution;

c.      notify all law schools to which Plaintiff applied for transfer, and any law school that received information about Plaintiff's disciplinary proceedings through any channel, that the LSAC referral and all related disciplinary proceedings were initiated in retaliation for Plaintiff's constitutionally protected speech, that USD's own administrators determined no policy had been violated yet continued prosecution for months, that all proceedings have been dismissed, and that no adverse inference should attach to Plaintiff's applications, academic record, or professional character as a result of Defendants' retaliatory conduct;

d.      implement policies requiring verification of student files before filing LSAC complaints, conflict screening for examiner appointments, and constitutional review before issuing contact orders restricting student speech; and

e.      provide training to administrators on First Amendment protections for student speech, with particular emphasis on the distinction between protected advocacy and actionable misconduct. Injunctive relief against USD, President

*JACKSON v. USD, et al.*

Gestring, and the Board of Regents is authorized under *Ex parte Young*, 209 U.S. 123 (1908).

F.    Order that a certified copy of this Court's judgment, including the declaratory relief set forth in paragraph D, shall be provided to Plaintiff in a form suitable for attachment to bar admission applications, character and fitness questionnaires, and professional licensing inquiries, so that Plaintiff may demonstrate by judicial determination that the proceedings at issue were retaliatory and without merit.

G.    Award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b) (for § 1983, § 1985(3), Title VI, and Title IX claims); 42 U.S.C. § 12205 (for ADA claims); and 29 U.S.C. § 794a(b) (for Section 504 claims).

H.    Award prejudgment and post-judgment interest.

I.    Reserve Plaintiff's right to amend this complaint to add claims, parties, or allegations as additional facts are revealed through discovery, in accordance with Federal Rule of Civil Procedure 15.

J.    Grant such other relief as the Court deems just and proper.

*JACKSON v. USD, et al.*

## VIII. JURY DEMAND

613.    Plaintiff demands trial by jury on all issues so triable.

## EXHIBIT INDEX

Exhibit 1: March 5, 2024 email chain: Fuerst → Fulton → Franken → Merkle

Exhibit 2: LSAC Charge Letter from Darren Kettles, Chair, Subcommittee on Misconduct and Irregularities in the Admission Process (April 4, 2024)

Exhibit 3: Ulrich LSAC referral and April 9, 2024 withdrawal email

Exhibit 4: NAACP letter to Dean Fulton (May 1, 2024)

Exhibit 5: Attorney Baron Houy responses to Examiner Notices (March 19, 2024 Severson response; April 11, 2024 Fuerst response)

Exhibit 6: October 3, 2024 corrected dismissal letter ("not a basis to proceed")

Exhibit 7: Title IX Coordinator Merkle Notice of Dismissal (May 13, 2024)

Exhibit 8: Moore accommodation memo (January 10, 2024), March 28 Zoom denial correspondence, and April 4 tenure evaluation request

Date: 3/23/2026

Tiauna Jackson

101 S. Reid Street, Ste 307

Sioux Falls, SD 57103

TJ@TJA.AGENCY; USD@SUEEMALL.COM

Plaintiff, Pro Se

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jackson, Tiauna

## DEFENDANTS

University of South Dakota et al; (see attachment)

**(b)** County of Residence of First Listed Plaintiff  **Lincoln**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  **Clay**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Tiauna Jackson, Pro Se (818) 538-5305
101 S. Reid Street, Ste 307 Sioux Falls, SD 57103

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [X] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | | | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice | | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | |
| | | | | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [X] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement Income Security Act | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | | [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause:
First Amendment retaliation, race discrimination, and disability discrimination against law student.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 27,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  [X] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____  DOCKET NUMBER _____

DATE  3/23/2026

SIGNATURE OF ATTORNEY OF RECORD  *Tiaun Jn*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**SOUTHERN DIVISION**

TIAUNA JACKSON,

Plaintiff,

v.

UNIVERSITY OF SOUTH DAKOTA, et al.,

Defendants.

**ATTACHMENT TO CIVIL COVER SHEET (JS 44)**

**LIST OF DEFENDANTS**

1.  University of South Dakota
2.  South Dakota Board of Regents
3.  Fulton, Neil — Dean, USD Knudson School of Law
4.  Mays, Shirley — Associate Dean of Academic Affairs, USD Knudson School of Law
5.  Miller, Robert — Professor, USD Knudson School of Law
6.  Ulrich, Katey — Director of Admissions, USD Knudson School of Law
7.  Thompson, Emma — Director of Student Rights and Responsibilities, USD
8.  Fitzgerald, Kate — Dean of Students, USD
9.  Franken, A.J. — General Counsel, USD
10.  Healy, Christopher — Deputy General Counsel, USD
11.  Gestring, Sheila — President, USD (official capacity only)
12.  Merkle, Jean — Director of EEO/Title IX Coordinator, USD
13.  Moore, Tyler — Professor, USD Knudson School of Law
14.  Fuerst, Jennie — Individual
15.  Severson, Julianne — Individual

POSTAL SERVICE

EXPRESS

MAIL
ENV
FOR DC
INTERN

USE

**UNITED STATES POSTAL SERVICE.**   Retail

**E**

US POSTAGE PAID
**$55.80**
Origin: 60115
03/23/26
1620340115-8

**PRIORITY MAIL EXPRESS®**

TIAUNA JACKSON
STE 307
101 S REID ST
SIOUX FALLS SD 57103-7045
(602) 614-9911

3 Lb 8.40 Oz

RDC 07

SCHEDULED DELIVERY DAY: 03/25/26 06:00 PM

C033

SHIP
TO:



CLERK US DISTRICT COURT
RM 128
400 S PHILLIPS AVE
SIOUX FALLS SD 57104-6851

**USPS TRACKING® #**



9570 1135 9883 6082 6767 89

To sched
s



USPS.COM/PICKUP



PS10000132900

EP13C September 2021
OD: 15 x 11.625

**UNITED STATES POSTAL SERVICE®**   |   **PRIORITY MAIL**

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM:
TIAUNA Jackson
101 s Reid St
Ste 307
Sioux Falls, SD 57103

TO:
CLERK, United States District Court
400 South Phillips Ave
Room 128
Sioux Falls, SD 57104

Label 228, December 2023      FOR DOMESTIC AND INTERNATIONAL USE

EN USED INTERNATIONALLY, A CUSTOMS DECLARATION LABEL MAY BE REQUIRED.

X-RAYED BY SOUTH DAKOTA CSG





**UNITED STATES POSTAL SERVICE®**